THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BLACK LIVES MATTER SEATTLE-KING COUNTY, ABIE EKENEZAR, SHARON SAKAMOTO, MURACO KYASHNA-TOCHA, ALEXANDER WOLDEAB, NATHALIE GRAHAM, AND ALEXANDRA CHEN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | No. 2:20-cv-00887-RAJ<br><br>DECLARATION OF NATHALIE GRAHAM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER |

I, Nathalie Graham, declare and state as follows:

1. I have been a Seattle resident for the past six years and currently work as a journalist at *The Stranger*, a biweekly newspaper. Since May 30, 2020, I have been reporting on the City's recent wave protests against police brutality. The information contained in this declaration is true and correct to the best of my knowledge, and I am of majority age and competent to testify about the matters set forth herein.

2. At approximately 4 p.m. on Saturday, May 30, 2020, I arrived at Westlake Park in downtown Seattle to report on the demonstration there. I understand that law enforcement had deployed tear gas shortly before I arrived, at approximately 3:45 p.m. The scene when I arrived

GRAHAM DECL. ISO TRO (No. ) –1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

148473749.2

was clouded by gas, with protesters scattering and sprinting away. The atmosphere was tense and frightening. I immediately felt the effects of the gas and began coughing. My eyes stung and watered. Although there did not appear to be any risk of violence from the crowd, law enforcement continued to fire flash bangs and tear gas, increasing the chaos. I took video footage of these protests and the violence that ensued.

3. I was determined to continue reporting, so I began roving around the Westlake area, observing the scene. As I approached the corner of 6th and Stewart, I saw a group of protesters peacefully kneeling in the intersection as a speaker addressed them. I stood on the sidewalk nearby and listened to the speaker for a while, but then I heard an explosion from down the street. I turned and moved partway down the block to see what was happening, and then watched as a police line advanced down the street towards me, with other demonstrators fleeing in front of them. They deployed tear gas, which filled the street like plumes of smoke.

4. It was not clear to me that the people fleeing the approaching police line and tear gas had done anything to provoke such an aggressive response. The protesters kneeling in the intersection, who were also impacted by the tear gas, had been completely peaceful. I did not see what happened next, but given the amount of gas in the air, I imagine that the kneeling protesters would have been forced to scatter.

5. I wanted to continue to document the situation, but the gas reached me seconds later, and I had to leave. Its effects were so powerful, so painful, and so alarming that I was physically unable to remain in the intersection. As a result, I was unable to continue reporting on that incident.

6. Shortly afterward, on E Pine St, I saw a truck playing music, as protesters danced around it. It was an uplifting, joyful scene that contrasted with the warlike chaos of the panicked demonstrators and tear gas in other areas of the neighborhood. I paused to observe and record a video, when law enforcement threw a flash bang grenade into the crowd without warning. They deployed tear gas seconds later.

GRAHAM DECL. ISO TRO (No.  ) –2

148473749.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

7. The dancing protesters at first scattered, but then coalesced back into a group. Law enforcement pushed them back and continued to deploy tear gas and flash bangs.

8. I was shocked and frightened by the consistently unprovoked, aggressive use of force by law enforcement officers on multiple different groups of peaceful protesters. I saw no evidence that any of these severe crowd-dispersal tactics were warranted, and there was never any warning before they were deployed.

9. At this point, I decided to leave the area, because I feared for my safety. There was tear gas everywhere, flash bang grenades exploding in the street, and I was anxious that the police would further escalate their tactics. I decided that reporting on the situation was no longer worth the pain of enduring tear gas and the risk of suffering violence at the hands of law enforcement.

10. On Tuesday, June 2, I was working at *The Stranger's* office at around 11:30 p.m. The office is on the third floor of a building that has a clear view of the intersection at 11th and Pine in Capitol Hill, which has become a daily protest site. That night, I was recording the demonstration from the fire escape.

11. The vast majority of protesters below had been peaceful, although a few individuals had thrown water bottles, rocks, and at one point a traffic cone. Overall, the demonstration did not appear to be dangerous or out-of-control.

12. The police made an announcement that I could not hear over a loudspeaker, and almost immediately afterwards removed their barricade so that officers on bikes could come streaming through into the crowd of protesters. They also started firing tear gas.

13. I was seriously alarmed by the sudden escalation, and quickly retreated back inside my office, where I shut the windows. The ground below was so immersed in gas that I couldn't see the road. Some of it began to seep in to my office, despite the closed windows, and I began to cough.

GRAHAM DECL. ISO TRO (No. ) –3

148473749.2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

14. When the gas cleared enough for me to at last observe the street, I saw that a woman in a wheelchair had been left behind by the crowd as it fled. Police continued to stream past her, but no one stopped to help her.

15. Later, while I continued to record events below from the window, the police directed a large spotlight at me. I don't know whether they knew my building was the Stranger's offices; this is common knowledge in the neighborhood, but our name is not displayed prominently on the street. Whether or not they knew that I was a journalist, I don't understand why they fixed their light on me, and it made me nervous. To be honest, I was frightened—it gave me the impression that I was doing something wrong, even though I knew that I wasn't. Despite my intimidation, I continued to record.

16. Witnessing the aggressive, indiscriminate deployment of chemical agents and flash bang grenades by police at these protests has made me reconsider how I approach my assignments. There is a new element of trepidation, anxiety, and fear to my experience of being a journalist. I am determined to assert my rights and do my job, so I will continue reporting—but I would not be surprised if other journalists felt that their ability report from the ground was significantly impaired by these law enforcement tactics. They are deeply disturbing.

Executed this 8th day of June 2020 at Seattle, Washington.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

By: _Nathalie Graham_
NATHALIE GRAHAM

148473749.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000