The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

BLACK LIVES MATTER SEATTLE-KING
COUNTY, ABIE EKENEZAR, SHARON
SAKAMOTO, MURACO KYASHNA-
TOCHA, ALEXANDER WOLDEAB,
NATHALIE GRAHAM, AND ALEXANDRA
CHEN,

                   Plaintiffs,

      vs.

CITY OF SEATTLE,

                   Defendant.

No.    2:20-CV-00887 RAJ

THE CITY OF SEATTLE'S RESPONSE TO
PLAINTIFFS' MOTION FOR ENTRY OF
A TEMPORARY RESTRAINING ORDER

The City of Seattle ("City") respectfully requests that this Court deny Plaintiffs' Motion for

Entry of a Temporary Restraining Order, and states the following:

**INTRODUCTION**

Since the murder of George Floyd, this country is witnessing unprecedented levels of calls

to action to support black lives. These calls have been joined and amplified by all elected City leaders

in Seattle. This City has a long, albeit imperfect, history of supporting the right of its people to

peacefully protest and demand change. The City supports the people's right to speak, to amplify

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 1

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

black voices, and to demand change, and has not and does not intend to interfere with those rights. Demonstrations continue in the City, including one scheduled for the very day of this Court's hearing on the Plaintiffs' TRO request. The City has adapted to the last two weeks of protests, resulting in peaceful demonstration consistently for the last four days and for the majority of the last eight. Plaintiffs' proposed TRO is not necessary to ensure that peaceful demonstrations continue, and Plaintiffs fail to meet the essential elements necessary to meet the stringent standards required for a TRO. It is important to note that even with the standing issues present here, the City's first instinct was and remains to work towards a voluntary agreement with Plaintiffs on the City's use of crowd management tactics which retain the ability to use them only when needed to protect individuals from physical harm consistent with the Orders entered in Portland and Denver. Further, while this brief provides facts regarding violence directed against officers, it should be clear that the City's focus on preventing physical harm is also taken with protesters' safety as a key consideration. Because Plaintiffs cannot meet the stringent standards for entry of a TRO, the Motion should be denied.

**PROCEDURAL BACKGROUND AND FACTUAL CONTEXT**

On June 9, 2020, Plaintiffs filed a Complaint seeking injunctive relief and monetary damages. (Dkt. 1). That same night, Plaintiffs sought a TRO that is the subject of this Response. (Dkt. 6).

I.      SPD Policy and Federal Oversight.

SPD's use-of-force policy and practices have been subject to extensive federal oversight since the City voluntarily entered into a Consent Decree in 2012 to address allegations by the U.S. Department of Justice's that SPD was engaging in a pattern or practice of excessive force. *United States v. City of Seattle*, Civ. No. 12-1282 (WD WA). The Consent Decree imposes extensive

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 2

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

requirements relating to, among other things, SPD's use-of-force policy and training, as well as the reporting and investigation of all force used SPD officers. *Id.* Dkt. 3-1, ¶¶ 69-129. The federal court overseeing the Consent Decree and the court-appointed Monitor approved an overhaul to SPD's use-of-force policy and training throughout 2014 and 2015 (*id.* dkt. 115, 153, 168, 199) and continue to approve regular updates and revisions to those policies (*id.* at 225, 447, 509).

SPD's use of force policy is publicly available on the Department's website.[1]  Under this policy "[o]fficers shall only use objectively reasonable force, proportional to the threat or urgency of the situation, when necessary, to achieve a law enforcement objective." Seattle Police Manual (SPM) Title 8.000-POL-4. The policy sets out four key principles to guide officers:

- Reasonableness. The reasonableness of force depends on "the totality of circumstances known by the officer at the time of the use of force"—not "the 20/20 vision of hindsight." SPM 8.050.
- Necessity. Force may be used only in the absence of "reasonably effective alternative[s]." *Id.*
- Proportionality. "To be proportional, the level of force applied must reflect the totality of circumstances surrounding the immediate situation, including the presence of an imminent danger to officers or others." Officers "should assess and modulate the use-of-force as resistance decreases." *Id.*
- De-escalation. Officers must attempt de-escalation tactics when safe and feasible. "[O]fficers shall attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution." The policy identifies de-escalation techniques, such as creating distance, cover, [or] concealment" and "using verbal techniques" to gain compliance."  SPM 8.000-POL-2 & 8.100.

In addition to these principles, force is expressly prohibited in some circumstances. For example, officers are prohibited from using force as a means of retaliation or against individuals who only orally confront officers. SPM 8.200-POL-2. Separate sub-sections of the policy address OC Spray and Blast Balls. SPM 8.300-POL-5 & 8.300-POL-10. In the crowd management setting,

---

[1] http://www.seattle.gov/police-manual/title-8

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 3

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

when feasible, officers must not deploy OC Spray or Blast balls until a dispersal order has been issued to the crowd, the crowd has been given a reasonable amount of time to comply, and a supervisor has authorized the deployment. SPM 14.090-POL-9(b) (OC Spray) & 8.300-POL-10(4) (Blast Balls).

The SPD Policy Manual authorizes the use of a less-lethal tool called a 40-mm launcher, which discharges polymer bolts with a sponge tip. SPM 8.300-POL-11. CS gas (tear gas) is not mentioned in the SPD Manual. As with any use of force, the deployment of OC Spray, Blast Balls, and the 40-mm launcher must be reasonable, necessary, and proportional. SPM 8.300-POL-5(3), 8.300-POL-10(3), 8.300-POL-11(7).

In addition to its use-of-force policy, SPD also has a specific policy addressing crowd management.[2] The court overseeing the Consent Decree, the Monitor, and the U.S. Department of Justice approved SPD's Crowd Management Policy on February 2, 2017. *United States v. City of Seattle,* Civ. No. 12-1282, Dkt. 363. SPD gave the Seattle Community Police Commission opportunities for notice and comment and incorporated several of the Commission's proposed revisions. In developing the policy, SPD also consulted with national experts on crowd management. The policy authorizes the Incident Commander of a crowd management event to direct the use of OC Spray and Blast Balls to disperse the crowd under specific circumstances. SPM 14.090-POL-9(b). The policy directs that, "[w]hen feasible, officers shall avoid deploying blast balls and OC spray in the proximity of people who are not posing a risk to public safety or property." *Id.* In addition, "officers may make individual decisions to deploy OC Spray or Blast Balls," if the crowd

---

[2] Available at http://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 4

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

management situation involves violent activity, for any of the following three purposes: self-defense, defense of someone else, or to  prevent significant destruction of property." 14.090-POL-10.

The Seattle Community Police Commission ("CPC") also guided development of the SPD crowd management policies. Beginning summer of 2015, CPC engaged with SPD, the Department of Justice, and members of the Monitoring Team concerning both the crowd management policy and overlapping policies concerning use of force. The CPC's involvement in reviewing and revising these policies is reflected in the redlines they provided to drafts of the policy – the majority of which, as reflected in the policy as approved by the Court, were incorporated.  (Boies Dec.).

A fundamental goal of the Consent Decree was to engrain in SPD processes for iterative review and reform of policies, training, and practice to ensure that the department stays current with law, changing demands, and best practices as they emerge.  In other words, policies will – and should – evolve over time as lessons are learned and experience drives insight. Over the past eight years, SPD has been committed to ensuring that its policies balance the reality of police operations with the voices of all at the table – including the CPC, OPA, and DOJ – while recognizing that, ultimately, the federal court overseeing the Consent Decree has the final say. In light of recent events, the City does not take the position that SPD's policy cannot be improved upon, but argues that Plaintiffs' attempt to circumvent this careful, thoughtful process with this injunctive action could be harmful.

## II.   George Floyd Demonstrations

As noted above, the Seattle demonstrations continue to this date. Information from events is still being collected, investigated, and processed. The Office of Police Accountability is conducting its own investigations into specific complaints of policy violations, while the Office of Inspector General and the Community Police Commission will conduct systemic assessments of the demonstrations and SPD's management. Likewise, the federal monitor and the Department of Justice

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 5

will review the events unfolding consistent with the requirements of the Consent Decree. The facts below were collected from available reports and information at this time, necessitating the short TRO response turn-around time.

Beginning May 28, 2020, national outrage spread over the death of George Floyd, resulting in mass demonstrations nationwide, but particularly in Minneapolis. *See* Elfrink, Tim et al., "Protests, fires rage through the night in Minneapolis," available at: https://www.washingtonpost.com/nation/2020/05/28/minneapolis-protests-george-floyd-death/ (May 29, 2020, last accessed June 10, 2010). While events unfolded nationally, demonstrations began in Seattle on May 29, 2020. (Mahaffey Dec. at ¶ 6). At that time, as it does for all major events, SPD mobilized the Seattle Police Operations Center ("SPOC") and planned for staffing and managing the demonstrations in the City. In the course of managing these fluid and dynamic events, SPD received reliable intelligence from other agencies of intent to destroy buildings in Seattle. (*Id.*).

SPD's priorities for the managing the events beginning on May 29th and continuing through the present have remained consistent. SPD's first objective was to provide for the safety of the general public, demonstration participants, spectators, first responders, and other participant's general safety, while facilitating the free speech rights under the First Amendment, during this state-wide state of emergency due to Covid-19. SPD also will take enforcement action in addressing violent crimes committed against persons, or in the face of significant property damage, while ensuring arrests for such crimes are carried out in a manner that is safe and effective and in accordance with training and law. Within these events, SPD also seeks to deter criminal activity, protect public and private property with a significant uniformed presence of officers, and, as required, minimizing the disruption to traffic through the use of traffic diversion. (*Id.* at ¶ 7). In so managing these and other crowd management events, SPD does not send sworn personnel to all

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 6

protests or demonstrations. Determinations about when sworn personnel are assigned, and how many officers are assigned, depends on a variety of factors, but the size of the demonstration is a key factor in that decision. (*Id.*at ¶ 8).

The night of May 29, 2020, a number of participants in the demonstrations engaged in violence. There was property damage to the City, civilians and officers were hit with rocks and other items, incurring injury. (*Id.* at ¶ 12); *see also* King5 broadcast from May 29, 2020, available at https://www.youtube.com/watch?v=9u6FyINlFvc (last accessed June 10, 2020).

On May 30, 2020, demonstrators marched peacefully for much of the day until violence ensued in the afternoon. *See* Chief Best update and summary of May 30, 2020 events, available at: https://spdblotter.seattle.gov/2020/05/31/chiefs-statement-on-may-30th-protests-downtown/;   *see also* "Timeline of Events on May 30, 2020," available at: https://spdblotter.seattle.gov/2020/06/01/timeline-of-events-on-may-30th-2020/.[3]   There were significant arson events, assaults on civilians and officers, as well as wide-spread looting and property destruction. (*Id.* at ¶ 13). By mid-day Sunday, May 31st, hundreds of buildings and businesses were damaged. At least 8 cars were burned and additional vehicles were damaged. Community members and officers incurred injury.

On May 31, 2020, Patrol Chief Mahaffey requested authorization from Chief Best to enable patrol to use CS Gas in the necessary event of crowd disbursement provided that its use was

---

[3] It is important to note that the department will generate after-action reports and that dedicated Force Review Boards will examine each crowd management event and every use of force, whether ordered by the incident commander or used by an individual officer. There are hundreds of hours of body worn camera evidence to review. Additionally, the Office of Police Accountability will be independently reviewing complaints, which as noted in plaintiffs' pleading, number in the thousands. Finally, the Office of the Inspector General will be systemically reviewing the policies and procedures of the Seattle Police in this context. As such, all of this information is preliminary and may change as the robust systems of review examine these events in granular detail.

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 7

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

otherwise consistent with SPD policy. (Mahaffey Dec. ¶ 14). This was authorized by Chief Best. (*Id.*). Beginning May 31, 2020, much of the demonstration focus shifted between downtown to the area around the East Precinct. While demonstrations were largely peaceful, specific incidents of officer injuries occurred, as officers continued to be hit with rocks, bottles, OC spray, fireworks, and other projectiles. (Mahaffey Dec. ¶ 15; Truscott Dec.).

Largely peaceful demonstrations were interrupted by specific instances of unrest on June 1, 2020 and June 2, 2020. (Mahaffey Dec., ¶ 16). There were several explosions (suspected fireworks) being deployed in the crowd. (Truscott Dec). Officers issued several dispersal orders that were not heeded. *Id.* June 1, 2020 was the "umbrella" night referenced by Plaintiffs, where officers deployed less lethal force by use of a chemical irritant. (*Id*). On June 2, 2020, Officers continued being hit by bottles, rocks, and other projectiles during otherwise peaceful demonstrations. Officers also had lasers pointed at their eyes and were hit by projectiles coming from rooftops/above-ground during these days. (*Id.*).

From June 3, 2020 through June 5, 2020, demonstrators were concentrated near the East Precinct. (Mahaffey Dec., ¶ 19). While largely peaceful with greater barrier space between officers and demonstrators, Officers still incurred injuries from projectiles. (Truscott Dec.). There were minimal arrests and deployment of less lethal tools. (*Id.*).  On June 5, 2020, SPD issued a departmental directive prohibiting the use of CS gas except the following circumstances: "Where SWAT is on-scene, consistent with Manual Section 14.090(4), SWAT will follow all department policies and procedures regarding the use of specialty tools, to include the use of CS gas, in life-safety circumstances and consistent with training.  **In such instances, and until further notice, any deployment must be approved by the Chief or the Chief's designee**." (Mahaffey Dec. ¶ 21).

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 8

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

June 6, 2020 was a largely peaceful protest day until conflict arose when demonstrators were not retreating from the police barricade around 7:30 p.m. (Truscott Dec). Plaintiffs' Declarant Chase Burns captured some portion of this scene at: https://twitter.com/chaseburnsy/status/1269460156548411392?s=20 (last accessed, June 11, 2020).

At, at around 7:22, the crowd of demonstrators approached and started to push the line of officers back 15 then 20 feet. SPD wanted to reestablish the line before officers were pushed farther. Several unheeded announcements were made before SPD moved forward to reestablish the line. Members of the crowd then began to throw items at officers and tried to take fencing from SPD, which resulted in OC spray and blast balls being deployed. SPD officers continued to be hit by glass bottles, fireworks, and improvised explosives. Multiple officers were injured and some required medical treatment by the Seattle Fire Department. After that encounter, officers were reportedly hit by various projectiles such as bottles, and had several lasers and strobe lights directed at their eyes. (Mahaffey Dec. ¶ 23; Truscott Dec.).

On June 7, 2020, at around 10:10 p.m., the crowd near the East Precinct broke fencing to use as weapons. *See* (6/7) https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/; (Mahaffey Dec., ¶ 24). Concurrently, about 20 individuals possessing shields, helmets, and gas masks attempted to create a disturbance, while the crowd advanced slowly. *Id.*. Several specific warnings and dispersal orders were given to the crowd to cease advancing. *Id*. SPD received a report of a white male individual in possible possession of a gun in his front pocket. *Id.*; Crowd continued to advance, while some members flashed lights into officers' eyes. *Id.* A physical disturbance developed in the front of the crowd between demonstrators. *Id*. Demonstrators continued to throw items at National Guard and officers – including one un-lit Molotov cocktail and a water bottle filled with chemical irritants. *Id.* SPD continued to advise crowds to move back. *Id.* The

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 9

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

crowds began to block 13th and Pine with rocks, boulders, and trash bins – which was the designated safe entry/exit point for SPD. *Id.*; (Mahaffey Dec). The crowd brought wooden shields with nails in the front of the line. OC and blast balls were deployed. *Id.* Continued dispersal orders were given, while officers were being hit with "large amounts" of fireworks, bottles, and projectiles causing officer injury. *Id.*. Concurrently, the crowd began to surround officers from three sides continuing to hit the officers with fireworks and bottles, while there was a report of a man with a gun in the area. *Id.* Just after midnight on June 8, 2020, CS gas was authorized and deployed, dispersing the crowd for some time. *Id.* Demonstrators stayed in the area. Officers were still hit with bottles and other projectiles, other reports of armed individuals were made, and there were several dumpster and bonfires in the area. *Id.*

During the day on June 8, 2020, SPD opened the area around the East Precinct for demonstrators, boarding up the precinct and reducing police presence in the area.  (Mahaffey Dec., ¶ 26). There has not been any deployment of crowd control measures since that date, despite daily demonstrations.

### III.    Plaintiffs' Individualized Allegations and Experiences

In their Complaint and Declarations, Plaintiffs each allege unique demonstration experiences, each impacting their position in bringing this instant motion and their position in the lawsuit. The City prepared the following charts assessing Plaintiffs' allegations in conjunction with their request for a TRO. The first chart reflects each day beginning with the first demonstration date identified by Plaintiffs' through the day before the filing of this Response – and whether either Plaintiffs allege and/or SPD used the crowd management tools Plaintiffs seek to enjoin.

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 10

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

| DATE# | USE OF CROWD MANAGEMENT TOOLS SOUGHT TO BE ENJOINED | ALLEGEDLY USED? |
|---|---|---|
| Fri May 29 | Yes | |
| May 30 | Yes | |
| May 31 | Yes | |
| June 1 | Yes | |
| June 2 | Yes | |
| June 3 | | NO |
| June 4 | | NO |
| Fri June 5 | | NO |
| June 6 | Yes | |
| June 7 | Yes | |
| June 8 | Yes (but no Pls present) | |
| June 9 | | None used* |
| June 10 | | None used* |

\# *For purposes of this chart, the date refers to a 24-hour period beginning at 8 a.m. on the date in question.*

\* *See Mahaffey Decl.*

The second chart summarizes Plaintiffs' Complaint and Declaration allegations by category.

PLAINTIFFS PROTESTED WITHOUT INJURY OF ANY KIND ON ALMOST ALL DAYS

| Plaintiff | Number of protests attended starting May 29 (unknown re June 9 & 10) | Number of Days Injury alleged + ^ | Indicated Intent to Continue Protesting |
|---|---|---|---|
| Abie Ekenezar | 4 – 6 (protests in Tacoma on weekdays but Seattle "on weekends") | 2 | Yes |
| Sharon Sakamoto | 0 | 0 | Only if crowd management tactics limited |
| Alexander Woldeab | 7 | 2 | Yes |
| Alexandra Chen | 7 | 2 | Yes |
| Muraco Kyashna-Tocha | 8 or 9 Complaint at ¶33, ¶108 | 1 | Yes |
| Nathalie Graham | 8 | 2 | Yes |

+ *Chart does not include use of crowd management tools plaintiffs allegedly saw deployed against others*

^ *For the purposes of this chart alone, an alleged physical symptom (e.g. coughing, but not being aware of use of less lethal tool through senses of sight taste or smell) was classified a claimed injury.*

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 11

The City also attempted to cross-reference some Plaintiffs' declarations with the time-stamped information from the SPD blotter of events occurring concurrent with the complained of force incidents. (Boies Dec., Ex 2). These charts reveal that Plaintiffs' experiences were snapshots in a large string of fast-moving unfolding events.

## LEGAL STANDARD

A TRO is an "extraordinary and drastic remedy." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997). TROs "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974). "[T]he standards for issuance of a temporary restraining order are at least as exacting as those for a preliminary injunction." *Pohlman v. Hormann*, 2014 WL 5425502 *1 n.1 (D. Or. Oct. 20, 2014) (citing *Los Angeles Unified Sch. Dist. v. United States Dist. Court for the Cent. Dist. of Cal.,* 650 F.2d 1004, 1008 (9th Cir. 1981)). "Plaintiffs bear the burden of proving each one of the [four] elements." *Klein v. City of San Clemente,* 584 F.3d 1196, 1201 (9th Cir. 2009). "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldridge,* 844 F.2d 668, 674 (9th Cir. 1998). Plaintiffs fail to meet this standard.

## ARGUMENT

I.    <u>Without waiving objections or its right to a full hearing at a later date, the City's offer to stipulate to entry of a TRO with modified language as detailed below.</u>

The City's proposed language is narrow and consistent with orders from other district courts from around the country addressing identical subject matter areas. (Sharifi Dec., ¶ 10-13, Ex. 9 - 11). Upon receiving Plaintiff's proposed TRO, the City notified counsel that it would agree to stipulate to

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 12

a modified Temporary Restraining Order that, like those in Denver and Portland, attempts to better balance constitutional rights and the public safety obligations faced by the City and its police. In the below, subtractions from Plaintiffs' proposed Temporary Restraining Order language is in strike through; additions in italics.

> The City of Seattle, including the Seattle Police Department and any other officers, departments, agencies, ~~or organizations acting within the Seattle Police Department's jurisdiction or~~ under the Seattle Police Department's control (collectively, "the City"), is hereby enjoined from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations. This injunction includes: (1) any chemical irritant such as and including CS Gas ("tear gas") and OC Gas ("pepper spray") and (2) any projectile such as and including flash-bang grenades, "pepper balls," "blast balls," and rubber bullets, *unless the incident commander or above-ranking member of command staff specifically authorizes such use of force in response to specific acts of violence creating likely imminent physical harm to an individual(s). This Order does not preclude individual officers from taking reasonable, necessary, and proportional action to protect against imminent threat of physical harm to themselves or identifiable others, including the deployment of OC spray.*

The City is aware of two federal courts that have issued a Temporary Restraining Order (TRO) related to the current civil rights movement addressing systemic racism in the United States, currently focused on policing due to the killing of George Floyd. In these Motions, plaintiffs challenge the use of less lethal tools for crowd management during demonstrations, citing, as in the present case, primarily First and Fourth Amendment claims. In all of the Motions, the courts carefully balanced the "absolute right to demonstrate and protest the actions of government officials" and the "difficult and thankless job" in which police officers are "called upon to make split second decisions and to expose themselves to danger while protecting the health and safety of the rest of us." *Don't Shoot Portland, et al v. City of Portland*, 20-cv-00917-HZ *4, United States District Court for the District of Oregon ("the Court recognizes the difficulty in drawing an enforceable line that permits officers to use appropriate means to

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 13

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

respond to violence and destruction of property without crossing the line into chilling free speech and abusing those who wish to exercise it.")

The City's proposal includes language similar to, *but more restrictive than*, the orders entered by the federal courts in Denver and Portland. In addition to this standing offer, the City responds in full to Plaintiffs' TRO request as follows.

II.     Plaintiffs Fail to Establish a Likelihood of Success on the Merits.

Plaintiffs must establish that they likely will succeed on the merits of their constitutional claims. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). A "possibility" of success is insufficient to meet this standard. Plaintiffs must make a "clear showing" that they are entitled to preliminary relief. *Id.* Even if Plaintiffs produce "a significant body of evidence that establishes some probability of success on their individual claims for relief for past violations of 42 U.S.C. § 1983 . . . ultimate success on these claims would entitle plaintiffs to money damages only, *not* injunctive relief." *Campbell v. City of Oakland,* No. C 11-5498 RS, 2011 WL 5576921, at *3-4 (N.D. Cal. Nov. 16, 2011). "Sporadic or isolated violations of individual protesters' rights are insufficient to support broad injunctive relief against an entire agency." *Id.* (citing *Lewis v. Casey,* 518 U.S. 343, 360, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Plaintiffs cannot meet this high standard.

Peaceful demonstration "for days on end without any alleged unconstitutional interference from local authorities" is insufficient to meet this standard. *Id.* Plaintiffs admit attending several peaceful protests – and admit days of peaceful demonstration with no police interference. (*See e.g.* Chen Dec., ¶ 9; Ekenzar Dec.; Kyashna-Tocha Dec., ¶¶ 11-12). Plaintiffs admit that officers during demonstrations were asking protesters to "move back" and such demands were not being heeded. (Ekenzar Dec., ¶ 13). There is also media footage from the referenced demonstration events that

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 14

some Plaintiffs attended revealing the chaotic scene faced by law enforcement and demonstrators alike. *See e.g.* https://www.youtube.com/watch?v=S_4FluN2Wsk (King5, May 30, 2020).

This Court must contemplate "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). There is no admission that the Seattle Police Department systematically deviated from policy during the alleged demonstration dates. Even if deviations had occurred – such deviations would be subject to the significant oversight structure of the City, possible discipline, and civil litigation for money damages, like the instant action. *See Campbell*, 2011 WL 5576921, at *4.

       *a.  Plaintiffs fail to show a likelihood of success on their First Amendment claims.*

Plaintiffs' allegations fail to meet a base threshold for First Amendment retaliation. For First Amendment claims based on the alleged retaliatory acts of officers, Plaintiffs must allege: (1) each Plaintiff was engaged in constitutionally protected conduct; (2) Defendants' conduct was retaliatory; and (3) actual injury. *Molokai Veterans Caring for Veterans v. Cty. of Maui,* No. CIV. 10-00538 LEK, 2011 WL 1637330, at *16 (D. Haw. Apr. 28, 2011).  Defendants then "may rebut Plaintiffs' allegation of a retaliatory motive by showing that Defendants would have engaged in the same conduct even in the absence of [any plaintiffs] protected activities." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)); *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314-15 (9th Cir. 1989). This standard overlaps with the one needed to make a general claim for a First Amendment violation, wherein Plaintiffs must allege facts showing that "by [their] actions, [Defendants] deterred or chilled [Plaintiff's] political speech *and* such deterrence was a substantial or motivating factor in [Defendants'] conduct." *Mendocino Envtl. Ctr. v. Mendocino Cty.,* 192 F.3d 1283, 1300 (9th Cir. 1999) (citing *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir.1994))

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 15

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

(emphasis added). The "proper inquiry asks 'whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Mendocino,* 192 F.3d at 1300.

Finally, the factual record cannot establish that the conduct was retaliatory in nature. While Plaintiffs argue that the content of the speech motivated the police to use less lethal tactics, the content of the speech was consistent throughout multiple days of protests, and on six of those days no less lethal tools were deployed over twenty-four hours. If one factors in the multiple protests that occurred on many of these days, the disparity between the isolated times less lethal tools were used - and the many times it was not - becomes even more clear. It is also important to note that when individuals in the crowd engage in unlawful activity, a response to that unlawful activity cannot be viewed as a response to protected activity.

### b. Plaintiffs fail to show a likelihood of success on their Fourth Amendment claims.

A person is "seized" when officers, by means of physical force or show of authority, terminate or restrain the person's freedom of movement "through means intentionally applied." *Nelson v. City of Davis,* 685 F.3d 867, 875 (9th Cir. 2012). Once a seizure is deemed to have occurred, courts evaluate the reasonableness of the seizure and force used to effectuate that seizure. Evaluation of whether a person was subject to excessive force requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Luchtel v. Hagemann,* 623 F.3d 975, 980 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). Courts evaluate the facts and circumstances of each case, including an assessment of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court must evaluate "the totality of the circumstances," judging the reasonableness of the particular use of force from the perspective of a reasonable officer

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 16

on the scene, not with "the 20/20 vision of hindsight," and bearing in mind that police officers need not use the least intrusive means available to them. *Id.* at 980, 982.

"What is reasonable in the context of a [potentially violent large-scale protest]" is different from what is reasonable in other, relatively calm, situations. *See Bernini v. City of St. Paul,* 665 F.3d 997, 1003 (8th Cir. 2012). In distinct circumstances, "the city clearly ha[s] a legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others . . . The wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens." *Forrester v. City of San Diego,* 25 F.3d 804, 807 (9th Cir. 1994) (citing *Bray,* 506 U.S. at ——, 113 S.Ct. at 769 (Kennedy, J., concurring)).

There is an insufficient factual record to establish that Plaintiffs Sakamoto and Black Lives Matter were subject to Fourth Amendment violations. (*See* Dkt. 1; Sakamoto Dec.). There are factual discrepancies and unanswered questions about whether the use of force encounters that the other Plaintiffs had with law enforcement was reasonable, proportionate, and a necessary to what those particular law enforcement officers were encountering at the moment force was employed. The facts detailed above reveal that law enforcement officers were under frequent – and at times continuous – assault by projectiles, explosives, and potential chemical agents. The facts also reveal that community members were injured by members of protest crowds. Plaintiffs present snapshots of events from their declarations – identifying a handful of moments amongst several uneventful demonstration days to see to enjoin the entire Seattle Police Department. There are thousands of hours of citizen and Body-Worn Video necessary for review and analysis, reports and radio calls to be reviewed, and accountability assessments to be conducted before evaluating the facts and

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 17

circumstances surrounding the Plaintiffs' allegations. Plaintiffs may have shown a possibility or even a probability of success on the merits as it concerns their Fourth Amendment claim. However, Plaintiffs' request for TRO and pleadings fail to identify a likelihood of success. As noted above, the "threatened injury must be certainly impending to constitute injury in fact, and allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct at 1147 (internal citations omitted) (emphasis added). Similarly, "[p]ast exposure to illegal conduct does not in itself show any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974). As a result, at this very early stage, plaintiffs have not carried their heavy burden by clearly showing likely success on their claims that defendants' alleged ongoing constitutional violations are so widespread, and systematic in nature, as to warrant the extraordinarily broad relief requested.

III.     Plaintiffs Will Not Incur Irreparable Harm.

To obtain a TRO, Plaintiffs must establish that they will suffer immediate and irreparable injury in the absence of the requested relief. *Hodgers-Durgin v. Gustavo De La Vino,* 199 F.3d 1037 (9th Cir. 1999). Plaintiffs own declarations defeat this element. "The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury that must be imminent in nature." *Gish v. Newsom,* 2020 WL 1979970, at *3 (C.D. Cal. Apr. 23, 2020). "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983). This is the extent of Plaintiffs' complaint allegations. As detailed at length in the preceding sections, Plaintiffs' declarations attest to the fact that they demonstrated on many days – before and after their claimed injuries - often in violation of the City curfew put in to place to address

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 18

the repeating pattern of peaceful daytime protests and violent night protests. Plaintiffs chose to assemble and demonstrate, knowing the inherent risks of doing so amid a global pandemic.[4]

Courts should distinguish between a pattern of police misconduct and "isolated event[s] caused by unusual or isolated factors." *Mult-Ethnic Immig. Workers,* 246 F.R.D. 621, 627 (C.D. Cal. 2007). Two consecutive weeks of demonstrations – many admittedly peaceful – establish that there is no nexus between Plaintiffs' claimed injuries, Plaintiffs' speculative belief of future injury. A TRO "is unavailable . . . where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Lyons,* 461 U.S. at 1111. The "speculative nature of [Plaintiffs'] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled. *Id.*

IV.    <u>Balance of Equities and Serving the Public Interest.</u>

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Defense Council, Inc.,* 555 U.S. 7, 24 (2008). The City agrees that in the context of government action, the balance of the equites factor merges with the public interest. *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014).In contrast, the City does not dispute Plaintiffs' constitutional rights weigh heavily on the Plaintiffs' side of the scale – all the Seattle Police Department's policies around crowd management are designed to facilitate and support free speech. Plaintiffs fail to address the interests of public and officer life and safety or the need to protect public and private property, at any level. The City has a significant commitment to protect and facilitate free speech, but it cannot break in its effort to do so. *See Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1196 (D. Mont. 2013) (The balance of equities and public

---

[4] Plaintiffs suggestion that the City "focus on arresting" demonstrators is an unexpected urging for the City to risk a public health issue for demonstrators given well-known concerns about the difficulties COVID presents for arrests and bookings. Dkt. 6, at 2.

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 19

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

interest considerations, including the protection of governmental buildings and facilities, weighed in favor of the defendants.).

In the balancing of equities analysis in Portland, Judge Hernandez recognized that harm "includes 'the breaking of the windows of the Justice Center and other buildings, setting off fireworks, property destruction, looting, setting fires in the Justice Center and other areas of downtown, throwing and launching deadly projectiles at the police, and attempting to dismantle a fence put up to protect the Justice Center.'" *Don't Shoot Portland, et al.,* citing *Winter*, 555 U.S. at 24. The concerns in Seattle are similar: burning of police vehicles, attempts to burn police headquarters, injuries to demonstrators and police officers alike, destruction of private businesses (both large and small) and looting of those businesses. Additionally, the department had intelligence from the FBI and DHS of credible threats to destroy the East Precinct and other buildings in Seattle. Burning buildings is not "property damage" – arson in residential and commercial districts directly threatens human life.

Unlike the circumstances in *Don't Shoot Portland, et al.*, Seattle has seen a diminishing level of violence and therefore, a diminishing level of responsive police force. As such, the current circumstances are more akin those in *Goyette v. City of Minneapolis*, where the Court noted its June 9, 2020 order: "Goyette does not allege that any of the conduct that he seeks to enjoin—occurring over a five-day period of unprecedented civil unrest—has occurred since May 31, 2020, or facts that plausibly demonstrate that such conduct is likely to recur imminently." Less lethal tools have not been deployed against any demonstrators for four nights.

V.      Plaintiffs lack standing to seek injunctive relief.

The City recognizes the importance of the issues raised by Plaintiffs and, as shown by the facts which indicate that the City approach to the protests is evolving where required and possible,

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 20

certainly is willing to work cooperatively with community leaders and stakeholders. However, the City regretfully must point out that as a legal and technical matter, these Plaintiffs are not able to seek an injunction under longstanding and basic constitutional restrictions on the judicial branch.  Keeping in mind that the City is willing to work towards voluntary agreement, we must nonetheless discuss standing.

Article III, section 2 of the United States Constitution limits federal jurisdiction to actual "Cases" or "Controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Jurisdiction is a threshold question that must be resolved in every federal proceeding. *City of Los Angeles v. Kern*, 581 F.3d 841, 845 (9th Cir. 2009). Courts should assume the absence of jurisdiction unless the record affirmatively shows otherwise. *See San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996). "Whether the question is viewed as one of standing or ripeness, the Constitution mandates that […] the issues presented are definite and concrete, not hypothetical or abstract[.]" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138-9 (9th Cir. 2000) (en banc) (internal citations and quotations omitted). Plaintiffs, the party invoking federal jurisdiction, bear the burden of alleging specific facts sufficient to establish standing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 5460 (1992).  Furthermore, each Plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Evtl Servs, Inc,* 528 U.S. 167, 185 (2000).

Plaintiffs do not meet the mandatory threshold requirement of Article III constitutional standing to obtain injunctive relief. "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 21

injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Shell Offshore, Inc. v. Greenpeace, Inc.* 709 F.3d 1281, 1286–87 (9th Cir. 2013). Plaintiffs do not expressly identify an injury in fact they seek to prevent. Absent actual, imminent threatened "injury in fact," Plaintiffs cannot establish standing regardless of Plaintiffs' speculative fear of future injury from the crowd management tools or a claimed chilling effect on protected speech.

(a) *No Standing Exists Based on Any Alleged First Amendment Chilling Effect.*

Plaintiffs cannot base a standing claim on a chilling effect on First Amendment rights unrelated to an express regulation on speech, especially when they have affirmatively stated they will continue to exercise those First Amendment rights regardless. Even where a plaintiff engages in legal behavior (such as First Amendment activities), injunctive relief is unavailable absent a showing of a likelihood of substantial and immediate irreparable injury. *Hodgers–Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999). Such a showing cannot be based on a subjective First Amendment chilling effect under the facts present here.

> Notably, when alleging harm, "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see also Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985) (applying *Laird* to find allegation of subjective chill insufficient to establish standing for claim of injunctive relief).

*Lininger v. Pfleger*, No. 17-CV-03385-SVK, 2018 WL 10455841, at *4 (N.D. Cal. Apr. 4, 2018). An attempt to base standing on a supposed chilling effect improperly conflates the elements of a First Amendment retaliation claim with the standing requirement. "'Chilling effect' is cited as the reason why the governmental imposition is invalid rather than as the harm which entitles the plaintiff to challenge it." *Id.*, at *9 (N.D. Cal. Apr. 4, 2018) (citing *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378–79 (D.C. Cir. 1984)).

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 22

Additionally, none of the Plaintiffs can establish standing based on speculative and subjective fears. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13-14, 92 S.Ct. 2318 (1972). The "existence of a 'chilling effect' . . . has never been considered a sufficient basis" to confer standing and the "only exception to this general rule has been the relaxed standards for overbreadth facial challenges [to statutes] involving protected speech." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1129 (9th Cir. 1996). The facts here are easily distinguishable from cases where speech is directly regulated and prohibited, such that standing requirements are expanded. *See, e.g, Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (the Court entertained a challenge to a statute that criminalized the teaching of evolution theory in public schools even though there was no record of any prosecutions under the statute.) *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18, 133 S. Ct. 1138  (2013) makes clear that any "fear" or "subjective apprehension" which results in "self-imposed" restrictions on the exercise of constitutionally protected rights will not confer standing. Here, there is no overbroad statute at issue, only claimed subjective fears. Moreover, the notwithstanding the standing issue, the City was willing to voluntarily restrict its use of crowd management tools (to an even narrower scope than the current court-approved SPD policy) as long as it retained sufficient flexibility to protect individuals from physical harm may help to assuage any fears, further supporting First Amendment activities.

(b) *Plaintiffs cannot establish a particularized threat of physical injury.*

Plaintiffs fare no better if standing is evaluated by looking at fears of physical harm. Over thirteen nights of protests, the challenged crowd management tools were utilized less and less as time went by. *See* Table 1, *supra.* Over the last eight days, no challenged tools were used on six days of protests, including on the night prior to this opposition being filed, when protests occurred at three

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 23

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

of five police precincts. This simple fact belies the narrative that the police are using force to suppress speech, and reveals the deeper complexity behind the specific instances of force. In denying a requested injunction in Minnesota on June 9, 2020 the Court noted that there had been no use of the crowd management tools at issue in that litigation since May 31, 2020 – belying a particularized threat of physical injury. (Dkt. 22-1, p. 56).

       (c) *Plaintiffs cannot establish an actual, imminent threat of physical injury.*

       Here, Plaintiffs rely on pure speculation to support the notion that they will be injured by the specific tools of crowd control management which they seek to enjoin. In *Haynes v. Biaggini*, No. 216-CV-01949, 2019 WL 5209246, at *2 (C.D. Cal. Oct. 16, 2019), the court denied injunctive relief against law enforcement because allegations of the same injury "in the past do not sufficiently link hypothetical future testimony to the hypothetical future harm[; s]uch speculative harm is not actual or imminent and does not convey standing for injunctive relief." *See also Lee v. Oregon*, 107 F.3d 1382, 1389 (9th Cir. 1997) (discussing that courts in the Ninth Circuit "have repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies"). Here, the chain of speculative contingencies has many links. Plaintiffs would need to attend a protest (which one Plaintiff has never done), the police would need to be present, the police would need to have access to the tools sought to be enjoined, the police would need to utilize those tools on either Plaintiff or the specific part of the crowd where Plaintiff was present, and the Plaintiffs would need to be in close enough proximity to sustain physical injury. This is far too speculative a chain. Consequently, Plaintiffs lack standing to seek the TRO.

VI.   <u>If this Court Considers a Temporary Restraining Order, Plaintiffs' Proposal is Too Restrictive</u>.

       The City's response reveals that a TRO is unnecessary for peaceful demonstrations to

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 24

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

continue in Seattle. However, if this Court concludes that Plaintiffs met their burden of being entitled to equitable relief in the form of a TRO, this Court should be mindful that the Plaintiffs' proposed TRO language goes far beyond what has been issued by courts with respect to other George Floyd demonstrations (when the TRO has not been outright denied), does not weigh the public interest and equities in a manner consistent with other federal district court opinions on this subject matter, and does not account for the very real need to protect against physical injury and violence. In such an instance, the City urges the Court to adopt the language proposed on June 10, 2020. (Dkt. 20). Since the June 10, 2020 telephonic status, communications between the City and Plaintiffs on possible stipulated language continues.

## CONCLUSION

Plaintiffs fail to meet the very high burden for this Court's entry of a TRO. The natural development of events – the Plaintiffs' own sworn statements – and the continuing peaceful demonstrations in Seattle reveal that a TRO is unnecessary to enable Seattle to continue marching and demanding change.

DATED this 11th day of June, 2020.

PETER S. HOLMES
Seattle City Attorney

By:  */s/ Ghazal Sharifi*
Ghazal Sharifi, WSBA# 47750
By:  */s/ Carolyn Boies*
Carolyn Boies, WSBA# 40395
Assistant City Attorneys
E-mail:  Ghazal.Sharifi@seattle.gov
E-mail:  Carolyn.Boies@seattle.gov
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Phone:  (206) 684-8200
*Attorneys for Defendant City of Seattle*

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 25

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Breanne Mary Schuster<br>ACLU of Washington<br>901 Fifth Avenue, Suite 630<br>P.O. Box 2728<br>Seattle, WA 98111<br>(206) 624-2184<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>bschuster@aclu-wa.org |
| John B. Midgley<br>ACLU of Washington<br>901 Fifth Avenue, Suite 630<br>P.O. Box 2728<br>Seattle, WA 98111<br>(206) 624-2184<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>jmidgley@aclu-wa.org |
| Lisa Nowlin<br>ACLU of Washington<br>901 Fifth Avenue, Suite 630<br>P.O. Box 2728<br>Seattle, WA 98111<br>(206) 623-1900<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>lnowlin@aclu-wa.org |
| Molly Tack-Hooper<br>ACLU of Washington<br>901 Fifth Avenue, Suite 630<br>P.O. Box 2728<br>Seattle, WA 98111<br>(206) 624-2184<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>mtackhooper@aclu-wa.org |
| Nancy Lynn Talner<br>ACLU of Washington<br>901 Fifth Avenue, Suite 630<br>P.O. Box 2728<br>Seattle, WA 98111<br>(206) 682-2184<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>talner@aclu-wa.org |

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER- 26

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

| | |
|---|---|
| Carolyn S. Gilbert<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 359-3279<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>carolyngilbert@perkinscoie.com |
| Mallory Gitt Webster<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 359-3701<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>mwebster@perkinscoie.com |
| Paige L. Whidbee<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 359-3629<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>pwhidbee@perkinscoie.com |
| Heath L. Hyatt<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 359-8000<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>hhyatt@perkinscoie.com |
| Joseph M. McMillan<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 583-8888<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>JMcMillan@perkinscoie.com |
| Nitika Arora<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>(206) 359-3267<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>NArora@perkinscoie.com |
| David A. Perez<br>PERKINS COIE<br>1201 3rd Avenue, Suite 4900 | ( x )  Via Email<br>DPerez@perkinscoie.com |

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 27

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

| Seattle, WA 98101-3099<br>(206) 359-6767<br><br>*[Attorneys for Plaintiffs]* | |
|---|---|
| Robert Seungchal Chang<br>Ronald A. Peterson Law Clinic<br>Seattle University School of Law<br>1112 E. Columbia Street<br>Seattle, WA 98122<br>(206) 398-4025<br><br>*[Attorneys for Plaintiffs]* | ( x )  Via Email<br>changro@seattleu.edu |

s/ Ghazal Sharifi
Assistant City Attorney

THE CITY OF SEATTLE'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER- 28

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200