1       UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

4                                )
   BLACK LIVES MATTER            ) C20-00887-RAJ
5   SEATTLE-KING COUNTY,         )
                                 ) SEATTLE, WASHINGTON
6            Plaintiff,          )
                                 ) June 12, 2020
7   v.                           )
                                 ) 9:00 a.m.
8   CITY OF SEATTLE,             )
                                 ) Motion for
9            Defendants.         ) Temporary
                                 ) Restraining Order
10                               )

11 _____

12          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE RICHARD A. JONES
           UNITED STATES DISTRICT JUDGE

13 _____

14

15  APPEARANCES:

16

17   For the Plaintiffs:    David Perez
                            Perkins Coie
18                          1201 3rd Avenue
                            Suite 4900
19                          Seattle, WA  98101

20                          Molly Tack-Hooper
                            ACLU of Washington
21                          901 Fifth Avenue
                            Suite 630
22                          Seattle, WA  98111

23                          Robert Chang
                            Ronald A. Peterson Law Clinic
24                          Seattle University School of Law
                            1112 E. Columbia Street
25                          Seattle, WA  98122

```
 1    For the Defendant:      Carolyn Boies
                              Ghazal Sharifi
 2                            Seattle City Attorney's Office
                              701 Fifth Avenue
 3                            Suite 2050
                              Seattle, WA  98104
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE CLERK:  We are here in the matter of Black Lives

2  Matter-Seattle King County versus City of Seattle, et al.

3  Cause No. C20-887-RAJ.  If counsel, first for the plaintiff,

4  could please make your appearances for the record.

5    MR. PEREZ:  This is David Perez with Perkins Coie

6  representing plaintiffs.  And with me on the line is

7  Professor Robert Chang from the Korematsu Center and Molly

8  Tack-Hooper from the ACLU of Washington.

9    THE COURT:  Who will be speaking on behalf of the

10  plaintiffs?

11    MR. PEREZ:  I'll be speaking on behalf of the

12  plaintiff, Judge Jones.

13    THE COURT:  Okay.  Thank you.

14    THE CLERK:  And for defendants, please?

15    MS. BOIES:  Good morning, Your Honor, and everyone.

16  This is Carolyn Boies for the City of Seattle.  And also on

17  the line is my co-counsel, Ghazal Sharifi.  Your Honor, Ms.

18  Sharifi and I are going to be speaking on different sections

19  of what we may be discussing today.

20    THE COURT:  Thank you.

21    THE CLERK:  Your Honor, we also have our court

22  reporter, Debbie Zurn, on the line.

23    Debbie, could you please just verify that you are on the

24  line as well?

25    THE COURT REPORTER:  Yes, I'm here.  Thanks,

1  Victoria.

2      THE CLERK:  Thank you.

3  Your Honor, that is everybody.

4      THE COURT:  Thank you.  I'll begin with some

5  preliminary remarks.  I'd like to first note that the city

6  and the nation are at a crisis level regarding the death of

7  George Floyd.  One would be missing the point to conclude

8  that the protests, which are the subject of this motion, are

9  only about George Floyd.  His death just happens to be the

10 current tragic flashpoint in the generational claims of

11 racism and police brutality in America.

12     The strength of the Black Lives movement and their obvious

13 commitment to change, are a clear indication -- not just to

14 this court, but globally -- that these protests will not be

15 short-lived; and the protestors have made it clear that their

16 determination will be relentless until change and police

17 reform are made.

18     What brings the parties to this court today are peaceful

19 protestors designed to engage in their rights guaranteed by

20 the Constitution, freedom of assembly without fear of

21 retaliation or disruption by Seattle police officers, the use

22 of tear gas, pepper spray, flash-bang devices or rubber

23 bullets.

24     The First Amendment guarantees that all citizens have the

25 right to hold and express their political beliefs through

1  peaceful protests.  Police should not interfere with orderly,

2  nonviolent protests, because they may disagree with the

3  content of the speech.

4      At the same time, this court must strike a balance with

5  these interests, when violent offenders choose to disrupt

6  peaceful, protected activity, threatening and endangering the

7  lives and safety of our community, and those charged with

8  providing constitutional law enforcement.

9      In these preliminary remarks, we will begin the hearing on

10 plaintiffs' motion for a temporary restraining order.  The

11 parties have previously been advised that they will have a

12 limit of 30 minutes each to make argument on the motion.

13     The public has been allowed access to this proceeding by

14 way of the court posting an audio-only broadcast.  No

15 in-court proceedings can take place, as the United States

16 District Court for the Western District of Washington is

17 currently closed for public hearings, due to the COVID-19

18 outbreak.

19     I have monitors listening to the same audio access to the

20 public, to ensure that the public can hear the entirety of

21 these proceedings.  Those monitors have been advised to

22 immediately advise this court if there's any disruption in

23 the broadcast.

24     Before each party will begin, I have several questions I

25 need to have answered, as your responses may be helpful in

1   rendering my final determination. Please know that I have

2   read all of your written materials. It's not helpful just to

3   read from your briefs; focus on the critical aspects of your

4   arguments within the time allowed.

5       These proceedings, as indicated, are recorded by a court

6   reporter. Please speak clearly and please identify yourself

7   before you address the court. If you are not speaking,

8   please make sure that your telephone is muted. And if for

9   some reason you are disconnected and have to call back in,

10   please advise the court so we know when we need to begin

11   again.

12       So with that, we're going to begin with my questions that

13   I have of counsel for the plaintiff. Mr. Perez, are you

14   ready, sir?

15           MR. PEREZ: Yes, Your Honor.

16           THE COURT: All right. I'd like to begin first of

17   all with page 19 of the City's response. And that reference,

18   and more specifically line 18, "Plaintiffs fail to

19   address" -- in their words -- "the interests of public and

20   officer life and safety or the need to protect public and

21   private property, at any level."

22       So let me narrow down specifically what I'm getting to.

23   Where do these concerns fit into the balance of equities

24   component for issues of the temporary restraining order?

25       Now, as you know, page 7 of the City's response, they made

1    reference to the May 30th timeline.  And the City represents,

2    and I would quote, "Significant arson events, assaults on

3    civilians and officers, as well as widespread looting and

4    property disruption, hundreds of buildings damaged, aid cars

5    burned, and additional vehicles damaged, as well as community

6    and officer injury."

7         So I'm trying to find, is there any room to permit law

8    enforcement officers to use tactics to respond to violence

9    without crossing over or into a circumstance with a chilling

10   of free speech?  So respond to that question first, counsel.

11            MR. PEREZ:  Yes, Your Honor.  And thank you for the

12   question.  The balance being struck by the City right now is

13   not a balance at all, it's a complete imbalance.  What

14   happened on May 30th could have been addressed with targeting

15   proportionate force.  But May 30th -- and we saw this today

16   with the U.S. Attorney's Office filing documents against a

17   woman, one woman that the City says set five aid cars on

18   fire, one woman did five of those fire events.  A

19   proportionate and targeted response could have got that

20   woman.  But tear-gassing 1,000 people was an imbalance.

21        Now let's suppose for the sake of argument, just for the

22   sake of argument, that the City's response on May 30th was

23   completely proportionate.  Everything that happened since

24   May 30th has been off the rails.  There was not car fires or

25   store looting on June 6th when the SPD visited wanton

1  violence upon protestors.  One of the events on Capitol Hill
2  was sparked not because of a car fire, Your Honor, not
3  because of destruction of property, but because a protestor
4  did not give the police a pink umbrella.

5      So, there are moments, absolutely -- so the answer is yes,
6  that the police can respond to violence.  And our proposed
7  order gives them that latitude to respond to individual
8  specific instances of threats of bodily injury, with specific
9  and proportionate responses to those threats.  But gassing
10 the people of Seattle, gassing an entire neighborhood and
11 using so many flash-bang grenades that journalists can't do
12 their jobs, that's not a proportionate response, Your Honor,
13 that's overkill.

14      THE COURT:  Counsel, you say a "targeted response."
15 What about the circumstance where it's not just one
16 individual that started multiple fires?  What about the
17 circumstance that took place on the day when there was mass
18 activity, mass destructive activity in downtown Seattle,
19 where it's not one concentrated area, it's a multitude of
20 individuals engaged in this type of activity.  It's hard to
21 discriminate and discern who is involved and who is not,
22 because of the circumstances and what's taking place.

23      MR. PEREZ:  Your Honor, what I would say to that, and
24 gently push back, I'm not entirely sure it's true to say it's
25 hard to discern who is breaking windows and who is not.  The

1  City could address looting with a proportionate response.

2  But what we saw on May 30th is the protests were mostly

3  peaceful, as reported by the Seattle Times, and in fact as

4  confirmed by the SPD blotter, which in many ways is

5  self-serving.  But most of the protests in downtown Seattle

6  and throughout the city were peaceful.  They were met with

7  overwhelming force of tear gas, pepper spray and blast balls,

8  which further inflamed the situation.  And empirically we saw

9  this subsequent to May 30th where tear gas and pepper spray

10  did not quell the anger, did not tone down the protestors, it

11  inflamed the tensions even more.

12      So however the SPD has been responding, it's been

13  overbroad and under inclusive.  What they've decided to do is

14  rather than arrest anyone, they will tear-gas everyone.

15  There must be a way that the SPD can address looting without

16  pepper-spraying a little girl.  And if that's the only answer

17  that the SPD can come up with, or the City can come up with,

18  then their response is unconstitutional.

19      We've gone 20 years, Your Honor -- go ahead.  I don't mean

20  to interrupt.

21          THE COURT:  When you say "targeted response," what do

22  you mean by targeted response?

23          MR. PEREZ:  Only as much -- the video evidence, it's

24  almost like profanity or obscenity, you know it when you see

25  it.  In the videos we saw, including on May 30th, but most

1  especially in the days after May 30th, because May 30th

2  cannot be used to justify disproportionate force over the

3  subsequent two weeks.  But focus on May 30th.  What would be

4  a proportionate response would be going into that street,

5  which was two or three streets, and making sure that you can

6  control those streets.  And if you need to use a

7  proportionate amount of force in those streets, then so be

8  it.

9       But gassing everybody, including folks three, four streets

10  away who are doing nothing, that doesn't solve the problem

11  of, say, looting on Pine, by gassing people on University

12  Avenue.  They're apples and oranges.  You can't lump all

13  protestors together, because a few protestors -- and in this

14  case one woman, one woman from Tacoma lit five fires, and

15  they found her, doing the hard work and investigation, and

16  they arrested her.  It wasn't 1,000 people setting car fires,

17  it was one woman.

18       THE COURT:  What about the circumstances when

19  individuals in the crowd, albeit a few, that start throwing

20  items like stones, or rocks, or bottles, or pop cans, and

21  flash devices or devices from the type of bottles that may

22  contain some type of noxious substance?  How are you supposed

23  to identify and deal with those individuals?

24       MR. PEREZ:  Again, Your Honor, what we've seen in the

25  video evidence, and what we've argued in our brief, in almost

1  every case, that behavior that Your Honor is describing and

2  the police have played up, the chronology is crucial.  It

3  almost always happens after the tear gassing, after the blast

4  balling.  In other words, the police violence instigated

5  violence.  That's what led to it.

6      And we see this in Mr. Burns Broderick's -- a journalist

7  at The Stranger -- video, that you see almost exclusive

8  peaceful activity, even on the front line, albeit loud

9  activity, then the police start throwing canisters of tear

10  gas and pepper spray.  And then everything breaks loose.

11      That chronology is incredibly important, as reported by

12  KIRO and KOMO, when they were on the front lines and even

13  said:  This was peaceful, I don't know what instigated it.

14  But once the canisters came, the bottles started being

15  thrown.  It was almost as a retaliation to the

16  disproportionate force.

17      And empirically we have seen that none of that has

18  occurred since the SPD has begun to deescalate.  That there

19  was a positive correlation to SPD's violence and the

20  protesters disrupting events.

21          THE COURT:  Counsel made reference to the videos.

22  Wouldn't you agree it's a little bit difficult to discern the

23  actual timing?  I mean, the police has provided, the City has

24  provided this court with their own timeline chronology and

25  inserted the references by the plaintiffs to try and create

1   what they appear to suggest is an accurate chronology.

2       How do I know the timing as represented in those videos is

3   an accurate chronology of exactly what actually took place?

4           MR. PEREZ:  The videos speak for themselves, Your

5   Honor.  And the SPD blotter, the self-serving document they

6   just created -- for instance, the Salisbury declaration in

7   paragraph 3 on the video, minute-by-minute, where by

8   9:04 p.m., folks are still behind the line.  And perhaps one

9   bottle may have been thrown.  But then suddenly the police

10  respond with sheer violence.  They get their goggles and

11  masks on.  And then they start deploying blast balls one

12  minute later.  I just don't see how -- go ahead, Your Honor.

13          THE COURT:  Go ahead.

14          MR. PEREZ:  Suppose a protester in the crowd, let's

15  play it out, just assume for the sake of argument a protester

16  in the crowd has thrown a bottle at police who are armed in

17  riot gear and shields.  And that somehow justifies throwing a

18  blast ball grenade at, for instance, Ms. Inda, who submitted

19  a declaration last night, who went into cardiac arrest, died

20  three times.  Her heart stopped at the scene.  And volunteer

21  medics had to resuscitate her.

22      A bottle thrown at police protected in riot gear cannot

23  possibly justify tear-gassing a woman in a wheelchair, which

24  is precisely what they did, causing Ms. Inda to go into

25  cardiac arrest; which is exactly what happened.

1     Or unleashing so much gas into the neighborhood, so much

2   gas that it became a cloud that infested a fourth-floor

3   apartment, a fourth-floor apartment where Mr. Azoulai, who

4   submitted his declaration last night, his three-month-old

5   baby starting coughing and they had to take him to the

6   emergency room.  There is no way that a bottle, or what the

7   SPD later found was a candle, justifies a grenade response.

8   A candle cannot justify a canister of pepper spray on a

9   thousand people.

10     At some point, Your Honor, the SPD may -- deputies may

11   order a crowd to move back five feet.  But if they do not,

12   that passive resistance, which is what the Ninth Circuit

13   calls such resistance, passive resistance, cannot justify

14   just the sheer amount of violence SPD unleashed upon the

15   public.

16          THE COURT:  All right.  Next question, counsel.  On

17   page 19 of the City's briefing, they allude to days that

18   there were peaceful protests versus the small number of

19   incidents where aggressive behavior by law enforcement

20   officers occurred.  They suggest the court should distinguish

21   between a pattern of police misconduct versus isolated events

22   caused by unusual or isolated factors.  Do the facts present

23   isolated versus patterns, and does that make a difference in

24   your assessment or analysis?

25          MR. PEREZ:  Respectfully, Your Honor, we disagree

1    with the City's characterization that their responses have --

2    their disproportionate responses have been isolated.  Even

3    the mayor has come out and said that their responses have

4    been disproportionate.  It is not our burden to say that

5    literally every moment of every day the SPD has acted

6    reasonably.  But many days, and in fact, eight out of the

7    eleven days of protests, the police in Seattle have used less

8    lethal weapons on protestors.  Eight out of eleven days.

9         The last few days, when the City has decided voluntarily,

10   and not in a legally binding way, to step back, that's when

11   the protests -- that's when the violence has decreased.

12        So in eight out of the eleven days, there was a strong

13   positive correlation, and a strong pattern, that when you are

14   tear-gassing people, bad things happen.  And that overbroad

15   and under-inclusive policy of arresting no one and

16   tear-gassing everybody just didn't work.  But it happened in

17   eight out of eleven days, not one out of eleven or two out of

18   eleven.

19             THE COURT:  Another question, counsel, that has not

20   been addressed whatsoever in your initial briefing, and

21   that's the standing issue.  And you made reference to their

22   too tenuous of circumstance to justify a TRO being issued.

23   Now, this issue is not addressed at all in your argument.

24   And it's the City's suggestion that each plaintiff must

25   establish standing for each form of relief.  Now, I think

1   they haven't specifically called out Ms. Sakamoto, one of the

2   named plaintiffs. But I think it's abundantly clear that

3   that's who they're referring to, by the fact that they note

4   the individual had not attended any protests, that it was her

5   fear. And then they make reference to the *Clapper* case,

6   challenging her fear is purely speculative and does not

7   warrant or justify the court granting the type of relief

8   requested.

9      So, I'm not asking you to necessarily direct your response

10   just to Ms. Sakamoto, although that would be helpful, but

11   just generally the standing issue for the named participants

12   to be able to advance as justification for a TRO.

13      MR. PEREZ: Thank you, Your Honor. The City's

14   standing argument is, to put it mildly, meritless. None of

15   the City's cases support a standing challenge, not a single

16   one. For instance, they rely heavily on *Haynes*. But that

17   case was a pro se prisoner with unsworn allegations and

18   hypotheticals. If anything, the City's authority contradicts

19   their argument, because it shows that we, in contrast to

20   *Haynes*, have standing. The declarations we submitted show an

21   injury in fact. We have protestors who were trying to

22   exercise their constitutional rights, they're getting shot at

23   with grenades and getting indiscriminately tear-gassed. Few

24   cases -- and you can run the gamut of contract cases or

25   constitutional cases -- present such concrete injuries as

1  these.

2  The City argues this injury is subjective. Their

3  arguments might explain why the City has been so cavalier

4  about using tear gas on its own people. But this is not

5  speculation. Ms. Graham is a journalist, and she explains

6  how the City's violence has blocked her ability to report on

7  events and made her fearful of doing her job.

8  Abie Ekenezar, a veteran who has been to real war zones in

9  Afghanistan, and likening her experience to that.

10  Ms. Sakamoto's declaration explains why she's afraid of

11  protesting, because the City has shown it is willing to

12  indiscriminately attack protestors. Ms. Sakamoto spent time

13  in internment in World War II and spent time in her life

14  fighting for civil rights and racial justice. She can't

15  attend protests if the City is going to visit wanton violence

16  on the protesters.

17  But setting Ms. Sakamoto aside, other plaintiffs and

18  declarants show a concrete injury that only a TRO can

19  address. Black Lives Matter Seattle-King County has planned

20  a citywide protest for today. Two of the organization's

21  board members have been attacked by police with OC spray.

22  Alex Woldeab, a named plaintiff, a 28-year-old black man

23  who was tear-gassed and pepper-sprayed twice in one week. He

24  wasn't violent. He wasn't breaking the law. He was

25  protesting. He describes being unable to breathe, because of

1  the sheer amount of tear gas the City attacked him with.  In

2  that moment, he understood what Erick Gardner and George

3  Floyd felt when they said they couldn't breathe; because he

4  couldn't either.  These injuries, these injuries are

5  concrete, they're real, they're not speculative.

6      In her declaration, Ms. Graham describes seeing protestors

7  dancing to music, only to be attacked with a grenade,

8  followed by tear gas.  It is harrowing, Your Honor, to think

9  that the City has created an environment where reporters are

10  no longer safe to do their jobs.

11      Gretchen Martini, a declarant who submitted a photo with

12  her declaration, showing bodily injury she endured.

13  Alexandra Chen, another plaintiff, was gassed without warning

14  and attacked with grenades while she was peacefully

15  protesting.  Muraco Kyashna-tocha, a plaintiff, was

16  peacefully protesting when the police fired a canister of

17  pepper spray right at her.

18      And, of course, perhaps most tragic of all, and although

19  he's not a plaintiff, this experience just shows why the

20  injury to everyone is one so concrete, Mr. Azoulai's

21  declaration of his little boy having to be taken to the

22  hospital because there was no much gas it went into his

23  fourth-floor apartment.  These aren't speculative injuries,

24  one-off flashes in the pan that don't mean anything, that

25  should be cast aside as legally irrelevant facts that you can

1  do nothing about.

2      If the City's argument is accepted, no one would have

3  standing to challenge these policies.  There's no limiting

4  principle.  And that's why we can't accept the standing

5  argument.  If the City believes what it did in the past was

6  correct and reasonable, and their brief is a 25-page ode to

7  the righteousness of what the City did, then they'll do it

8  again in a heartbeat.

9      This isn't speculation, Your Honor.  It's the opposite.

10  It's empirical.  And we can't hang our hopes on the City's

11  wink and a promise that they won't do this again.

12          THE COURT:  Counsel, the last area of examination

13  makes reference to the obvious, that this is not the first

14  court to address similar types of relief being sought.

15  Orders have been issued in other jurisdictions, specifically

16  including Portland and Denver.  And these are actions similar

17  to that now being brought to the court, although some of the

18  circumstances in terms of alleged police misconduct vary

19  slightly.  But the actions, nonetheless, are similar to

20  issues that you raise.

21      But to the extent that you seek relief, this court is

22  curious as to why the remedies that you should receive in

23  this court should be any different than what's been accorded

24  in those particular cases.  And I'm not saying this court is

25  bound by what other district court judges have done in two

1   other jurisdictions.  This court will make up its own

2   independent mind, based upon the facts and the evidence in

3   this particular case.  But I'm curious as to why you think

4   the circumstances of this case would warrant a dramatically

5   different outcome with no restriction -- with no limitation

6   allowed whatsoever on the use of gas, grenade bombs and

7   flash-bang devices and the rubber bullets.

8        MR. PEREZ:  Thank you, Your Honor.  The City is

9   arguing for exceptions.  And our proposed order, which we

10   submitted, admittedly late last night, we think strikes the

11   right balance and gives the City only as much latitude as it

12   needs for a proportionate and targeted and constitutional

13   response.

14      The City insists, without really arguing or justifying, on

15   their need for discretion to promote or protect public

16   safety, discretion of when to launch blast grenades into the

17   crowds, discretion on when to indiscriminately gas their own

18   people.  But the last two weeks, Your Honor, have shown that

19   the City is abusing and will abuse that very discretion.

20      The discretion the City is asking for allowed them to

21   pepper-spray a little girl, and move on to pepper-spray

22   others, while a medic poured milk over her burning face.

23   That discretion allowed them to tear-gas a disabled and

24   elderly woman in a wheelchair.  That discretion allowed them

25   to three blast-ball grenades at kneeling protestors, and more

1  grenades at protestors who were dancing.  That discretion

2  allowed them to attack medics, to target journalists.  Your

3  Honor, that discretion allowed the City, in the Mayor's own

4  words, to turn Seattle into a war zone.

5      The City is not entitled to any more discretion.  The City

6  has earned an injunction.  And as Your Honor notes, Portland

7  and Denver had issued injunctions on different facts.  But on

8  these facts, we think it's even worse than what happened in

9  Portland and Denver.  And the proposed order that we

10 submitted last night allows the City to respond to specific,

11 particularized threats with proportionate responses.  But

12 there's never a reason to indiscriminately gas an entire

13 crowd.  There's never a reason just to start throwing

14 blast-ball grenades, like this is a video game, into crowds.

15 There's no public-safety interest that that's promoting.

16     For 20 years, Your Honor, a generation, a generation, we

17 have not had to tear-gas the people of Seattle.  And the City

18 broke that streak and continued to break it over the last two

19 weeks.  Our proposed order strikes the right balance and puts

20 an end to this violence.

21     THE COURT:  Counsel, when you say "targeted

22 response," I want to narrow this down, how do you participate

23 in a targeted response with a tear-gas-type device?  Once

24 that's released, you can look outside and see the weather

25 right now, there's a slight wind blowing, that's going to

1    meander into different parts of that crowd.  So when you say

2    targeted response with gas or pepper spray, how can that take

3    place?  Perhaps better to pepper-spray because that's a

4    handheld device.  But once an officer releases the tear-gas

5    device, how is that to be targeted?

6              MR. PEREZ:  Exactly, Your Honor.  Exactly.  It's

7    non-directional.  In fact, with pepper spray, they did the

8    same thing, they filled non-directional canisters, grenades

9    of gas, and just launched it into crowds.  Not even the

10   pepper spray was directional, Your Honor, even when they were

11   directional.

12             THE COURT:  My question to you is, in those

13   circumstances that warrant or may justify the response to

14   violent behavior, does that targeted response, in your

15   opinion, permit the use of tear gas if it's directed at the

16   individuals causing the violence?

17             MR. PEREZ:  Over the past two weeks, I don't see a

18   scenario, Your Honor, where tear gas would have been

19   appropriate, particularly in any of these situations where

20   the police could have gone in with a -- gone in and taken a

21   block, or used directional pepper spray at those actually

22   committing the violence, or the one woman setting fire to

23   cars.  I have not seen a hypothetical in the last two weeks,

24   or in the last 20 years, justifying non-directional use of

25   tear gas on an entire group of peaceful protestors.

1       The theory and hypothetical that the City might spin up

2   that, you know, is the people will grab pitchforks and start

3   rioting and we're going to need these tools to quell them,

4   the City will have to use proportionate force against that.

5   But don't let that scenario, which hasn't even occurred yet,

6   don't let that scenario justify building in an exception

7   where the City has already shown it will drive a truck

8   through any exception.  The City said it would not use tear

9   gas on Friday, and by Sunday night it was using tear gas

10  again.

11      What we -- the proposed order we submitted last night

12  strikes that balance.  It would allow the City to use

13  proportionate response against specific threats.  But it

14  can't just start throwing canisters of tear gas into crowds

15  and hope for the best.  That's not a public -- especially in

16  a pandemic, especially in a pandemic, that's not going to

17  solve public safety, it's going to create chaos.  It will

18  increase the violence.  It will make tensions worse.  That's

19  what we've seen.  And that's not speculation, Your Honor.

20  That's empirical.

21          THE COURT:  Mr. Perez, most of the lawyers that come

22  before this court find that by the time the court finishes

23  asking its questions, that usually exhausts the arguments

24  that the lawyers wanted to make in the first place.  I'm not

25  going to preclude you from having the opportunity to

1  supplement the responses you've provided.  But is there any

2  additional argument you would like to make that has not

3  already been addressed in your presentation to the court?

4          MR. PEREZ:  Your Honor, I think we have met the

5  standard for a TRO, the likelihood of success on the merits

6  on the First Amendment and Fourth Amendment.  I think Your

7  Honor's questions honed in on the correct issues.  I will

8  just end by saying, Your Honor, that police violence ought to

9  be rare, extraordinary and targeted.  But over the last two

10  weeks in Seattle, police violence has become all too common,

11  ordinary and indiscriminate.  So we need your help to put a

12  stop to it.

13      And if you have follow-up questions, but I agree with you

14  your questions honed in on the right issues.

15          THE COURT:  All right.  Thank you, Mr. Perez.  You'll

16  certainly have a chance to respond to the City's response to

17  the court's inquiry.

18      I would normally say you may be seated, counsel, but since

19  we're on a telephone, that's not necessarily appropriate at

20  this time.

21      I do have questions for the City as well.  Counsel, are

22  you prepared and ready to proceed?

23          MS. BOIES:  Yes, Your Honor.

24          THE COURT:  My first question -- actually, I want to

25  start with the proportional argument that counsel just made

1  in terms of their recent recommendation for the language to

2  be incorporated into the TRO order.  When they say

3  "proportional" or "targeted" response, what's your response

4  to that suggestion or recommendation to the court?

5          MS. BOIES:  Your Honor, this is Ms. Boies.  I think

6  looking at their language, which we had an opportunity to see

7  as well last night, our concern is that there are important

8  modifiers missing that make this essentially a complete bar.

9  And, you know, even counsel for plaintiffs have talked about

10  there may be scenarios where these types of tools are

11  necessary.  And to say, well, they don't -- the fact that

12  there may be in the future scenarios where these tools are

13  necessary doesn't justify any sort of exception, well, there

14  needs to be exceptions and there needs to be these types of

15  allowances, simply because, otherwise, you have a

16  law-enforcement service that is trying to protect -- to

17  promote public safety, and they have to violate a court order

18  to do it.  And that is why the exceptions are necessary.

19      So when you're talking about, for example, protests or

20  protestors, you need modifying language.  You need something

21  that says "peaceful" or "lawful," although I would hesitate

22  to use the word lawful, simply because right now, depending

23  on the Governor's orders, there may be a situation where

24  people are not supposed to leave their houses to protest.

25  So, you know, to try to avoid a situation where we are

1 changing our wording on any order that was entered every few

2 days, I think "peaceful" would be a more appropriate wording.

3    And there's nothing about, you know, they use the word,

4 for example, "Enjoined from deploying." A more appropriate

5 word there would be "directing." Because that focuses on

6 what is important to public safety, which is the idea that if

7 there is violence in a crowd, if there is law breaking in a

8 crowd, if there is a situation where there is a need to act

9 to protect the public, that may occur within what is a crowd

10 of largely peaceful people, with some problems.

11    That is something that Your Honor talked about at the very

12 beginning when you were talking about the need for balancing

13 these concerns and the need to focus on constitutional

14 policing. And it just -- it's not workable to take away all

15 those constitutional policing options in terms of the

16 policies that the police department has worked very carefully

17 on, over a number of years, with the help of the federal

18 monitor, with the help of the Department of Justice, with the

19 help of Judge Robart, and with input from the community

20 police commission, and a bunch of stakeholders, to get to a

21 place where we have policies that strike that balance.

22    And so to, say in an emergency situation in an

23 unprecedented time, to simply back away from what has taken

24 years to develop and put another very restrictive policy in

25 place that is beyond what judges in other jurisdictions that

1   have considered similar situations have felt struck the

2   appropriate balance, that's why we're concerned.  So that's

3   why the language in their order, we think, is problematic.

4         THE COURT:  Now, counsel, you referenced a consent

5   decree currently under the supervision of Judge James Robart

6   of this court.  And you note the decree considered the

7   crowd-management policy of the Seattle Police Department.

8   Right now I'm on page 5 of your brief.  And that

9   crowd-control policy of the police department has a basis to

10  authorize them to disperse a crowd under certain

11  circumstances.

12       Now, are you suggesting that the consent decree would

13  preempt the right or shield inappropriate, or excessive

14  use-of-force challenges that is now before this court?

15        MS. SHARIFI:  Your Honor, this is Ghazal Sharifi.

16  No, thank you for your question.  That is not the argument

17  that the City is making, Your Honor.  Just to clarify, the

18  challenges to the constitutionality of specific instances of

19  use of force as referenced by plaintiffs' counsel can stand

20  and will stand in this, even in this litigation as it goes

21  forward, through the 1983 action, as was pleaded by

22  plaintiff.

23       Additionally, there is a robust oversight system in the

24  City of Seattle that is currently, as we speak, reviewing

25  these specific instances of conduct that plaintiffs' counsel

1   alluded to, reviewing systematic responses, and assessing

2   whether changes need to be made, assessing whether actions

3   need to be taken.  The plaintiffs' brief identified the

4   Office of Police Accountability conducting review.  Some of

5   the plaintiffs' declarations indicated that they've sought --

6   they've made complaints through that avenue.  The Office of

7   Inspector General is reviewing this.

8        So the consent decree does not shield the City from

9   anything.  In fact, the consent decree is a check on -- a

10  continuous check, an ongoing check on the City's system, as

11  it continues to improve and adapt to change, by the system

12  that it set up within the parameters set forth by Judge

13  Robart and the DOJ.

14       I believe Ms. Boies has an additional comment, Your Honor.

15            MS. BOIES:  Thank you, Ms. Sharifi.

16       Yes, Your Honor, I think the other thing to talk about

17  here is that when we're talking about specific incidents,

18  we're missing sort of the bigger picture.  And that's what we

19  tried to lay out in our brief, which is that things are

20  adjusting on the ground.  And things are getting better.

21  We've had, I believe in the last nine days, we've had seven

22  days where none of the tools that the plaintiff has

23  complained about have had to be utilized.  And it's that sort

24  of, "where did we start, where are we now" consideration that

25  we think is an important factor here as well.

1          Because as things improve, as things adjust, you know,

2     counsel spoke about a positive correlation between SPD's

3     current approach and events on the ground.  And we

4     wholeheartedly agree.  We think that the events over the last

5     few nights have shown, as people adjust, things are

6     improving.  And I think all parties can agree that's a good

7     thing.

8          And when you're looking at a temporary restraining order,

9     that is the important analysis.  No one -- if I may, Your

10    Honor, I'd like to talk briefly about the standing argument,

11    just because I want to make the City's position clear.

12          THE COURT:  Counsel, I'd like you to stay on the same

13    topic, because we're going to get to standing in a little

14    bit.  But when you talk about improving and making

15    adjustments, does that mean the citizenry or peaceful

16    protesters suffer the consequences of being gassed or

17    targeted with rubber bullets in the process of the police

18    department improving their processes?

19          MS. BOIES:  I don't think anyone is arguing for that,

20    Your Honor.  I think what I'm saying is that conditions on

21    the ground are improving.  And when we're talking about a

22    temporary restraining order, which is what we're talking

23    about today, what we need to focus on is what may happen in

24    the future.  And I think it's hard to talk about the entire

25    two weeks as if it were just one wave of violence.  I don't

1  think that's the case.  And I would assume no one would argue

2  that.

3     I think it's, as Ms. Sharifi said, there's different

4  relief being sought here.  And so there are lawsuits that

5  will continue about specific acts, and then there's also what

6  will happen in the future in terms of a restraining order.

7  And that's why we're focusing on a different picture in terms

8  of what's been happening lately and how things are going.

9        THE COURT:  Counsel, on that same page 5, I believe

10 it's on line 16, the defense indicates that the City does not

11 take the position that the Seattle Department policy can't be

12 improved upon.  Those are your words.  Doesn't that imply the

13 way to improve is to test the crowd-management policy the

14 Seattle Police Department has implemented?  In other words,

15 isn't a temporary restraining order restricting the use of

16 gas a method of testing what other approaches can be

17 appropriately utilized to effectively manage crowds, in

18 crowd-management circumstances?

19        MS. BOIES:  I don't think so, Your Honor.  I think

20 there may be more specifics that are able to be added in

21 there, but what the restraining order is talking about is a

22 wholesale scrapping of the policy and changing to a bar of

23 tools that may have a time and place.  And so I think that's

24 the concern.  Can there be more language added?  Can there be

25 more guidance provided?  These are the kinds of things that I

1  think can be evaluated in the future.  It's that wholesale

2  bar is something totally different.

3       THE COURT:  Okay, counsel, let's now go to the

4  standing issue.  Looking now at page 24, starting at line 15,

5  that states a series of links.  And, again, you haven't

6  called out Ms. Sakamoto specifically and I know I've made a

7  reference to her several times because she's the one

8  individual, as a plaintiff, who didn't attend or participate

9  in any of the protest activities.

10      Now, in your briefing, you indicate that to claim

11  standing, there's essentially the need to be present.  And I

12  think your language is:  The police need to have access to

13  tools, police need to utilize those tools on either the

14  plaintiff or a specific part of the crowd where plaintiff was

15  present, and you go on to list a litany of things that she

16  would have to have suffered or engaged in in order to have

17  standing.

18      First of all, those series of links that you identified, I

19  notice that there's no case that supports those links.  So

20  you're not advancing that that language comes out of any

21  particular case; is that correct?

22      MS. BOIES:  No I'm not, Your Honor.  I think what it

23  is is that in cases that look at these issues, they talk

24  about future harm.  And this is where I'd like to take a

25  second, Your Honor, to clarify the City's position.  No one

1  is disputing injuries in the past.  That's absolutely not

2  true.  We understand that there have been injuries.  We take

3  that seriously.  Every injury is a significant injury.  That

4  is not something that the City takes lightly.

5       But what we are talking about is what the proper analysis

6  is for whether or not an injury will happen in the future.

7  And that is the analysis that every case that looks at

8  standing for injunctions and other things requires, that

9  there be an actual, concrete, particularized threat of injury

10 that is imminent.

11      So when we're talking about speculation, the causal chain

12 that we talked about, that is directly from case law, not

13 those specific facts.  But the idea that you have to look at

14 what would have to happen for the kinds of injuries that may

15 have happened in the past to be so clearly and likely to

16 happen again that a temporary restraining order is warranted

17 and not an overreach.

18      So that is why the causal chain is listed, because there

19 is this need to say, for that kind of injury, what would have

20 to occur?  And as the causal chain increases, as the number

21 of things that would have to happen expands, it becomes way

22 too tenuous, way to speculative.  And that is consistent,

23 Your Honor, with the case law.

24           THE COURT:  Are you suggesting, counsel, that the

25 court crosses out the chilling effect?  In other words, if an

1  individual sees, on some of these protests, that the police

2  respond to, dispersing individuals, that they use a large

3  amount of gas in a non-discriminatory way, are you suggesting

4  an individual has to go get tear-gassed in order to claim

5  that their rights are affected?

6      MS. SHARIFI:  Your Honor, this is Ghazal Sharifi.

7  Sorry.  Go ahead, Your Honor.

8      THE COURT:  Go ahead.

9      MS. SHARIFI:  Thank you, Your Honor, for the

10  question.  No, that is not the City's position.  I think that

11  there are a couple of important facts to identify here in

12  that the -- out of the last 14 days, most have been peaceful

13  demonstrations with SPD and the citizens of the city and the

14  state marching and demanding change and demanding action.

15  And thousands of people, an unprecedented and very impressive

16  number of demonstrators hit the streets, pretty much on a

17  daily basis, including today, to go and demand change.

18      And so the fact, just of the available facts to all of the

19  parties and the court is that there is not a chilling effect.

20  The facts show that SPD's inaction or action, whatever you

21  want to -- however you want to phrase it, in the last several

22  days, have demonstrated that a TRO is not necessary because

23  there is no chilling effect, because there is the ability for

24  peaceful demonstrations to continue.  And that we are in a

25  situation where there are claims and maybe even probable

1   claims of specific instances of conduct and claimed

2   unconstitutional action, which certainly are in this court

3   and will continue to be in this court.

4       But as far as the need for injunctive relief,

5   demonstrations continue, speech is not chilled.  Even the

6   plaintiffs themselves proceed to go and demand action and

7   demand change.  And I believe that people are responding.

8           THE COURT:  Well, is the City arguing that future

9   protestors face no threat of tear gas or other weapons used

10  in the future?  It seems like there's a possibility and their

11  desire to keep the weapons by the police, as an option so

12  that they may want to use them in the future.

13          MS. SHARIFI:  Your Honor, there is no way to look

14  into the future and what possibility exists or arises.  I

15  believe that peaceful protestors are really not the subject

16  of police use of force.  This has been indicated and revealed

17  through as much of the timeline as we could establish in our

18  day to respond to the plaintiffs' TRO motion.  There are acts

19  of violence and conduct that resulted in the specific

20  instances of use of force.

21      Plaintiffs' counsel, Mr. Perez, noted himself and conceded

22  that SPD has done -- well, I'll insert -- a good job,

23  deescalating and working with and adapting to demonstrations

24  to reduce the need and the use of such crowd-management

25  tools.

1    However, courts throughout this country recognize, and I

2    believe this court cautioned, that there still needs to be

3    the ability, some ability for the police department to ensure

4    the safety of demonstrators, peaceful demonstrators, the

5    safety of officers and other people standing by.  And the

6    plaintiffs' proposed language and the reason why the City

7    proposed kind of alternate language that was more consistent

8    with the law and other courts, is because that -- there does

9    need to be that ability to take action and effectively

10   police, but also understanding that there has been an

11   exhibited demonstration of deescalation and peaceful -- a

12   significant number of days of peaceful demonstrations.

13        THE COURT:  Counsel, how does this fit, when I see a

14   video -- and I'm referring to the pink-umbrella video --

15   where you argue there's no chilling effect or it shouldn't

16   have any chilling effect, where from my perception it

17   appeared that law enforcement officers were on one side of

18   that steel fence and protestors were on the other side, and

19   the officer initiated the contact by smashing the pink

20   umbrella from the protester.

21    So when a person like Ms. Sakamoto sees that type of

22   reaction and following that is aggressive law-enforcement

23   action, which includes eventually tear gassing, doesn't that

24   type of circumstance present the type of fear that would

25   warrant a standing determination to be made by this court?

1    MS. BOIES:  Your Honor, I think certainly that

2  incident was troubling from what we saw in the video.  And I

3  think we're not going to vouch for every incident; we're

4  going to expect that our accountability and oversight system

5  will look into those things and determine if there were

6  mistakes made.

7    Certainly, as Ms. Sharifi has pointed out on several

8  occasions, there is a process also in the judicial branch for

9  addressing concerns like that.  What I think we are talking

10  about is in the context of a temporary restraining order and

11  in the context of 13, I believe 14 days now of

12  demonstrations, there has to be sort of a wide-scope look at

13  this.  And I would hope that anyone seeing that video would

14  also see what has happened since.  And what has happened

15  since is that there have been days and days of peaceful

16  protests that have been met with a peaceful response.

17    You know, the City is certainly not intending to do

18  anything to suppress First Amendment rights.  Our policies

19  were written in order to support them.

20    THE COURT:  Counsel, as I look at paragraph 139 of

21  the complaint --

22    MS. BOIES:  I'm sorry, Your Honor, what page are you

23  on?

24    THE COURT:  Page 139 of the complaint -- I'm sorry,

25  of the -- well, I think you'll be familiar with this,

1  counsel, "Mayor Durkan and Chief Best," what the complaint

2  says, "in apologizing for the conduct of the Seattle Police

3  Department officers, as much admitted that the officers used

4  disproportionate force against the demonstrators and deployed

5  less-than-lethal weapons too quickly."

6      Now, I firmly believe that they were trying to calm things

7  down, and I'm referring to the statements made by the mayor

8  and by the chief, but shouldn't the court consider those type

9  of statements as true, as tacit admissions of inappropriate

10  use of the less-than-lethal weapons?

11      MS. SHARIFI:  Your Honor, I believe that the mayor --

12  and, again, Your Honor, I apologize, I need to -- I didn't

13  have an opportunity to look exactly at the particular

14  statement referenced in paragraph 139.  The court can

15  interpret the statements of the mayor and the chief as -- if

16  the court were to interpret those statements as admissions of

17  excessive force, those statements do not, again, render a

18  systematic deviation from policy during demonstration.

19      The authority cited by plaintiffs' counsel has uniformly

20  been citations of banning demonstrations, of prior restraint.

21  And here, there is overwhelming evidence of an overwhelming

22  number of peaceful demonstrations where there wasn't a use of

23  force at all, let alone a use of excessive force by law

24  enforcement officers, accompanying demonstrators as they were

25  marching and they were, you know, chanting and requesting

1   change.

2   The standard and the threshold for the reason we are here

3   today, which is the temporary restraining order, is that

4   these -- and I'm quoting the *Campbell* case citing *Lewis v.*

5   *Casey*, "Sporadic or isolated violations of individual

6   protestors' rights are insufficient to support broad

7   injunctive relief against an entire agency."

8   And there isn't a demonstration by -- maybe an interesting

9   word choice -- by the plaintiffs' counsel that we, the City,

10  have acted in a way that's inconsistent with its policy and

11  with the Constitution and the law in a systematic way, given

12  the fact that there is an admission that there have been an

13  overwhelming number of peaceful protests.

14  MS. BOIES:  Your Honor, this is Carolyn Boies.  If I

15  could add one further thought to that, which is, I don't

16  want, within this discussion, to lose sight of the fact that

17  there is a difference between what's in the SPD policy and

18  what's in the Constitution.  And by that I mean the SPD has

19  created policies to try to hold itself to a higher standard,

20  to a higher degree of accountability and restricting itself,

21  than what would be required by the Constitution.

22  So there can be something that occurs that is unfortunate

23  and not inconsistent with our policy.  That is not the same

24  thing as saying that there is a constitutional violation that

25  was admitted to.

1        And that's why we keep returning to the policies and their

2    scope and the amount of time involved it would have taken

3    into putting those in place.

4        You know, the City has proposed, in fact, in our

5    discussions outside of the hearing context with Mr. Perez and

6    his team, language for a proposed order.  But I would note

7    that the language that we were discussing was, in fact,

8    beyond what, for example, the court in Portland put in place,

9    where the Portland court simply said, "Follow your policies."

10   And so, you know, I think those are two important things to

11   keep in mind here.

12        THE COURT:  All right.  Let me ask another question,

13   counsel.  What happens if the situation develops where you do

14   have peaceful protests and a group of individuals bent on

15   violence, damage, risk of injury to others, show up, and they

16   start breaking into the group of peaceful protestors -- and,

17   again, we can't speculate what's going to happen, but I want

18   to pose a hypothetical to test the merits of the argument --

19   how do you discriminate with less-than-lethal devices for --

20   how do you approach this with precision so that you won't

21   hurt people who have nothing to do with that type of

22   violence?

23        And I'm referring to the video where law enforcement were

24   responding to protestors.  And I see Seattle Police

25   Department officers come out with those rubber bullets, and I

1  don't know if they have any crosshairs or methods of

2  targeting, but it looked like they're just randomly shooting

3  in the crowd.

4      So when you don't have some type of limitation or

5  restrictions, isn't that just a random approach to control

6  violence or inappropriate behavior at the risk of

7  consequences to peaceful protestors?

8          MS. SHARIFI:  Thank you, Your Honor.  This is Ghazal

9  Sharifi.  And, Your Honor, if I misinterpret the court's

10  question, please let me know.

11      First to clarify, the Seattle Police Department does not

12  have -- does not use rubber bullets.  They have a separate

13  thing, which is a foam-tipped launcher, and there are certain

14  circumstances in which that can be used.

15      Now, to address the court's question -- go ahead, please.

16          THE COURT:  Let me clarify, because I don't want to

17  mislead the public that's present.  One of the documents that

18  was filed with this court is Exhibit A to Document 25.  So

19  when you say foam-tipped, there's a woman that displayed her

20  body, and she's got a sizeable bruise on I believe it's her

21  stomach that looks like it's several inches across her

22  stomach, and Exhibit B, she's hit once again in her thigh by,

23  again, this foam-type projectile, whatever you'd like to call

24  it.  So I don't want to be misleading or for you to mislead

25  the court, that these aren't a device that can cause pain and

1  significant injury.  Would you agree, counsel?

2      MS. SHARIFI:  Your Honor, yes.  That is not what I'm

3  arguing.  I was just clarifying that in terms of the weapons

4  that the Seattle Police Department officers are permitted to

5  use, weapons with rubber bullets is not that.

6      Yes, just because a tool is less lethal does not

7  necessarily indicate that injury cannot incur.  And so that

8  is not an argument that I'm making.  Thank you, Your Honor.

9      There are -- okay, so, Your Honor, your question was --

10 I'm sorry, we got a little bit sidetracked.  The question was

11 how do we --

12      THE COURT:  Bottom line, counsel, is how do you

13 target gas?  If you get a situation where there's a host of

14 violent protestors that emerge all at one time and you wish

15 to deploy gas or gas-type devices, how are you going to

16 target that into a group of peaceful protestors who are mixed

17 in that group?

18      MS. SHARIFI:  Yes, thank you.  So first on the tear

19 gas.  As it stands right now, there is a restriction on the

20 Seattle Police Department, self-imposed restriction by the

21 executives, that the only authority for the use of tear gas

22 comes from the chief, or the chief's designee.  And the chief

23 was the one, since the imposition of that restriction, as

24 indicated by the submissions to the court, that authorized

25 that.

1    Now, as far as OC spray and as far as blast balls go,

2    there is attempts to -- and officers are trained to utilize

3    those weapons in ways to avoid direct contact and hit with

4    people.  Now, I understand that plaintiff has submitted

5    declarations and there are instances where individuals can

6    specifically get impacted by those tools.

7    Additionally, as the court was discussing with the

8    plaintiffs' counsel earlier, is that if there's a slight

9    breeze, the gas and the gas-like substances will float.

10    So, it would be dishonest to say that you can't

11    specifically target it.  But the courts have consistently

12    permitted for the ability to use that to the extent a crowd,

13    like the court noted with violent individuals bent on

14    violence, to be able to disperse the crowd so that those

15    individuals do not harm the co-protestors and law

16    enforcement.

17    Moreover, SPD has and tried to utilize when safe and

18    feasible to do so, specific tactics, if there is an

19    individual to be arrested, to be able to surround them and

20    effectuate an arrest.

21    Sometimes in these situations where the crowd is

22    overwhelming, where the crowd tries to what's called

23    de-arrest someone, or un-arrest someone, by kind of getting

24    in the way of law enforcement trying to do that, it isn't

25    safe and feasible for the other demonstrators in the area and

1   for law enforcement to conduct that, quote-unquote, targeted

2   arrest.  So violence could potentially escalate and people

3   could be harmed.

4       And that's why other courts in this country and this court

5   earlier noted that that discretion is necessary for those

6   circumstances where such targeting can't happen.

7           THE COURT:  Counsel, another obvious concern as

8   identified in the complaint is COVID-19 and we can't escape

9   the reality that any amount of tear gas or pepper spray is

10  going to cause irritants to the eyes, throats, cause coughing

11  and spread the virus.  Isn't there a substantial risk of

12  concern to peaceful protestors that COVID-19 could be spread

13  because of the enhanced or excessive use of tear gas?

14          MS. SHARIFI:  Your Honor, I think that there is

15  experts that have acknowledged that.  I believe plaintiffs'

16  counsel referenced expert testimony.  So I think that, one,

17  the existence of several days of peaceful demonstration

18  without the use of OC spray or tear gas shows that SPD is not

19  intent on utilizing those when not necessary.

20      Additionally, counsel alluded to people just being

21  arrested -- in the briefing -- arrested on that.  And there

22  are very real and genuine COVID concerns with large groups of

23  people being in a small space awaiting due process.

24      So the need for crowd dispersement at the point at which

25  something gets very violent and the potential necessity to

1  use OC or blast balls, or -- you know, I don't believe there

2  is an intent really to use tear gas -- is there.  But there

3  is no perfect solution to this.

4      And it's clear that people should have the ability to go

5  and safely and peacefully demonstrate.  But it's also clear

6  to be able to maintain public safety in the process of doing

7  that.

8      And, yes, there is the exposure to chemical irritants does

9  not help that situation.  But we've seen that there has been

10  a concerted effort by the Seattle Police Department, without

11  court intervention, to limit and basically exclude the use of

12  any of those things.

13          MS. BOIES:  Your Honor, this is Carolyn --

14          THE COURT:  Go ahead, counsel.

15          MS. BOIES:  I think it's important to note that it's

16  not just -- that it's an effort that has been successful,

17  that this is -- again, the situation on the ground is

18  improving, and it's improving in part because of voluntary

19  actions the police department is taking.  So if we're going

20  to, as we always should, return to the standards that are

21  being applied here, you know, we have to look at -- when

22  we're thinking about an injunction -- what is next, what is

23  concrete, particularly likely to be next?

24      And, you know, I think that as the days have gone on, as

25  things have improved, what is next is more positive, more

1  hopeful.  And the crowds are getting bigger.  I think as you

2  know, Your Honor, we put in our briefing, that today's

3  demonstration is one that the City has made sure that its own

4  employees are all aware is happening, and that they have the

5  means to join in if they want to.

6      So what we're talking about in terms of the future is

7  hopefully a continued peaceful exercise of First Amendment

8  rights.  And the City is getting more involved in that

9  process, not less.

10     THE COURT:  The last question I wanted to raise,

11  counsel, inherent in the proposals that the City has

12  submitted, and I think this was briefly addressed the other

13  day when I asked the parties if they wished to engage or had

14  been engaged in methods to resolve their own conflict, there

15  was the City's suggestion of having higher-up officials being

16  able to make the final determination or final call.

17     One of the concerns I have about the fact that law

18  enforcement has behaved, therefore don't put any

19  restrictions, is on June 5, 2020, Mayor Durkan and Chief Best

20  had a joint announcement that the Seattle Police Department

21  would stop tear gas for 30 days; and yet this didn't stop the

22  activities of the officers, because two days later, there was

23  a violation.

24     So the mere fact that the officers have not -- or stopped

25  the use of the tear gassing, isn't the court supposed to look

1　at the totality of circumstances that have been presented to

2　this court in making an assessment of whether or not a TRO is

3　warranted under these circumstances?

4　　　　MS. SHARIFI:  Your Honor, thank you.  To clarify, the

5　deployment of CS gas two days after the order was at the

6　authorization of the Chief of Police.  And that was the only

7　limitation there and that was the one deployment of tear gas.

8　　　　I do think that there is a distinction between tear gas

9　and other crowd-control measures that is not as widespread or

10　as impactful as tear gas.  So the City's proposal does permit

11　for individuals that are higher up to implement this call.

12　But as it concerns tear gas, it is now really the authority

13　of the chief and only the chief for its use.  And so there

14　wasn't an officer violation, necessarily.

15　　　　One other indication is from the information that we were

16　able to collect in a 24-hour period, the City attempted to

17　kind of detail the conditions or the claimed conditions on

18　the ground of what was happening at that time at the

19　deployment period, when authorization was provided to deploy

20　tear gas then.  And so that was one instance where the --

21　that decision, and the authorization of that decision, and

22　the constitutionality of that decision, can certainly be

23　contemplated, litigated, discussed internally within the

24　accountability systems.

25　　　　But that one instance, and the several days that followed,

1    where obviously it wasn't deployed, where there wasn't a

2    particular violation of policy, where there was a limitation

3    on it and an acknowledgment that we are doing everything we

4    can to deescalate situations to avoid such uses of force, I

5    really think for the perspective of today and the evaluation

6    of whether injunctive relief is necessary should be a

7    consideration for the court.

8              THE COURT:  Just so I'm clear, counsel, when you

9    talked about higher-up authorities, such as the chief or

10   incident commanders, you're referring to tear gas.  Because

11   as I look at Document 28, which has attached to it the

12   Seattle Police manual, it indicates that officers may make

13   individual decisions to deploy OC spray.  So there's a

14   distinction between OC spray, the pepper spray, and the tear

15   gas; is that correct?

16             MS. SHARIFI:  There is a distinction between the OC

17   spray and the tear gas within the Seattle Police Department

18   manual, the rules as they are right now.  One thing I would

19   like to also clarify for the court, and I -- in the proposed

20   language that the City offered Mr. Perez and the court a

21   couple days ago, and we continued discussions on -- I just

22   need to pull that language again, Your Honor, I'm sorry.  So

23   there can be situations where an officer, in order to defend

24   himself or the safety of another individual, can use

25   individual discretion to deploy a small burst of OC spray, as

1  opposed to a higher level of force, such as a baton or a

2  firearm.

3      And I believe that in the proposed language, it still

4  allows for that, but -- I'm sorry, my computer is not

5  cooperating -- but it does allow for that.  But also it

6  allows for -- but it's more restrictive.  The language that

7  was proposed is more restrictive than the policy at this

8  time.

9      THE COURT:  Paragraph 10, counsel, is what I'm

10 referring to.  And that indicates that the authorized use of

11 OC in crowd-management situations involving violent activity.

12 Is there someplace in the police manual that describes

13 violent activity, so that an officer has an appreciation for

14 when it's appropriate to use it?  I mean, they have

15 limitations here that says to defend one's self, to defend

16 someone else, to prevent significant destruction of property.

17 Is there someplace to define violent activity?

18      MS. SHARIFI:  Your Honor, off the top of my head, I

19 do not know.  I can certainly look it up for the court.

20     I believe that the court's definition that was just

21 summarized there, to protect self or others, or significant

22 destruction of property, to the point at which other

23 individuals could get harmed, such as arson, or if there is

24 somebody, for example, standing right behind a window and the

25 glass is being broken into so as to cause that person injury,

1    I think those are certain considerations.

2        But if it's people just shouting, or marching, or, you

3    know, even making certain demands, obviously that is not

4    considered violent activity.

5        If there is the possibility of barriers or otherwise

6    benign things that may be used as weapons, those may be

7    considerations for assessment of whether the activity is

8    violent.

9        So I think there is some discretion in a case-by-case

10   assessment of what is happening in a particular moment.  But

11   I do think that there are still parameters that officers are

12   trained to evaluate.

13            THE COURT:  And, counsel, the court has looked at the

14   proposed order by Black Lives Matter, and they, in their

15   proposal, seek the injunction, but then the modifier is that

16   the order does not preclude individual officers to take

17   necessary and reasonable and proportional and targeted

18   actions to protect against a specific imminent threat of

19   physical harm to themselves or identifiable others.  Under no

20   circumstances shall chemical irritants or projectiles or any

21   other weapons be deployed indiscriminately into a crowd.

22       Why doesn't that, counsel, address the concern of both

23   parties?  It restricts the use, but it doesn't preclude the

24   officers from using that type of less-than-lethal weaponry to

25   protect against specific imminent threat.  Why doesn't that

1  fix the issue, counsel, at least for the TRO if the court

2  grants it?

3          MS. SHARIFI:  Your Honor, I believe Ms. Boies is

4  muted.  One moment.

5          MS. BOIES:  I'm sorry, Your Honor.  Were you reading

6  from our proposed order or their proposed order?

7          THE COURT:  I believe it's their proposed order.

8          MS. BOIES:  Okay.  So I think the concerns that we

9  were discussing were the same as from earlier, which is

10  namely line 12 says, "Employing chemical irritants or

11  projectiles of any kind against persons peacefully engaging

12  in protests or demonstrations."

13     It becomes hard, as Your Honor has noted, when there is a

14  massive crowd.  This would create liability for the City and

15  a violation of the court order if a peaceful protester was

16  surrounded by 20 violent protestors.  So there is some

17  language missing here that makes the proposed order from the

18  plaintiffs unworkable.  And that's why we tried to address it

19  with a counterproposal that allows for the appropriate

20  modifiers to be included, such that everyone's goal is met of

21  using these as sparingly as possible, given the circumstances

22  on the ground.  And that's the kind of specific example of

23  concerns about their language that led the City to be unable

24  to, unfortunately, just reach a voluntary agreement on the

25  language here.

1    THE COURT:  Just so we're on the same page, counsel,

2    the Black Lives Matter redraft was sent last night at

3    9:00 p.m.  Are we working off the same document?

4    MS. BOIES:  Your Honor, one moment, let me just pull

5    that up.

6    I've got Seattle plaintiffs -- oh --

7    MS. SHARIFI:  Your Honor, may I ask counsel a

8    clarifying question?  I think this might be helpful.

9    THE COURT:  I'm sorry, is that the court reporter?

10   Go ahead and clarify.

11   MS. SHARIFI:  No, this is Ghazal Sharifi, Your Honor.

12   I just wanted to clarify with Mr. Perez.  Is the proposed

13   order language what was circulated to me yesterday evening?

14   THE COURT:  This was sent via e-mail, it wasn't

15   filed.

16   MR. PEREZ:  This is David Perez.  But what

17   Ms. Sharifi is getting at is this is the same text that we

18   proposed to the City several hours before.  Just to orient

19   her, yes, it's the same language that we sent to you.

20   MS. SHARIFI:  Thank you.  I just need a moment to

21   pull that up.  I was curious, because I did not see a filing

22   come through.  So I need to go find the e-mail where this was

23   transmitted.  I don't see it in my e-mail.

24   MS. BOIES:  Your Honor, this is Ms. Boies.  I'm also

25   having difficulty locating anything from --

1    THE COURT:  Let me do this, counsel.  Mr. Perez, do

2  you have the capacity to re-email the document to defense

3  counsel?

4    MR. PEREZ:  I will do so right now.

5    It has been sent.

6    THE COURT:  Thank you.

7    MS. SHARIFI:  Okay.  Your Honor, I believe that I am

8  prepared to address a couple of the points.  The -- and

9  Ms. Boies, feel free to chime in if you need to -- the

10  language identified that under -- it says the City is hereby

11  enjoined from employing chemical irritants or projectiles of

12  any kind, against persons peacefully engaging in protests or

13  demonstrations.  The word "employing" is an issue of concern,

14  because that is an outright prohibition on the ability to use

15  these, even in those targeted situations.  And as Ms. Boies

16  referenced earlier, there might be a situation where a

17  peaceful demonstrator is surrounded by a very large group of

18  non-peaceful individuals.

19    The other thing for the court's consideration -- and

20  that's why, so, "employing" is just too restrictive and

21  doesn't allow for the discretionary use of those tools.  And

22  also there is the situation, as we noted before.  So the word

23  "directing," perhaps, is a better word.  And, Carolyn, go

24  ahead if you need to.

25    THE COURT:  Counsel, doesn't that last sentence

1  answer that specific question?  It says, the order does not

2  preclude individual officers from taking necessary,

3  reasonable, and proportional, and targeted action.  So if

4  there's a modifier explanation, what "employing" means,

5  doesn't that address that concern, counsel?  It allows for

6  some restricted use.

7       MS. BOIES:  Your Honor, I think part of the concern

8  is those two sentences appear to be somewhat contradictory.

9  So I think that's -- if the wording is changed in the way

10  Ms. Sharifi is discussing from "employing" to "directing,"

11  then they become synonymous.  And I think that a clear

12  directive, if there's going to be one issued, would make a

13  lot more sense.

14       THE COURT:  Okay.  All right.  Counsel, I've

15  exhausted all the questions I have.  I don't know if I've

16  exhausted you so that you have no additional arguments.  But

17  I wanted to make sure you had a full opportunity, from the

18  City's perspective, to make all arguments for the court's

19  consideration before I make my final determination.

20     Counsel, anything further?

21       MS. SHARIFI:  Your Honor, no.  We just wanted to

22  thank the court for its time and consideration, and to note

23  that the City continues to be committed to supporting

24  peaceful demonstrations.  And we believe that we've shown

25  that commitment in the way that the Seattle Police Department

1    has operated in the last week.

2            THE COURT:  Okay.  Thank you, counsel.

3        Mr. Perez, I'll give you a chance to briefly respond.

4            MR. PEREZ:  Your Honor, I just wanted to address,

5    briefly, the standing argument, because this is one where I

6    think the case law goes in one direction.  This is sort of a

7    circular argument, which is if we follow our policy, we are

8    fine.  But the policy is the Constitution, not the SPD's

9    policy.  The City tear-gassed protestors June 8th.  We filed

10   our TRO on June 9th.  Courts in Denver and Portland found no

11   bar to standing in the entry of their TROs, and correctly,

12   because the case law is clear that deprivation of

13   constitutional rights is a presumptive irreparable injury.

14       And all we need for standing, per the Ninth Circuit, is a

15   realistic threat of repetition of the violation.  Numerous

16   cases we cite hold that.  Otherwise, there's no limiting

17   principle to their arguments.  We've submitted --

18           THE COURT:  Counsel, was standing raised in those

19   cases, counsel?

20           MR. PEREZ:  Your Honor, off the top of my head, I do

21   not know.  But it may.

22           THE COURT:  In reading the orders from both those

23   courts, there was no reference whatsoever to standing.  I

24   don't know if the courts ignored it or if it wasn't raised.

25   Can you represent to the court that it was raised and

1   addressed by the court, or ignored by the court?

2       MR. PEREZ:  Standing is obviously a threshold issue.

3   I don't know whether it was addressed in the briefing, Your

4   Honor, I just don't know.  I will say it did not --

5   obviously, it was not an objection in those cases, is the

6   point I was trying to make.  And for good reason.  Even the

7   cases the City cites supports our standing.  It supports the

8   fact that we have standing.  We have 15 sworn declarations,

9   documenting recent police abuses against our plaintiffs.  The

10  threat is real, and easily a realistic threat of repetition.

11      The City seems to be arguing, hey, so long as these folks

12  are still protesting, no harm, no foul.  Then they say if you

13  don't come out, you don't have standing.  So which is it?

14  Yes, our plaintiffs are brave.  They are courageous.  They've

15  come out, in spite of police violence, to demonstrate against

16  police violence.  That's the point of these protests.

17      But the City's own case, in *Multi-Ethnic Immigrant*

18  *Workers*, held if plaintiffs were subjected to police violence

19  at a protest, are likely to suffer the same harm again.  And

20  in that case, they submitted declarations that that's

21  standing.

22      In the Ninth Circuit, in *Melendres* -- and this is another

23  case, *Melendres v. Arpaio*, in the Ninth Circuit -- in our

24  brief, found that plaintiffs have standing.  Because

25  defendants had a pattern of practice of doing the actions

1   that they were challenging in that case.

2       The problem with this argument is that no protester would

3   ever be able to challenge the City policy.  And that's just

4   not what the Ninth Circuit or the Supreme Court has held.

5   The case for standing is, is there an injury that's occurred

6   and is there a realistic possibility it might occur again?

7   On this record, of course.

8       The only other point I just wanted to address with the

9   court is just the use of force, which goes to the Fourth

10  Amendment issue.  And the City seems to be saying:  Well, in

11  this dystopian hypothetical where someone is surrounded by

12  people and where we need to start deploying tear gas, we just

13  need the latitude to do so.  But the leading case in the

14  Ninth Circuit is the *Nelson v. City of Davis* case.  And in

15  that case, the Ninth Circuit found that indiscriminately

16  firing pepper gas against nonviolent students at a rowdy

17  party, even when others were throwing things, was an

18  unreasonable use of force.  Indiscriminate crowd control is

19  unacceptable.

20      We think our proposed order strikes the right balance, and

21  the court was right to hone in on, it doesn't preclude

22  individual officers from taking those necessary, reasonable

23  and proportional actions.  If the hypothetical that the City

24  is presenting -- the hypothetical's never occurred, by the

25  way -- happens, an officer can go in there using

1  proportionate force.

2      And it's just important, that I just want to stress, and

3  underline it, and bold it, and I will end it here, it is very

4  important that, under no circumstances, these weapons be

5  deployed indiscriminately into crowds, because that's what's

6  been going on and that's what we need to stop.  If the court

7  has any follow-up questions.

8          THE COURT:  I just want to be clear, counsel.  And

9  I'm not tying the plaintiffs to what appears to be efforts to

10 try and resolve the differences between the parties, and it

11 certainly wasn't a filed document or pleading before the

12 court, but nonetheless it was a communication with counsel

13 for the City that I believe the parties wanted the court to

14 consider.  Now, in your modification, specifically the last

15 couple sentences, that indicates that there may be deployment

16 of tear gas, the foam-covered projectiles, and CS gas, in

17 specific circumstances, as long as it's directed or deployed

18 at the individuals and not being deployed indiscriminately.

19 Is the court's understanding and summary an accurate

20 statement?

21         MR. PEREZ:  I think that's largely accurate, except

22 for the fact that tear gas, Your Honor, we're not aware of

23 that being able to be deployed indiscriminately.  And the

24 City has repeatedly cited its policies.  But it's sort of

25 buried in their brief, but this is a very crucial point, the

1   City does not have a policy in the manual on tear gas.  It

2   has a policy on pepper spray.  And their policy makes clear

3   it must be directional.  So a directed, proportional,

4   targeted use of, say, OC spray, which is pepper spray, Your

5   Honor, as a specific threat, absolutely, that would be

6   allowed.  Throwing canisters of tear gas in the crowd, we

7   cannot conjure a hypothetical where that's acceptable, at

8   least on these facts.  And I think the City would have a

9   heavy burden to justify that.  They should probably draft a

10  policy on tear gas before they start using it

11  indiscriminately.

12          THE COURT:  Okay.  All right.  With that, counsel,

13  the court is going to bring this proceeding to a close.  I

14  deeply appreciate the work that has gone into the proposal

15  before this court, and the City's response to the proposals,

16  as well as the briefing that was provided to this court.  It

17  was extensive, but it did provide a large amount of

18  information for the court to consider.

19      Whichever way the court goes with this motion for

20  temporary restraining order, it's abundantly clear to this

21  court, as I stated at the beginning of this proceeding, that

22  these protests are ongoing.  In fact, there's a protest

23  scheduled for today.  And I would encourage that the concept

24  of peaceful protesting and constitutional law enforcement be

25  the hallmarks of the approach to the demonstrations that take

1   place.

2      Nothing more needs to be said other than this court's

3   written order.  I will get this written order out, and do my

4   best to get it out before the demonstration this afternoon.

5   My understanding is that there is to be an assembly that

6   begins around 1:00, and the marches begin at, I believe,

7   2 o'clock.  So that's the goal, counsel.  So please stand by

8   for an electronic order that will be coming from this court.

9      Thank you, we'll be in recess.

10                       (Adjourned.)

11                  C E R T I F I C A T E

12

13

14      I certify that the foregoing is a correct transcript from

15   the record of proceedings in the above-entitled matter.

16

17

18

19   */s/ Debbie Zurn*

20   DEBBIE ZURN
     COURT REPORTER

21

22

23

24

25