UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BLACK LIVES MATTER SEATTLE-KING COUNTY, ABIE EKENEZAR, SHARON SAKAMOTO, MURACO KYASHNA-TOCHA, ALEXANDER WOLDEAB, NATHALIE GRAHAM, and ALEXANDRA CHEN, <br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | NO. 2:20-cv-00887 <br><br> DECLARATION OF JOHN BROOKS |

I, JOHN BROOKS, hereby declare as follows:

1. I am over the age of 18 years old and am a citizen of the United States. I have personal knowledge of the facts set forth herein and am competent to testify to them at trial.

2. I am a Lieutenant with the Seattle Police Department. I was hired by the Seattle Police Department in 1992. As an officer, sergeant, and now a lieutenant, I have been involved in numerous civil disturbances and crowd management events over my career. In approximately 2005

I attended the National Tactical Officers Association weeklong less lethal munitions instructor school. I completed the school and became the Cadre leader for less lethal munitions within the SWAT team. The school certified me as an instructor for the entire class of munitions associated with less lethal force tools. This included "blast balls", distraction devises, launchable munitions and gas options. The school also trained me in how to deploy the tools and provided models for using devices in various situations. After that, I assisted SPD in developing training, tactics, and creating a qualification course and a process for certifying that members were appropriately trained. In 2013 I was assigned to the training unit, where I developed crowd control training for the supervisors and officers. In that role, I wrote the Integrated Crowd Management manual intended to document and define the departments approach to addressing crowd management events. The manual covers history, tactics, crowd dynamics, philosophy, law, how to employ certain assets and how to manage these events. The manual was reviewed and approved by peers, by the Department Legal Advisors, by the Department of Justice, the Monitoring Team, the Community Police Commission and other external reviewers. In 2017 I was promoted to Lieutenant and became a watch commander in the West Precinct. Due to my experience as bike officer and my familiarity with managing demonstrations, I have been the incident commander or operations section chief for a number of major demonstrations and events.

3. On Saturday, July 25, 2020, I was the Deputy Operations Section Chief for the demonstration event that occurred that day. The overall event was commanded by an Incident Commander. Under the national incident command system adopted by emergency responders, the Incident Commander is the overall person responsible for an event. The Incident Commander sets

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

the objectives for an incident and the Operations Section develops the tactical plan to meet those objectives. The Deputy Operations Section Chief directs all resources in the field with the approval of the Incident Commander to achieve the objectives of an incident. The mission of the Seattle Police Department for the events of July 27, 2020 was to keep people safe, enforce the law and preserve order. The Seattle Police response priorities were: Life Safety, Incident Stabilization, Property Conservation, and Crime Scene Preservation. Operationally, as stated in our briefing, we intended to facilitate peaceful demonstrations and free speech. We would act in a content neutral way when addressing demonstrators and counter demonstrators during the event. The plan was to use trained bike and foot officer tactics to reduce the potential for conflict during the demonstration. Time, distance and the use of barriers would also be employed to lessen the likelihood of conflict and to de-escalate confrontations. Officers would prioritize life safety emergencies as a prompt for police intervention. Any acts of violence that create life safety risk would be addressed with enough resources and tools to de-escalate and make arrests; provided police action was safe and feasible. If officers needed to engage a crowd or address criminal conduct, our objective was to use enough officers in an initial response to minimize the need to use further force.

4. Officers deployed for the event on July 25th, 2020 with less lethal tools. These tools are designed to create space and stop assaultive behavior or property destruction. They are intended to counter resistance without relying on greater force options that increase the likelihood of injury to the suspect, to the community or to the involved officers. The tools also allow officer to address conduct at distance, which protects other protestors, police, property and the suspect. In addition

DECLARATION OF JOHN BROOKS - 3

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

to tools routinely carried, specially trained officers carry blast balls, a light and sound diversion device which can also help to disrupt ongoing criminal acts.

5. This declaration is not intended to be an exhaustive description of my actions or observations from that day. Instead, it is intended to provide the Court with information pertinent to the Plaintiffs' arguments that the Seattle Police Department violated this Court's Preliminary Injunction. As described in more detail below, on July 25, 2020, I was not only familiar with the injunction, I took steps to refresh SPD officers' knowledge of the specific terms of the injunction as well.

6. In advance of the July 25, 2020 demonstration, we received intelligence information from the Federal Bureau of Investigations that anarchists were driving up to Seattle from California and Portland, bringing explosives and radios with them in a van. The intelligence bulletin informed us that these anarchists planned to cache the explosives in various locations in Seattle, so they could more easily access them during the July 25 demonstration. Anarchists and others who seek to disrupt peaceful protests by engaging in acts of destruction and violence, typically directed at law enforcement, use a number of known tactics. Anarchists and others who seek to disrupt peaceful protests by engaging in acts of destruction and violence, typically directed at law enforcement, use a number of known tactics. These tactics include using items like umbrellas or shields to block officers' movements and views into the crowd, thereby limiting officers' ability to see projectiles, explosives, and other objectives thrown from the crowd into the police line. Members of the crowd on July 25, 2020 employed these tactics.

7. In recent demonstrations that have resulted in officer injury and property damage, there have been tactics used by some in the crowd that were similar to the ones used on July 25. On July 25th, 2020, individuals in the crowd used vehicles and bicyclists to re-direct traffic and law enforcement away from the demonstrations. These individuals tried to forcibly stop police vehicles and personnel from entering the area of the event. The group demonstrated, what appeared to be a high degree of coordination. Members used small radios, cellphones and mobile scouts around the periphery to identify police resources. As police units move, they were tracked by two to four similarly dressed people on bikes who appeared to be updating others in the event. As police move units, officers have observed the group appeared to respond and move at the direction of their scouts. This coordinated effort makes it very difficult for police to monitor events so they can respond and react to any developing safety issues. Often it is impossible for police to see the actions of the group or to identify those committing specific criminal acts. Often police will hear damage to property or receive calls for service indicating the group is committing crimes. Entering past these improvised mobile barriers creates confrontation and escalation exposing both officers and bystanders to violence. The potential for confrontation and the likelihood that entering the demonstration will result in physical resistance creates a substantial officer safety risk. The use of mobile barriers are but one form of action that limits or is intended to interdict the actions of police to hold people individually accountable for criminal acts. Members of the crowd on July 25, 2020 employed these tactics.

8. Use of umbrellas, shields, protective clothing, lights, smoke and lasers all make it difficult for officers to identify, safely approach and arrest persons for crimes. These devices are

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

intended to limit movement of police and defeat the tools used in crowd control incidents. The groups create formidable shield walls that are used as physical barriers to keep police out of the crowd, which is a concern when there is an appropriate safety or other law enforcement need to enter the crowd. These devices are also used offensively to poke, jab or strike officers as they attempt to enter or move the group. Additionally, the groups intentionally place those doing criminal behavior deep in the crowd, behind people that are not engaged in criminal conduct. The criminal actors use the confusion of the event and the anonymity created by being deeper in the event to act to evade arrest. The sheer number of people that officers must move past to make contact makes arrests very difficult.

9. Prior to July 25, 2020, the Seattle Police Department located the slide below on social media. The slide sets forth common tactics employed by those who attend protests with the intent of assaulting police or creating violence. Many of the tactics highlighted in the slide were replicated by the demonstrators during the event.

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

**PROTEST ROLES**

There are many ways to participate in a protest and support each another.

**EACH FIGHTING OUR OWN WAY
WE CLIMB THE MOUNTAIN TOGETHER**

**SHIELD SOLDIER**
frontliners who use woodboards, swim boards, or signs to form a first line of defense

**PEACEFUL PROTESTER**
protesters who don't want to fight, but join hand in hand with frontliners, sometimes using their phones to film police aggression

**FRONTLINER**
protesters who use umbrellas to guard against projectiles and cameras, while keeping hands free for when help is needed

**RANGE SOLDIER**
protesters who throw water bottles, umbrellas, and trash to stop police from advancing

**FLAG BEARER**
uses signs or a phone to signal to protesters when police are advancing or attacking

**FIRE MAGE**
protesters who come prepared to set fire to barricades and throw flammable projectiles

**FIRE SQUADS**
protesters who use water and traffic cones to suppress and extinguish teargas cannisters

**LIGHT MAGE**
protesters who use laser pointers to obstruct surveillance cameras, drones, and police visors

**MEDIC**
protest supporters who are able to treat injuries or have materials to treat teargas exposure

**COPWATCH**
protest supporters who use phones to record violent police and document police tactics and weaponry

**BARRICADER**
protesters who build barricades out of found objects at strategic positions to block oncoming police and traffic that trails protesters

**ONLINE COMMS**
online protesters who use social media apps like Signal and Telegram to report on police strategies and provide protesters with real-time strategic updates

**DESIGNERS**
protest supporters who make inspiring graphics, helpful infographics, or banners for protests

10. At times in these demonstrations, if law enforcement allows members of the crowd to commit violent acts without arrest, it can cause life-safety concerns, like fires and exposure to explosives from the crowd, that jeopardize the peaceful demonstrators, officers, and the public. I know from intelligence reports and my experience managing demonstrations that these groups have also trained in de-arrest tactics that attempt to thwart officers once they are able to approach a suspect. The group trains to grab the offender and pull them away from officers to defeat the

DECLARATION OF JOHN BROOKS - 7

arrest. This is very common and creates substantial officer safety issues. Often those attempting to de-arrest a suspect will push, pull or even strike officers as they attempt to make an arrest. The space is usually very congested with large numbers of people limiting an officer's ability to move. To make an arrest it is often necessary to assemble large groups of officers to move in a coordinated way to enter and make the arrest. This takes time, must be planned and can only be executed when the event is relatively static. Throughout the events on July 25, 2020, members of the crowd employed de-arrest tactics.

11. At 1000 hours, we held roll call at the West Precinct. During roll call, we informed officers that unpermitted marches had been planned for the day. During roll call, I read language from this Court's Temporary Restraining Order, instructing all officers that they were not to use any chemical irritants or projectiles of any kind against people who were engaged in peaceful protest. I also instructed that officers were only to use OC spray, blast balls, pepper balls, flash bang grenades, or foam-tipped projectiles to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property. Consistent with the Court's Order, I also instructed officers that the use of CS gas was not permitted, unless efforts to subdue a threat or threats by using alternative crowd measures, including OC spray, had been exhausted and were ineffective, and only if the Chief of Police determines that the use of CS gas is the only reasonable alternative. I also advised officers that to the extent that chemical irritants or projectiles are used, they shall not be deployed indiscriminately into a crowd and to the extent reasonably possible, they should be targeted at the specific imminent

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property.

12. SWAT Lieutenant Trent Bergmann, who is the SWAT Commander and was in attendance at this roll call, then went and held roll call with all SWAT officers that would attend the demonstration and conveyed the same information to them.

13. Crowd Control tools are needed to address events of the size experienced on July 25, 2020. We had approximately 150 officers monitoring the event. Officers were substantially outnumbered and lacked the resources to take action if required to address an emergency. Crowd Control tools and tactics can be used to address acts of violence at distance facilitating movement of the crowd if necessary for public safety or to stop criminal conduct.

14. Lt. Bergmann and I rode together in a Chevy Tahoe to monitor the demonstration and any necessary police action with respect to it. In the early afternoon, at approximately 1330 hours, a large group that I estimate to have been approximately 5,000 to 7,000 people, some of whom were carrying large sticks, baseball bats, and poles, departed from the Seattle Central Community College and marched. At the front of the group were individuals on bicycles, as well as a number of people with shields and umbrellas.

15. The initial march was relatively uneventful with no police action taken or required. However, at approximately 1545 hours, we heard a radio broadcast that there was a fire at the King County Youth Services Center (YSC), a juvenile detention facility, which is where the demonstrators were located. The crowd was reportedly breaking windows at the YSC and broke out car windows in the employee parking lot on the north side of the YSC. Once we circled around

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

the YSC and approached it from Yesler, we could see that five trailers at the adjacent construction site had been set on fire. We grew extremely concerned that the crowd would light the YSC itself on fire, which would pose a significant threat to the lives of those inside. Due to the size of the crowd, it was difficult for Seattle Fire Department members to access the trailers to fight the fires. Lt. Bergmann ordered SWAT officers to protect the firefighters as they worked to extinguish the fire. The crowd significantly outnumbered Seattle Police Department officers by approximately 20 to one, in my estimation.

16. Lt. Bergmann and I continued to follow the march as it headed northbound up 12th Avenue from the YSC. As the crowd moved north, we received a report over the radio that a Starbucks at 12th Avenue and Columbia Street had had its windows smashed and there was smoke coming out of it. This was extremely concerning, as there are occupied apartments above that Starbucks store, so a fire would pose a life safety emergency. The building was reportedly evacuated out of concern for the tenants' safety.

17. The crowd continued marching northbound and we received a radio report that members in the crowd had damaged a business and someone in the crowd assaulted the business owner. From the fires set at the YSC and Starbucks, it was clear this crowd was growing more and more violent in a short period of time. We continued to receive reports over the radio that significant numbers in the crowd were engaging in criminal activity, namely property destruction, assaults and arson. Lt. Bergmann and I proceeded to the intersection of 14th Avenue and Pine Street. From there we observed that the crowd had surrounded the East Precinct of the Seattle Police Department. Officers broadcast over the radio that items were being thrown at the precinct.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

I could see objects that appeared to be rocks and bottles thrown at the north side of the precinct. People were also climbing the fence outside the precinct in an apparent effort to breach it. I requested additional officers to come to the East Precinct, and Lt. Bergmann also requested SWAT to come to that location. I then received a report that someone from the crowd had "shot" something through the precinct wall. I could see smoke from something flammable in that same area. There was another report of an explosive device exploding against wall of the East Precinct, and its explosion created an 8-inch hole in the exterior and 5-inch hole in the interior walls. Photos of that hole, taken from inside the precinct are below:



DECLARATION OF JOHN BROOKS - 11

Christie Law Group, PLLC
2100 Westlake Avenue N., Suite 206
Seattle, WA 98109
206-957-9669



18. I had deep concern that these acts of violence from the crowd directed at both the Precinct building and the surrounding area would continue to escalate and that, given that there had already been multiple fires started by members of this crowd, they might attempt to burn down the East Precinct or other structures. There was a significant number of officers inside the precinct building and this neighborhood has both business and residences, meaning that there were many individuals present even on a weekend. Given the violence from the crowd, I declared that this demonstration was now a riot and authorized the use of blast balls, OC spray, and sponge-tipped

projectiles to assist in addressing assaults on officers from the crowd as they attempted to stop ongoing direct life-safety threats. Although I felt a substantial life safety emergency existed after the acts at YSC, the decision to deploy at that time was further supported by the ability to see crowd actions and to act from my point of observation. There was minimal vehicle or bike demonstrators to stop our movement from east to west on Pine Street. Officers were instructed to deploy and to move the crowd away from the crowd to the west. Munitions employed were targeted to stop identifiable acts of violence by members of the crowd and to protect officers or others. Once I declared the march a riot, we gave verbal commands to move and I ordered PA announcements for the crowd to disperse. All uses of force that I witnessed during this event were consistent with this Court's order and SPD policy. I did not see any indiscriminate deployments of less lethal munitions, including blast balls and OC spray. Furthermore, no officers used or deployed any CS gas (tear gas) at any point on July 25, 2020.

19. Officers approached the demonstrators and repeatedly told the crowd to move back. This is a standard command we give crowds in this type of situation, because it is clear and easy to understand. The intent of moving the crowd was to reduce the risk to officers inside the precinct who were at substantial risk based on the use of what appeared to be an improvised explosive against the building. I believed that if the situation continued to escalate as it had throughout the day, the building would be set on fire, exposing officers inside to risk of grave bodily harm or death. I was also concerned about the safety of the neighborhood, although the immediate focus of the crowd appeared to be the East Precinct building.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

20. Officers were able to exit the east side of the East Precinct and move a crowd of approximately 1,000 to 2,000 people southbound. During this time, I observed members of the crowd physically fighting police officers. Members of the crowd in front of the East Precinct were throwing all manner of objects at the bicycle officers, including rocks, bottles, bricks, and improvised explosive devices. Based on my observations and the information I had at the time, all of the OC spray deployments that I witnessed were in compliance with the Court's order and SPD policy, as they were only in direct, targeted response to acts of violence.

21. We utilized bicycle officers to keep the crowd moving toward Broadway. One of the reasons it is important to keep a crowd moving is that it prevents those individuals in it who are committing violent acts and assaults from having the time to stage and plan. By keeping the entire crowd moving, we limit the ability of those individuals to remain in place and carry out more targeted assaults on police. Significant numbers of people in the crowd appeared to be working to stop police efforts. They were using shields, barriers, gas masks, body armor and other measures to defeat our tools and tactics. Those not directly assaulting officers appeared to work in concert with those who were committing crimes, supporting resistance to lawful orders. As the bike line moved the crowd, individuals in the crowd continued to struggle and fight with officers. By the time we reached Broadway, I grew concerned that the bicycle officers were over-extended and vulnerable due to being heavily outnumbered by the crowd. The move to Broadway over extended police resources and I was in fear of being outflanked by rioters. As a result, I ordered officers to retreat to the area of 11th Avenue and Pine Street. This tactical movement gave an opportunity for the crowd to de-escalate and stop acts of violence or criminal conduct. Instead,

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

when we reached that area, rocks, bottles, bricks, and explosives continued to be thrown from the crowd into the line officers. They also shot fireworks at officers. Officers were sustaining serious injuries from the projectiles and explosives. I observed two officers fall to the ground with what I thought was a life-threatening injury. One officer thought he was struck with some form of shrapnel in his rib cage. I observed the assaults on officers escalating to a dangerous degree of violence.

22. I felt we had to move the crowd again to avoid escalation of the situation. We reformed the bicycle line and began to again push to the west. When we did this, violent acts resumed from the crowd. Officers deployed blast balls in direct response to the ongoing acts of violence, supporting our efforts to keep the crowd moving. When not taking rocks, bottles and projectiles, officers resorted to trained bike line movement tactics. At all times, officers used standard crowd management tactics of moving in a bike line and only responding to identified threats. When the assaultive behaviors from members of the crowd would cease, so too would officers' use of OC spray and blast balls. Eventually, the crowd thinned out and we ended up with approximately 200 people in front of the East Precinct by the later evening hours, demonstrating and being allowed to remain in the area.

23. Based on the preliminary information gathered so far, I understand that there are 59 reported injuries to officers from the July 25 demonstration. These injuries include shrapnel wounds, burns, lacerations, contusions, and hearing issues. They were caused by officers being hit or struck by projectiles like rocks, bottles, fireworks, and improvised explosive devices thrown

DECLARATION OF JOHN BROOKS - 15

or launched at officers from the crowd. The majority of these injuries occurred at the 11th and Pine area.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

SIGNED in Seattle, Washington this 28th day of July, 2020.

_____
JOHN BROOKS

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669