THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLACK LIVES MATTER SEATTLE-KING COUNTY, ABIE EKENEZAR, SHARON SAKAMOTO, MURACO KYASHNA-TOCHA, ALEXANDER WOLDEAB, NATHALIE GRAHAM, and ALEXANDRA CHEN,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

NO. 2:20-cv-00887

DECLARATION OF JOHN BROOKS

I, JOHN BROOKS, hereby declare as follows:

1. I am over the age of 18 years old and am a citizen of the United States. I have personal knowledge of the facts set forth herein and am competent to testify to them at trial.

2. I am a Lieutenant with the Seattle Police Department (SPD). I was hired by the SPD in 1992. As an officer, sergeant, and now a lieutenant, I have been involved in numerous civil disturbances and crowd management events over my career. In approximately 2005 I attended

DECLARATION OF JOHN BROOKS - 1

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

the National Tactical Officers Association weeklong less lethal munitions instructor school. I completed the school and became the Cadre leader for less lethal munitions within the SWAT team. The school certified me as an instructor for the entire class of munitions associated with less lethal force tools. This included "blast balls," distraction devices, launchable munitions, and gas options. The school also trained me in how to deploy the tools and provided models for using devices in various situations.  After that, I assisted SPD in developing training and tactics, and creating a qualification course and a process for certifying that members were appropriately trained.  In 2013 I was assigned to the training unit, where I developed crowd control training for the supervisors and officers. In that role, I wrote the Integrated Crowd Management manual intended to document and define the Department's approach to addressing crowd management events. The manual covers history, tactics, crowd dynamics, philosophy, law, how to employ certain assets and how to manage these events. The manual was reviewed and approved by peers, by the Department Legal Advisors, by the Department of Justice, the Monitoring Team, the Community Police Commission and other external reviewers. In 2017, I was promoted to Lieutenant and became a watch commander in the West Precinct. Due to my experience as bike officer and my familiarity with managing demonstrations, I have been the Incident Commander or Operations Section Chief for a number of major demonstrations and events.

3.     This declaration is not intended to be an exhaustive description of my actions or observations from the August 26, September 7, or September 22, 2020 events described below. Like my prior declaration that addressed the July 25, 2020 events, this declaration is intended to provide the Court with information pertinent to the Plaintiffs' arguments that the City of Seattle

DECLARATION OF JOHN BROOKS - 2

**Christie Law Group, PLLC**
2100 Westlake Avenue N., Suite 206
Seattle, WA 98109
206-957-9669

violated this Court's Preliminary Injunction on August 26, September 7, September 22, and September 23, 2020. As set forth in the previously filed Declaration of David Puente, the operative language from this Court's Temporary Restraining Order was emailed to all SPD officers on June 12, 2020. Since that time, officers have been repeatedly instructed on the provisions contained within it. Protest marches have been held nearly every day since the beginning of this summer, and command staff instructs officers on the language and requirements of the Court's Temporary Restraining Order, and, later, Preliminary Injunction, at the briefings provided before each event to all participating SPD officers. SPD also holds mandatory briefings before each shift in which officers are expected to provide crowd control management. As part of that briefing, one or more members of the command staff shares with the group of officers the anticipated schedule and events for the day, intelligence gathered about potential threats, the Commander's intent and objectives, and the rules of engagement. This briefing always includes a reminder to SPD officers to act consistently with SPD policies and the Court's Orders regarding use of CCWs. Command staff also provides the SPD officers with a copy of the Incident Action Plan (IAP) associated with that shift. This standard protocol was followed on August 26, September 7, and September 22.

4. As with other protests during the last four months, officers deployed for the event on August 26, September 7, September 22, and September 23 with less lethal tools, namely OC spray and blast balls. These tools are designed to create space and stop assaultive behavior or property destruction. They are intended to counter resistance without relying on greater force options that increase the likelihood of injury to the suspect, to the community or to the involved officers. The tools also allow officer to address conduct at distance, which protects other protestors,

police, property and the suspect. In addition to tools routinely carried, specially trained officers carry blast balls, a light and sound diversion device that can also help to disrupt ongoing criminal acts. During pre-demonstration briefings, when discussion the rules of engagement, command staff instructs SPD officers that warnings are to be given prior to use of OC spray or blast balls when it is safe and feasible to do so. In most instances in the crowd management context, when warnings are not given prior to the use of OC spray or blast balls, it is because there is an immediate incident that requires immediate response, making a warning impractical or infeasible. These incidents are typically assaults on officers, assaults on others, or violent acts of property damage.

5. Those who seek to disrupt peaceful protests by engaging in acts of destruction and violence, typically directed at law enforcement, use a number of known tactics. These tactics include using items like umbrellas or shields to block officers' movements and views into the crowd, thereby limiting officers' ability to see projectiles, explosives, and other objectives thrown from the crowd into the police line.

6. Use of umbrellas, shields, protective clothing, lights, smoke and lasers all make it difficult for officers to identify, safely approach, and arrest persons for crimes. These devices are intended to limit movement of police and defeat the tools used in crowd control incidents. The groups create shield walls that are used as physical barriers to keep police out of the crowd, which is a concern when there is an appropriate safety or other law enforcement need to enter the crowd. Umbrellas and shields are also used offensively to poke, jab, or strike officers as they attempt to enter or move the group. Additionally, the groups intentionally place those committing criminal behavior deep in the crowd, behind people who are not engaged in criminal conduct. The criminal

actors use the confusion of the event and the anonymity created by being deeper within the crowd to act to evade arrest. The sheer number of people that officers must move past to make contact makes arrests very difficult and very dangerous to the officers entering into the crowd to try to make an arrest.

7. At times in demonstrations, if law enforcement allows members of the crowd to commit violent acts without arrest, it can cause life-safety concerns that jeopardize the peaceful demonstrators, officers, and the public.  I know from intelligence reports and my experience managing demonstrations that some groups have trained in de-arrest tactics that attempt to thwart officers once they are able to approach a suspect.  The group trains to grab the offender and pull them away from officers to defeat the arrest. This is very common and creates substantial officer safety issues. Often those attempting to de-arrest a suspect will push, pull or even strike officers as they attempt to make an arrest. The space is usually very congested with large numbers of people limiting an officer's ability to move. To make an arrest it is often necessary to assemble large groups of officers to move in a coordinated way to enter and make the arrest. This takes time, must be planned and can only be executed when the event is relatively static.  Throughout the events at issue in Plaintiffs' motion members of the crowd employed these de-arrest tactics.

8. Moving the crowds is also a common crowd control tactic that SPD employs when managing protests that turn violent and must be dispersed.  One of the reasons it is important to keep a crowd moving is that it prevents those individuals in it who are committing violent acts and assaults from having the time to stage and plan.  By keeping the entire crowd moving we limit the ability of those individuals to remain in place and carry out more targeted assaults on police.

DECLARATION OF JOHN BROOKS - 5

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

9. By way of recent background, on August 16, 2020 a protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices causing injuries to officers. On August 24, 2020, an event resulted in serious threats to officer Safety. Notably, quickrete (quick-setting concrete) and other barricades were used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on August 24, 2020, Molotov cocktails were used in apparent attempt to set fire to the Seattle Police Officers' Guild (SPOG) building at 2949 4th Avenue South. Remnants of a Molotov cocktail and two other Molotov devices were located at the scene. A Molotov cocktail is an incendiary device, usually assembled in a breakable glass bottle containing a flammable substance such as gasoline. A source of ignition, such as a burning cloth wick soaked in flammable liquid, is inserted into the bottle's neck. The wick is lit and the bottle is then thrown. When the bottle smashes on impact, the ensuing cloud of fuel droplets and vapor is ignited by the attached wick, causing an immediate fireball, followed by spreading flames as the remainder of the fuel burns off. Molotov cocktails can cause significant property damage, substantial injury, or death. On September 1, 2020, a group of approximately 75 people attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct. These events are part of an escalating pattern of increasing confrontation directed at police and highlighted by significant acts of violence endangering officers.

**August 26, 2020 Event.**

10. On Wednesday, August 26, 2020, I was the Operations Chief for the demonstration events that occurred that day. The events were commanded by Captain Todd Kibbee, who was the Incident Commander. Under the national incident command system adopted by emergency

responders, the Incident Commander is the person who has overall responsibility for an event. The Incident Commander sets the objectives for an incident and the Operations Section develops the tactical plan to meet those objectives.  As with all protest events, the mission of the Seattle Police Department for the events of August 26, 2020 was to keep people safe, enforce the law and preserve order. The Seattle Police response priorities were and are: Life Safety, Incident Stabilization, Property Conservation, and Crime Scene Preservation. Operationally, as stated in our briefing, we intended to facilitate peaceful demonstrations and free speech. We act in a content neutral way when addressing demonstrators and counter demonstrators during the event. The plan was to use trained bike and foot-officer tactics to reduce the potential for conflict, and therefore reducing the potential need for crowd control weapons, during the demonstration. Time, distance, and the use of barriers would also be employed to lessen the likelihood of conflict and to de-escalate confrontations. Officers would prioritize life safety emergencies as a prompt for police intervention. Any acts of violence that create life safety risk would be addressed with enough resources and tools to de-escalate and make arrests; provided police action was safe and feasible. If officers needed to engage a crowd or address criminal conduct, our objective was to use enough officers in an initial response to minimize the need to use further force.

11.     During roll call earlier in the afternoon, we informed officers that unpermitted marches had been planned for the day.  Consistent with this Court's Stipulated Preliminary Injunction, all officers were instructed that they were not to use any chemical irritants or projectiles of any kind against people who were engaged in peaceful protest.  Officers were instructed to only use OC spray, blast balls, pepper balls, flash bang grenades, or foam-tipped projectiles to protect

against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property. Officers were also instructed that the use of CS gas (tear gas) was not permitted, unless efforts to subdue a threat or threats by using alternative crowd measures, including OC spray, had been exhausted and were ineffective, and only if the Chief of Police determines that the use of CS gas is the only reasonable alternative. Officers were also advised that to the extent chemical irritants or projectiles are used, they shall not be deployed indiscriminately into a crowd and to the extent reasonably possible, they should be targeted at the specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property.  Officers were given the same instructions prior to the September 7 and September 22, 2020 events at issue, as well.

12. At approximately 1947 hours on August 26, officers began monitoring the crowd of approximately 50-75 people as they marched from Volunteer Park.  Officers had observed several suspects from the crowd commit property damage to local businesses and a bank by breaking out windows to these establishments near 15th Avenue East and Thomas Street.  Officers arrested several suspects for the property damage and subsequently recovered Molotov cocktails; one from the intersection of 15th Avenue East and Thomas St. and another from the backpack of one of the arrestees.

13. At approximately 2113, the crowd had gathered near Roanoke Street and East Broadway and were blocking traffic with approximately a dozen vehicles.  The vehicles were parked in front of the Washington State Patrol station and the Seattle Fire Station, which is next door.  As a result, the cars prevented emergency vehicles from entering or exiting the Fire Station.

The vehicles also blocked the off-ramp from eastbound 520. This was especially hazardous, as that exit ramp is somewhat "blind," so motorists decelerating from highway speeds would have suddenly been confronted with a completely unexpected blockade with very little time to react to it. The decision to move the vehicles was made for public safety reasons. By blocking traffic, the drivers of the cars were committing a crime. We used time place and manner restrictions to address criminal conduct that created the safety concern. We were enforcing content-neutral statutes pertaining to traffic and public safety. Obstructing traffic is not free speech, particularly when creating a public safety emergency. Closing down police and fire facilities, virtually stopping emergency vehicle movement on a major arterial, has a significant adverse impact on our ability to address emergencies in the surrounding community. The government has a substantial interest in maintaining open arterials used by emergency vehicles to serve the community and to permit the free flow of traffic. There were ample opportunities for alternative methods of demonstration or exercise of free speech. We did not restrict sidewalk access or use of a nearby park. We provided extensive warnings and opportunities to voluntarily open traffic. Even when action was taken if the vehicle driver agreed to move then we actively coordinated the extraction. Each vehicle was approached, a working environment was created around it and the driver was offered an opportunity to leave. Space around the cars was needed in case the car moved so officers could get out of the way. This actually occurred, with cars moving and almost striking officers on foot. Many drivers chose to leave, but two drivers were unwilling to cooperate. They were warned several times, because they did not exit the cars, their windows were broken and officers arrested

them for obstruction and other charges. Initially, the group on foot blocking officers were able to be redirected.

14. Eventually, WSP troopers started moving protesters away from the station into Roanoke Street. SPD officers formed a line and began moving the protesters westbound on Roanoke, which still had parked vehicles in it. As we moved the group began coordinated resistance, poking umbrellas at officers, assaulting officers, refusing to move and attempting to de-arrest suspects. The group deployed pyrotechnics and smoke devices endangering officers and obstructing vision. Many of the protesters were wearing helmets and gas masks and carrying shields and umbrellas. Members of the crowd now routinely use these items to assault officers, thwart crowd control tools, and conceal violent acts, like launching projectiles and explosives at police, from within the crowd. One person was arrested for shining a laser pointer into an officer's eyes – a Class C felony. As officers effected the arrest of that person, people holding shields pushed back against line officers. One officer deployed a targeted burst of OC spray at two individuals who were pushing forward with shields in an attempt to de-arrest the suspect. The two subjects retreated and were not arrested.

15. At approximately 2238 hours, the event had become violent and dangerous, so I gave repeated dispersal orders. I generally used the following language and concepts taken from the Seattle Police Department Manual 14.090-TSK-3:

> "I am Lt. John Brooks of the Seattle Police Department. I am now issuing a public safety order to disperse and I command all those assembled at (specific location) to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include the use of chemical agents or less-lethal munitions, which may inflict significant pain

or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: (routes). You have (reasonable amount of time) minutes to disperse."

I added specific language related to that event describing how the group was creating a public safety hazard by blocking EMS, Fire Department and State Patrol traffic, and denying emergency vehicle movement along a primary arterial. I added several specific descriptions heard on BWV related the acts of the crowd that day. The intent of the orders was to inform the group they were committing crimes, creating a public safety hazard, and they were ordered to leave or be subject to arrest. After repeated warnings, officers began moving the crowd, after continued warnings from Acting Lt. Geoghagen and me, to avoid further confrontations and to reduce the need to use force. I observed only a few OC deployments, all targeted at resisting suspects, with most force involving leverage and control tactics.

16.  It is my understanding, based on preliminary information, that one SPD officer deployed a blast ball in the vicinity of Harvard Avenue East and Roanoke Street. While the officer was walking northbound on Harvard behind the line, he observed a suspect throw at least two spherical objects at officers on the line who were making arrests. Concerned the objects could be explosive devices, the officer deployed one OC blast ball with a "low" deployment through a small gap in the crowd on the right side of the police line. The blast ball took an unpredictable bounce to the left and hit the shield of a protestor in front of the officer. The blast ball bounced back at the officer and detonated at the officer's feet. The officer deployed this blast ball in a targeted effort to disrupt a violent subject from continuing to assault officers. The officer's bodyworn video

captured the blast ball deployment. A true and correct copy of an excerpt from that video is attached hereto as **Exhibit A**.

17. In the beginning of Exhibit A, my dispersal orders are audible. The movement of the crowd up Harvard Avenue starts at approximately two minutes into playback of Exhibit A. The blast ball deployment occurs at 3:18. At 4:36, officers increase their pace. The purpose behind this accelerated movement is to disrupt efforts of the crowd to attack officers. Directed movement of the crowd makes planned acts of continued violence and property destruction difficult to coordinate. It also creates distance reducing the potential for conflict and allowing the time to assess alternative response options. Movement is a form of de-escalation. SPD has repeatedly found that movement significantly reduces the potential for physical confrontation and increases the safety for all. We consistently train that movement is our ally. Movement creates space between officer and demonstrators. We want to avoid close contact which would require officers to rely on crowd control tools to defend themselves. Often in these circumstance officers are substantially outnumbered and staying in close contact in fixed positions creates a substantial officer safety risk. Once movement begins the goal is to maintain movement using other reasonable trained tactics. Historically once movement has begun, the crowd begins to voluntarily disengage and leave the area. That is what happened on August 26 after moving the crowd for several blocks.

**September 7, 2020 Demonstration Activity and Police Response**

18. At approximately 2:00 p.m. on September 7, 2020, Incident Commander Captain Matt Allen provided a briefing at the Seattle Police West Precinct. I was the Operations Section

Chief for the event.  The briefing included the Commander's intent, a discussion of the SPD mission for the day, and a reminder that use of Less Lethal tools in the field must be consistent with the law, SPD policy, and recent court guidance.  The Commander's Intent read as follows:

> There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.

19. The Seattle Police Officers were also aware that, despite numerous peaceful protests over the past several months, there had also been a pattern of confrontations between individuals and the police, involving assaultive behavior and acts of violence, including assaults against officers and numerous attempts to damage or burn the SPOG building and Seattle's East Precinct.  The September 7, 2020 intelligence briefing warned that members of the protest group would seek confrontation with the police that day.

DECLARATION OF JOHN BROOKS - 13

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Case 2:20-cv-00887-RAJ   Document 137   Filed 10/02/20   Page 14 of 19

20. At approximately 5:20 p.m. that evening, an organized group of approximately 500 people marched from the ID rail station toward the SPOG office at 2939 Fourth Avenue South in Seattle. A majority of the people in the group wore gas masks, goggles, helmets, improvised shields, backpacks, and/or all black clothing. They were an unusually homogenous group, indicating that they may be working in concert with coordinated tactics that, based on past experience, might be focused on confronting police. The group had supplies set out, shields available for participants, blocking vehicles in use and scouts who were observed photographing police license plates and using radios for communication.

21. Seattle Police Officers paralleled or shadowed the march toward the SPOG building and stood by in order to protect these individual's right to peacefully protest and to prevent injury or property damage that individuals in the crowd might have been intending to inflict. The Seattle Police first engaged with members of the crowd at approximately 6:20 p.m., after the police received reports that a member of the crowd was readying a Molotov cocktail. Members of the crowd were also throwing garbage and other material over the exterior fence near the SPOG office, apparently providing combustible material to be ignited. Some officers reported smelling gasoline. I assumed the suspect's purpose was to set the SPOG office, endangering the safety of those inside.

22. Music can be heard in the background of many of the videos taken at the time the SPD officer first contacted members of the crowds outside the SPOG building. My understanding is that this music was being played by someone within the SPOG building and not an SPD officer on duty at the time. I did not have the ability to turn the music off.

23. We had a description of the suspect and probable cause to affect his arrest. They also identified his location in the crowd. However, as police moved in without using any OC spray or blast balls, members of the group attempted to prevent the arrest by using improvised shields and other tactics to stop the officers from effecting the arrest. One individual struck the arresting officer in the face with a pipe. Other members of the crowd began directing what appeared to be bear mace at police, while also throwing projectiles and explosives, igniting smoke grenades, using leaf blowers to direct OC spray back at officers, and striking officers with shields and umbrellas.

24. Incident Commander Captain Allen issued a dispersal order. The incident momentarily stabilized with the crowd instructed to move north. However, as the group moved north, individuals re-engaged with officers, assaulted officers, and continued throwing rocks, bottles, and full cans of soda. SPD continued moving the crowd north. Movement is an ally, making a coordinated attack difficult, because it does not allow those looking to assault officers the time or static environment to stage and carry out the assaults. Simply put, it is harder for a person to commit acts of violence if he/she is constantly moving. Forcing the crowd to move is also the least confrontational way to thwart assaults and it is the least likely method to result in violence. Officers continued with the push north, because members of the crowd continued throwing projectiles. The group did not initially move and countered by detonating improvised explosive devices and smoke grenades. We continued to receive projectiles and less lethal munitions were ordered to address specific threats and to stop the assaults on officers. It was necessary to move the crowd to avoid further escalation of the confrontation. When not taking

1  rocks, bottles and projectiles, officers resorted to trained bike line movement tactics to keep the
2  group moving.

3  　　　　25.　　Officers deployed a limited numbers of blast balls and some OC spray at specific
4  targets. The crowd then began to move north again. We continued to receive projectiles, but the
5  crowd did move. However, just south of Holgate on Fourth Avenue, someone in the crowd on the
6  east side of the street threw a lit Molotov Cocktail at officers. Fortunately, it did not strike an
7  officer, but it did ignite in the street creating a swath of flame. The crowd was directed east, north
8  on Sixth Avenue, east on Dearborn, and south on Rainier with the crowd breaking up just north of
9  I-90.

10 　　　　26.　　At the conclusion of the event several key pieces of evidence were recovered: a box
11 containing 12 Molotov Cocktails prepared for deployment, unused improvised explosive devices,
12 material used to assist in combustion and armor used to thwart police action was located. Nine
13 officers were injured and several uses of force were reported, but I do not know the exact number
14 at this time.  I believe 23 people were arrested.

15 **September 22, 2020 Event**

16 　　　　21.　　On September 22, 2020, I served as the Operations Lieutenant for the
17 demonstration events that day. The first demonstration began in the afternoon with a group forming
18 outside City Hall. After the vote to override the Mayor's veto of the proposed City budget, the
19 group disbanded and departed the area. No police encounters occurred.

20 　　　　22.　　At around 7:30 p.m. a car caravan blocked the 16th Avenue South Bridge for over
21 an hour. No police encounters occurred.  At 10:20 p.m., 40+ individuals gathered and approached

the East precinct. In the crowd was pickup truck, which pulled up parallel to the northern wall of the precinct. A passenger exited the vehicle. There was concern that the person was attempting to set up an explosive device intended to harm the precinct, endanger the officers inside and put the other occupants of the connected buildings at risk. East precinct resources responded and set up a car line on 12th Avenue, just to the south of Pine Street. Vehicle lights and sirens were used to move the crowd away from the precinct. This worked and the crowd moved north on 12th Avenue. At about John Street, the crowd turned back south toward officers who were in their vehicles. The group attempted to surround officers' vehicles, impede movement, and damage vehicles.

23. I gave several verbal PA warnings to not interfere with vehicles, and to not shine strobes in the eyes of officers driving cars backward. I also notified them they were creating a public safety hazard. We tried to gain distance in an effort to de-escalate and reduce potential physical confrontation. The group closed in on one police vehicle, pounded on its windows, stood in the path of a moving vehicle, and used lit cigarettes to damage the hood. A member of the crowd also shined a laser-pointer into the vehicle, in an apparent attempt to injure the eyes of the officer.

24. Officers could not gain sufficient distance from the crowd, and the crowd continued to close in on officers, ignoring verbal commands. I gave multiple dispersal orders over the PA. When we reached 12th and Pine, I ordered the deployment of one blast ball to create separation between officers and the crowd. A bike officer who was certified to carry and deploy blast balls was able to approach from the side and deploy the munition.

25. I was able to see the officer deploy the blast ball and did not notice a person down on the roadway. At the time she tossed it underhand, a crowd of people was in front of two SPD vehicles. A true and correct copy of a clip from the body-worn video from that officer is attached hereto as **Exhibit B**. At the beginning of the clip, it captures my request that the officer deploy a blast ball at 12th and Pine. At the 00:50 mark, the PA commands to disperse are audible. At 1:10, it captures the officer's view of the crowd and her deployment of the blast ball. The person on the ground was not clearly visible to the officer at the time she deployed the blast ball. Moreover, in-car video from officers in one of the vehicles backing up shows that the blast ball did not detonate next to the person lying in the street. A true and correct copy of excerpts from the in-car video is attached as **Exhibit C**. In the beginning of the video, one can see the members of the crowd walking at the police vehicle with one person shining a strobe light into the vehicle, creating an obvious hazard for the driver. At the end of the video, the blast ball detonates. The subject is on the ground on the left side of the frame, and the blast ball detonates on the right side of the frame, several feet off of the ground, away from the subject on the ground. Further de-escalation was not possible, as members of the crowd were repeatedly advised to disperse and declined to do so. I was not made aware by anyone of any medical attention needed by a member of the crowd. The blast ball effectively created separation between the group and the officers' vehicles. This created room for the patrol cars to move away and continue to monitor the incident. Once the goal of safe separation was achieved no further munitions were used.

26. The group later returned to the front of the precinct and marched around. Officers used vehicle lights and sirens to deter the crowd and keep them moving. After about 30 minutes the crowd returned to Cal Anderson, changed out of black attire and left the area.

27. Seattle Police officers did not deploy or use CS gas (tear gas) of any kind on August 26, September 7, September 22, or September 23, 2020.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

SIGNED in Seattle, Washington this 2nd day of October, 2020.

_____
JOHN BROOKS