THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLACK LIVES MATTER SEATTLE-KING COUNTY, ABIE EKENEZAR, SHARON SAKAMOTO, MURACO KYASHNA-TOCHA, ALEXANDER WOLDEAB, NATHALIE GRAHAM, and ALEXANDRA CHEN,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

NO. 2:20-cv-00887

THE CITY OF SEATTLE'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE WHY THE CITY OF SEATTLE SHOULD NOT BE HELD IN CONTEMPT

NOTE ON MOTION CALENDAR:
November 18, 2020

ORAL ARGUMENT REQUESTED

/
/
/

## I. INTRODUCTION AND RELIEF REQUESTED

This Court entered Orders for preliminary injunction (Dkts. 42 & 110) balancing the First Amendment rights of demonstrators with law enforcement's duty to protect against property destruction and violence. The balancing elements are inlaid throughout the Court's Orders, with the recognition that circumstances during events can change rapidly. Plaintiffs' Motion for Contempt addresses just four demonstrations over a period of months: August 26, September 7, September 22, and September 23, 2020.[1] Plaintiffs allege that, by clear and convincing evidence, the City – as a whole – failed to substantially comply with the Court's Orders. There is no dispute CCWs were used. However, Plaintiffs seem to ignore the Court's language allowing CCWs under specific circumstances, instead viewing the use of CCWs as de facto proof of contempt.

Plaintiffs' declarations contain snapshots from an individual's point of view but do not present a complete story of what is a complex series of events.[2] SPD commanders and officers had more available information and context about non-peaceful individuals present, what was transpiring beyond each declarant's immediate field of vision, and why the police employed specific force at a specific time against specific individuals or threats. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989). Not all these events remained – or even began as – protected First Amendment activity, and not all of the participants in these events were peaceful. Officers responded to escalating property destruction, violence, and significant threats to officer and public

---

[1] On some of these dates, multiple protests occurred, but claims are raised about only a single protest site.

[2] This need for a fuller evaluation rather than a single viewpoint was highlighted recently when there were 16,000 complaints to the Office of Police Accountability regarding what appeared from one perspective to be an improper OC spray of a small child, but the complete picture, after thorough investigation, showed incidental exposure from a deployment by a different officer than the one originally accused.

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 2

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

safety. Even assuming First Amendment protections, the Court's Orders anticipate that peaceful protesters may at times be incidentally exposed to CCW deployments against non-peaceful individuals or significant safety threats, and these incidental impacts do not amount to contemptuous conduct. Plaintiffs' evidence does not establish, by clear and convincing evidence, that the City failed to substantially comply with the Courts' orders regarding use of CCWs. Nor have Plaintiffs established that any individual deployment, even if a violation of the Court's Orders, rises to the level of contempt by the City.

## II. STATEMENT OF FACTS

The City adopts and incorporates the facts contained in the declarations of Lt. John Brooks, Captain Matt Allen, Assistant Chief Lesley Cordner, and Robert L. Christie, filed herewith.

## III. AUTHORITIES AND ARGUMENTS

**A.   The Applicable Court Orders**

Under the Court's June 17, and August 10, 2020 Orders, the Court enjoined the City from employing chemical irritants or projectiles, except under specific conditions, when peaceful protestors were present. (Dkts. 1, 34, 42 & 110.) The Orders do not prohibit the use of these CCWs when necessary, reasonable, proportional, and targeted to protect against a specific imminent threat of physical harm to themselves or others or in response to destruction of property. (Dkts. 42 & 110.) Additionally, SPD cannot (1) use CCWs to re-route a protest, unless re-routing is necessary to prevent specific imminent threat of physical harm, to respond to specific acts of violence, or to respond to destruction of property; (2) use CCWs without first issuing a warning and allowing individuals a reasonable opportunity to leave, if feasible; or (3) deploy CCWs

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 3

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

targeted at journalists, legal observers, or medics when they are acting in that capacity, again acknowledging the possible unintentional exposure to allowable uses of CCWs that are not enjoined. (Dkt. 110.) The City is not violating the Court's Order if blast balls that are otherwise consistent with the order are directed to an open space near a targeted individual rather than at the individual, and the Court also acknowledged that, in the event of an unlawful assembly or riot, it may not be feasible for CCW deployments to be as specifically targeted as would be expected during lawful demonstrations. (*Id*.)

### B.   Plaintiffs Cannot Establish a Violation of These Orders

#### *1.   Legal standard for establishing civil contempt by the City.*

The City incorporates the applicable legal standards for establishing civil contempt set forth in its prior response brief (Dkt. 78), which requires proof that the non-moving party failed to substantially comply with a court order by clear and convincing evidence. Additionally, because the Orders are directed to the City as a municipal entity to protect against potential violations of Plaintiffs' constitutional rights, the *Monell* standard of liability must apply when considering whether action of individual officers could constitute the City's failure to substantially comply with the Orders. A municipality cannot be held liable solely because it employs a tortfeasor. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018 (1978). Instead, plaintiffs must establish municipal liability by demonstrating that alleged unconstitutional action was proximately caused by an unconstitutional custom or policy; the result of a deliberate indifference to a known need to train; or ratified by the City's policymakers. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010); *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 4

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Cir. 2001); *see also Vertex Distrib. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891-92 (9th Cir. 1982) ("If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt."); *Campbell v. City of Oakland*, No. C 11-5498 RS, 2011 WL 5576921, *3-4 (N.D. Cal. Nov. 16, 2011) (citing *Lewis v. Casey,* 518 U.S. 343, 360, 116 S. Ct. 2174 (1996)) ("Sporadic or isolated violations of individual protesters' rights are insufficient to support broad injunctive relief against an entire agency."). "[S]ubstantial compliance and reasonable efforts are interrelated, and reasonable efforts are in fact a necessary component of substantial compliance." *Anti-Police Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2020 WL 6381358 (N.D. Cal. Oct. 31, 2020) (internal citations and quotations omitted) (Attached as Exhibit 1).

The City implemented the terms of the Orders for crowd control management (Dkt. 112), and there is no evidence, or even argument, that City officials are ratifying actions in violation of the Orders. To the contrary, the City utilizes a robust review process to identify police violations, the results of which are shared with the public.[3] Plaintiffs must establish by clear and convincing evidence that the pattern and practice of individual CCW deployments shows that the City itself is proximately causing constitutional violations in defiance of the Court's Orders. Plaintiffs do not, and cannot, make this showing.

### 2. The Court's Orders Only Apply in the Context of First Amendment Protected Demonstration Activity.

The Orders were crafted to allow for the continued exercise of First Amendment rights by

---

[3] See, e.g., https://www.seattletimes.com/seattle-news/seattle-officer-who-repeatedly-punched-man-during-protest-arrest-used-excessive-force-inves2tigation-finds/.

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 5

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

peaceful protesters while maintaining public safety. The Orders specifically do not apply to those engaged in criminal conduct – and allow for the use of CCWs to address specific criminal conduct that rises to violence or property destruction. Courts established several clear lines over the years with respect to demonstrations that parallel some aspects of the four in question. There is no First Amendment right to block traffic or otherwise imperil public safety. *See, e.g., Frye v. Police Dep't of Kansas City, Missouri*, 260 F. Supp. 2d 796, 799 (W.D. Mo. 2003), *aff'd sub nom Frye v. Kansas City Missouri Police Dep't*, 375 F.3d 785 (8th Cir. 2004). *See also,* https://www.aclu.org/know-your-rights/protesters-rights/#im-organizing-a-protest. "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S. Ct. 2294 (1972). There is a point when public safety requires, and the law allows, for an end to the protest.[4] *See also* SMC 12A.12.020. Restrictions on the use of crowd control tools in the Order applies to peaceful protesters, not those engaged in unlawful activities.

> 3. ***The City has unequivocally and consistently apprised its police officers of the terms of the Courts' Orders and the requirement that they comply with them.***

There are often multiple demonstrations every day in Seattle. (Christie Decl. Ex. L, ¶4.) For most of these events, it is determined that police resources will likely not require deployment, and these events occur without SPD's involvement. (*Id*. at ¶6.) Of those events needing police

---

[4] *Collins v. Jordan,* 110 F.3d 1363 (9th Cir. 1993), cited in the Court's June 12 Order, cannot and should not be read as a requirement for police to ignore safety concerns and enter a violent crowd to try and arrest those individuals who are committing unlawful acts; that was a case about **prior restraint** of free speech, which is not an allegation here. Instead, that case provides support for the approach being utilized by SPD, namely that knowledge of prior events (and participants) can be used to evaluate the safety of current demonstrations and be a factor determining when to declare an unlawful assembly, along with the events of the current demonstration. *Id.,* at 1372.

resources to ensure public safety, crowd management tools are not always necessary and are thus not used at most events. (*Id.* at ¶7.)

Nonetheless, since the inception of the Court's TRO and later converted preliminary injunction, SPD repeatedly instructs officers of the parameters of the Orders. Relevant to the time frame of this motion, on August 11, 2020, Detective Puente sent an email to all SPD officers attaching the Court's June 17, 2020 and August 10, 2020 Orders, copying the language from each of those orders into the body of the email, and indicated in bold that "[a]ll SPD members are required to read each of these orders and be familiar with their terms." (Dkt. 112). Since that time, SPD has repeatedly instructed its officers on the provisions contained within those orders at the briefings provided before each demonstration event to all participating SPD officers. (Updated Brooks Decl., ¶3.) As part of these briefings, command staff also shares with the group the anticipated schedule for the day, intelligence about potential threats, and the Commander's intent and objectives, which emphasize the need to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. (*Id*. Ex. A and B; Allen Decl. Ex A and B.) This standard protocol was followed on August 26, September 7, September 22, and September 23. (Updated Brooks Decl., ¶3.; Allen Decl. ¶8.) The City and its Police Commanders do not encourage or incite officers to violate the Orders, nor have they failed to substantially comply with the Orders in good faith; to the contrary, the City continually instructs and orders its officers to act in full compliance with the directives from this Court.

4. ***SPD officers are subject to discipline if they are found to violate the Orders.***

Not only did the City repeatedly instruct its officers to comply with this Court's orders, officers are subject to comprehensive scrutiny and discipline if they violate the Orders. (See Christie Decl. Ex J ¶¶ 13-24, Ex. L ¶ 7.)

**5.    *Police officers deployed CCWs in compliance with the Court's Orders.*[5]**

   ***a.*** <u>Targeted CCW deployments at the August 26, 2020 demonstration complied with the Courts' Orders.</u>

There is no dispute that demonstrators parked cars in the road, blocking traffic exiting the SR 520 off-ramp and preventing emergency vehicles from turning westbound out of the Seattle Fire Station on August 26, creating major safety concerns, including impeding emergency vehicles responding to calls for service, and protesters were ordered to move cars and disperse. (Updated Brooks Decl., ¶¶16-19; Ivanov BWV 2020-08-26_2129.) As one officer moved forward with the line to clear the roadway, he deployed bursts of OC in targeted response to individuals shoving officers. (Cordner Decl., Ex. A(3); Waldorf BWV 08-26-2020_2150.) One demonstrator shined a laser pointer into officers' eyes, as shown in Mr. Salisbury's video and also from body-worn video. (Dkt. 119, ¶3 at 19:08-19:13 and 19:29-19:33; Bourdon BWV 08-26-2020_2217.) As officers effected the arrest, people with shields pushed back against line officers. (Cordner Decl., Ex. A(7).) One officer deployed a burst of OC spray at two individuals who were pushing forward with shields. (*Id*; McKee BWV 2020-08-26_2217; Todorov BWV 08-26-2020_2217.) Mr.

---

[5] If the Court disagrees that Plaintiffs are required to prove *Monell* liability in order to establish contempt on the part of the City, and is instead inclined to hold the City in contempt based on one or more independent CCW deployments, the City requests that this Court identify those individual deployments and allow the City additional time to fully identify all of the information relevant to each one so that the Court can examine the totality of evidence available for each deployment. Finding contempt against the City for any one or more deployments at this individual level without all of the facts violates the *Monell* standard and the City's right to due process. (See Dkt. 78, pp. 4-5.)

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 8

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Salisbury's video also shows an individual in a helmet and gas mask trying to de-arrest the laser-pointer suspect by grabbing him and pulling him away from officers. (Dkt. #119, ¶3 at 20:15.)

Because the demonstrators became violent, Lt. Brooks issued a dispersal order, notifying demonstrators they could be subject to arrest if they remained. (Updated Brooks Decl., ¶18; Bourdon BWV 08-26-2020_2217.) One officer deployed OC spray as demonstrators engaged in physical resistance with officers moving the crowd up Harvard. (Cordner Decl., Ex. A(5); Bourdon BWV 08-26-2020_2217.) The blast ball deployment was a targeted effort to stop a person from throwing objects at police. (Cordner Decl., Ex. A(1); Updated Brooks Decl., ¶¶19-20, Ex. D; Page BWV 08-26-2020_2226.) The blast ball ricocheted, detonating at the officer's feet. (*Id.*) All uses of CCW were in targeted deployment.

      **b.**    <u>The CCW deployments during September 7, 2020 demonstration were necessary to respond to criminal activity and disperse a violent crowd.</u>

Plaintiffs contend that SPD engaged with the crowd on September 7 "with no provocation other than us having shown up at SPOG headquarters." (Dkt. 130, ¶7.) This is not accurate. Simply put, declarants' observations were made without knowing the threats that some members of the crowd posed to the police and others, because police had information which individual declarants did not. (Dkts. 116-118; 120-130). SPD did not engage with the crowd until approximately 6:20 p.m. (Updated Brooks Decl., ¶23.) At that point, members of the crowd, including Plaintiff Alexandra Chen, began placing and throwing garbage and other combustible material at and over the fence near the SPOG office. (*Id.;* Dkt. 130, ¶¶4-5; Christie Decl., Exs. B and D; Updated Brooks Decl., ¶23.) SPD received multiple reports that a member of the crowd

was in possession of and readying a Molotov cocktail. (Updated Brooks Decl., ¶23; *see generally,* Cordner Decl., ¶10.) Officers also reported smelling gasoline. (Updated Brooks Decl., ¶23; Cordner Decl., Exs. B(4), B(10), B(34).)

SPD moved in to arrest the suspect with the Molotov cocktail, and members of the crowd attempted to prevent the arrest, using de-arrest tactics and improvised shields. (Compare Dkt. 130 at ¶7 with Updated Brooks Decl., ¶25; Cordner Decl., Exs. B(3), B(5), B(8), B(10), B(11), B(12), B(19), B(22), B(25), B(26), B(28), B(39); Christie Decl., Exs. B, D.) One team of officers moved in for the arrest, and another team moved in to support and move the crowd back. (*see e.g.* Cordner Decl., Ex. B(39); Christie Decl., Exs. B, D.) The plume of smoke complained of by declarants was caused by a fire extinguisher deployed by a member of the crowd attempting to shield and de-arrest the suspect. (*Compare* Dkt. 130, ¶7; Dkt. 116 ¶43; Dkt. 126 at ¶8; Dkt. 128 at ¶11; Dkt. 129 ¶6 to Dkt. 120, ¶10, Christie Decl., Exs. B, D.) One officer was struck in the face with a pipe. (Updated Brooks Decl., ¶25; Cordner Decl., Ex. B(19).) Other members of the crowd assaulted officers, throwing projectiles and explosives. (*Id.*; Cordner Decl., Exs. B(1)-(2), B(4)-(8), B(10), B(13)-(14); B(16)-(19); B(22)-(23); B(25)-(27), B(38)-(39); Christie Decl., Exs. B, D.)

Officers gave repeated clear commands for the crowd to "move back" to create space for the officers attempting to effect the arrest of the suspect. (*Id.,* Christie Decl., Exs. B, D; Dkt. 130, ¶8, video link at 0:00-:50.) Ms. Chen can be seen on Sgt. Didier's BWV, walking very slowly backwards. (Christie Decl., Exs. B, D.) Though there are repeated commands to move back, Ms. Chen eventually slows, walking parallel to the SPD line while continuing to film officers. (Christie Decl., Exs. B, D.) Though officers continued to command the crowd to move back, one

THE CITY OF SEATTLE'S SUPPLEMENTAL
RESPONSE TO PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE (20-cv-00887) - 10

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

demonstrator encroached on the officers' line, ignoring commands to move back. (Christie Decl., Exs. B, D.)  Sgt. Didier deployed a targeted burst of OC spray at the individual. (*Id*.; Cordner Decl., Ex. B(39).)  Ms. Chen and others swarmed the individual and failed to comply with repeated commands to move back. (Christie Decl., Exs. B, D; Dkt. 130, ¶8, video link at 0:00-:50.)  Officer Didier deployed a single targeted burst of OC spray at Ms. Chen and another at a suspect in the same group, who had thrown multiple objects at officers, including a stick that struck Sgt. Didier in the face. (Christie Decl., Exs. B, D; Dkt. 130, ¶8, video link at 0:00-:50.)

Captain Allen issued continuous dispersal orders, notifying demonstrators they could be subject to arrest and instructing them to move north. (Updated Brooks Decl., ¶26; Christie Decl., Exs. B, D; *see generally,* Cordner Decl., ¶10.)  Yet, the crowd continued to engage with officers, throwing projectiles including IEDs, smoke grenades, rocks, and Molotov cocktails. (Updated Brooks Decl., ¶¶22-28; *see also* Cordner Decl., ¶10.)  Officers used targeted deployments of OC spray and blast balls at specific threats to keep the crowd moving thereby reducing the threat of ongoing assaults against officers. (Updated Brooks Decl., ¶¶26-27.)  SWAT Officer Bonet deployed less lethal rounds at a suspect who threw a traffic cone at an officer and prepared to throw another. (*Compare* Cordner Decl. Ex. B(2); Christie Decl., Exs. B, D; to Dkt. 120, ¶16.)  After the event, SPD recovered 12 Molotov cocktails prepared for deployment in addition to other unused explosive devices. (Updated Brooks Decl., ¶28; Christie Decl., ¶11.)  Nine officers were injured, and 23 suspects were arrested. (Updated Brooks Decl., ¶28; Christie Decl., ¶11.)

        c.    <u>The Single CCWs deployed during the September 22, 2020 Demonstration was consistent with the Courts' Orders.</u>

There was a single, appropriately targeted blast ball deployment on September 22. The events leading up the deployment are detailed at length in Lt. Brooks' updated declaration, with video. (See also Cordner Decl., Ex. C(1).)

      **d.**    <u>CCW deployments during September 23, 2020 demonstration were necessary to respond to criminal activity and disperse a violent crowd.</u>

On September 23, SPD responded to several events and subsequent acts of property destruction and violence, detailed in Captain Allen's previous declaration. (Christie Decl., Ex. K.) Captain Allen began issuing dispersal orders at approximately 8:45 p.m., which were clearly and continually issued throughout the night. (*Id.*, ¶¶14-40.) SPD continued to move the crowd to prevent ongoing assaults on officers with projectiles and to prevent additional property destruction. (*Id.*, ¶¶14-17.) At about 10:44 p.m., someone threw a firework into the East Precinct, detonating near officers. (*Id.*, ¶23; Hay BWV 2020-09-23_2244.) SPD moved in to arrest the person who threw the firework while members of the crowd continued assaulting officers with one individual striking an officer in the head with a metal baseball bat. (*Id.*, ¶¶25-28; Cordner Decl., Exs. D(1)-(19).) By 11:12 p.m., SPD had information that individuals were preparing Molotov Cocktails and setting up fortifications. (Allen Decl., ¶¶25-28.) Shortly afterwards, someone started a fire in the street. (*Id.*, ¶29.) Captain Allen ordered the officers to move the crowd to put out the fire, safeguard property, and prevent further unlawful and dangerous behavior. (*Id.*)

This was a dynamic crowd with some engaging in violent and destructive behavior that created a serious safety threat to everyone. Demonstrators were continually throwing projectiles at police, including bottles, rocks, and mortars; some even brought their own chemical agents to

deploy. Multiple fires were set that the night, some inside of dumpsters with added chemical agents and smoke pointed toward police. Despite continuous orders, the crowd refused to disperse.

Many of the declarations submitted by Plaintiffs document perceptions that the police were using pepper spray and deploying blast balls for no apparent reason, but they have no foundation to know (1) whether the chemical irritant they complained of was deployed by the police or members of crowd; (2) whether loud bangs and associated shrapnel contact was caused by blast ball deployments or fireworks ignited by members of the crowd; and/or (3) whether the CCW deployments they actually observed were indiscriminate uses of force in violation of the Courts' orders. Captain Allen's Declaration, the draft Blue Team reports from this date, the video evidence submitted by both sides, and the Information filed against the individual who hit an officer in the head with a baseball bat, all provide a more complete and complex picture of the events at issue.

### 6. The Court should not address police conduct not governed by its June 17, 2020 and August 10, 2020 Orders.

Plaintiffs complain about perceptions of police officer demeanor, arrests, crowd movement tactics, the decision not to allow cars to block the road, and music played by a private entity, SPOG. Respectfully, this type of conduct is not governed by this Court's Orders, nor is this the appropriate forum to determine whether any specific officer engaged in an excessive use of force under the Fourth Amendment or conduct that may trigger criminal or civil liability.

## IV.   CONCLUSION

This Court should deny Plaintiffs' motion for contempt as Plaintiffs failed to show by clear and convincing evidence that the City is in substantial compliance with this Court's Orders.

Respectfully submitted this 2nd day of November, 2020.

                CHRISTIE LAW GROUP, PLLC

                By    */s/ Robert L. Christie*
                   ROBERT L. CHRISTIE, WSBA #10895
                   THOMAS P. MILLER, WSBA #34473
                   ANN E. TRIVETT, WSBA #39228
                   MEGAN M. COLUCCIO, WSBA #44178
                   Attorneys for Defendant City of Seattle
                   2100 Westlake Avenue N., Suite 206
                   Seattle, WA 98109
                   Phone: 206-957-9669
                   Email: bob@christielawgroup.com
                          tom@christielawgroup.com
                          ann@christielawgroup.com
                          megan@christielawgroup.com

PETER S. HOLMES
Seattle City Attorney


                By    */s/ Ghazal Sharifi*
                   GHAZAL SHARIFI, WSBA# 47750
                   CAROLYN U. BOIES, WSBA #40395
                   Attorneys for Defendant City of Seattle
                   Assistant City Attorneys
                   Seattle City Attorney's Office
                   701 Fifth Avenue, Suite 2050
                   Seattle, WA 98104
                   Phone: 206-684-8200
                   E-mail: Ghazal.Sharifi@seattle.gov
                           Carolyn.Boies@seattle.gov