EXHIBIT B(1)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Devon Benner - 30054231

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:20 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58049 | 2020-261072 | |
| **Date/Time Entered** | | |
| 9/7/2020 23:04 | | |

## Incident Summary

EVENT/GO#: 20-261072
DATE OF OCCURRENCE: 9-7-2020
STATEMENT OF: DEVON BENNER
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sergeant Sylvester #5644. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sergeant Sylvester screened this incident during the event the first time it was feasible to report the use of "blast balls"
B. ICV/BWV recorded: This entire incident was captured on Body Worn Camera. I reviewed and flagged the incident just prior to the use of force.

DETAILED NARRATIVE: I am Seattle Police Officer Devon Benner #8309, assigned to Uniformed Bicycle Unit-North Precinct.

I attended the Basic Law Enforcement Academy and have been a sworn police officer since June 30th, 2015. After graduation from the Basic Law Enforcement Academy, I was assigned to the Seattle Police Department's Advanced Training Unit for an additional 2 months of department training.
I started field training in September of 2015, after three and a half months of the field training I successfully passed. Once I was finished with training I was assigned to patrol at the North Precinct. I also completed a 40-hour Crisis Intervention Training in May of 2016. In October of 2016 I successfully passed a 40-hour Police Mountain Bike School. In SPD's Police Mountain Bike School, I was trained on crowd control tactics and movements. After I completed several annual crowd control classes and participated in facilitating protests on numerous occasions on a police mountain bike. After working very frequently with the bicycle team I was selected in July of 2018 to work as a full-time bicycle patrol officer. I was assigned to the North Precinct Bicycle team to proactively patrol high crime areas.
In addition to my crowd control course I also completed training in using "Blast Balls" as a part of our Non-lethal engagement. I completed this annual course twice, once in Spring of 2019 and once again a year later in April of 2020.
On September 7 2020 I was working an organized march against the Seattle Police Officer Guild's office (SPOG). SPOG has been targeted the past few weeks prior to the march by improvised incendiary devices, commercial grade fireworks, and blunt items E.G. rocks and bottles. The march had several protesters with gas masks, goggles, improvised shields, carrying backpacks, dressed in all black. In the recent weeks we knew groups with similar outfits, improvised items and equipment were training on tactics to prevent police movements, arrests, and to unarrest members of the crowd.
The march was updated to have approximately 500 people. We paralleled the march out of sight and it led to the front of the SPOG office on 2939 4th Ave S. We were on stand-by in the 2900 block of 3rd Ave S. Officers advised that a subject within the group had a Molotov cocktail. The officers continued to give a specific description and location of the suspect and asked the all the bike squads standing by on 3rd to move and arrest the subject. Our bike squad made a combined effort with several other bike teams and Anti-Crime teams to arrest the subject with the Molotov cocktail.
As soon as the officers moved in for the arrest dozens of people became hostile and confronted the police officers. I observed the crowd start throwing large rocks (the size of a softballs), used bear mace, and a fire extinguisher against officers.
This movement occurred in the 2900 block of 4th AV S, a city street open to the public. Our legal authority was to protect the Officers from the ongoing assault of projectiles and chemical agents.
As the Bike teams were trying to push the crowd using a bicycle line I observed individuals in a small group of

15-20 people throwing rocks at officers. I attempted to interrupt the ongoing flurry of projectiles assaulting officers with the use of blast balls. I deployed a blast ball, using an under-hand pitch, towards the individuals observed. The blast ball was effective momentarily.

The same individuals started throwing projectiles at officers. Again, I deployed a second blast ball, using an under-hand pitch, towards those that were assaulting officer with projectiles. The blast ball appeared to be effective, the crowd stopped throwing projectiles and the group dispersed.

Our Bike team in conjunction with the other bike teams and Anti-crime teams continued to move the majority of the crowd to the east and eventually started moving the crowd north on 4th AV S. The push continued north for several blocks.

As we continued to move the crowd north we continued to take large projectiles and even a large mortar style firework was launched and denoted within our officer ranks. The projectiles were coming from a group that were using a shield line to conceal themselves. As we continued to take projectiles Lieutenant Brooks commanded to "Use Munitions".

Based on my training and experience "Munitions" are a term used to refer to blast balls.

The command occurred in the 2700 block of 4th AV S, a city street open to the public. Our legal authority was to protect the Officers from the ongoing assault and interrupt the flurry of projectiles.

In attempts to prevent the assault of ongoing projectiles, I deployed a blast ball, using an underhand pitch towards the group throwing rocks, asphalt, and launching fireworks. The deployment appears to assist in us moving the crowd but projectiles were continually thrown at officers.

I deployed a second blast ball, using an underhand pitch towards the same group. The deployment seemed to be successful and paused the assault of projectiles.

I prepped a third blast ball for the same group but there was a pause in projectiles being thrown. I held onto the unpinned blast ball for a couple of minutes before I decided to expend the munitions in a safe direction. I followed training and deployed the blast ball away from individuals, in an empty parking lot.

During my Blast Ball deployments, I was not made aware of any injuries caused by the blast ball. The targeted suspects continued in the protest and left the area, no medical evaluation was possible.

ADDITIONAL INFORMATION: N/A

## Incident Location

- 2949 4th Ave S, Seattle, WA 98134 - Location of Occurrence: South - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Self | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 11 – 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 176-225 pounds | 5'7" – 5'9" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| Yes | No | |

## Reporting/Involved Community Member Information

## John Doe

DOB:   Race:   Ethnicity:   Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Blunt Object – Use
- Chemical Agent
- Explosive
- Personal Weapons – Punch/Elbow
- Personal Weapons – Push
- Passive Noncompliance (including Verbal)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Devon Benner - Serial: 30054231 - Badge Number: 8309
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage:** [No Response]

**Role**
-

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | | |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Devon Benner |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 6:18 PM |
| **Instructions from Police Officer Devon Benner to Police Lieutenant Seth Dietrich:** | |
| Use of force during the SPOG march. | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer Devon Benner - 30054231

EXHIBIT B(2)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Michael Bonet - 30016315

## Incident Details

| **Date Received** | **Date of Occurrence** | **Time of Occurrence** |
|---|---|---|
| 9/9/2020 | 9/7/2020 | 18:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58105 | 2020-261072 | |
| **Date/Time Entered** | | |
| 9/9/2020 13:11 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFFICER MICHAEL E. BONET #6370
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police
Department manual order by Sgt. Stone. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Stone #7540, 09/07/2020, about 1830 hours, 2700 blk 4 Av S. Sgt.
Stone also observed my use of force.
B. ICV/BWV recorded: When I exited our SWAT Tahoe, I pressed my BWV. After dismounting, I observed it
did not activate, so I activated it. The UOF was captured on my BWV.
C. I reviewed portions of my video for locations and approximate times.

PRE-ARRIVAL/ARRIVAL
I have been a Seattle Police Officer for approximately 21 years. My training and experience over 21 years is
diverse and extensive. I have been assigned to the Seattle Police SWAT Team since 2011. I have been
involved in numerous crowd management situations throughout my career. Some examples of those are
WTO, N30, Mayday, Occupy Wallstreet, BLM Ferguson protests, and numerous other spontaneous protests
throughout my career. None of those previously listed compare to the violence that has occurred since the
George Floyd incident.

Some of my assignments with the department have been: South Precinct Patrol Second Watch, South
Precinct Third Watch Patrol, South Precinct ACT, and South Precinct CPT SHA Officer.

My training has included: 6 month Law Enforcement Training Academy, Street skills (every year), ACT
School, Police Mountain Bike Training, Patrol Rifle School, Undercover School, Valley SWAT School, Seattle
SWAT School, State SWAT Operators Basic Course, PIT Training, WASTOA Basic Sniper School, WASTOA
Advance Sniper School, I.C.C. Instructor training, Tactics Instructor training, Firearms Instructor Certified,
WASTOA Basic and Advanced Sniper Instructor, and Energetic Breaching Certified.

I have also been trained and certified in the use of less lethal devices that we utilize within the SWAT Unit.
The ARWEN, 40MM Single Launcher, 40 MM Multi-Launcher, Pepperball and FN303. Also, trained and certified
in all the hand thrown devices that we utilize for crowd management and warrant services. Our certification is
an annual practical re-cert with a qualification and written test. We also conduct scenario-based training.
On 09/07/2020, I was assigned to the Seattle Police Special Weapons and Tactics Team (SWAT) as an Officer.
I was wearing my grey duty uniform, a ballistic helmet, eye protection, plate carrier, my gun belt, issued gas
mask and "Police" markings on the front and rear of my plate carrier. I was also responsible for carrying an
FN303 less-lethal launcher. My primary role was to provide less-lethal capability to line officers and bike
officers conducting crowd management tactics.
The FN 303 is an air powered less lethal device. It has sights and a round drum that holds 15 small plastic
projectiles. The FN 303 projectiles that we use in SWAT are about the size of a dime and are roughly a 1/2
inch in thickness. They are filled with yellow paint or powdered O.C. and contain a Bismuth powder to add
weight to the projectile. Tonight, I carried red O.C. powdered projectiles. The projectile has approximately
25-foot pounds of energy. When fired, it leaves the muzzle at approximately 280-300 feet per second. The FN
303 allows the operator to gain pain compliance while at a safe distance away from an assaultive suspect.
Targeting for this device is consistent with other less lethal devices of mid torso and below, avoiding the
genital area.
At about 1400, I attended a briefing at the Seattle Police West Precinct. At the briefing, it was said that Black

Bloc/Anarchists were going to march to the Seattle Police Officers Guild building and attempt to destroy it. We were advised that there was a high probability that Molotov cocktails would be used, and we should have our Cold Fire on our person.

The Situation from the IAP:

"The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice. Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25. More recently, on August 16 2020, the protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On 8/24/2020, ENDD resulted in serious threats to Officer Safety. Notably, quickrete and other barricades were used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on 8/24/2020, Molotov cocktails were used in attempt to burn down the SPOG building at 2949 4th Ave. Remnants of a Molotov cocktail and two other Molotov devices were located at the scene. On 9/1/2020, a group of approximately 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct. For the past several weeks, there has been nightly planned demonstrations, called "Every Night Direct Demonstration", which is being promoted on social media. During previous evening events, incidents of significant property damage have occurred."

The Commanders Intent from the IAP:

"There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct."

After the briefing, the SWAT Tahoe I was in was staged to the north and east of 4 Ave S/S Holgate St. As we were waiting in our position, I heard updates on the radio that marchers were carrying shields, umbrellas, and improvised weapons.

At about 1823 hours, I responded to the 2900 blk of 3 Av S. This was in the area of the Seattle Police Officers Guild building. We were there to support bike officers with affecting an arrest of a subject in the crowd that was reported to have a Molotov cocktail. The subject was described as a male wearing a tan dress and a pink bandana. The subject was behind someone with a yellow umbrella. I dismounted our Tahoe and began running on foot behind the bike officers. As I rounded the corner of an Orient Express restaurant, I could see the crowd starting to run N/B on 4 Av S and east into a multi business parking lot. Most of the crowd had helmets on, gas masks on, a lot were wearing arm guards, knee/shin guards. Numerous subjects were carrying shields, forming a human barricade as the bike officers approached.

As soon as the bike officers contacted the crowd, several members in the crowd started grabbing, pushing and pulling at the officers' bicycles. I could see water bottles and other objects being thrown in the direction of bike officers. I heard several officers yell "rocks", "bottles" as these objects were being thrown at them. I could also see bottles and rocks impacting in and around officers. Some of these rocks were the size of a softball. I could not make out who was throwing the bottles because they were deep in the crowd. Some officers were deploying hand thrown less lethal devices, but I did not specifically see who was deploying these objects. I did see an officer aggressively pushed backward and onto the street by a protester, but I did not see where the suspect went. Someone in the crowd was deploying bear spray at officers from back in the crowd.

There were also protester support vehicles in the rear and front of the protesters. When the protesters started to run in two separate directions, these vehicles also started to leave the area, which made it very dangerous for officers and protesters running in between vehicles.

LEGAL AUTHORITY/LAWFUL PURPOSE

My legal authority was that this was a city street that is open to the public. My lawful purpose was probable cause to arrest the female subject for throwing and hitting a bike officer with a traffic cone. My purpose was

also to prevent further assaults on line officers. Once the crowd dispersal order was given to the crowd by Cpt. Allen, my job was to assist dispersing the crowd.

CONTACT WITH SUBJECT(S)

Other officers and I on this demonstration were in clearly marked "Police" uniforms, department vehicles had their emergency lights and sirens on. Capt. Allen was giving loud verbal repeated orders to disperse. Bike officer and line officers were constantly telling the crowd to move back.

During line movement N/B on 4 Av S, I was on the west side on the street, mainly on the sidewalk with crowd in the street on 4 Av S. The crowd size was approximately 300-400 people. The crowd was moving N/B at a walking pace, officers were deploying OC Blast Balls, and yelling, "move back." Even though the crowd was moving N/B, I noticed a female dressed in black with a helmet and her face covered running S/B towards the bike officers. The subject had two traffic cones, one in each hand. I was approximately 30 feet from the subject as she got closer to the bike officers.

DE-ESCALATION TECHNIQUES EMPLOYED

Cpt. Allen gave dispersal orders, Officers were telling the crowd to move back. I was unable to give a verbal warning to the subject because of how quickly the subject became a physical threat to the bicycle officers. Again, I was about 30 feet from the subject with the traffic cones, she was running, the crowd was loud, explosions were going off and it was not feasible at the time to give her verbal orders to stop.

THREAT ASSESSMENT/DECSISION MADE

The subject posed a threat to the bike officers making a push of the crowd N/B in the 2700 blk of 4 Av S. The threat was the traffic cones that the subject was going to throw and eventually did at bike officers. A traffic cone thrown at an officer could have struck them in the head, face or other body part that could injure, incapacitate, or knock an officer off their bike. Being in such close proximately to a violent crowd could have resulted in further injury to officers struck by the cones and incapacitated.

USE OF FORCE

Again, as I saw the subject running S/B toward the bike officers' line with two traffic cones in her hands. As she got closer, she stopped and threw a cone at a bike officer, hitting him. As she started to throw the second one, I fired five rounds from my FN303. One round appeared to impact her right thigh and the others appeared to strike her in the buttock's region. Once I saw that the rounds were effective in disrupting her throw of the second cone, I stopped using force against her. The subject then took off running into the crowd in an easterly direction. I attempted to visually locate her, but she disappeared and was concealed by the crowd. It would have been dangerous for me to chase after her into such a violent crowd. Throughout our continuous movement with the crowd, I looked for the female subject so I could arrest her for assault, but I did not see her again.

MEDICAL AID AND EVALUATION

No medical aid was provided or needed because the female subject that assaulted a bike officer, ran away.


ADDITIONAL INFORMATION: None

## Incident Location

• 2700 4 Ave S, Seattle, WA - Location of Occurrence: South

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | Greater than 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'4" – 5'6" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**

No

**Employee(s) Taken to Hospital**

No

## Reporting/Involved Community Member Information

### Unk Unk

DOB:    Race:    Ethnicity:    Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| Soft Tissue Damage | 10, I, K | 1, 2, 3, 4, 5 |



**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Michael Bonet - Serial: 30016315 - Badge Number: 6370
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Special Operations Bureau
B600/Metropolitan Section B620/Swat Unit B621/Swat - Night Squad 2 B621D/Swat - Night Squad 2 B621D

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- FN303 - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| FN303 | Yes | 10, I, K | 1, 2, 3, 4, 5 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Employee Witnesses

### Police Sergeant Steven Stone - Serial: 30041021 - Badge Number: 7540

**Video Footage**: Equipped - Activated

**Role**
- Supervisor on Scene

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/9/2020 | UOF Level II, Officer Bonet #6370 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Michael Bonet |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 2:15 PM |
| **Instructions from Police Officer Michael Bonet to Police Sergeant Ronald Campbell:** | |
| UOF II, Officer Bonet #6370, 2020-261072 | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Michael Bonet - 30016315

EXHIBIT B(3)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer James Coma - 30052020

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:21 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58042 | 2020-261072 | 2020UOF-1371 |
| **Date/Time Entered** | | |
| 9/7/2020 22:03 | | |

## Incident Summary

I am currently assigned to the Seattle Police Department's West Precinct Mt. Bike patrol squad. I am equipped with Body Worn Video and it was activated during this incident. I have been assigned to the West Precinct 3rd watch Mt. Bike patrol squad since May 2015. I attend yearly demonstration management training and bike refresher skills. At the time of this incident I was wearing my department issued Mt. Bike patrol uniform to include; a black Seattle Police Department issued rain jacket with obvious Police markings, long black bike pants and a bike helmet.

On 9/07/2020 I attended a briefing regarding a large preplanned demonstration that was beginning near 5th Ave S. and S. Jackson St. I was told the groups plan was to march to the Seattle Police Officer Guild's building on 4th Ave S. During previous demonstrations with this group, individuals in the crowd have thrown bottles, rocks, Molotov cocktails and large commercial grade fireworks at officers. We were also advised by our intelligence unit that there would likely be Molotov cocktails involved in today's demonstration.

The following incident occurred at approximately 1821 hours on 9/07/2020. My legal authority was this occurred on a city street open to the public. My lawful purpose was to protect officers who were being threatened by a large, hostile crowd armed with shields, Molotov cocktails and to prevent significant property damage.

During the march and as the large group of around 500 individuals gathered around the SPOG Building. Probable Cause had been established to make an arrest of an individual within the crowd that was carrying a Molotov cocktail. The decision was made for bike teams to enter the crowd and attempt to place the male suspect under arrest. As my team approached the crowd, I could see that individuals near the front of the crowd who were standing on 4th Ave S., were actively fighting and blocking bike officers who were attempting to arrest the male suspect. I saw approximately 20 individuals who were locking arms and using shields and umbrellas to actively block and assault officers.

As I stepped up to assist, I was able to identify three unknown and unidentified subjects who were actively fighting with bike officers in front of me. The subjects were pulling at the bike officers bikes and jabbing them with umbrellas. At the time, de-escalation was not feasible or reasonable. I dismounted my patrol bike and I then deployed my Mark 9 Oleoresin Capsicum solution on all three of the subjects. I directed my spray directly at the three subjects and the subjects alone. Each deployment was deployed for approximately one second aiming at the subjects' faces. The deployment had the desired affect as the unknown subjects immediately ran eastbound from the area. The subjects were all wearing black clothes and gas masks. I was unable to determine gender, age or race of the three subjects. At the time we were still dealing with a very hostile crowd, so it was unfeasible for me to provide any medical aid or any further assistance. The unknown subjects ran into the crowd and I was unable to locate them again.

## Incident Location

• 2900 4th Ave S, Seattle, WA 98101 - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered |
|---|---|
| Defense of Others | Demonstration |

| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
|---|---|---|
| Clear | Daylight | 1 – 5 feet |

| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
|---|---|---|
| No | No | No |

**More than 1 Community Member Involved**

Yes

| **Community Member's Build** | **Community Member's Height** |
|---|---|
| 176-225 pounds | 5'10" – 6'0" |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### John Doe

DOB:     Race: Unknown   Ethnicity:     Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

### John Doe

DOB:     Race:     Ethnicity:     Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

### John Doe

DOB:     Race:     Ethnicity:     Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer James Coma - Serial: 30052020 - Badge Number: 7736

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 3Rd W B113/West Pct 3Rd W - David Beats B113A/West Pct 3Rd W - David Beats B113A

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | Ofc. Coma Use of Force 2020-261072 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer James Coma |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/7/2020 10:12 PM |
| **Instructions from Police Officer James Coma to Police Lieutenant Seth Dietrich:** | |
| Ofc. Coma UoF 2020-261072 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:15 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer James Coma - 30052020


**Chain of Command Signature Lines**

_____
Police Lieutenant Seth Dietrich

EXHIBIT B(4)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Brandon Dorr - 30049540

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 14:02 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58036 | 2020-261072 | 2020UOF-1437 |
| **Date/Time Entered** | | |
| 9/7/2020 21:01 | | |

## Incident Summary

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Domholt. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: yes
B. BWV recorded: yes

DETAILED NARRATIVE:
On this date I was in full uniform as a bike officer. I was wearing a black polo with SPD patches on both sleeves, an external vest carrier with my hard badge on my left chest, and name on the right side of my chest. The word Police runs across the back of my vest in retro reflective material. I was also wearing black shorts, knee and elbow pads, black shoes, a department issued helmet with attached chin protection, and fox racing gloves with protective panels.
I wore extra protection on this date as officers had seen multiple tweets on this date referring to the march to SPOG headquarters. Many of these tweets promised violence and property destruction. These statements were confirmed by the Intel unit during our briefing.
Past violence from groups who have similar ideologies or claiming to be this same group have included; Throwing of rocks/concrete, fireworks/mortars, frozen water bottles, glass bottles, wrenches, and weapons of opportunity.
Officers have been struck at close range by kicks and punches, umbrellas, signs, shields, boards, sticks, and weapons of opportunity.
We were warned to be extremely vigilant in watching for incendiaries as the intent was to burn the SPOG office down.
Our briefing emphasized our commitment in facilitating freedom of speech to peaceful protestors while preparing officers for the possibility that some of the crowd my be intent of violence.
Once the protest began we staged a few blocks away so as not to agitate the crowd.
At approximately 1556 hours there were reports via radio of a known yellow panel van circling the area. This van has been observed supplying violent protesters in the past.
At approximately 1633 hours a report was heard via radio of approximately 150 protesters near the train station "A lot in body armor, gas masks".
1645 subjects in the crowd were observed wearing "full body armor, helmets/eye protection"
Multiple reports of this same nature can be read in the CAD notes.
At approximately 1718 a march of approximately 500 people and more than 10 cars headed southbound on 5th Ave from King St.
At approximately 1727 members of the crowd were heard stating they were willing to be arrested to ensure damage was done along the route.
At approximately 1732 a shield wall was observed at the head of the march. A shield wall is commonly used by protesters who wish to harm people and/or property. The walls consist of homemade shields of plastic, wood, and metal. They are often accompanied by umbrellas. This combination makes it difficult for officers to identify specific subjects or direction of attack and can make is possible for attacks at both short and long range to be successful in harming officers.
At approximately 1736 "bike scouts" were observed southbound on 4th ave. This is a tactic used to look ahead of a slower moving crowd. The scouts then relay information back to the leaders who can alter their plans to avoid officers or change directions and possibly targets.
At approximately 1753 members of the crowd were observed putting on gas masks. This was as they were reaching SPOG.
At approximately 1807 it was learned smoke from the crowd was the "signal" for the crowd to "act".

At approximately 1809 a male was observed in the crowd with a suspected Molotov cocktail.

A Molotov cocktail is a glass bottle filled with an accelerant such as gas. A rag is stuffed into the top of the bottle. The accelerant is soaked up the length of the rag and can be lit on fire easily. The fuel will also stay lit while being thrown through the air. When the bottle strikes a hard surface it shatters spreading flames. The groups have been known to add dish washing detergent to the mixture. This makes the fluid sticky. This causes further damage and injury when it comes in contact with people and property.

Molotov's are incredibly dangerous as highlighted above. The weapon is also very volatile. They will break when dropped and can explode on their own when held too long after lighting. This can cause serious injury to the person trying to throw it and anyone close by.

At approximately 1819 hours the smell of gas was observed from the male with the suspected Molotov.

At approximately 1820 bike officers were directed in to arrest the suspect with the Molotov.

At approximately 1822 officers were being attacked with explosives and bear spray. This violent action directed at officers rose the crowds behavior to the level of a riot.

At approximately 1823 the order was given from Lt. Brooks to move the crowd north.

While entering from the west we were met by a screaming crowd who were throwing objects at officers and attempted to form a "shield wall". Smoke was seen coming from inside the shield wall. As officers approached the shield wall and began taking the umbrellas and shields from the protestors orders were given repeatedly to leave the area. Officers fended off attacks from fists, and both handheld objects and thrown projectiles.

I observed who I believed to be Officer Pratt taking a suspect into custody. A large W/M wearing a helmet, goggles, a gasmask, gloves, and knee/shin guards was running at officer Pratt with his fists held high. I feared Officer Pratt was in imminent danger of being assaulted. I believed this as it is a common practice to assault officers while they are taking a suspect into custody. This often times allows the suspect to get away. I reached Officer Pratt at approximately the same time the W/M did. I delivered a focused shot of OC to his forehead and goggles of about two seconds. The force used was successful as the suspect then disengaged before disappearing into the crowd.

At approximately 1826 explosives were thrown at officers.

At approximately 1827 officers requested fire to attend to a male with a laceration to his head. At this time, officers were taking multiple subjects into custody. Officers were also being actively assaulted by the crowd. We began moving the crowd northbound on 4th Ave.

At approximately 1829 baseball sized rocks were seen being hurled by the crowd. These rocks were especially dangerous as they continued forward after striking the ground like cannon balls. They had potential to cause injury to officer's legs as they could no longer be seen in the air and were traveling at nearly the same speed. At this time, we were ordered to "push the line. Use munitions."

More large rocks were reported as the crowd took them from the rock garden outside of the diner on 4th Ave. the crowd also began throwing fireworks at officers. These can be incredibly dangerous as the metals used to create the colors stay glowing hot as it flies through the air. They can cause horrible burns when coming in contact with fabric or skin.

We continued to take rocks, and fireworks as we moved northbound. A firework appeared to be dropped in the crowd.

At approximately 1833 a box of explosive devices (Molotov cocktails) was found by officers.

Smoke was again released by the crowd. Again, this was reported to be the signal to attack.

At approximately 1834 I observed a W/M wearing all black, to include a sweatshirt with the hood up. He had a gas mask and sunglasses. The male ran to a small opening in the crowd and threw an object at officers.

At that point I deployed an OC blast ball I had prepped to the suspects location. I used an overhand throw as I had multiple officers in front of me and there was a wall of protestors who had linked arms and were slowly walking backwards. I do not believe there is any way I could have delivered the blast ball to its intended location without using an overhand throw.

The force used was affective as it assisted in moving subjects from the area and I did not see any more objects thrown from that location.

The tactics used by officers began to move the crowd more quickly. This gave the protesters less time to turn and throw objects. Due to this I found it unnecessary to use a second blast ball I had prepared.

At approximately 1837 I informed Sgt. Moore I needed to perform a "bang out." I then walked to a doorway and rolled the blast ball into the alcove away from officers and the public.

I then returned to my squad. I did not use any further reportable force during this protest.

## Incident Location

• 425 S. Jackson St, Seattle, WA - Location of Occurrence: Demonstration - Precinct: K2 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |

Clear                                    Daylight                           1 – 5 feet

**Community Member Injured**             **Community Member Taken to**       **Community Member**
                                         **Hospital**                       **Arrested**

No                                       No                                 No

**More than 1 Community Member**
**Involved**

No

**Community Member's Build**             **Community Member's Height**

176-225 pounds                           6'1" – 6'3"

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**                  **Employee(s) Taken to Hospital**

No                                       No

## Reporting/Involved Community Member Information

### Unknown Unknown

DOB:    Race: White  Ethnicity:    Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Complaint of Pain Only | 1 | 1 |



**Charges against this Community Member**
- Obstructing Charge

## Involved Employees

### Police Officer Brandon Dorr - Serial: 30049540 - Badge Number: 7664
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - Mary Beats B112C/West Pct 2Nd W - Mary Beats B112C

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Brandon Dorr |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/11/2020 12:45 PM |

**Instructions from Police Officer Brandon Dorr to Police Lieutenant Seth Dietrich:**

2020-261072

**Comments/Response from Police Lieutenant Seth Dietrich:**

Approved: Not approved

Reason: Needs Additional Information

Comments:
Couple things I noticed as I was skimming over your statement.  You have me listed as a Sgt.  I am a Lieutenant.  Also, I did not order you to write this statement.  Please indicate the sgt that ordered you to write the statement.  You can then either send it to me, or directly to Sgt. Domholt.

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Officer Brandon Dorr |
| CC: | (none) |
| Sent Date/Time: | 9/14/2020 7:36 AM |

**Instructions from Police Lieutenant Seth Dietrich to Police Officer Brandon Dorr:**

Indicate which sgt. actually ordered you to write this statement.

**Comments/Response from Police Officer Brandon Dorr:**

Approved: Approved

Reason:

Comments:
My apologies for the mistake. No disrespect intended.

| Routing #3 | |
|---|---|
| Sent From: | Police Officer Brandon Dorr |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |

| Sent Date/Time: | 9/16/2020 11:25 AM |
|---|---|
| **Instructions from Police Officer Brandon Dorr to Police Sergeant Jason Domholt:** | |
| Type II UOF #2020-261072 | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer Brandon Dorr - 30049540

**Chain of Command Signature Lines**

_____
Police Lieutenant Seth Dietrich

_____
Police Officer Brandon Dorr

EXHIBIT B(5)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Erik Eastgard - 30055801

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/10/2020 | 9/7/2020 | 18:20 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58129 | 2020-261072 | 2020UOF-1431 |
| **Date/Time Entered** | | |
| 9/10/2020 14:46 | | |

## Incident Summary

EVENT/GO#:2020-261072
DATE OF OCCURRENCE:9-7-2020
STATEMENT OF: OFC. EASTGARD
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Moore 5995. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: After things had calmed down, I later screened my uses of force with Sgt. Moore 5995
B. ICV/BWV recorded: BWV was recording.

DETAILED NARRATIVE:
I have been with the Seattle Police Department for 5 years. Prior to that I was with the Memphis Police Department for two years. I attended the Memphis Police academy, which is a 21-week long academy that goes over defense tactics, police tactics, and constitutional law, including other law enforcement relevant topics. When I got hired by the Seattle Police Department, I attended the two-week lateral academy at the Washington State Criminal Justice Training Center, where I was taught Washington State laws. I then completed nine-weeks of POST-BLEA, where I was taught Seattle Police policy, and tactics. Every year I have attended and completed all mandatory training and complete all e-directives. I have been assigned to West Precinct Mary Sector Bikes since July 2017 under Sgt. Moore. I have made and participated in hundreds of proactive stops. As a bike officer, I have been trained in the handling of crowd management and I know the use of force policy in regards to the use OC spray and munitions, and in regards to crowd management.
On 09-7-2020 at aprox 1800hrs I was working uniform mountain bicycle patrol, in full police uniform working for the Seattle Police Department, in the City of Seattle. I was part of the 2-Mary-90s, and we were assigned to a large demonstration that had marched down to the Seattle Police Officer Guild (SPOG) building.
This group is extremely hostile towards police. For the past three months, multiple officer shave been assaulted by protesters. This march was to say that police are not "workers" and don't deserve a union. They have shown extreme hostility towards SPOG and this group had previously marched on the SPOG building, throwing lit fireworks, and throwing Molotov cocktails, trying to burn it down. During previous encounters with this group, they have chanted "burn it down", towards the SPOG building. This group has been found to have Molotov cocktails and willingness to use them. They have thrown large explosive fireworks at officers, causing several Officers to go to the hospital. Rocks, glass bottles, and other objects are routinely thrown at Officers.
The group of demonstrators which numbered around 500 people, had gathered around the international district transit station. The group was dressed mostly in black bloc clothing. 214, Lt. Brooks, over radio, gave out several updates, about the group as they marched from the transit station, down to SPOG. Updated included: "500 people in march", "group is animated and willing to be arrested and do damage on the route", "shield wall in front, crowd size easily 500, multiple umbrellas", "group putting on gas masks", "all lanes blocked, umbrella, shields, possible improvised weapons". All these updates showed the hostility of the crowd, and the willingness to be confrontational towards police. While following the group, from a distance, on 4 AV S, the group had posted a large sign on an overpass, stating "all my hero's kill cops".
As the crowd marched S/B on 4 AV S, getting closer to the SPOG building, it came out over radio that a member of the crowd had a "Molotov cocktail" or incendiary device. It was advised the person with Molotov cocktail, was wearing tan, and was towards the front of the March. It was announced that the suspect with the Molotov cocktail should be arrested. Bikes were called to form up on 3 AV S, just West of the SPOG building. My squad, 2-Mary-90s, formed up with several other bike squads behind the SPOG building. It was announced again that the suspect is near the front, and that the area smelled of gas. It was announced that bike Officer were to move in on that suspect with the Molotov cocktail. I observed East bikes started to move

in first and followed. As I went around the SPOG building, I observed the crowd had formed up against the approaching bike squad, forming a shield wall, with makeshift wooden shields and umbrellas. I observed, as East bikes made contact, they were immediately met with what looked like bear mace and could hear an explosive device go off.

Within five minutes of the initial contact with the crowd, there were multiple assaults on officers. In a parking lot across the street from SPOG, explosives were being thrown at Officers. 214, announced to push the crowd north. During the push, several large rocks, fireworks, and explosives were thrown at Officers. Orders were to push the crowd from North from the SPOG building. Using trained tactics, the crowd was pushed from the SPOG building N/B 4 AV S. We then pushed E/B on Holgate St, N/B on 6 Av S, E/B on Dearborn Way, and then S/B on Rainier Av S. During the push, demonstration crowd management tactics were used by us. I was part of this crowd management push and I had two use of forces, involving OC deployment at two different subjects.

My legal authority is that I am a sworn Seattle Police Officer, dressed in a fully marked uniform, working the demonstration. In my first use of force, my lawful purpose was to prevent Officers from being assaulted, as they concentrated on making the arrest of a suspect. My second use of force, my lawful purpose was to prevent Officer Legaspi from being assaulted.

My first use of force occurred at approximately 1835hrs, just north of Landers St, on 4 Av S, I observed East bikes make an arrest of a suspect. I immediately made my way over to where the East bikes were making the arrest, as there were several in the crowd that here trying to de-arrest, who East bikes were arresting. During a de-arrest, it is common for officers to be assaulted, as it distracts from focusing on the original arrest. I observed an unknown subject, wearing all black, black helmet, goggles, go towards the Officers, making the arrest, and my threat assessment was that the person was going to try and de-arrest the suspect, by assaulting the officers. Using the OC mk-9 canister issued to me by the Department, I sprayed a small burst at the subjects face and head, to get them away from the Officers, as well as to keep them back from the Officers making the arrest. De-escalation was not feasible as it all happened very fast. The force was effective, the subject the force was used against, ran away and I did not see them again. After the subject ran away, I no longer had contact with subject. I was unable to provide medical treatment for the OC exposer, as the subject ran into the crowd. It was not feasible to make an arrest of the subject, as he disappeared into the crowed.

My second use of force occurred at approximately 1840hrs, at Holgate St, on 4 Av S. A Molotov cocktail had just been thrown at Offices, and the ground middle of 4 Av S, just South of Holgate St was on fire. I was focused on a group of demonstrators that were walking slower, and was looking for more Molotov cocktails and fireworks, that could be thrown towards us. Then, out of the corner of my eye, I observed a demonstrator wearing a red shirt, wearing a gas mask, and tan tactical vest, grab Officer Legaspi's bike. My threat assessment was that the protester, if they could get a hold of the bike, would then use it to assault the Officer or then steal the bike. I once again used my Department issued Mk-9 canister and using a trained short burst of OC spray, sprayed the subject from at least 3 feet away, aiming for their face. The force worked, even though the subject was wearing a mask, as the subject let go of the bike and backed away. De-escalation was not feasible, the use of force against the subject happened fast, and did not have time to order him to not grab the bike. It was not feasible to make an arrest of the subject, shortly after the spray, the subject ran into the crowd. I was unable to provide medical aid for the OC exposer, as the subject ran into the crowd. No one came up to me asking for themselves or someone else, for medical attention.


ADDITIONAL INFORMATION:
Due to the large amounts of force used this day, I was unable to get a computer in order to write this us on the day of. Extension approved that day by Sgt. Moore 5995.

## Incident Location

• 2700 4 Av S, Seattle, WA 98104 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 1 – 5 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |

**More than 1 Community Member
Involved**

Yes

**Community Member's Build**              **Community Member's Height**

125-175 pounds                            5'10" – 6'0"

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**                   **Employee(s) Taken to Hospital**

No                                        No

## Reporting/Involved Community Member Information

### unknown Unknown

DOB:    Race:    Ethnicity:    Gender: Unknown

**Role**
- Other

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

### Unknown Unknown

DOB:    Race:    Ethnicity:    Gender: Unknown

**Role**
- Other

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Erik Eastgard - Serial: 30055801 - Badge Number: 8348

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct
B110/West Pct 2Nd W B1122/West Pct 2Nd W - Mary Beats B112C/West Pct 2Nd W - Mary Beats B112C

**Video Footage:** [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Canister - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|------------|-----------|---------|-------------------|
| Canister - OC | Yes | 1 | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | use of force | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Erik Eastgard |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 4:52 PM |
| **Instructions from Police Officer Erik Eastgard to Police Lieutenant Seth Dietrich:** | |
| 2020-261072 Ofc. Eastgard Type 2 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer Erik Eastgard - 30055801

EXHIBIT B(6)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Michael Eastman - 30037785

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/11/2020 | 9/7/2020 | 14:02 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58158 | 2020-261072 | 2020UOF-1438 |
| **Date/Time Entered** | | |
| 9/11/2020 16:53 | | |

## Incident Summary

EVENT/GO#:2020-261341
DATE OF OCCURRENCE:9-7-2020
STATEMENT OF:M. EASTMAN#7412

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Didier. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: This incident was not screened in person due to the ongoing nature of the riot and delay in being released from the riot line. I had informed Sgt Didier of my use of OC spray and blast balls at the time of their use.
B. ICV and/or BWV recorded: I am a bicycle patrol Officer and I do not carry ICV. I was carrying body worn video and it was recording at the time of this incident.


PRE-ARRIVAL DETAILS:
I reviewed my body camera prior to writing this report.

On 9/7/2020 I was working as unit 2K97 uniform bicycle patrol in the City of Seattle. I was wearing a standard bicycle Officer uniform with black shorts, a black polo shirt and an external vest carrier. I had Police Patches on my shoulders across my back and above my left breast. I wore a bicycle helmet with a protective chin bar, safety glasses, gloves and kneepads. I was assigned to the 2K90 bicycle squad under Sgt Didier. On that day I was assigned as a linebacker. A linebacker is responsible for assisting line Officers by providing the ability to go hands-on to make arrests and is also primarily responsible for the deployment of less lethal munitions. The incident commander was West Precinct Captain Allen. I was part of a large deployment of Officers assigned to the Labor Day protest and march that began at 1600hrs. This was a pre-planned event and I had seen 3 flyers online that advertised the march. I included the flyers with this report. One flyer stated "workers unite against Police", another said "101 days of protest in Seattle, calling all workers no more Police union" and the last "Calling all workers 101 days of protests in Seattle! Labor Day march stand up against Police unions, cops aren't workers". The flyers had some generic imagery of union workers and the time listed for the rally.


I attended the roll call before deployment and was given a copy of the incident action plan which included the commander's intent "There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics

that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.". I was personally aware of a previous protest with similar attention the Police Union on 8/16/20 SPD case #2020-241783. I worked that previous protest which resulted in multiple arrests with several Officers injured including myself. While the previous protest did not dictate Police action on the current day it did factor into the increased deployment of Police resources for the 9/7/2020 event.

ARRIVAL:
I began the day deployed well away from the starting location of the rally. My squad operated on standby until the march began, at which point we followed the march from several blocks away. I could see the march proceeding Southbound on 4 Ave S near S Royal Brougham Way blocking all lanes of vehicular traffic. It appeared to be around 300 people and there were several protester bicycles and cars accompanying the march. I could also see that the marchers were disregarding traffic signals. This was causing vehicular traffic congestion even with the light holiday traffic. I could see that Police were taking no action to direct or hinder the movement of the crowd.
Even from a distance I could see that members of the crowd were clothed in nearly all black clothing and some were wearing filter gas masks, protective helmets, goggles, carrying wooden or plastic shields and umbrellas. The black clothing is part of a coordinated tactic called "black bloc" which is meant to increase the anonymity of individuals in the crowd and decrease the chance of specific identification and arrests if crimes are committed. The filter gas masks were not a part of the COVID-19 precautionary measures that the general public has adopted but rather a specific choice to hinder and render ineffective the use of crowd control munitions used by Police should a riot be declared. The protective helmets, shields and umbrellas were also part of a calculated measure to block, hinder and obstruct law enforcement should crowd control munitions be used or attempts at arrest be made. Members of the crowd with shields/umbrellas will group closely together interlocking their shields/umbrellas to prevent Officers from entering the crowd to make arrests. The shields/umbrellas are also used to physically block or bounce back crowd control munitions and provide concealment for other members of the crowd to throw rocks or other items to assault Police. The composition of the crowd made me suspicious that some in the crowd planned to commit criminal acts.
My squad continued to monitor the march from a distance until the march reached 4 Ave S and S Holgate St. I heard over radio that Officers had seen a person in the crowd with a Molotov Cocktail. A Molotov Cocktail is an improvised incendiary device. It is made by using a glass bottle filled with gasoline or some other fuel and a cloth wick stuffed into the top. This is lit on fire and thrown shattering on impact an spreading the burning fuel over an area. Molotovs are unpredictable and dangerous weapons and it is a felony to possess one. My squad was ordered to group together with other squads and to move in to arrest the specific person who was carrying the Molotov. As My squad moved parallel to the march I listened for updates over my radio. I heard that they did not have a specific location yet for the suspect with the Molotov so we could not move in. My squad eventually linked up with several other bicycle squads on 3 Ave S just behind 2949 4 Ave S. We waited for confirmation over radio of the suspect location. The above address is the Seattle Police Officer Guild building and the apparent destination of the march. The march had stopped and was spread out in front of the building on 4 Ave S. I could see that the marchers had seen Police Officers on 3 Ave. The marchers had created a line of people with wooden shields blocking the 4 Ave S exit of the Police Guild parking lot with interlocked shields. This appeared highly coordinated and I worried that the marchers would not cooperate with any Police action. At that point I heard over radio that the suspect with the Molotov was located directly in front of the Seattle Police Guild on the West side of 4 Ave S near a person with a yellow umbrella. From my location on 3 Ave S I could see only one yellow umbrella on the North end of the shield wall a few feet East of the West sidewalk. I heard the order given for the bike squads to move in and arrest the suspect. The 2K90 bicycle squad was the 2nd of I believe 4 bicycle squads that moved in from 3 Ave S to make the arrest.

LEGAL AUTHORITY & LAWFUL PURPOSE:
My legal authority that day was that I was working as a uniform Police Officer in the City of Seattle. The incident occurred on Seattle street and on the attached sidewalks.
My lawful purpose was the enforcement of both the revised code of Washington for felony crime of possession of an explosive device (Molotov cocktail), the crime of felony assault on a Police Officer and the enforcement of Seattle municipal code for pedestrian interference and finally obstruction of a Law Enforcement Officer.

CONTACT WITH SUBJECT:
I heard Officers give clear verbal commands to move back and to move out of the way to the marchers. It did not appear to me that more than a handful of the 300 people in the crowd complied. Not enough of the marchers moved to allow an arrest to be made. The marchers who had formed the shield wall did not move at all. I saw that the shield wall was supplemented by unfurled umbrellas at the tops of the shields further concealing the people behind. I saw a red pepper spray canister held up by the protesters above the shield and a yellow cloud shot out from the canister engulfing myself and other Officers. I knew that it was pepper spray because almost instantly I had pain in my eyes, and I began coughing. I was only able to keep one eye open while I assisted other Officers in moving people away from the location of the Molotov suspect. I gave repeated commands to protesters to move back, I had to physically push people back. When other Officers were assaulted, I deployed OC spray to protect myself and others and to prevent further assaults. I was not able to arrest the specific persons that I deployed OC on.
After clearing the immediate area in front of the Seattle Police Officers Guild I noticed that I had become separated from my squad. I found my bicycle which I had left behind in the melee and then I saw that my

squad was involved in a foot pursuit with a suspect through the crowd. I mounted my bicycle and assisted in the pursuit. Please see SPD case 2020-261291 for further details. After assisting in taking S/L████████ into custody for felony assault my squad returned to addressing the crowd. By then the crowd was Northbound on 4 Ave S. I could hear dispersal orders being given over a loudspeaker. I could see that the rioters were gathering again near 4 Ave S and S Forest St and they were not dispersing. It appeared to me that they were preparing to assault Officers again. The marchers had turned to face South and had a front line of shields and umbrellas. Just minutes previous most of the crowd had been on the East Sidewalk and in the adjoining parking lots of 4 Ave S which could have afforded the marchers the ability to leave the area as per the dispersal order. When my squad arrived with other Officers, I saw several palm sized rocks being thrown from behind the new shield wall. I did not see if the rocks hit any Officers, but I was nearly struck several times myself.

The rioters continued to throw rocks and other items to assault Officers until Officers deployed crowd control munitions. I heard further dispersal orders being given by loudspeaker. The crowd maintained its cohesion with a line of wooden shields and umbrellas facing Officers. The shield wall was concealing the rioters that were throwing rocks. This appeared to be a coordinated effort by the crowd to assault us. I saw a smoking brown cardboard tube be thrown from behind the shields directly at me. It landed next to my right foot and exploded spreading burning embers around me and causing me to go temporarily deaf with ringing in my ears. It took several seconds for my hearing and equilibrium to return. At that point I heard over radio that multiple arrests had been made and that several Officers were injured.

My squad worked in conjunction with other bicycle squads to control the crowd and move them Northbound on 4 Ave S until we reached S Holgate St. Despite multiple dispersal orders and hundreds of verbal commands from Officers on the line the rioters did not disperse but remained in a tight group. I saw several additional arrests be made. When we approached the intersection with S Holgate St, I saw a flaming glass bottle thrown at Officers. It missed and shattered on the ground spreading flaming fuel on the street. This was a Molotov cocktail. I assisted other squads in continuing to move the rioters, this time Eastbound on S Holgate St to move them away from the downtown area. I continued to give verbal commands to disperse and I heard a few more dispersal orders given over a loudspeaker. It appeared that these orders were also disregarded. I could see that there were several side streets and open unfenced parking lots that people could have dispersed into, but they were not utilized.

I continued to assist with moving the crowd Eastbound on S Holgate St then Northbound on 6 Ave. We turned Eastbound on S Dearborn St to Rainier Ave S. Once on Rainier Ave S we moved the Crowd Southbound until we were unable to restrict their movement and they fled Eastbound into the park at Interstate 90 to Judkins Park.

While moving the crowd they had continued to disregard verbal commands and it was only with the display of team tactics that the crowd moved. The team tactics mainly consisted of crossbow line formation movements. This is where a squad of bicycle Officers with move in a double column and ride towards the crowd. The Officers will split and fan out to the left and right covering the width of the street and then suddenly slide to a stop forming a line. This is done as a team in a uniform and controlled manner. The objective is to provide the crowd with the belief that Officers will contact them or is about to arrest someone but to not necessarily do so. This tactic can be used to make contact, but it is less effective if it does. The tactic is meant to be seen approaching and is accompanied by repeated verbal commands to move back. Due to the uniform and team nature of the movement there is a psychological effect on the crowd and most times the crowd does indeed move away from Officers. This team tactic was effective at moving the rioters. The rioters continued to occasionally throw items at Officers but the quicker that we forced them to move, the less items were thrown. When the crowd reached Rainier Ave S at I-90 it appeared that it was beginning to disperse by running into the park. We were ordered to stop following the rioters and allow them to disperse. I remained in the area until released back to the West Precinct. I heard over radio that a total of 27 people had been arrested and that 10 Officers had been injured including one who was hospitalized with a broken bone. I saw that at least one of the rioters who had been arrested appeared injured and I heard that Seattle Fire was called to treat them. At first, I did not believe that I was involved with any injury to any rioter. Later I was informed that the one arrest I had been involved in at the beginning of the riot had an injury. I later completed the required use of force paperwork for the arrest. I also completed a general use of force for the event for using OC spray and OC blast balls. I did not receive medical attention for the bruises, abrasions, pepper spray or hearing damage I had been exposed to. I did notify my supervisor and the on-duty SPD EMTs of my injuries. I heard that several of the rioters had shown up in another area of the City and were being monitored by other Officers. I was not re-deployed that day and I was released to write paperwork.

DE-ESCALATION:
In the above listed narrative I detailed numerous attempts at de-escalation by the use of verbal commands and team tactics. In almost all cases verbal commands were ineffective. Team tactics were effective when the opportunity to use them occurred.

DECISIONS MADE:
I made the decision to use OC spray to defend myself and other Officers specifically to stop and prevent further assaults. The assaults that were happening were the use of pepper spray by the protesters and the physical assaults that were happening to Officers on the line. There were also Officers that were making arrests on the line and protesters were actively attempting de-arrests which involved assaults on Officers. The assaults on Officers that I observed were being grabbed, pushed and struck by shields. The protesters outnumbered Officers and had displayed no compliance with verbal commands. There did not appear to be an alternative to using force to stop the ongoing assaults. I chose to use OC spray because it was the most

immediately accessible use of force that I possessed and force needed to be used quickly to mitigate the ongoing assaults. OC spray is a targeted use of force that I could direct and also has a force multiplying effect when witnessed by others. I noticed that by using OC spray other people not directly sprayed would move away from me. When distance and movement are created the risk of physical injury from assaults dramatically decreases.

I later made the decision to deploy OC blast balls to protect myself and other Officers from thrown objects from the crowd. I did not have an alternative method to respond to thrown objects from the crowd. I am blast ball trained and certified and I was carrying a bag of OC blast balls. My role that day was as a linebacker and other Officers were not carrying any use of force tools to respond to thrown objects. I observed that rocks were being thrown from several people deep in the crowd. The rocks were about palm sized and could cause serious injury. I threw the OC blast balls at the specific locations where I believed the thrown rocks originated from. I believe that the OC blast balls were effective in stopping further rocks from being thrown.

THREAT ASSESSMENT:

As detailed in the above narrative the crowd was prepared and organized that day. They had upwards of 300 people in the crowd. When force occurred the crowd remained organized and used their own tactics of shields/umbrellas to provide concealment for people assaulting Officers. Even when a Molotov cocktail was used (a deadly weapon) the crowd remained committed to being uncooperative with Officers and continued to use concealment tactics to prevent the identification and arrest of the responsible person. Overall the threat to Officers was high which was reflected by the fact 10 Officers were reported as being injured.

FORCE USED:

All listed uses of force are bookmarked on my body worn video.

At 1822hrs I was just East of 2949 4 Ave S in the middle of the street. I was part of an effort to arrest a person with a Molotov cocktail. Several bicycle squads had just pushed a crowd to the East side of 4 Ave with their bicycles. That action was the equivalent of a baton push. This was in response to being assaulted by thrown bottles, being stuck with wooden shields and being sprayed by a pepper spray fogger from the protesters. I did not strike anyone with my bicycle. I was assigned as a linebacker and I had left by bicycle parked while I pushed several people with my open hands. I did not expect my pushing to cause any injury and I did not believe my pushing to be effective against their wall of shields. I observed that Officers on the line were still being assaulted by persons with shields and those standing shoulder to shoulder with the shield bearers. I decided to use my Mk9 OC to defend myself and other Officers on the line from further assaults. I specifically targeted two people at the center of the shield wall line. I did not think it was feasible to give a warning prior to deploying OC as they would have blocked the OC with their shields. I noticed that they were wearing safety glasses and respirator filter masks. I sprayed first one person then the other at the sides of their glasses and at their ears in an attempt to defeat their equipment. I believe that my deployment was effective as both persons then the entire line of people turned away from me and walked away Eastbound. There did not appear to be any further contact between Officers and the crowd at that location at that time. I turned around and left the front line to retrieve my bicycle from across the street.

At 1829hrs I was with a line of bicycle Officers facing North near the intersection of 4 Ave S and S Forest St. A dispersal order had been given over loudspeaker and an unlawful assembly had been declared. I observed that the crowd was not dispersing and that it was in fact organizing to prevent efforts at dispersal. I could see that the front line of people facing Officers were nearly all equipped with wooden or plastic shields and many were carrying unfurled umbrellas. This was concealing the activity of many of the people behind the shields. I saw several palm sized rocks thrown from behind the line of shields at Officers. The rocks landed among the Officers around me and I believe if any of the rocks struck Officers they would cause serious injury. I decided to deploy an OC blast ball to protect myself and other Officers. I had no other force option to respond to prevent further assaults on Officers. I did not give a warning of deploying a blast ball as I did not think it was feasible. The warning would not have been heard by the persons throwing rocks. I deployed the OC blast ball with an overhand deployment at the specific person closest to where I saw the rocks thrown from. This was due to the distance to the location where I believed the rocks to be originating from. I saw the blast ball detonate and I believe that it was not effective because more rocks were thrown at Officers. I prepared a second OC blast ball for deployment. When I saw more rocks being thrown, I deployed that second OC blast ball at the specific person closest to where I saw the rock being thrown from. I did not give a warning for the second blast ball due to it not being feasible. I still believed that the persons throwing rocks would not have heard my warning. I deployed the second OC blast ball overhand due to the distance to rock throwers. I believe that the second blast ball was effective as I saw no more rocks being thrown at that location.

At 1840hrs I was with several squads of bicycle Officers involved in a dispersal push near the intersection of 4 Ave S and S Holgate St. We were facing Northbound. Previous team tactics had disrupted the organization of the crowd. The majority of the crowd were walking/running Northbound on the East sidewalk of 4 Ave S. I observed a liquid filled glass bottle with a flaming top be thrown from the crowd. I believed it originated from a person next to a man wearing a desert camo colored Kevlar helmet. I saw the Molotov shatter in the middle of 4 Ave S and spread burning liquid near Officers. I deployed an OC blast ball to protect other Officers from any further Molotovs being thrown. I gave no warning prior to deployment because I thought that immediate action was required to prevent further assault. I used an underhand deployment to target the man with the tan colored Kevlar helmet. I saw the blast ball detonate and I believe that it was effective and no other Molotovs were thrown and many untargeted people began to run away.

MEDICAL AID AND EVALUATION:

I was aware from radio broadcasts that there were several injured Officers. I was also injured by a firework

and being assaulted with shields. I had abrasions on my right forearm which were examined by SPD EMTs. I had been pepper sprayed by the rioters but by the end of the night the effects had worn off. I was not immediately aware of any injuries to protesters from any of my own uses of force. I declined any medical aid for myself.

RESOLUTION: I later completed a separate use of force statement for the arrest of S/L███████ SPD case 2020-261291. There was an extended period of time that I remained on the riot line before being released. I later reviewed my body worn video to complete my reports. I was not aware of anyone I used OC spray or blast balls on being arrested.

ADDITIONAL INFORMATION:

## Incident Location

• 2949 4 Ave S, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 11 – 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'7" – 5'9" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| Yes | No | |

## Reporting/Involved Community Member Information

### John Doe

DOB:     Race: Unknown   Ethnicity:     Gender: Male

#### Role
• Suspect

#### Types of Resistance Community Member Used Against Employee(s)
• Blunt Object – Use
• Explosive
• Other (Specify in Narrative)

## Involved Employees

### Police Officer Michael Eastman - Serial: 30037785 - Badge Number: 7412
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - King Beats B112B/West Pct 2Nd W - King Beats B112B

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Balls - OC - Was force effective: No
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes
- Chemical Agent – OC Spray - Was force effective: Yes
- Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | No | X | 1 |
| Balls - OC | Yes | X | 2 |
| Balls - OC | Yes | X | 3 |
| Chemical Agent – OC Spray | Yes | 1 | 4 |
| Chemical Agent – OC Spray | Yes | 1 | 5 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Organ Damage | 1 | 1, 2 |
| Complaint of Pain Only | 1 | 3 |
| Abrasion | 4 | 4 |
| Bruise | 4 | 5 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/11/2020 | Flyer for the march | jpg |
|  |  |  |

| 9/11/2020 | flyer "workers against Police" for march | jpg |
| 9/11/2020 | flyer "no more police unions" | jpg |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Michael Eastman |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/18/2020 2:22 PM |
| **Instructions from Police Officer Michael Eastman to Police Lieutenant Seth Dietrich:** | |
| Type 2 crowd control UOF OC spray and blast balls 9/7/2020 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments: Sgt's review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/20/2020 7:07 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt's review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____
Police Officer Michael Eastman - 30037785

**Chain of Command Signature Lines**

_____
Police Lieutenant Seth Dietrich

EXHIBIT B(7)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Vanessa Flick - 30040635

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 17:20 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58041 | 2020-261072 | 2020UOF-1370 |
| **Date/Time Entered** | | |
| 9/7/2020 21:50 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: OFC. V FLICK
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police
Department manual order by Sgt. Rees. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Throughout the course of the days demonstration/riot I deployed a total of
1 blast ball for crowd management and conducted a bang out for a malfunctioning munition. To clarify, this
item never detonated. I have reviewed my body camera and bookmarked these events
B. ICV/BWV recorded: BWV was on during the incidents. As I am a bicycle officer, I do not have ICV.
C.

DETAILED NARRATIVE:
I have been a sworn Seattle Police Officer since February of 2009. I am a Certified Master Defensive Tactics
Instructor with the Seattle Police Department and received my "Black Shirt" with the DT cadre of the SPD
training unit in 2018. I am currently a CART certified officer, certifying me in the use of blast balls and have
been so since 2017 I am also trained and certified in the use of OC spray. On this day, I deployed with CART
munitions. I am also a member of the department Hostage Negotiations Team.

Currently, I am assigned to the East Precinct Night bikes squad and have been so since June of 2016. During
my time with East Night Bikes, I have responded to dozens of nighttime disturbances including large scale
fight disturbances after bar closing, weapons calls, shootings, homicides and other chaotic scenes and
situations. I have worked dozens of protests of various sizes, causes and hostility levels since becoming a
certified bike officer in 2012.

I did review my BWV of the below incident. I bookmarked important moments during this incident.
On 9/7/2020 I was working a planned demonstration event in the City of Seattle. The planned demonstration
was labelled as "Worker's March Police Aren't Workers." During the briefing I attended at the West Precinct,
Lt. Yoon from the Intelligence unit informed us that the intel gathered about this event indicated that the
group was planning to march to the Seattle Police Officer's Guild office located in SODO. The march was to
begin with a rally at the International District Light Rail Station. On previous occasions, groups that have
marched to the SPOG office have committed acts of property damage and assaults on officers. Assaults
included throwing projectiles, pushing shields into officers' lines, throwing large commercial grade fireworks
at officers, using bear mace to assault officers and striking with blunt objects such as sticks and poles. More
recently, black clad members of anti-police demonstrators have set fires to police precincts while
simultaneously cementing exit doors with quick-crete (a rapid drying form of concrete) and rebar attempting
to prevent officers from escaping the fire. Days after that arson, a group marched to the East Precinct and
launched three Molotov cocktails that ignited and burned along a power pole in front of the precinct. The
violence has been escalating from anti-police groups.
During the briefing at the west precinct, we were informed of the possibility of subjects possessing Molotov
cocktails in order to burn property or severely injure officers.
At approximately 1720, the march began from the International District Light rail station. Lt. Brooks
broadcast that several members in the group were wearing protective gear consisting of helmets, protective
vests, goggles and were possessing gas masks. The group was also wearing black clothing, consistent with
the Blac bloc ANTIFA group that has been committing or complicit in the acts of arson against the East
Precinct.
At 1727, the following update was broadcast: GROUP IS ANIMATED AND WILLING TO BE ARRESTED AND DO

DAMAGE ON THE ROUTE. As the march began, there were several plywood shields at the front of the crowd with umbrellas mixed in at the front. In previous demonstrations, shields were used to push against officers and to also block visual of criminal activity going on within the group. Primarily, shielding subjects who were throwing projectiles at officers with intent to cause injury and harm. At 1753 the following update was broadcast: GROUP IS PUTTING GAS MASKS ON.

At 1809, intel units broadcast the following: IN THE CROWD THERE IS MALE WITH MOLOTOV,TAN DRESS AND PNK BANDANA,NO EYES ON YET,EAST SIDE OF GROUP. There was probable cause for the possession of an incendiary device. The description was updated SUSP WEST SIDE OF MARCH TOWARDS FRONT 6 ROWS BACK BEHIND YEL UMBRELLA,GRY BACKPACK,BLU DETROIT TIGERS HAT IS IN FRONT. This was occurring as the group was approaching the Guild office. At 1820, bike squads moved in to facilitate the arrest. As we approached the group to affect the arrest, I was shouting "Move back!" several times, loudly and clearly. The group positioned their shields to prevent officers from moving in to effect the arrest. I used my bike to push the shield and umbrella holders back, to create space for in coming bike officers and to push the crowd away from the SPOG building to prevent the damage from incendiary devices. I was struck by a yellow umbrella several times as I was affecting my push. An unidentified suspect began pulling my bike away from me and into the crowd via the handle bar. I pulled my bike back to me and prevented the theft of my bicycle. Another subject was spraying a fire extinguisher at officers.

Other unknown officers began deploying OC spray, which was effective in pushing the crowd back and away. We continued pushing the crowd towards the east sidewalk and then north on 4th Av S.

I looked for my squad and once I located them and my supervisor, we regrouped. I briefly provided perimeter security as officers were completing an arrest of a suspect just north of the guild office. After that arrest was secured into a transport vehicle, my squad regrouped and joined the line pushing the group north bound on 4 Av S.

As we were pushing the group north on 4 Av S, we began taking projectiles. I saw several large rocks flying high and at our bike line. A large commercial grade firework was thrown from the crowd that detonated directly behind me, causing pain to my legs. Continuing our NB push, we continuously received a barrage of projectiles. Several rocks and bottles were coming from the crowd, as well as fireworks. I retrieved a blast ball from my bag. I continued walking, with the blast ball in my hand. A bike squad was effecting an arrest to my left and in order to prevent a crowd from swarming to de-arrest, I decided to deploy the ball. I palmed, prepped, peeked and pull the pin. The entire spoon and pin came off the top, removed from the main ball. I yelled "bang out!" as I threw the undetonateable ball behind me and away from the crowd. The spoon mechanism ignited in my hand and I dropped that. The device never detonated due to its defectiveness.

I mounted my bicycle and continued with the north bound push. The crowd continued to throw projectiles, including full cans of soda and rocks. They were also placing construction barricades into the roadway to hinder the movement of officers. As we approached the Jack in the Box on 4 Av S, I heard an explosion and saw a fire in the middle of the street. This was a Molotov. It was thrown from the crowd and towards the bike officers pushing the crowd. Lt. Brooks ordered the use of OC and blast balls to continue pushing the crowd. I retrieved a blast ball from my bag and palmed it. I prepped the ball, peeked to where I wanted to deploy (which was to the East sidewalk and push the crowd Eastbound), I pulled the pin and placed the blast ball on the East sidewalk. It prompted crowd movement East, which was the desired effect.

I did not see any injured subjects, nor did I hear any complaints of pain from the deployment.

This was the only force I used during this demonstration. I reported my blast ball deployment to Sgt. Rees. No subjects from the crowd reported any pain or injury to me.

I sustained several abrasions during the day's events. This included my left forearm and both right and left legs.

Legal Authority: These uses of force occurred on streets, open to the public.

Lawful Purpose: Life safety and in defense of myself and other officers. Also, to facilitate crowd movement in a specific direction, at the order of Lt. Brooks.

ADDITIONAL INFORMATION:

## Incident Location

- 2949 4 Av S, Seattle, WA - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |

No                          No                          No

**More than 1 Community Member Involved**

No

**Community Member's Build**        **Community Member's Height**


**Employee Assessment of Community Member Condition During Incident**


**Employee(s) Injured**             **Employee(s) Taken to Hospital**

Yes                                 No

## Reporting/Involved Community Member Information

### Unknown Unknown

DOB:    Race:   Ethnicity:   Gender: Unknown


#### Role
- Unknown

#### Types of Resistance Community Member Used Against Employee(s)
- Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |


## Involved Employees

### Police Officer Vanessa Flick - Serial: 30040635 - Badge Number: 7521
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/East Pct B240/East Pct 3Rd W B243/East Pct 3Rd W - East Beats B243A/East Pct 3Rd W - East Beats B243A


#### Video Footage: [No Response]

#### Role
- Primary Officer

#### Force used by this employee against the community member
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | | |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Abrasion | 11, 13, 4, J, L | 1, 2, 3, 4, 5 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | Type II UOF, 2020-261072, Ofc. V Flick 9/7/2020 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Vanessa Flick |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/7/2020 9:55 PM |
| **Instructions from Police Officer Vanessa Flick to Police Lieutenant Seth Dietrich:** | |
| Type II UOF, 2020-261072, V. Flick 9/7/20 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments: Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:14 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Vanessa Flick - 30040635


**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(8)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Jimmy Haas - 30060294

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 16:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58046 | 2020-261072 | 2020UOF-1433 |
| **Date/Time Entered** | | |
| 9/7/2020 22:54 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: HAAS, J. #8511
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Sylvester. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt Sylvester was notified when feasible at the end of the long encounter.
B. ICV/BWV recorded: BWV was activated and recording.

DETAILED NARRATIVE:
PRE-ARRIVAL DETAILS:

This incident occurred on 09/07/2020 within the City of Seattle, while on uniformed patrol, riding a marked police bicycle between the International District of the West Precinct and the SODO area of the South Precinct. I was assigned to the North Bikes team. My BWC was activated and recording.

Prior to this specific series of use of force, my team was asked to monitor the protest rally which was taking place inside the International District. During that time before the march, we had to make an arrest which ended up very close to the rally. During that arrest, the protesters already attempted to un-arrest the suspect and interfere in that arrest. As we held them off, they were aggressive, agitated and shouting all sorts of explicit words and threats to officers. I also observed that most of this group was wearing, eye protection, helmets, gas masks, homemade shields and were using sticks and poles to hold up their signs. I addition, they had large backpacks with them which they made sure to keep out of officer sight. I know from my experience, that they've used backpacks in the past to transport homemade explosives, Molotov Cocktails and other sorts of weapons. I'm also familiar with this group of protesters and their anti-police rhetoric and willingness to fight law enforcement. In fact, this rally was advertised as an anti-police march reading "Labor Day march, cops are not workers". Most of the advertising pointed out SPOG as their desired target and wanting to have a "BBQ" at SPOG. Now from past actions of members associated to this group, BBQ's involve Molotov Cocktails and explosives being thrown at the building.

ARRIVAL:

At approximately 1820 hours, Bikes were staged behind the Seattle Police Officers Guild building at 2949 4 Av S, off 3 Av S. We were there monitoring a large anti-police march which had marched from the International District to that location. Prior to their arrival, we were advised over radio that members of the crowd intended to cause property damage and were willing to go to jail.

More specifically, we had a Unit identify a male who was in possession of Molotov Cocktails. The suspect was carrying a "Corona" beer box with the prepped bottles inside. He was described as wearing a blue top and yellow gloves and we were informed that he was getting closer to the south east corner of the SPOG building. The protesters also had "scouts" out and about trying to locate our location, this is apparent that they knew we were in the alley west of when a "shield wall" made of umbrellas and makeshift wooden shields was formed facing westbound towards us.

At that time, we were told to move in to affect the arrest on the suspect with the Molotov's. A few bike teams started to move in before ours. As the initial bike team made the arrest, I observed as the crowd tried to prevent further officers from advancing and also started throwing hard objects at officers.

Contact/Force Used #1:

As we got off our bikes and moved towards the south side of the parking lot, where the crowd was offering more resistance, I observed as one suspect wearing all black was waving an umbrella at an officer's face and pushing back against the officer. I moved up and O/C sprayed the suspect who was able to block the spray with the umbrella. I therefore moved the umbrella out of the way with my hand and sprayed again. I observed as the stream/spray made contact on the suspect's goggles which were covering his eyes. This was effective as not only this individual moved back rapidly but so did the surrounding rioters around him.

Legal Authority/ Lawful Purpose: At the time this occurred, the suspect was standing on 4 Av S which is a public street open to public access. I had probable cause to arrest the suspect for assault on officer, when force was used however making an arrest was not safe or feasible due to resources being spread out and not being able to make a safe and coordinated plan.

Contact/Force Used #2:

Roughly 9 minutes after the first UOF, we were moving northbound on 4 Av S forcing the riotous crowd to walk away from SPOG and the other arrests. While moving northbound, several rocks, fireworks and other hard objects had been thrown at officers including direct assaults on officers. One of the fireworks which had been thrown at a large group of officers I was riding next to, exploded and was powerful enough to knock me off balance off my bicycle.
After evaluating myself, I quickly got back up and continued to catch up with my team. As I joined with them and we continued to give orders to keep moving, I observed an officer move in to make an arrest on a nearby protester to my left which was the west side of the street.
Immediately following the officer attempting to make this arrest, several members of the crowd rushed in to un-arrest their comrade. I observed as several offenses were being committed such as obstruction and assault. I focused on one suspect who was assisting in the un-arrest by pulling on another suspect who had a hold of the arrestee. I used my O/C spray and targeted the face region on that suspect who's only differentiating description was that they were wearing brown knee pads.

I noticed that a suspect with a red backpack then tried to step into the stream to block it with their hand and prevent it from being effective. At the same time, another suspect wearing brown pants and a wooden stick moved in towards officers to un-arrest another suspect who was now on the ground. Due to that obstruction and that he was advancing towards officers with a stick, I also sprayed him in the face region of his body.

Legal Authority/ Lawful Purpose: At the time this occurred, the suspects were standing on 4 Av S which is a public street open to public access. I had probable cause to arrest the suspect for obstruction, when force was used however making an arrest on them was not safe or feasible due to resources being spread out thin and the inherent risk to officers.

Contact/Force Used #3:

Approximately 4 minutes after the second volley of UOF, we were still moving the crowd northbound on 4 Av S when I observed an officer on my right side, the east side of the street, effect an arrest. Again, when he did so, the crowd rushed in to un-arrest their comrade. I too moved in to prevent intervention from the crowd.

One suspect in particular who was a white male with all black clothing and clear goggles grabbed onto the arrested suspect and started pulling on them away from the officer's grasp. I therefore used my O/C spray and deployed it in the face region of that suspect's body.

This was a very effective deployment as not only did he let go of the arrestee and tried to run away, but so did the rest of the other suspects trying to un-arrest the arrestee, start to run away. They tripped and fell but it did not appear there were any injuries.

Legal Authority/ Lawful Purpose: At the time this occurred, the suspect was standing on 4 Av S which is a public street open to public access. I had probable cause to arrest the suspect for obstruction, when force was used however making an arrest on them was not safe or feasible due to resources being spread out thin and the inherent risk to officers.

Resolution:
Due to the rapidly escalating situation and volatile crowd I was not able to communicate my UOF with my supervisor at the time it occurred. There were also many other officers using force and the focus was in crowd control.

I did notify Sgt Sylvester once the situation was under control and when feasible.

ADDITIONAL INFORMATION:
De-escalation was not safe or feasible in any of the OC spray deployments since the intended recipients of the spray were either actively assaultive to officers or actively interfering with a lawful arrest.

Medical assistance was not rendered to any of the suspects on which O/C was deployed on. The suspects all ran away therefore rendering medical aid was not an option.

All of the un-arrests in my experience create an inherent safety risk to the officers effecting the arrest. That is because un-arrest techniques include, assault on officers, or giving the arrestee the upper hand on the struggle which turns into assault on officer. Therefore, the use of O/C or other less lethal tools are appropriate and necessary to ensure the safety of all those involved.

## Incident Location

• 2949 4th Av S, SEATTLE, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

**Reason for Use of Force**
Defense of Others

**Service Being Rendered**
Demonstration

**Weather Condition**
Clear

**Lighting Condition**
Daylight

**Distance to Community Member**
1 – 5 feet

**Community Member Injured**
No

**Community Member Taken to Hospital**
No

**Community Member Arrested**
No

**More than 1 Community Member Involved**
Yes

**Community Member's Build**
176-225 pounds

**Community Member's Height**
5'7" – 5'9"

**Employee Assessment of Community Member Condition During Incident**
Unimpaired

**Employee(s) Injured**
No

**Employee(s) Taken to Hospital**
No

## Reporting/Involved Community Member Information

### John Doe

DOB:    Race: Unknown    Ethnicity:    Gender: Male

#### Role
• Suspect

#### Types of Resistance Community Member Used Against Employee(s)
• Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

### John Doe

DOB:    Race:    Ethnicity:    Gender: Unknown

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use
- Personal Weapons – Push

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race:    Ethnicity:    Gender: Unknown

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## John Doe

DOB:    Race: White    Ethnicity:    Gender: Male

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Jimmy Haas - Serial: 30060294 - Badge Number: 8511
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage**: [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | Yes | 1 | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

| No running sheet entries to show |
| --- |

## Attachments

| Date Attached | Attachment Description | Attachment Type |
| --- | --- | --- |
| 9/10/2020 | 2020-261072 Haas, J. 8511 | docx |

## Assignment History

| Sent Dt | From | To |
| --- | --- | --- |
| | | |

## Chain of Command History

| Routing #1 | |
| --- | --- |
| Sent From: | Police Officer Jimmy Haas |
| Sent To: | Acting Police Lieutenant David Sylvester |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 5:12 PM |

**Instructions from Police Officer Jimmy Haas to Acting Police Lieutenant David Sylvester:**

| 2020-261072 Haas, J. 8511 Type 2 OC spray |
| --- |

**Comments/Response from Acting Police Lieutenant David Sylvester:**

| Approved: Approved |
| --- |
| Reason: |
| Comments:<br>Forwarded without review |

| Routing #2 | |
| --- | --- |
| Sent From: | Acting Police Lieutenant David Sylvester |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 5:31 PM |

**Instructions from Acting Police Lieutenant David Sylvester to Police Lieutenant Seth Dietrich:**

| 2020-261072, Type 2 Crowd Control, Haas, 9/10/2020 |
| --- |

**Comments/Response from Police Lieutenant Seth Dietrich:**

| Approved: |
| --- |
| Reason: |
| Comments:<br>[Open routing] |

**Author Signature Line**

_____

Police Officer Jimmy Haas - 30060294

**Chain of Command Signature Lines**

_____

Acting Police Lieutenant David Sylvester

Case 2:20-cv-00887-RAJ    Document 146-2    Filed 11/02/20    Page 55 of 303

EXHIBIT B(9)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer James Kellett - 30051836

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/8/2020 | 9/7/2020 | 18:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58061 | 2020-261072 | 2020UOF-1375 |
| **Date/Time Entered** | | |
| 9/8/2020 00:12 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: J. KELLETT #7732
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Kraus #5290. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt Kraus #5290
B. BWV recorded: BWV recorded the following level 2 Use of Force I reviewed the BWV prior to this statement. I activated my BWV camera as soon as it was safe and feasible to do so all Mark 9 deployments were included on the camera.


DETAILED NARRATIVE:
Prior to arrival at this large demonstration I attended a roll call/briefing at the West Precinct. During the briefing the Incident Commander was identified as Captain Allen and the Operation Section Chief was identified as LT Brooks. The commander's intent and other details regarding the event and use of force protocols were discussed in the briefing (please reference the "Labor Day Events" IAP for more information.
I have worked many demonstrations and received a variety of training in regards to crowd and demonstration management. I have worked demonstrations in both a bicycle officer capacity as well as an Anti-Crime Team officer. On this day 9/7/2020 I was working as a member of West ACT and was wearing a BDU uniform with all of my regular duty gear as well as a helmet, black baton, Mark 9 OC Canister and shin guards.
Immediately prior to our arrival in the 2900 block of 4 AV S, I heard radio broadcasts that there were multiple individuals walking near buildings with suspected incendiary devices.
We exited the ACT van in the 2900 block of 4 AV S, from this point West ACT moved northbound on 4 AV S with a large crowd. It was in this area that I started to observe numerous assaults on officers, including individuals striking officers, as well as suspects throwing rocks, bottles, and mortar fireworks at officers. Due to constant violent attacks on officers by the crowd I attempted to protect and stop these violent attacks against fellow officers and myself by using a canister of Mark 9 OC Spray directed at specific individuals who I could see assaulting officers and throwing projectiles.
I have received SPD training in the proper use of OC spray and followed my training during each deployment.
The first burst of OC spray was at approximately 1831 hours. I had observed the following immediately prior; a large group of suspects hitting officers who were ordering them to move back, they were hitting officers with makeshift weapons, what I suspected to be plywood covered in black paint. I also observed an individual throw something at the line of bike officers. I moved forward and attempted to direct OC spray at the specific individual who had thrown the item. I attempted to move up and identify this suspect who I directed the spray at, in order to make an arrest when safe and feasible but the suspect ran into the crowd.

The second burst of OC spray was at approximately 20 seconds after the first. On my BWV video you can see a rock fly through the air and strike me in the left arm. I attempted to direct a spray at this suspect who had just assaulted me in order to stop the assault. The suspect quickly ran into the crowd and I was unable to note a description in order to make an arrest later when it may have been safe and feasible to do so.

The third burst of OC spray occurred at approximately 10 seconds after the second. Bike officers were making an arrest just to my left, as they were making the arrest a suspect started to advance towards the officers carrying a wooden baton. The suspect was wearing a black hoodie and brown pants and can be seen advancing on officers on my BWV. With his makeshift weapon in hand and his disobeying officer's lawful orders to move back, as well as his disobeying the dispersal order I focused my attention on this suspect. The

suspect moved forward and started pushing on the officers, assaulting them. I sprayed the suspect in an attempt prevent a further assault from happening. The force was effective and the suspect fled into the crowd. This stopped the assault, however I was unable to arrest the suspect as he ran into the crowd and I did not see him again.

All three of these bursts of OC spray occurred on a city street in Seattle, which I and other officers had the legal authority to be on. All of the use of force also occurred with a lawful purpose of attempting to stop ongoing assaults on officers and myself. Additionally, prior to the first OC spray, the dispersal order being given by SPD can be heard on my BWV.

I was unable to summon medical aid for this Mark 9 deployment due to suspects fleeing into the crowd, evading arrest and thus medical treatment.

This ended all the force that I used in regards to Mark 9 deployment.

Sgt Kraus #5902 screened the use of force at the scene, I informed him of my level 2 use of force.

## Incident Location

- 2700 4 AV S, Seattle, WA 98134 - Location of Occurrence: Demonstration

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 11 – 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |
| | | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### John Doe

DOB:    Race: Unknown   Ethnicity:    Gender: Male

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|

| No injuries noted or visible | | |
| --- | --- | --- |

**Charges against this Community Member**
- Felony-Person Crime

# John Doe

DOB:    Race:    Ethnicity:    Gender: Unknown

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Blunt Object – Use

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
| --- | --- | --- |
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

# John Doe

DOB:    Race:    Ethnicity:    Gender: Male

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Personal Weapons – Push

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
| --- | --- | --- |
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

## Police Officer James Kellett - Serial: 30051836 - Badge Number: 7732
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct Ops B119/West Pct Ops - Act Night B119B/West Pct Ops - Act Night B119B

**Video Footage:** [No Response]

### Role
- Secondary Officer

**Force used by this employee against the community member**

- Canister - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Canister - OC | Yes | 1 | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/8/2020 | PDF 2020-261072 | pdf |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
|  |  |  |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer James Kellett |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/8/2020 2:50 AM |
| **Instructions from Police Officer James Kellett to Police Lieutenant Seth Dietrich:** | |
| 2020-261072 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:11 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer James Kellett - 30051836

**Chain of Command Signature Lines**

_____
Police Lieutenant Seth Dietrich

EXHIBIT B(10)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Adam Losleben - 30038015

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/9/2020 | 9/7/2020 | 18:30 |

| Record ID # | Case # | IA Pro Number |
|---|---|---|
| 58116 | 2020-261072 | 2020UOF-1415 |

| Date/Time Entered | | |
|---|---|---|
| 9/9/2020 22:33 | | |

## Incident Summary

EVENT/GO#:2020-261072
DATE OF OCCURRENCE:09/07/2020
STATEMENT OF:OFC ADAM LOSLEBEN #7420
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police
Department manual order by Sgt M. Renner. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt Renner
B. ICV/BWV recorded: BWV was activated during the incident. I discovered that when I exited the BearCat
that the sling of the satchel, I was carrying turned the camera off. Once I noticed that it was off, I turned it
back on. It happened a couple of times during the riot and when I noticed I turned it back on. There is not
ICV because the vehicle I was in is not ICV equipped. I attempted to watch my body worn and that is when I
discovered it missed a lot of the riot. I notified Sgt Renner after the incident.


PRE_ARRRIVAL/ARRIVAL:
At the time of the incident I was wearing a marked uniform that consisted of a ballistic plate carrier, duty
belt, helmet with police markings, and a gas mask. I also was armed with a 40mm less lethal launcher. I am
currently part of the less lethal cadre for the SWAT Team. That means I am responsible for training the SWAT
Team on the use of the less lethal tools we have. I have received training from the National Tactic Officers
Association on less lethal applications and training other officers on their use. I take a written test annually on
the use of Less Lethal tools and get practical applications of the tools in training. I also have received crowd
management training from the department and have assisted with controlling demonstrations dating back to
the Occupy Movement in 2009. I did attend department training this year for the deployment of Blast Balls.

Before the incident started, I attended a briefing at the West Pct where I learned that the protest was against
police unions since police officers are not actually workers. We were told that the group of folks were going to
be made up of "Black Bloc/Anarchists" and their intention was to try and destroy the Seattle Police Officers
Guild Building in the 2900 of 4 Ave S. I had already worked one protest that ended in a riot. In that riot, the
same group, light the East Pct on fire and tried to cement the doors shut. During the brief I was told that we
would let them march and protest but would not let them commit any acts of violence or significant property
destruction. I was informed that the suspects were planning on throwing an explosive device underneath the
BearCat to try and disable it.

For the incident I was assigned to work from the Bear Cat and support the line officers with less lethal
munitions if needed. I initially heard everything over radio and did not see anything. One of the incidents I
heard was that someone in the crowd, at the light rail station near 5 Ave S/S King St, assaulted another
person and subsequently got arrested for the assault. Around 1730 the group of approximately 500 subjects
started walking toward the SPOG Building in the 2900 block of 4 Ave S.

The crowd arrived in front of the guild building around 1820 hours. Officers were off in the distance observing
the crowd. We were trying not to be the flash point for the protest. The crowd also had approximately 10
vehicles tailing the march. When the crowd got in front of the guild office, I heard an officer report that there
was a strong smell of gas in the crowd. I then heard that they believed other officers had identified the
suspect who had the molotov cocktails. An order was given to move in and make the arrest of the suspect
with the devices. A short time later Captain Allen declared it unlawful assembly and for the crowd to disperse.

Legal Authority/Lawful Purpose:
The area that the suspects were in was open to the public. It was a public street (4 Ave S or a public parking lot) and I had to use force to stop suspects from actively assaulting officers with fists, feet, rocks, fireworks, water bottles, street signs/cones, and molotov cocktails. Some of the assaults the suspects were committing I consider to be lethal or would cause serious bodily harm (assault 1 and 2). Every time I used force (a blast ball) it was to stop an assault or prevent a suspect from carrying out an assault or joining in on an assault.

Contact with Subjects: (If feasible)
The suspects knew I was a Seattle Police Officer because of the uniform I was wearing, and I had police vehicles behind me with their lights and sirens active. I also heard numerous other officers giving the suspects commands to leave the area after Captain Allen's dispersal order. I did not give any real verbal commands because I was wearing my gas mask and that made it hard to communicate.

The crowd was approximately 500 and all hated police officers. They were yelling anti-police sayings and assaulting officers. They were assaulting us with fists, feet, rocks, water bottles, fireworks, road construction equipment, shields, and molotov cocktails. Any time that we stopped moving towards the crowd several suspects in the crowd would start to throw things at officers. Whenever officers moved in to make an arrest several suspects would try to unarrest the suspect. Often those altercations turned violent and I saw several suspects punch or kick officers in the head to try and unarrest their friend. The only way I was able to stop these assaults or prevent them was with the use of force. Seeing officers get attacked while they were on the ground with a suspect is a dangerous situation and earlier in the year an officer in Las Vegas was shot in the head during a similar situation.

De-Escalation Techniques Employed:
Captain Allen gave a dispersal order over a PA system and I heard numerous officers giving the suspects commands to leave the area. We also tried to keep things calm by having a lot of officers' present at a distance. I estimate we had over 100-150 officers on scene. The use of blast balls in themselves is a form of de-escalation. By using them I was able to end an activate assault on an officer or prevent suspects from coming closer to them while they were arresting someone. Using blast balls also allowed me to ability to effect a suspect without physically touching them and minimizes the amount of force I had to use.

Threat Assessment/Decision Made:
Every time I deployed a blast ball it was to end an assault on myself, an officer, or prevent an assault. The suspects were actively assaulting officers with personal weapons, rocks the size of a softball, construction equipment, fireworks, and molotov cocktails. Seeing these assaults, I made the decision to use a blast ball. I could not us my single 40mm to end them because officers were under the suspects or the suspects had shields. The only option I had was to use a blast ball or close with the suspect and use my hands and feet. By using a blast ball, I was able to help mitigate injuries to the suspects.

Use of Force:
During the incident I believe I deployed four OC blast balls. I cannot verify the number because my body worn camera got shut off. I deployed two blast balls in the parking lot across the street from the guild. The parking lot was to the east and while I was in that parking lot, I saw several officers attempt to arrest someone. While they were taking that suspect into custody numerous other suspects ran up on the officers and started hitting them in the head. I believe another suspect started to kick officers. When I saw these assaults, I tried to deploy my single 40mm but was not able to because of my backdrop. I then decided that I had to use an OC blast ball to stop these assaults and convince others from joining in. I believe I deployed that blast ball behind them with an under-hand toss as taught by training.

A short time later I saw another arrest unfold in front of me in the same parking lot. Again, I watched officers arrest someone and other suspects start to move towards them. Seeing that threat, I had to act and the only tool I had that was effective was a blast ball. I used under hand toss to keep a group of suspects from trying to under arrest their friend.

We eventually pushed out of the parking lot and started moving north on 4 Ave S. While moving north several bike officers made an arrest of a suspect in front of me. That suspect resisted and started to fight and that required more officers to get involved. I got knocked to the ground by the fight. When that occurred, a hole formed in the police line. When I looked up, I saw the hole and saw suspects moving towards me. I then decided to deploy another OC blast ball. That kept the suspects from moving forward towards me and the officers on the ground. I deployed that blast ball close the line and on the ground.

After that the line reformed and I joined in behind it. I was on the east side of 4 Ave S. While approaching the intersection of 4 Ave S/S Holgate St I saw a white object in the air and that object was on fire. I then saw that object hit the ground and explode into a ball of fire. The explosion was very close to officers and I was able to feel the heat from it from my location. I was able to identify it as a molotov cocktail and saw the area it came from. Have a molotov cocktail thrown at us could result in serious injury or even our death. Once that was thrown at us, I deployed another blast ball into the area the molotov cocktail came from to get the suspect moving away from us. That blast ball was deployed on the ground at the suspects feet.

During the whole incident I only used force when I had a specific threat to me or other officers and when that

threat ended, I stopped using force.

Medical Aid and Evaluation:
All the suspects ran away and did not stick around for me to ask them if they required aid.

ADDITIONAL INFORMATION:
It should be noted that a suspect(s) in the crowd had brought molotov cocktails to the event and when the order was given to move in and make the arrest, they dropped the box carrying numerous incendiary devices. The box was recovered and turned over to ABS for processing.

## Incident Location

- 2900 4 Ave S, Seattle, WA - Location of Occurrence: Demonstration

## Use of Force Specific Information

**Reason for Use of Force**
Defense of Others

**Service Being Rendered**
Demonstration

**Weather Condition**

Clear

**Lighting Condition**

Daylight

**Distance to Community Member**

6 – 10 feet

**Community Member Injured**

No

**Community Member Taken to Hospital**

No

**Community Member Arrested**

No

**More than 1 Community Member Involved**
Yes

**Community Member's Build**
125-175 pounds

**Community Member's Height**
5'10" – 6'0"

**Employee Assessment of Community Member Condition During Incident**

**Employee(s) Injured**
Yes

**Employee(s) Taken to Hospital**
No

## Reporting/Involved Community Member Information

### Unknown

DOB:    Race:    Ethnicity:    Gender:

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Explosive
- Blunt Object – Use
- Personal Weapons – Punch/Elbow
- Personal Weapons – Feet/Leg Kick/Knee
- Personal Weapons – Bodyweight
- Passive Noncompliance (including Verbal)
- Resist Handcuffing
- Chemical Agent

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

### Charges against this Community Member
- Felony-Person Crime
- Misdemeanor-Person Crime
- Obstructing Charge

## Involved Employees

### Police Officer Adam Losleben - Serial: 30038015 - Badge Number: 7420
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Special Operations Bureau
B600/Metropolitan Section B620/Swat Unit B621/Swat - Night Squad 1 B621C/Swat - Night Squad 1 B621C

**Video Footage**: [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | | |
| Balls - OC | Yes | | |
| Balls - OC | Yes | | |
| Balls - OC | Yes | | |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/9/2020 | Use of Force | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Adam Losleben |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 10:39 PM |
| **Instructions from Police Officer Adam Losleben to Police Sergeant Ronald Campbell:** | |
| Use of Force | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Adam Losleben - 30038015

EXHIBIT B(11)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Vaughn McKee - 30051296

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:21 |

| Record ID # | Case # | IA Pro Number |
|---|---|---|
| 58044 | 2020-261072 | 2020UOF-1373 |

**Date/Time Entered**
9/7/2020 22:37

## Incident Summary

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/Sergeant M. Blackburn. I DO invoke my Garrity rights prior to giving this statement.

BWV was activated and captured the force used.
2020-261072
Pre-Arrival Details

On September 7, 2020, I was in uniform working for the East Precinct Anti-Crime Team (ACT). Our assignment for the day was crowd management/RDF for an organized protest against the Seattle Police Officers Guild building. Last time a gathering like this occurred, a crowd dressed in all black (Antifa) attempted to set fire to the building. This required an extremely large police response to combat these acts of violence. When police defended the SPOG building, many officers were injured from Antifa throwing explosives, rocks, and other projectiles.

Antifa had another planned event to protest against SPOG today and intelligence believed there would be more acts of violence. A crowd of approximately 200 people dressed in all black marched to the SPOG office building on Fourth Avenue. Undercover officers located a suspect in the crowd with a Molotov cocktail. This type incendiary device was used last time Antifa tried to commit arson against the SPOG office. A Molotov cocktail is extremely dangerous to people and property. It has a very high potential to light an individual on fire on cause serous injury or death. It was imperative that this suspect be apprehended before the illegal incendiary device was deployed.

Undercover officers kept eyes on the suspect and an arrest plan was created by the incident commander. Bicycle officers were going to arrest the suspect who was in the crowd and ACT officers and SWAT were going to support them.

Arrival

Around 1821 hours, bicycle officers moved in to arrest the suspect with the Molotov cocktail. East ACT was around the corner and we arrived on scene shortly after the bicycle officers moved into the crowd. By this point chaos ensued between SPD and the Antifa rioters. The crowd were throwing projectiles at officers and attacking bicycle officers. Bicycle officers created a line and started to push the mob back. Shortly after arriving, the incident commander declared this crowd an unlawful assembly and a dispersal order was given. The crowd refused to leave the area and SPD had to push from fourth avenue to Rainier Av S and I90 approximately 2 miles away.

Legal Authority and Lawful Purpose
Legal Authority: I was on a public street and an order to disperse was given by the incident commander who deemed the gathering a riot.

Lawful Purpose: My lawful purpose was to protect Seattle Police East Precinct, myself, and fellow officers. Each time I used force, it was to prevent myself or other officers from being assaulted. I was also assisting officers make a felony arrest to a suspect in possession of a Molotov cocktail.

De-Escalation
De-Escalation was not feasible prior to me using force. Other officers were being assaulted and I risked causing them injury by not protecting them with the C.A.R.T. capabilities that I had available to me.

Force Used

When I arrived on scene, I observed the crowd clashing with bicycle officers. They were making physical contact with the bicycle officers by pushing into them. In order to protect the bicycle officers and give them space, I threw a blast ball underhand at a small group of suspects pushing back against SPD. The blast ball landed in front of the small group. The crowd immediately retreated and did not proceed forward again. This deployment was necessary to defend the bicycle officers and assist them with making a felony arrest. I only targeted a small group within the crowd that was actively committing a crime. I did not target the crowd as a whole.

A dispersal order had been given by the incident commander. Several minutes later, I threw another blast ball underhand at a group of rioters who were charging toward officers making an arrest. The blast ball landed in front of the small group of suspects. An officer was just kicked in the head by a suspect and needed assistance on the east side of Fourth Avenue in a parking lot across from the guild office. After throwing the blast ball, the small group of suspects fled the opposite direction. This deployment was necessary to assist officers who were making arrests and unable to defend themselves from other threats in the crowd. I believed this small group were going to assault the arresting officers and also attempt to de-arrest suspects. Why else would a group of people charge forward when police are actively using OC, munitions, and other means of force towards rioters. I only targeted a small group within the crowd that was actively committing a crime. I did not target the crowd as a whole.

Resolution
The force that I used was reasonable and necessary. This was a very chaotic and violent scene where officers were being assaulted. My actions were to prevent assaults that were actively occurring along with dispersing the crowd. Without SPD intervention the mob would have burned the SPOG office. The blast balls were effective and forced the intended group that I was targeting to go in the opposite direction. SPD had to push the crowd two miles away until they finally dispersed in a park near Rainier Av S/ I90.

This incident was screened by A/Sergeant Blackburn.

## Incident Location

• 2949 Fourth Avenue South, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 11 – 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'10" – 6'0" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

## Unknown (s) Demonstrator

DOB:   Race: Unknown  Ethnicity:   Gender:

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Personal Weapons – Push

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

## Police Officer Vaughn McKee - Serial: 30051296 - Badge Number: 7720

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/East Pct B240/East Pct Ops B249/East Pct Ops - Night Act B249B/East Pct Ops - Night Act B249B

### Video Footage: [No Response]

### Role
- Secondary Officer

### Force used by this employee against the community member
- Balls - Blast - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - Blast | Yes | X | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | UOF Type 2 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Vaughn McKee |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | Acting Police Officer Detective Matthew Blackburn |
| Sent Date/Time: | 9/7/2020 10:45 PM |
| **Instructions from Police Officer Vaughn McKee to Police Lieutenant Seth Dietrich:** | |
| UOF TYPE 2 2020-261072 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:17 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Vaughn McKee - 30051296

**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(12)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Acting Police Lieutenant Ben Morrison - 30019447

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 17:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58039 | 2020-261072 | 2020UOF-1369 |
| **Date/Time Entered** | | |
| 9/7/2020 21:44 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 09-07-20
STATEMENT OF: SGT. B. MORRISON, #6643
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police
Department manual order by Sgt. Ron Campbell. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: N/A
B. ICV/BWV recorded: Yes-BWV

DETAILED NARRATIVE:

On 09-07-20 at approximately 1700 hours, I was working as a sergeant with the Seattle Police Department
and assigned to the East Precinct ACT Team for several protest events scheduled for Labor Day. I was
wearing black BDUs, a ballistic helmet, and multiple police markings.

East ACT was positioned near the SPOG office in anticipation of a protest and attacks on the SPOG office.
Approximately 500 people, most dressed in "Black Bloc"-style clothing and armed with shields, umbrellas, and
other apparatus, had marched from the International District to the SPOG office.

SPD resources advised that there was an individual in the crowd that possessed Molotov cocktails. These
potentially deadly weapons had been used to attack the East Precinct and SPOG over the past month or so.

Based on the PC developed by an SPD resource, officers moved to seize that individual who was standing in a
public street. (lawful purpose and legal authority)

East ACT followed multiple bike squads toward the crowd to arrest the one individual that had been identified.
When officers attempted to detain the individual, other members of the crowd immediately began to throw
rocks, bottles, and fireworks at officers.

The crowd was dispersed south and northbound on 4th Ave S. One group went south then circled back north
through the parking lot across the street from the SPOG office (behind the Pick Quick coffee stand on the east
side of 4th Ave S.)

As this crowd meandered through the lot, I saw at least two arrests taking place. One involved a black male
in a red shirt, the other involved a black male in a blue shirt. Multiple officers were attempting to arrest these
suspects and both suspects appeared to resist.

As I moved to assist those officers, I saw several individuals break off from the crowd that was at the north
end of the parking lot and run toward the two arrests taking place. One individual was a black male with a
multicolored shirt. I was too far away to physically place myself in between these suspects and those being
arrested. I threw an OC blast ball with an underhand motion at the group running toward the suspects being
arrested to defend the officers involved in the arrests.

I heard the blast ball initiate but did not see if it had its desired effect.

I continued to move toward the officers arresting the black male in the blue shirt. I briefly assisted them with
taking him into custody.

End of statement.

## Incident Location

• 2949 Fourth Ave S, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
| --- | --- | --- |
| Defense of Others | Demonstration | |

| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| --- | --- | --- |
| Clear | Daylight | 11 – 20 feet |

| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| --- | --- | --- |
| No | No | No |

**More than 1 Community Member Involved**

Yes

| **Community Member's Build** | **Community Member's Height** |
| --- | --- |
| Less than 125 pounds | 5'10" – 6'0" |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
| --- | --- |
| No | No |

## Reporting/Involved Community Member Information

### John Doe

DOB:    Race: Black   Ethnicity:    Gender: Male

#### Role
• Suspect

#### Types of Resistance Community Member Used Against Employee(s)
• Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
| --- | --- | --- |
| No injuries noted or visible | | |

## Involved Employees

### Acting Police Lieutenant Ben Morrison - Serial: 30019447 - Badge Number: 6643

**Assignment at time of incident:** Title: Acting Police Lieutenant Chief of Police A000/Investigations Bureau

B700/Violent Crimes Section B710/Robbery, Fugitive and Gang Unit B712

**Video Footage**: Equipped - Activated

**Role**
- Supervisor on Scene

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | X | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | 2020-261072 Type 2 Blast Ball Sgt. Morrison 9-7-20 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Acting Police Lieutenant Ben Morrison |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/7/2020 10:26 PM |
| **Instructions from Acting Police Lieutenant Ben Morrison to Police Lieutenant Seth Dietrich:** | |
| 2020-261072  Type 2-Blast Ball  Sgt. Morrison  9-7-20 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments: Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:12 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Acting Police Lieutenant Ben Morrison - 30019447

**Chain of Command Signature Lines**

Case 2:20-cv-00887-RAJ          Document 146-2          Filed 11/02/20          Page 80 of 303

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(13)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Brian Muoio - 30056731

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/9/2020 | 9/7/2020 | 18:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58110 | 2020-261072 | |
| **Date/Time Entered** | | |
| 9/9/2020 16:25 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFC. MUOIO #8381
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by . I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Kraus #5290
B. ICV/BWV recorded: No ICV. BWV activation was approx. 1min late. Due to my arrival happening quickly to provide support to bicycle officers who were being assaulted by a large unruly crowd.


DETAILED NARRATIVE:
PRE-ARRIVAL DETAILS: On 9/7/2020 I, Officer Muoio #8381, was working as unit 191 as part of the West Anti Crime Team. My direct supervisor was Sgt. Kraus and the group Supervisor for the Crowd Management was LT. Dyment. My unit was called in to monitor multiple events that was scheduled for the day. We were briefed on three specific events: "The Labor Day Caravan", "Labor Day March calling for no more Police Unions" and "Let us Worship" events.
There have been numerous protests over the past several months throughout the City Of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. The commander's intent was to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. The commander's expectation was to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction was not going to be allowed. Officers were advised to look for specific acts of violence or property destruction and respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then a dispersal order would be given and coordinated crowd control tactics that are consistent with law, policy and training to restore order. Once the crowd is dispersed adequately and order is restored, personnel are expected to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.
Some specific protests that resulted in significant property destruction or assaults on Officers include on August 16, when the protest was deemed a riot after the crowd assaulted offices with rocks, bottles and explosive devices the caused injuries to Officers. On 8/24/2020 the march resulted in serious threats to Officers safety. Notably, quickrete and other barricades were used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on 8/24/2020, Molotov cocktails were used in attempt to burn down the SPOG building at 2949 4 Av. On 9/1/2020, a group of approx. 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct.
For this event at approx. 1520 hours Offices got intelligence that there was a crowd of approx. 500 people at the "Labor Day March calling for no more Police Unions" getting ready to march on 5 Av towards the SPOG Office from Jackson St. Members in the crowd were seeing wearing all black clothing, gas masks, carrying heavy backpacks, trash bags, shields and other makeshift devices.
When the march approached the SPOG Office at 2949 4 Av an Officer spotted a male in the crowd with a Molotov cocktail. A description was provided and an arrest team was formed to effectuate the arrest of the male holding the Molotov cocktail.

ARRIVAL: While the bicycle Officers moved into the crowd to make a targeted arrest of a suspect who was holding a Molotov cocktail they were immediately met with resistance from the crowd.

My unit was staged on the West side of the SPOG Office, on standby to assist in crowd management if needed.

When the crowd turned their attention to the arresting bicycle Officers and started throwing objects at them myself and my unit moved in to assist. My BWV was late to activate as my involvement happened quickly. I activated it immediately when I noticed it was not on. On my approach on foot to the conflict I witnessed as large objects were being thrown from the crowd at officers and heard multiple loud explosions that were not blast balls from Officers. One subject was seen discharging a fire extinguisher in the crowd at officers and then throwing it officers.

I witnessed as one male threw an unknown object at officers from the front of the line. Bike Officers formed a crossbow arrest team, a trained tactic to make arrests in large crowds, and attempted to arrest the suspect. The suspect ran and the bicycle officers pursued and I gave chase on foot to provided security for those Officers as they moved deep into the unruly crowd. The suspect was eventually taken into custody after he collided with a pursuing bicycle Officer near the Pink Elephant car wash (unknow address on 4 Av). I placed the suspect's legs into a figure four leg lock to prevent the subject from assaulting arresting officers. This technique is a trained tactic that all Officers receive in annual defensive tactics training. Once the suspect was placed into custody and no longer a flight risk or risk to injure officers I put my attention back onto the unruly crowd as they headed North on 4 Av.

The crowd was seen throwing very large rocks from the rear of the crowd towards Officers. We were ordered to keep the crowd moving North on 4 Av to further disperse the group. At approx. this time I heard a dispersal order being broadcasted on the SPD loud speaker saying it was deemed an unlawful assembly and the participants were to disperse immediately.

As I approached the group I witnessed as one suspect dressed in all black holding a black umbrella grab ahold of an Officers bike and pull it away from the Officer. As the Officer was retrieving the bicycle I administered a one second OC deployment on the specific target to provided that Officer distance from the suspect to regain control of his bicycle. The targeted OC deployment was effective as the suspect was seen turning around immediately afterwards and leaving the area. Due to the suspect turning around and leaving the area it was not safe or feasible to effectuate an arrest or provide medical aid to the suspect.

Approx 15 seconds later I witnessed as a group of approx. 20 individuals were huddled in a tight group, holding umbrellas and shields, wearing helmets and gasmasks. They were standing directly in the middle of the street preventing SPD from advancing forward to disperse the crowd further. The SPD bicycle line was attempting to move forward telling the suspects to move back and to disperse. The suspects were using their umbrellas to jab at Officers as Officers closed the distance between the two sides. I used two controlled 1 second OC deployments to separate the bicycle Officers from the tightly formed group. The first deployment was aimed at a specific target who was wearing a full face gasmask holding an umbrella. A second before my deployment the suspect can been seen shoving the umbrella at the Officer to my left. The deployment hit the suspect's gasmask and covered the face shield with OC. The second deployment was aimed directly at an induvial who was poking an umbrella at an officer to my right. I believed the force to be effective as the whole group took large steps backwards giving more distance between Officers. It was not feasible to rush into the group to make arrests for assault on Officers or failure to disperse. The subjects continued moving backwards and dispersed into the large crowd that was forming behind them. Which was approx. 10 yards from the advancing officers. At this time I was unable to provide any medical assessment as I lost eyes of the suspects.

As myself and other officers advanced forward telling the group to disperse I witnessed more large objects being launched at officers from the crowd. Towards my left, on the west side of the road, I saw another large group, with approx. 30-40 subjects, huddling together holding shields and umbrellas preventing Officers from advancing forward. As Officers got closer to the group that was not dispersing an unknown skirmish broke out. I advance forward to the incident to provided cover for the Officers. When I approached, I saw people in the group pulling on each other, a tactic I have seen used to "Un-arrest" a suspect. This tactic causes a significant risk of injury to the officer and the suspect they are trying to arrest. To prevent any significant bodily injury to all involved I targeted a specific individual that I saw pulling on another subject with a controlled 1 second OC deployment. The individual was wearing a black hoodie with the hood up, black face covering, and blue jeans. After the deployment the individual immediately released the person he was pulling and walked away from the incident. The force was effective as the induvial left the area. Due to this I was unable to effectuate an arrest for obstruction and was unable to screen for any injuries.

The crowd then continued moving North on 4 Av with SPD giving dispersal orders. As we approached 4 Av Stacy St. A member of my squad recognized a suspect wanted for throwing a Molotov cocktail at the East Precinct on 9/1/2020 in the crowd of people. My squad formed a team and reached in a placed the suspect under arrest. The take down resulted in a type 2 Use of Force which I will be completing under the case number 2020-261308. This arrest ended my involvement on the crowd dispersal incident.

No further action taken.

Case 2:20-cv-00887-RAJ     Document 146-2     Filed 11/02/20     Page 84 of 303

## Incident Location

- 2949 4 av, Seattle, WA

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |

**Employee Assessment of Community Member Condition During Incident**

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### John Doe

DOB:   Race: Unknown   Ethnicity:   Gender: Unknown

**Role**
- Suspect

### John Doe

DOB:   Race: Unknown   Ethnicity:   Gender: Unknown

**Role**
- 

### John Doe

DOB:   Race: Unknown   Ethnicity:   Gender: Unknown

**Role**

Case 2:20-cv-00887-RAJ     Document 146-2     Filed 11/02/20     Page 85 of 303

- 

**John Doe**

DOB:     Race: Unknown   Ethnicity:     Gender: Unknown

**Role**
- 

## Involved Employees

### Police Officer Brian Muoio - Serial: 30056731 - Badge Number: 8381
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - David Beats B112A/West Pct 2Nd W - David Beats B112A

**Video Footage:** [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Canister - OC - Was force effective: Yes
- Canister - OC - Was force effective: Yes
- Canister - OC - Was force effective: Yes
- Canister - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Canister - OC | Yes | 1 | 1 |
| Canister - OC | Yes | 1 | 2 |
| Canister - OC | Yes | 1 | 3 |
| Canister - OC | Yes | 1 | 4 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/9/2020 | Type II UoF document | docx |

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|
|         |      |     |

## Chain of Command History

| Routing #1 | |
|------------|--|
| Sent From: | Police Officer Brian Muoio |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 4:45 PM |
| **Instructions from Police Officer Brian Muoio to Police Lieutenant Seth Dietrich:** | |
| Per instructed. | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____
Police Officer Brian Muoio - 30056731

EXHIBIT B(14)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Alex Pratt - 30048795

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58043 | 2020-261072 | 2020UOF-1372 |
| **Date/Time Entered** | | |
| 9/7/2020 22:30 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 9/7/2020 1830
STATEMENT OF: OFFICER ALEX PRATT #7643
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sergeant Moore (5995). I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sergeant Moore 5995 at 1400 S LANE ST
B. ICV/BWV recorded: Bike officer no ICV. BWV was activated but fell off my body during the first push. I do not have video footage of the remainder of the riot. A officer found my body camera and returned it to me once back at the West Precinct. I did not review any footage.


DETAILED NARRATIVE:

(A) I have been a Seattle Police Officer for approximately seven years. I completed 720 hours of the Basic Law Enforcement Academy in 2013. I completed approximately two months of post-academy training through the Seattle Police Department and then successfully completed my Field Training. I worked as a patrol officer for approximately 4.5 years before becoming a full-time bicycle officer. I was selected as a field training officer and served for approximately 1.5 years. I successfully completed the Seattle Police Basic Mountain Bike School, which encompasses bicycle riding, skills and crowd control management via bicycle. I have been a part of hundreds of free-speech events and multiple riots. I have served as an assistant team leader my entire time in my current assignment. In addition, I attended Seattle Police's Supervisor's school and have served as an Acting Sergeant in multiple free speech events and protests. I have been CART certified for the previous three years.
(B) I am a sworn officer. I was in full bicycle uniform, assigned to the protest with a team of roughly 8 officers and our sergeant. I was wearing my normal uniform with soft knee pads and a face guard to my department issued helmet. None of these items are designed to protect against explosives, rocks, impact weapons or fire. My uniform is also not fireproof. I was with dozens of other officers either in full demonstration management equipment, bike uniforms or SWAT uniforms. In addition, there were dozens of National Guardsmen in full military uniform carrying clear plastic shields with "POLICE" written on them.
(C) We were assigned to a demonstration that was advertised to start in the International District against the Seattle Police Officer's Guild in SODO. The guild had been targeted with Molotov Cocktails in previous riots and the crowds have assaulted officers with commercial grade fireworks that have the capacity to seriously injure or kill someone. Bike officers attempted to keep their distance and followed the group from multiple blocks away as to not be seen as "escalating" the situation.
(D) At our briefing we received intel that the group was planning on using Molotov cocktails against the SPOG building and officers. We were told to have "cold fire" on our persons to ensure that we were able to put out any fire to ourselves or partners. Intel units were inside the group and we were told we were to take enforcement action based on their observations inside the group.
(E) Once our squad was instructed to follow the crowd at a distance, I observed a large crowd of approximately 300-400 people. They were dressed in all black and were holding shields and umbrellas which they have used to assault officers, plan attacks and hide the identity of people igniting explosives. We were in the SODO area which is an industrial area. It was Labor Day so many employees were not in the area. SPOG was supposedly having a barbeque for members so there was the potential that the group could assault SPOG members and their families. The weather was clear and it was approximately 80 degrees out.

LEGAL AUTHORITY AND LAWFUL PURPOSE:

LEGAL AUTHORITY: I was in the middle of 4 AV S in the 2700 block near the Denny's Restaurant. This is a public street open to the public.

LAWFUL PURPOSE: My lawful purpose was to stop the immediate and eminent assault against officers. The demonstration shifted from a march to a riot (criminal mischief RCW 9A.84.010) when the group reached the SPOG office. Intel detectives inside the crowd identified an individual with multiple Molotov Cocktails. Officers were ordered to enter the crowd in order to stop the immediate threat of assault against officers with those explosive devices. There was probable cause to arrest an individual for RCW 9.32.020. The suspect was said to have black clothing and a grey backpack near someone waving a flag in the air. We moved in to make the arrest and disperse the crowd before they could use the Molotov Cocktails against us.

At the Denny's I had probable cause to stop the immediate and eminent attack against officers with large rocks that were being thrown at officers. The rocks were larger than an adult's fist and could potentially seriously injure or kill officers if they were to strike an officer in the head.

CONTACT WITH SUBJECTS:

A) I was working with a squad of eight officers and a sergeant all wearing full SPD uniforms and SPD bikes. There were also task force officers in full SPD uniforms as well as ACT Teams and SWAT Team members. The group was protesting the Seattle Police Department and the Seattle Police Officer Guild. They were very aware that we were the police and they were intent on causing serious bodily harm and large-scale arson against the SPOG office.
B) We staged on 3 AV directly west of the group which had gathered on 4th AV in front of the SPOG office. We were told to enter the crowd to make the arrest of the individual with the Molotov Cocktails. When I turned the corner to go east, I saw a group of a few hundred in all black with a wall of shields. When I approached, they began using umbrellas to assault officers and pushed officers with shields. One individual directly behind the shield line began using bear spray (which is much stronger than police issued munitions) against bike officers trying to make space to effect the arrest. As I was attempting to establish a safe work area with my bicycle I was physically shoved by a large white male in black clothing and mask. I attempted to arrest him, but another person interfered, and the suspect was able to escape into the crowd. The crowd was violent, and it was no longer a peaceful protest. I yelled multiple times for the crowd to move back and to disperse the area.

The crowd split and a large amount went into a private parking lot directly east of the SPOG officer while another group began walking northbound on 4 AV S. Our instructed tactic was to move the group northbound with bicycles in order to stop an imminent threat.

I was assigned as an assistant team leader where I typically stand behind the front line of officers and direct resources to where they need to be. I assisted in moving police resources and continued to provide verbal instructions for the crowd to move back and to clear the area. The majority of the crowd complied and continued to move northbound with police orders. There were still significant amounts of rioters who remained close to the line as a way to interfere with police lines and movements.

DE-ESCALATION:

SPD command did not want direct confrontation with the group. This is evidenced by the fact that bicycle officers were blocks away from the crowd until there was intelligence that an attack with Molotov Cocktails was imminent. At the time we were staged on 3 AV while the group was on 4 AV S.

The group was intent on conflict as evidenced by them seeking out the SPOG office and armoring themselves with shields, umbrellas, sticks and explosives.

As we approached on our bikes to make the arrest and recover the Molotov Cocktails I began to yell "Get Back" which is a trained tactic and verbal communication.

Bicycles are used to create time, distance and shielding. Once bike lines can be established squads can work in coordinated and trained tactics to move the crowd and make arrests. Verbal instructions from officers are de-escalation. In addition, command staff had an SPD truck outfitted with loudspeakers to make riot declarations and provide additional instructions to rioters to leave the area.

THREAT ASSESMENT:

The group posed a major threat to every officer assigned the event. The crowd had multiple Molotov Cocktails that they planned to use to attempt to ignite the SPOG office and against officers. There were hundreds of them, with tools and weapons and they were acting in a coordinated manner. They were intending to cause physical harm to the SPOG office and officers as they have done for the past several months. The group had signs encouraging the murder of police officers as well.

I have been struck with explosives, rocks, pepper sprayed multiple times in the past riots. The group began using Molotov Cocktails against officers and police facilities.

At the initial push I participated in establishing a bicycle line and then began moving the crowd northbound on 4 AV S. Once we reached the Denny's in the 2700 block of 4 AV S the rioters were throwing very large rocks at officers from the Denny's property. These rocks were larger than an average adult male's fist which could potential seriously injure or kill someone if struck in the head. I knew I needed to deploy crowd control munitions at the specific threat to stop the assaults against officers for life safety reasons.

FORCE USED:

A) When I used force it was because I observed an individual in dark clothing throwing large rocks directly at officers on the eastside of 4 AV S. The rocks were thrown near head level and have potential for serious injury or death. The rock were coming from approximately 30 yards away and inside the crowd. The garden at the Denny's was all large rocks and I knew the crowd needed to be moved from that area in order to stop the assaults against officers.
B) I continued to yell to officers when rocks were coming in order to keep them from being harmed. I also yelled for the crowd to get back hundreds of times throughout the riot. De-escalation was no longer feasible because of their immediate access to the rocks they were using as weapons against officers. I needed to use a targeted deployment of two blast balls to respond to the active assaults.
C) I used two OC blast balls in response to 2 large rocks that were thrown at officers. Both deployments were to individuals on the eastside of 4 AV S approximately 30 yards in front of the line. I did not provide a verbal warning as I was approximately 30 yards away
D) I used a blast ball as it was the only less-lethal crowd control munition in which I could deploy into the area of the immediate assault. A blast ball is designed for crowd control situations as it emits sounds, heat and light in addition to small amounts of OC. The devices typically create space which was my intention as to move them from the large amounts of rocks near the Denny's. The rocks were potentially deadly weapons. A blast balls is a less lethal that typically does not create serious injury. I believe a limited targeted deployment of a blast ball to the area where I saw rocks being thrown was proportional as to stop any further assaults.

The crowd brought multiple Molotov Cocktails to use against he SPOG Office and officers on scene. After the initial push over 13 Molotov Cocktails were recovered. In addition a bicycle Sergeant was struck in the face with a metal pipe and I had been assaulted by a rioter. The crowd continued to throw large softball sized rocks at officers and it was unknown what other weapons they were willing to use. Using a trained and SPD and DOJ approved tactic to move the crowd due to exigent circumstances of being actively assaulted was necessary.

E) The two deployments were successful. It created space from the large amount of rocks at the Denny's Restaurant. The deployment of the blast balls in addition with continued bicycle line movement kept the crowd from gaining additional rocks to be thrown at officers. I threw the first blast ball and did not see any additional rocks from the area I deployed it. Shortly after I saw another rock and deployed the additional blast ball which again created space and made the crowd move. Once the rocks stopped I did not need to deploy any additional crowd control munitions against the specific threats.

Medical Aid/Resolution:

No one was taken into custody for throwing the large rocks as they were using the crowd as cover for their criminal actions. No one reported any injuries to me or my squad that I am aware of.

ADDITIONAL INFORMATION:
Multiple Molotov Cocktails were recovered from the rioters. In addition, one Molotov Cocktail was thrown at officers near 4 AV S and S HOLGATE ST which successfully ignited but fortunately missed officers.

## Incident Location

• 2700 4 AV S, SEATTLE, WA - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

**Reason for Use of Force**                    **Service Being Rendered**

Defense of Others                Demonstration

**Weather Condition**            **Lighting Condition**           **Distance to Community Member**

Clear                            Daylight                         Greater than 20 feet

**Community Member Injured**     **Community Member Taken to Hospital**    **Community Member Arrested**

No                               No                               No

**More than 1 Community Member Involved**

Yes

**Community Member's Build**      **Community Member's Height**

176-225 pounds                   5'7" – 5'9"

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**          **Employee(s) Taken to Hospital**

No                               No

## Reporting/Involved Community Member Information

### Unknown Unknown

DOB:    Race:    Ethnicity:    Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

### Unknown Unknown

DOB:    Race: White    Ethnicity:    Gender: Unknown

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Alex Pratt - Serial: 30048795 - Badge Number: 7643
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - Mary Beats B112C/West Pct 2Nd W - Mary Beats B112C

**Video Footage**: [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - OC | Yes | X | 1 |
| Balls - OC | Yes | X | 2 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | Pratt UoF | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Alex Pratt |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | Police Sergeant Sean Moore |
| Sent Date/Time: | 9/7/2020 10:37 PM |
| **Instructions from Police Officer Alex Pratt to Police Lieutenant Seth Dietrich:** | |
| Officer Pratt Use of Force Statement | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments: Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:16 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

Case 2:20-cv-00887-RAJ     Document 146-2     Filed 11/02/20     Page 95 of 303

_____

Police Officer Alex Pratt - 30048795

**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(15)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Sergeant Brian Rees - 30032822

## Incident Details

| | | |
|---|---|---|
| **Date Received** | **Date of Occurrence** | **Time of Occurrence** |
| 9/11/2020 | 9/7/2020 | 18:17 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58149 | 2020-261072 | |
| **Date/Time Entered** | | |
| 9/11/2020 02:17 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: SGT B.REES #6890
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. J.Dyment. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Lt J.Dyment
B. ICV/BWV recorded: BWV recorded. NO ICV as I was on bike

DETAILED NARRATIVE:
I have been a Seattle Police Officer for almost 15 years. I was promoted to the rank of sergeant in January 2019. I am trained and certified in the use of OC spray and blast balls. My permanent assignment is the East Precinct Night Bike sergeant, call sign 3-EDWARD-80. I have been permanently assigned to bikes as either an officer or sergeant for approximately 12 years. In that time, I have worked hundreds of protests of various sizes, causes, and hostility levels.
I did review BWV prior to writing this statement.
On 9/7/20, I was assigned as a bike sergeant of a squad, assigned to a planned Labor Day demonstration against the Seattle Police Union. Information at the morning briefing was that the belief was a group would assemble at the International District metro station and march to the SPOG office. The last time this event took place there were multiple violent attacks on officers with explosive fireworks and other objects thrown. There were also previous Molotov cocktails thrown at the SPOG office. Information provided was that we should expect the same type of behavior. As the group assembled, they were observed to be predominately dressed in all black, wearing helmets, goggles, body armor, and respirators. Some were carrying shields and loaded backpacks of unknown items. As the group was still assembled at the transit station an arrest was made on one of their members for assaulting an evangelical preacher at approximately 1638hrs. During that arrest, the rest of the crowd hurled insults and anti-police statements at officers.
The group eventually started their march around 1718hrs. They went south on 5 AV S, west on S Dearborn St, and south on 4 AV S. When they got to Edgar Martinez Dr S, someone hung a large black banner off the overpass that read, "All my heroes kill cops". The written and verbal statements combined with the groups attire to create anonymity, weapons, shields, and armor, lead me to believe this group intended to commit criminal acts and had come prepared to do so and hide their identities to make it more difficult for us to identify them.
The group arrived at the SPOG office at approximately 1817hrs. Just prior to this, information came in of at least one subject in the crowd being in possession of a Molotov cocktail. Officers were directed in to make an arrest of that subject who was able to escape after others in the crowd assaulted the arresting officers. Items were thrown, what I believe to have been a fire extinguisher was discharged at officers, at least one mortar style firework detonated in our vicinity and multiple arrests were being made.
Command issued a dispersal order via loudspeaker and we were ordered to push the crowd northbound on 4 AV S. As we began moving the crowd northbound, the dispersal order was repeated with an authorization to use less than lethal munitions. An update came in that a box of explosive devices was recovered near the SPOG office. I later found out this was a box containing multiple Molotov cocktails.
In the 2700blk of 4 AV S, I observed a group of officers in front of me who appeared to become engaged with the crowd. The subjects were facing officers and appeared to be resisting the officers attempts to move the crowd. Several of the subjects had improvised shields and umbrellas and I could not tell if officers were making an arrest or just trying to move the crowd. I moved closer to assist those officers when I observed an unknown officer pull one of the shields away from one of the subjects. As I continued up to the line, I could clearly hear multiple officers giving commands to move back and to back up. Officers were moving at a

walking pace and the group did not appear to be making any real attempt to move out of the way. I got behind the line of officers and saw multiple subjects facing officers while slowing walking backwards. They were still pointing their shields and umbrellas towards officers and others behind them were holding on to their backs. In past experience I have found that this is done to either assist pushing their front lines harder into officers or to try to pull them away from us if we try to arrest someone.

Due to the lack of distance they were providing officers, their failure to comply with multiple dispersal orders, assaults on officers that had already taken place, and the discovery of explosive devices, I believed this group was creating an imminent threat of assault to the officers directly in front of them. It was creating additional safety concerns towards officers as the body of the crowd was taking up the entire street but this smaller portion on the west side was moving much slower than the east side of the street. This meant our resources on the west side were being slowed down and prevented from addressing any other violent actions potentially occurring. While this was going on rocks and bottles were being thrown from within the crowd.

For all those reasons, I deployed a burst of OC spray from my department issues mark9. The deployment last approximately 1-2 seconds and was directed towards the face of what I perceived to be a white male with a red bandana over his face and sunglasses. I would estimate my distance from that subject to have been 8-10 feet. I returned to recover my bike as other officers continued to move the crowd northbound. I never saw the subject I directed OC towards again, so I am unaware if the OC deployment was effective or if the subject required any medical attention. My OC deployment is marked at the 8:48 point of my BWV.

My Legal Authority was that this incident occurred on a public street. My lawful purpose was defense of other officers and I also had PC to arrest the subject I deployed OC towards for failure to disperse and obstruction. I did not make an attempt to arrest him however as he was positioned almost behind the front line of protestors and the main goal for the crowd was to get them to move and disperse in an attempt to prevent further violent acts and assaults.

Prior to my deployment there had been multiple orders to move back. I found de-escalation was no longer feasible as the crowd was refusing to follow the commands while multiple assaults and violent acts were occurring. Approximately 10minutes after my OC deployment, we were just south of S Walker St, while still on 4 AV S, someone within the crowd threw a Molotov cocktail into the street from the eastern sidewalk. It hit the ground and exploded into flames approximately 15-20 feet in front of me.

My OC deployment was the only reportable force that I used. The event continued and at the conclusion I reported my OC deployment to Lt Dyment.

ADDITIONAL INFORMATION:
n/a

## Incident Location

• 2700 blk 4 AV S, Seattle, WA - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 6 – 10 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |
| 176-225 pounds | 5'10" – 6'0" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### Protestor Unknown

DOB:    Race: White   Ethnicity:    Gender: Male

**Role**
  •

**Types of Resistance Community Member Used Against Employee(s)**
  • Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
  • Obstructing Charge

## Involved Employees

### Police Sergeant Brian Rees - Serial: 30032822 - Badge Number: 6890
**Assignment at time of incident:** Title: Police Sergeant Chief of Police A000/Operations Bureau B100/East Pct B240/East Pct 3Rd W B243/East Pct 3Rd W - East Beats B243A/East Pct 3Rd W - East Beats B243A

**Video Footage:** [No Response]

**Role**
  •

**Force used by this employee against the community member**
  • Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | Yes | 1 | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/11/2020 | 2020-261072, Sgt. B Rees #6890, Level 2 OC, 9/7/20 | docx |

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Sergeant Brian Rees |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/11/2020 2:51 AM |
| **Instructions from Police Sergeant Brian Rees to Police Lieutenant Seth Dietrich:** | |
| 2020-261072, Sgt B.Rees, Level 2 OC, 9/7/20 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Sergeant Brian Rees - 30032822

EXHIBIT B(16)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Ty Selfridge - 30035588

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58051 | 2020-261072 | 2020UOF-1374 |
| **Date/Time Entered** | | |
| 9/7/2020 23:16 | | |

## Incident Summary

EVENT/GO#: 2020 - 261072
DATE OF OCCURRENCE: MONDAY – 9.7.2020
STATEMENT OF: OFC SELFRIDGE #6971

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Ron Campbell. I DO invoke my Garrity rights prior to giving this statement.

Preface:
A. In-person supervisor screening: Sgt Steve Stone #7540 – 9.7.2020 @ ~1900 hours the intersection of 10 Av S / S Dearborn St – Seattle – King County – Washington State)
B. ICV/BWV: yes – I reviewed my BWV prior to writing this report.

Pre-Arrival / Arrival:
On 9.7.2020 I was assigned to the Seattle Police Department Special Weapons and Tactics (S.W.A.T.) Team as a sworn police officer. I was wearing my grey duty uniform with clear police markings.

In addition, I was equipped with a helmet, hearing-protection, eye-protection, plate-carrier with hard & soft body-armor, air purifying respirator (gas-mask) and gun belt. I was also equipped with OC blast ball grenades, Cold Fire, OC spray and an FN303 less-lethal launcher.

My chain of command for this operation is listed below:

• Incident Commander - Capt M. Allen
• Deputy Commander – Lt J. Brooks
• S.W.A.T. Commander – Lt Bergmann #6146
• Field Sergeant – Sgt S. Stone #7540
• Team Leader – Ofc M. Bonet #6370

I have been a sworn Seattle Police Officer since May 2007. I've completed SPD Shotgun & Rifle School, SPD Handgun Instructor School, Bike School, SPD Undercover School, SPD Anti-Crime Team School, Washington State S.W.A.T. Basic School, and the SPD S.W.A.T. Pup School. I've been assigned to the SPD S.W.A.T. Team since October 2015. I served as a Security Forces Officer (2Lt – Capt) in the United States Air Force from 2002 – 2006.

I've been trained on every piece of equipment available to the Seattle Police S.W.A.T. Team, except for energetic breaching materials and sniper rifles. I receive annual training on all our less-lethal tools and munitions, including those used on 9.7.2020. I receive hands-on training, as well as a knowledge test.

Prior to my assignment with S.W.A.T., I worked several protests as a Bicycle Officer. I've been involved in many large protests since 2013. I've been involved in several violent and dangerous demonstrations since May 2020.

At ~1330 hours I responded to the S.W.A.T office for a team briefing. Our team has been working the violent protests in Seattle since Friday 5.29.2020. I was assigned to an unmarked police vehicle (black Chevy Tahoe) equipped with emergency lights and sirens. Also in my Tahoe were Sgt Stone, Ofc. N. Evans, and Ofc. Bonet.

At ~1400 hours I responded to the West Precinct and attended the official briefing for today's events. The

commander's intent was discussed, as well as the chain of command I listed above. The intelligence surrounding this event said the protesters would gather in the International District and march towards the Seattle Police Officers Guild (2949 4 Ave S – Seattle – King County – WA – 98134. According to them, police officers are not workers.

My Tahoe was assigned to the north end of the protest. At ~1630 hours I heard someone broadcast (over police radio) an assault in progress near the address of 425 S Jackson St. My Tahoe responded to that location and helped to secure the scene while other officers made an arrest. The suspect was already in custody by the time I arrived. I am unsure of their final disposition.

As I provided security during this arrest, I faced a very hostile, angry, and hateful crowd. They called me a bastard and told me I should have been swallowed. We cleared the scene when the suspect was loaded into a transport van for further processing at a nearby police station.

My Tahoe returned to our staging location and prepared for the protest to officially begin. At ~1730 hours I heard information over my police radio that the protest group was heading SB on 4 Av S.

Legal Authority / Lawful Purpose:
My legal authority was a city street open to the public. My lawful purpose was to protect police officers and others from assault & physical injury. I was also there to prevent significant property damage. I was also there to make arrests (when feasible) for crimes of violence and significant property destruction.

Contact With Subjects:
At ~1800 hours I heard information over my police radio that the protest group would initiate action by igniting some sort of smoke device in the crowd. At ~1815 hours I heard information over my police radio that another officer had probable cause to arrest someone for possessing and incendiary device. That person was described as wearing a grey backpack standing near a yellow umbrella and someone waving their hat in the air.

As uniformed Seattle Police bicycle officers moved in to make the arrest, I followed them (on foot) from 2900 blk of 3 Av S. As the bicycle officers approached the mass of protesters, I saw what I thought was a massive cloud of pepper spray coming from the crowd towards the officers. They were equipped with improvised shields I later learned it was a fire-extinguisher. I don't know if the person with the incendiary device was ever located or arrested.

At approximately 1830 hours the crowd moved away from the S.P.O.G. building and started walking NB on 4 Av S. As they trudged north – I saw several softball size rocks flying through the air towards police officers. They were the biggest flying projectiles I've seen at any protest. Several officers had to duck, dodge and dive to avoid getting assaulted.
As the crowd continued NB on 4 Av S, I saw a lone subject carrying an umbrella exit the crowd and walk into the open. I saw him bend over at the waist to pick up something off the ground. It was my belief that after he picked it up, he would hurl it at me or other uniformed officers.

As I saw this happen, I deployed an ALS O.C. blast ball at that subject. I used an underhand deployment method and only targeted him. The subject retreated back into the crowd and was not contacted by me. I don't know if he picked anything up, as he was ~10m away when I deployed the blast ball.

The blast ball seemed to be effective, as the subject fled on foot. When I deployed the blast balls, I followed my training and evaluated the effectiveness of each force application. The blast ball appeared effective, so I stopped using force. I deployed the blast ball in an underhand manner. was a very dynamic application of a trained tactic.

I used an ALSG101OC-BG Blast Ball Grenade. It is a single use diversionary device, coupled with an OC Powder payload that produces irritation upon contact.

Near the intersection of 4 Av S / S Holgate St I saw the road on fire. Based on my training and experience – this was the aftermath of a Molotov Cocktail / incendiary device. I walked past the flames as the crowd continued NB on 4 Av S towards S Royal Brougham Wy.

With the help of SPD Bike Officers and other police vehicles, we continued to push the crowd EB on Dearborn towards Rainier. I witnessed other Seattle Police officers deploy blast balls and OC spray – but I don't know exactly who did what.

De-escalation:
Each force application (blast ball) was an independent decision based on the threat I observed at that time. My intention was to stop or prevent an assault on officers. De-escalation tactics of time, distance, shielding, officer presence, display of S.W.A.T. armored rescue vehicles, bicycle tactics, and verbal commands were not effective and the crowd remained assaultive and defiant throughout.

Medical Aid / Resolution:

I was unable to affect the arrest of anyone targeted by my force applications (blast ball). The one person I targeted ran away or retreated into the crowd. I was also unable to render first aid. No one complained to me of pain or injury.

I did my best to remember every use of force. The scene was chaotic, fast moving, and ever evolving. We were assaulted on several fronts for a long time over several city blocks. The crowd was intent on doing us harm and harassing us at every opportunity.

ADDITIONAL INFORMATION:
I've been a police officer for more than 13 years. The protests I've worked since Friday 5.29.2020 have been the most violent and well-orchestrated. The crowd was prepared with rocks/bottles/spraypaint/golf balls/ply-wood shields/gas masks and other tools. Now they use improvised explosives, high powered firework mortars, and incendiary devices.

This is coordinated criminal activity at the highest level, in my opinion. They are well funded and well trained with a sophisticated communication and logistics network. The violence continues to escalate. I fell they are intent on great bodily harm and/or burning a building to the ground.

## Incident Location

- 2949 4 Av S, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| | | |
|---|---|---|
| **Reason for Use of Force** | **Service Being Rendered** | |
| Defense of Self | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | Greater than 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'4" – 5'6" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### Unknown

DOB:   Race:   Ethnicity:   Gender:

**Role**
-

## Involved Employees

### Police Officer Ty Selfridge - Serial: 30035588 - Badge Number: 6971

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Special Operations Bureau
B600/Metropolitan Section B620/Swat Unit B621/Swat - Night Squad 2 B621D/Swat - Night Squad 2 B621D

**Video Footage:** Equipped - Activated

**Role**
 - 

**Force used by this employee against the community member**
 - Balls - Blast - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Balls - Blast | Yes | | |



FRONT                    BACK

Missed

**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/7/2020 | Selfridge Type II UOF | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Ty Selfridge |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/7/2020 11:20 PM |
| **Instructions from Police Officer Ty Selfridge to Police Sergeant Ronald Campbell:** | |
| selfridge SWAT Type II blast ball | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Ty Selfridge - 30035588

EXHIBIT B(17)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Acting Police Lieutenant David Sylvester - 20159661

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/8/2020 | 9/7/2020 | 16:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58062 | 2020-261072 | 2020UOF-1380 |
| **Date/Time Entered** | | |
| 9/8/2020 01:33 | | |

## Incident Summary

EVENT/GO#: 2020-261072
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: SERGEANT DAVID SYLVESTER #5644

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lieutenant Dyment. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Lieutenant Jim Dyment
B. ICV/BWV recorded: Incidents were recorded with BWV. As a bicycle officer, I am not equipped with ICV.


DETAILED NARRATIVE:
These incidents were recorded with BWV. Due to the unprecedented events during the last four months, many of the demonstrations appear similar where force was used to prevent assault and significant property destruction. For a full recounting of incidents, refer to BWV.

I was hired on January 4th, 1991 by the Seattle Police Department. I completed both BLEA and Post-BLEA schools in 1991. I was trained as a bicycle officer in 1995 and received refresher training in 2016. In 1999, I completed SPD SWAT and Washington State SWAT schools. I completed ACT School in 2000. I have completed over 15 classes in Crowd Control/Management, including additional training in Mountain Bicycle Crowd Control. I have been yearly certified for CART munitions for the last three years. I have had crowd control experience in the Rodney King Riots of 1992, WTO Riots of 1999, multiple N30 demonstrations, Mardi Gras Riot of 2001, Black Lives Matter demonstrations in 2015, UW riot of 2017, and yearly May Day Protests. I have been to daily protests this summer since May 29th regarding George Floyd, CHOP and Defund the Seattle Police Department.

I was promoted to the rank of Sergeant in 2014 and was assigned to the North Precinct Mountain Bicycle Patrol Unit in 2017. My duties are to supervise a squad of Mountain Bicycle Officers. I wear a black bicycle uniform clearly marked with patches and labels as a Seattle Police Sergeant. During this day, I was assigned to Crowd Management detail with my squad.

We were to provide for the safety of the general public, facilitate citizen's rights to peacefully express their First Amendment free speech rights, take enforcement actions for violent crimes against persons or significant property destruction, and to deter criminal activity by providing a significant uniformed presence. As a supervisor, I was to ensure arrest were made in a safe and effective manner and in accordance with training and law. I was equipped with body armor, bicycle gloves, cloth face mask and a bicycle helmet with chin bar. I carried a gas mask, OC Blast Balls, OC Spray, and a baton, along with my other duty gear.

This event occurred during a Stage 2 Mobilization and the Seattle Police Department had instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. The Governor had issued a Stay at Home Order on February 29th and extended the order indefinitely. The Mayor of Seattle suspended all permitted events until further notice.

Since May 29th, 2020, the Seattle Police Department has been responding to daily demonstrations throughout the City following the in-custody death of George Floyd in Minneapolis. Many of the events have involved widespread looting, arson and assault as the they became declared riots. Officers have been

repeatedly assaulted with rocks, bottles, and commercial grade fireworks. Some of the assaults have also included Molotov cocktails, an incendiary device thrown at officers. On August 24, 2020, demonstrators barricaded the doors shut to the East Precinct, with knowledge that officers were inside, and lit the building on fire. That same night, demonstrators threw several Molotov cocktails at the SPOG office. Demonstrators again attacked the East Precinct with Molotov cocktails on September 9th, 2020.

On September 7th, 2020, I attended a briefing for several demonstration events happening in Seattle. One particular event was called "Labor Day March calling for no more Police Unions." Given recent demonstrated violence against the Seattle Police Department and the starting location in Chinatown, it looked highly likely they would come to attack the SPOG Office Building at 2949 4th Ave, possibly with the intent to burn it down. That day, I organized a ten officer bike squad in addition to myself. We were assigned to work under Lieutenant Dyment. Captain Allen was the Incident Commander. The Operations Chief was Deputy Chief Brooks.

The event began staging in Chinatown at the light rail station at 5th Ave S and S King St. I had my squad two blocks away at Maynard Ave S and S King St, next to Hing Hay Park at around 1530 hours. As the group grew in size and prepared for their rally, Lieutenant Alcantara updated that several of the participants were gearing up in body armor, gas masks and shields.
Around 1630 hours, Lieutenant Alcantara called out that a subject was being assaulted by one of the participants. She gave out the suspect's description and gave the direction of travel as south from 5th Ave S and S Jackson St with Transit Security following closely behind. She requested a bike squad to come in and make the arrest. I volunteered my squad and we approached west on S Jackson St. Officer Joy and Lopez spotted the subject as we came south on 5th Ave S. The suspect was near the intersection of 5th Ave S and S King St. Several bike teams went in. As I arrived, officers had the subject on the ground and were taking him into custody (RE: 2020-261218). The suspect was struggling with the officers as they tried to place him into custody using open hand control. This was right next to the crowd. I had my squad and other arriving bike unit place a mobile fence line between us and the crowd of demonstrators. The crowd were yelling at officers and demanding information. I maintained my focus on the crowd to provide security for the arresting officers. Once the arrested subject was loaded up in a transport vehicle, I had my squad return to Maynard Ave S and S King St. Officer Joy suffered a bleeding abrasion to his right knee during the struggle. This was reported to SPOC.

A short time after that, I was waved down by an Asian woman that could not speak English. She pointed to the west end of Hing Hay Park with great urgency. There was a fight disturbance between two heavily intoxicated men, not affiliated to the protest. They were grappling on the ground. I had my squad respond to break up the fight. Radio advised of receiving a call of a subject throwing furniture about the park. No one appeared injured or interested in pursuing charges. Both subjects were trespassed from the park. ███████ M█████ refused to leave the park and appeared to want to re-engage in fighting the other subject. M█████ was placed into hand cuffs. Officer Turk and Gore arrived on the scene. They were familiar with M█████ and requested permission to transport him to a sobering center. I screened the unarrest and allowed them to transport M█████ to the sobering center (2020-261232). During this incident, the demonstration began marching south in the direction of the SPOG Office.

We began paralleling the event from the east side. The crowd moved south. Leading the way was a rank of vehicles acting as blockers, followed by a rank of shields in front of the crowd. Several in the crowd were masked. Information was relayed that the crowd would coordinate their attack by launching smoke as a visual signal. As they neared the SPOG Office, radio relayed information of a suspect armed with Molotov Cocktails. Lieutenant Dyment had us approach the scene just to the west on 3rd Ave S. A subject description was given, and we were directed into his location by observers. Several bike teams moved in east bound from 3rd Ave S.

As I moved my squad up, I could see a struggle to my left near the SPOG office and the parking lot. There were several hundred people filling the street. I believed the officers to my left were arresting the suspect with Molotov cocktails. I had my squad move the crowd back to keep the arresting officers safe. It was at this time a large fire extinguisher was deployed over the crowd by one of the suspects, making a large cloud of yellow smoke. This reminded me of their intended signal to attack.

My squad pushed first east, the crowd started to go south on the street and the officers continued to follow. The crowd began throwing items directly at officers' heads. I saw one bounce off Officer Poole's bike helmet. I could hear blast balls being deployed to my left, north of our location. Fearing that we would be overextended and divided, I brought the officers back and quickly established a mobile fence line. This allowed us to time to evaluate our next steps. I saw several officers struggling with subjects on the ground in the middle of the street. They were using open hand control.

The crowd regrouped, on the east side of the street in a parking lot, directly across from the SPOG office. Several more rocks and bottles were being thrown. I could also see fireworks going off in the crowd. I heard a dispersal order being given to the crowd by Captain Allen. Several arrests were being made in that parking lot. The crowd began walking northbound on the east sidewalk and out of the area. My squad prevented them from coming back towards the arresting officers by keeping a mobile fence line along the east sidewalk. Officer Benner reported being hit by a baseball size rock. He also reported deploying two blast balls.

Once the crowd thinned out, I had my squad form up in double column. We went north towards the crowd that had regrouped in the street. We were joined by several other bike squads and ACT squads. Lieutenant Alcantara ordered us to keep pushing them to the north.

Use of Force:
Legal Authority – Incident occurred on a City Street open to the public.
Lawful Purpose – Preventing assault on police officers.
De-escalation – A line of uniformed officers stretching for 30 yards, gave orders to "Move Back". Bicycles were utilized as a fence barrier between officers and protesters.
Type of Force Used – I deployed OC Blast Ball at a black dressed subject. No other alternative was available that was reasonable or necessary.
Medical Evaluation – Not possible, as subject retreated into the crowd to the north and out of sight.
Resolution – The subject was not located or arrested, as it created a significant risk to officers and an escalation of force.

A dense crowd of shields stop directly in front of the police line. Suspects behind them appeared to be getting ready to throw items at the officers. The group looked to be working together as one to assault the officers in a coordinated attack. I have seen this tactic deployed during previous demonstrations where they stall the advance and attack officers by throwing items over their "shield wall". I deployed an OC Blast Ball to the leading edge of the group to disrupt the assault. It was effective and broke up the group, allowing the officers to continue advancing.

Use of Force:
Legal Authority – Incident occurred on a City Street open to the public.
Lawful Purpose – Preventing assault on police officers.
De-escalation – After a dispersal order was given, a line of uniformed officers stretching for 30 yards, gave orders to "Move Back". Bicycles were utilized as a fence barrier between officers and protesters.
Type of Force Used – I deployed OC Blast Ball at the feet of subject dressed in black. No other alternative was available that was reasonable or necessary.
Medical Evaluation – Not possible, as subject retreated into the crowd to the north, and out of sight.
Resolution – The subject was not located or arrested, as it created a significant risk to officers and an escalation of force.

The crowd had reorganized itself. As seen on several other protests, and during their published training rehearsals, they had the shields up against the police line. Above the shields they had umbrellas to hide their actions from officers, and to push back if officers got to close. Behind the shields and umbrellas, subjects dressed in black threw items at advancing police officers. Several items, including road cones, traffic barricades and rocks had been thrown at the line of officers in front of me. I saw one subject dressed in black continue to throw items. I deployed an OC Blast Ball at the person's feet behind the row of shields and umbrellas. This was effective as the subject moved off north and away from officers on the west side.

We were then commanded to advance on the line at a faster rate. This is a tactic that makes the crowd turn their back away from officers to keep pace. They can no longer use people as shields because they can't walk backwards at that rate. It was at this time two subjects in the crowd were arrested outside of Cannabis City. Officers had reported getting more rocks thrown at them. I heard several commercial grade fireworks being deployed to my right, as unknown officers struggled with suspects using open hand control. I tried to get the bike line past the arresting officers and block off the crowd to provide for their safety. I heard several blast balls detonated in front of me deployed by unknown officers.

At this point we had enough space between us and the crowd to start deploying crossbow line formations to keep the crowd moving. Working with the other bike team, we coordinated getting teams in double columns and begin our advance. As we were preparing to do this, the crowd erected a barrier in the roadway with traffic barrels. The tactic was not executed, as all the bikes rode up and kept advancing. As we neared S Stacy, we started taking rocks again. We again tried to get crossbow line formations going again. The officers fan out to make a line but keep advancing on foot. The other bikes continue advancing through the line.

Officer Haas tells me that there is probable cause to arrest a white male wearing a maroon sweatshirt and purple knit cap for throwing rocks at police officers. He is near the southern edge of the group. I let Sergeant Diddier know we are going to make a crossbow arrest on the subject. I have Officer Joy and Lopez as my points verify they can see the subject and give the command to make a crossbow arrest. They team moves in and makes the arrest. Officers take him to the ground and place him under arrest using open hand control (2020-261378). Suspect is identified as N██ B██████. Officer Haas later releases the suspect after it is determined that a similar dressed subject was already arrested for that crime.

At this time, a suspect throws a Molotov cocktail at 4th and Holgate. We wait for prisoner transport. Officer Nguyen collected the evidence of the Molotov cocktail. Once the street is cleared, I leave Officers Haas and Joy with the arrest. I take the remaining officers to catch up with the protest. We respond to 4th and Dearborn, trying to leapfrog ahead of the crowd.

Lieutenant Brooks directed us to push the crowd east down Dearborn. While waiting for the crowd, I heard

several reports of officers being assaulted by rock throwers. The crowd comes up north bound on Maynard Ave S. We set up a police line of bikes and patrol vehicles to direct them east bound. Working with other bike squads we continue to deny them access north by leap frogging ahead and making bike lines.

Use of Force:
Legal Authority – Incident occurred on a City Street open to the public.
Lawful Purpose – Preventing assault on police officers.
De-escalation – Not possible, attack was sudden.
Type of Force Used – I deployed OC Spray at the subject's face from a distance over ten feet. No other alternative was available that was reasonable or necessary.
Medical Evaluation – Not possible, as subject retreated into the crowd.
Resolution – The subject was not located or arrested, as it created a significant risk to officers and an escalation of force.

We were moving east along the north sidewalk, bypassing the crowd to leapfrog ahead from 9th Ave S. I saw a black male dressed in black top and tan trousers run up towards me as if he was going to tackle me. I pulled out my OC, looked over my shoulder to see five males running up on me as if their intent was to attack me. I immediately sprayed OC in their direction. Because I was riding a bicycle and keeping up with the team, I continued riding. I am unsure if the OC had contact on any of the individuals. It did have the desired effect, and they ran back into the crowd.

We continued leapfrogging up to Rainier Ave S. We then were ordered to move them south. As the crowd got close to I-90 ramps, we blocked their access to prevent them from getting on the freeway. Instead of going south, the crowd ran into Judge Charles Stokes Overlook Park in a southeast direction. We monitor them to be sure they do not try to make entry on the freeway. Lieutenant Brooks then orders us to return to Dearborn to recover. I was not involved in any other uses of force or ordered tactics that evening.


ADDITIONAL INFORMATION:
Due to the delay at Dearborn, I had deactivated my BWC. I thought I had reactivated it once we began making bicycle fence lines along Dearborn. I noticed it was not recording during my deployment of OC and immediately activated It.

## Incident Location

• 400 5th Ave S, Seattle, WA - Location of Occurrence: Demonstration - Precinct: K3 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

## Unknown Unknown

DOB:   Race:   Ethnicity:   Gender: Unknown

**Role**
- 

## Involved Employees

### Acting Police Lieutenant David Sylvester - Serial: 20159661 - Badge Number: 5644

**Assignment at time of incident:** Title: Acting Police Lieutenant Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122

**Video Footage**: Equipped - Activated

**Role**
- Supervisor on Scene

**Force used by this employee against the community member**
- Canister - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes
- Balls - OC - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Canister - OC | Yes | 1 | 1 |
| Balls - OC | Yes | X | 2 |
| Balls - OC | Yes | X | 3 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | Crowd Control Type 2 Template | docx |

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|
|         |      |     |

## Chain of Command History

| Routing #1 | |
|------------|--|
| Sent From: | Acting Police Lieutenant David Sylvester |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 7:17 PM |
| **Instructions from Acting Police Lieutenant David Sylvester to Police Lieutenant Seth Dietrich:** | |
| 2020-261072, Crowd Control Type 2, Sylvester, 9/10/2020 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Acting Police Lieutenant David Sylvester - 20159661

EXHIBIT B(18)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

    C.  Location
    D.  Information received from briefing/supervisor
    E.  What was happening when you arrived/first observed the demonstrators?
          a.  People / other officers on scene, activity occurring, dangers
          b.  Buildings, vehicles
          c.  Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

    A.  Legal Authority (Explain in Detail):
        i.     Public area, Street, Park, Open to public
        ii.    Exigency
    B.  Lawful Purpose (Explain in Detail):
          a.  Riot
          b.  Looting
          c.  Assault


**Contact with Subject(s): (If feasible)**

    A.  How did you make your presence and authority clear?
        i.     Uniform – UO Gear
        ii.    Verbal identification, commands, instructions, orders, PA announcements
    B.  Describe contact with involved subject(s)
        i.     Observed details
                - Physical/verbal reaction to officer
                - Verbal actions / statements made
                - Size of crowd / movement
        ii.    During line movements, provide details
                - Your actions
                - Subject's response


**De-Escalation Techniques Employed:**

    A.  Communication
        i.     Advisements/warnings. If no warning, explain why.
        ii.    Describe instructions given
        iii.   Dispersal orders you heard
    B.  Time, Distance, or Shielding employed
    C.  If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| **PRE-ARRIVAL DETAILS / BRIEFING** | X | **DECISIONS MADE & ORDERS GIVEN AND RECEIVED** | |
| **ARRIVAL** | X | **THREAT ASSESSMENT** | |
| **LEGAL AUTHORITY & LAWFUL PURPOSE** | X | **FORCE USED** | |
| **CONTACT WITH SUBJECT (S)** | X | **MEDICAL AID AND EVALUATION** | |
| **DE-ESCALATION** | | **RESOLUTION** | |

**Copy and Paste Template Below. Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-261072**

**DATE OF OCCURRENCE: 09/07/20**

**STATEMENT OF: OFFICER JOSH VELLIQUETTE**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Acting Sergeant Whicker. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A. In-person supervisor screening: Yes, on scene.
    B. ICV/BWV recorded: BWV recorded.

**DETAILED NARRATIVE:**

**Work Experience:**
November 2013 – April 2019

I worked as a Patrol Officer for the Seattle Police Department and was assigned to nightshift in the University District within the North Precinct. My duties involved conducting preliminary criminal investigations including, but not limited to assaults, burglaries, robberies, narcotics violations, property crimes, traffic offenses, and numerous others.

**Current Position:**
April 2019 – Present
I am currently assigned to the Seattle Police Department's North Precinct Anti-Crime Team.  My duties involve conducting preliminary criminal investigations mentioned above as well as participating in and organizing undercover operations, surveillance operations, vice investigations, narcotics investigations, shooting investigations, and assault investigations.

**General Incident Overview:**
On 09/07/2020, I was working as a member of the North Precinct Anti-Crime Team as Unit 295. I was riding in a police van equipped with emergency lights and siren, but not equipped with Coban in-car video. I was wearing my black SPD uniform with "police" clearly marked on the front, back, and both sides. I was wearing my helmet/face shield and gas mask. There were four to six total officers in our vehicle.  Our unit was working at the Seattle Police West Precinct during the unpermitted demonstrations which quickly turned into riots.

During our briefing at 1400 hours at the West Precinct, Captain Allen read his Commander's Intent, which was:

"There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct."

The demonstration today was a continuation of the demonstrations which began on May 30th, 2020. Many of these past demonstrations turned violent, with members of the demonstrations assaulting officers with projectiles including glass bottles, large rocks, fireworks, metal fire extinguishers, and incendiary devices. During the demonstrations downtown, we also recovered a backpack full of Molotov Cocktails, which consisted of multiple glass bottles already filled with lighter fluid and rags. The backpack included a large wrist rocket which would be used to shoot the Molotov Cocktails at us. These demonstrations had turned into violent riots in cities across the country. Officers in other areas of the country had already been shot by rioters. Multiple officers in Seattle had been transported to the hospital as a result of injuries sustained from being assaulted with projectiles from these rioters.

Throughout the last three to four months of protests and riots, rioters have taken many steps to counter

our police tactics. These have, in turn, made our crowd control tactics less effective and made the riots more dangerous for both officers and rioters. Some of the tactics used by rioters involve having the first four to five rows of rioters utilizing umbrellas, goggles, and sometimes gas masks. Umbrellas were utilized for multiple purposes including to block pepper spray deployments from officers and to knock blast balls back at officers. Goggles and gas masks are used to keep pepper spray out of their eyes, nose, and mouth. All these tactics make our less lethal devices less effective and escalate the amount of force needed to protect ourselves and control the violent crowd.

Over the past week, protestors have turned their attention from various businesses to the Seattle Police Officers Guild (SPOG) building. Prior to today's event, there had already been one attempt to burn down the SPOG building by way of Molotov cocktail. Due to this threat, windows of SPOG were boarded up and a chain link fence was erected around the SPOG property. The purpose of the fence is to keep unauthorized people from forcefully entering the SPOG building and to limit projectiles, such as Molotov cocktails, from striking the building and catching the building on fire. Today, there was a scheduled SPOG Labor Day barbecue to take place at the SPOG building.

The crowd of protestors who gathered in front of SPOG at around 1800 hours was estimated to be about 500 people. From my experience working these riots, I know that the larger the crowd is the easier it is for people to hide and blend into the crowd while committing acts of property destruction and violence. The larger crowd size also makes it more difficult and more dangerous for officers to find and arrest those responsible for crimes.

At around 1808 hours, officers received information an unidentified male wearing a tan dress and pink bandana was standing on the east side of the group and had possession of at least one Molotov cocktail. After a few more description changes, it was determined the suspect in possession of the Molotov cocktail was wearing all black clothing, a gray backpack, and was standing next to an individual who was waving a baseball cap. Command staff had devised a plan to send in bicycle officers, ACT officers, and SWAT officers into the crowd from the west to arrest the suspect in possession of the Molotov cocktail.

**ARRIVAL:**
Our squad was designated as an arrest team alongside multiple bicycle squads and ACT teams. Our role was to enter the crowd of protestors from the west and arrest the suspect identified in possession of the Molotov cocktail.

**LEGAL AUTHORITY & LAWFUL PURPOSE:**

**Legal Authority:** We were in a public street and the demonstration had been deemed a riot by command staff at the time of use of force.

**Lawful Purpose:** My lawful purpose was to protect myself and other officers from dangerous projectiles from the crowd. Prior to the deployment of the blast ball, I had witnessed numerous baseball-sized rocks being thrown by the crowd toward officers, including one rock that may have struck an officer or his equipment. The use of handheld chemical munitions was necessary to create time, distance, and shielding from the crowd of protestors which was growingly increasingly hostile.

**CONTACT WITH SUBJECT:**
Once the order was given to move into the crowd, multiple people were arrested, and the rioters began running away from the scene eastbound and northbound. During the movement into the crowd, bear spray was used toward officers and an unknown device exploded. Officers were ordered to corral the rioters and move them uniformly away from the SPOG building northbound up 4 Av S. As officers began moving the rioters, they began throwing multiple explosives at officers. As officers continued pushing the rioters northbound up 4 Av S past S Forest St, baseball-sized rocks were being thrown at

officers at a high velocity. At this point, Captain Allen authorized the use of pepper spray and munitions to disperse the crowd, prevent property damage, and ensure life safety. During this time, I had personally witnessed numerous baseball-sized rocks being thrown by the crowd toward officers, including one rock that may have struck a bicycle officer (believed to be Officer Josh Goodwin #7564) or his equipment during a push northbound.

Countless rioters, dressed in all black, had opened umbrellas and were using them as makeshift shields to block pepper spray deployments and redirect blast balls back toward officers.

**DE-ESCALATION**:

**Time:**
By the time officers were ordered to push the rioters up 4 Av S, dispersal orders were already provided to the rioters. Furthermore, less lethal tools such as pepper spray and munitions had been used to prevent property damage and additional assaults on officers.

**Distance:**
Upon arrival to the scene, maintaining distance from the rioters was no longer an option. Command issued dispersal orders to the crowd, gave permission to deploy less lethal tools and munitions, and ordered officers form officer lines to push the crowd northbound away from the SPOG building.

**Shielding:**
We had multiple lines of officers dressed in protective gear including helmets, face shields, gas masks, and holding batons and shields.

**Verbal Commands:**
Dispersal orders were provided to the rioters by Captain Allen using a loudspeaker system housed within a police vehicle fixed with loudspeakers. Throughout the incident, I used my hand to motion for the rioters to move away from the police line and issued nearly constant verbal commands for the rioters to move northbound as well.

**DECISIONS MADE**:
It was imperative that officers moved the rapidly escalating crowd away from the SPOG building to prevent property damage and further injury to officers.

**THREAT ASSESSMENT**:
During our push into the rioters, officers had begun being assaulted by rioters who were throwing projectiles such as water bottles, rocks, and fireworks toward officer lines. Countless rioters had opened umbrellas and were using them as makeshift shields to block pepper spray deployments and redirect blast balls back toward officers. Clearly, the rioters had no intention of following dispersal orders and were instead interested in defending themselves from less lethal tools and assaulting officers in response to these deployments. My use of force was an effort to create space between rioters and police lines to ensure no additional projectiles, such as rocks or fireworks, were thrown toward officers and one else, rioter or officer, was injured.

**FORCE USED**:
At about 1840 hours, I deployed one handheld chemical munition (Serial #: 200800493), also referred to as a "blast ball". The blast ball was tossed northbound just past Denny's located at 2762 4 Av S into a crowd of roughly ten to twenty rioters all dressed in black who were using black umbrellas to conceal their behavior, block pepper spray deployments, and redirect blast balls back toward officers. The reason I threw a blast ball in their direction was because moments beforehand, I had witnessed multiple baseball-sized rocks thrown from that area toward officers. Before and after the deployment, I evaluated the situation and determined if the deployment of another blast ball was necessary.

Before the deployment, I motioned to the rioters to move away from the police line with my hand. Additionally, I followed the five P's taught during CART training, which are "Palm, Prep, Peek, Pull, and Pitch". The deployment was tossed underhand at a low velocity and with a downward trajectory towards the ground. I wanted to toss the blast ball beyond bicycle and SWAT officers to startle and distract the rioters from throwing any additional projectiles toward officers and create space between the group of rioters and the advancing officer line.

My deployment of a blast ball effectively pushed the group of rioters further northbound up 4 Av S, creating additional space between the crowd and the officer line.

**MEDICAL AID AND EVALUATION**:
It did not appear that the blast ball I deployed physically hit anyone. No one appeared to be injured from the blast balls or the OC released from within it.

**RESOLUTION**:
The group of rioters continued northbound up 4 Av S and mainly discontinued throwing projectiles at officer lines. The remaining members of the crowd were dispersed along several blocks. As the crowd dissipated, this created a much smaller, more manageable crowd for officers.

**ADDITIONAL INFORMATION**:
N/A

**ADDITIONAL INFORMATION**:

EXHIBIT B(19)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

**EVENT/GO#: 2020-261072**

**DATE OF OCCURRENCE: 09/07/2020**

**STATEMENT OF: J. ZIEMER, #6725**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Lt. Aagard.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Lt. Aagard
B. ICV recorded: No ICV recording as I was working as a Bike Unit Supervisor and not equipped with an ICV.
   BWV recorded.  I reviewed my BWV prior to completing this statement.

**PRE-ARRIVAL DETAILS:**

At about 1400 hours on 09/07/2020 I was working as unit 2E80, the supervisor of the East Precinct Day Bike Squad.  My officers and I were detailed to work a march on the Seattle Police Officers Guild (SPOG) office.  Groups demanding the defunding of the Seattle Police Department and the removal of our rights to a union were organizing a march to the SPOG office at 2949 4 Av S.  This is the poster distributed by the Every Night Direct Demonstration (ENDD) group on the internet and around the city to advertise the march:



This was the second demonstration planned with a march to the SPOG office. The previous demonstration occurred on 08/16/2020 and was quickly declared a riot by the incident commander. I was working that event as the East Precinct Day Bike Squad supervisor. The demonstrators quickly turned to property destruction and violence against officers when they began to throw explosive devices at police vehicles and the uniformed police officers present. Multiple officers were injured during the riot including a severe facial injury to one. 18 rioters were arrested and booked into jail.

For this event there appeared to be a change in strategy. The previous march did not start until after sunset in what would appear to be an attempt to use the cover of darkness to hide their actions. This time they were having the event earlier in the day. I believe the intent of the time change was to attract additional demonstrators who would not typically be willing to attend a violent rally. This would offer the agitators who intended violence more anonymity and create more sympathy for the actions taken by officers on "non-violent demonstrators".

I frequently monitor the posts on Twitter of the groups associated with the demonstrations around the Seattle and Portland areas. In Portland the demonstrators had increased their violence and began to use Molotov cocktails in their attacks. There are videos of them unintentionally igniting their fellow demonstrators with the accelerants in Portland. The group behind this demonstration, ENDD, has shown a willingness to resort to violence in past events. This group attempted to seal officers in the East Precinct while lighting fire against the exterior walls. It can only be assumed that they were attempting to kill the officers inside. They have thrown Molotov cocktails at the East Precinct while it was occupied. Every action this group has taken that the police have needed to address has led to a conflict between officers and members of this group.

Given my knowledge of the history of the group sponsoring this event and the tactics they were using it appeared likely to me that their intent was to create a violent conflict with the officers assigned to protect the SPOG office and its employees. I had significant enough concerns that this group intended to use a Molotov cocktail against officers that I had all of the officers in my squad bring Coldfire fire extinguishers with them to the event. I also knew it was likely that we would be significantly outnumbered.

Prior to the start of this event the SPOG advertised that they would be having a BBQ for officers and their families. It was unknown when the BBQ would end or if it would overlap with the demonstration. This posed a significant risk to participants if they were present when the hostile crowd arrived. Prior to the march we were informed that the BBQ had ended and most of the attendants had left. However, I was told that there were 6 employees of SPOG in the office and they were still present when the demonstrators arrived.

**ARRIVAL**:

Prior to the march the demonstrators met up in the area of the 400 block of 5 Av S to rally their numbers. I posted my squad to the south of that location while other squads placed themselves in the area. While we were waiting for the march to start a known agitator approached the group. This subject was a religious preacher who was always met with hostility. A short time later Lt. Alcantara broadcast that this male had been assaulted by one of the demonstrators. My squad responded to the area along with the North Precinct Bike Unit. Lt. Alcantara provided a description of the suspect in the assault and we assisted the North Precinct Bike Unit in arresting him. The group of demonstrators immediately became hostile and surrounded our bike teams. Once the suspect was loaded into a prisoner transport, we left the area. This action was necessary to show the group that violent behavior would not be tolerated but also likely agitated them.

At 1718 hours the group began to march in the direction of the SPOG office. I took my unit and followed the group as the marched towards the SPOG office. Just prior to their arrival at the office my unit commander, Lt. Dyment, requested that we meet at a location just south of the office. Our division gathered out of sight of the SPOG office to the southwest. A second division of officers were staged to the north of the group though I do not know where.

As the march approached the SPOG office it was broadcast that at least one of the members of the march was in possession of a Molotov cocktail. Lt. Brooks gave us the direction over radio to make an arrest of this suspect if it was feasible and safe. When the group reached the front of the SPOG office I moved my squad behind the building just to the south (2963 4 Av S). Another by bicycle squad was with us. The rest of the bicycle squads approached from the north on 3 Av S and positioned behind 2939 4 Av S. With the number of bicycle squads ready and available I felt that it would be feasible and safe to arrest the possessor of the Molotov cocktail if he approached the SPOG office. I had reliable information that the SPOG office was occupied at this time. It was broadcast over radio that

the suspect in possession of the Molotov cocktail was at the edge of the crowd and standing at the southeast corner of the fencing around the SPOG office.  I advised my officers that we were going to make the arrest and signaled the other bike teams that we were moving.  Leading the bicycle units, I approached the demonstrators on my bicycle with the intent to arrest the suspect in possession of a deadly and illegal device.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

Legal Authority:  This event took place on a public street that was open to me and other officers.

Lawful Purpose:  The initial contact between police and the demonstrators was based on an officer reporting that one of the demonstration participants was in possession of a Molotov cocktail.  RCW 9.40.120 states, "Every person who possesses, manufactures, or disposes of an incendiary device knowing it to be such is guilty of a class B felony punishable according to chapter 9A.20 RCW, and upon conviction, shall be punished by imprisonment in a state prison for a term of not more than ten years."  By definition a Molotov cocktail was considered an "incendiary device".  Further per the Federal National Firearms Act it is federally illegal to possess or manufacture an incendiary device.  As such I had probable cause to arrest the possessor of the Molotov cocktail.

The intended target of my OC deployment was actively attempting to prevent officers from making an arrest by trying to pull the arrestee away.  I had probable cause to arrest her for SMC 12A.16-010 – Obstructing a Public Officer which states "A person is guilty of obstructing a public officer if, with knowledge that the person obstructed is a public officer, he or she:1.Intentionally and physically interferes with a public officer…"

**CONTACT WITH SUBJECT**:

There were two separate occasions where I used Type II force on different individuals.  I will break down the content of each force encounter separately.

Use of Force #1

When I entered the crowd to make the arrest of the indicated suspect (not identified) I was immediately met with resistance and violence.  I grabbed ahold of the suspect and advised him he was under arrest.  The suspect began to back away and numerous people in the crowd took ahold of him and an pulled him out of my grasp.  I attempted to keep control of the suspect and was struck multiple times in the face.  One unknown suspect struck me in the face with what I recall to be a short metal pipe.  Another unidentified suspect punched me in the face with a closed fist, which caused me

to let go of the initial suspect and lose sight of him. I sustained lacerations to my nose and lower lip from these assaults.

Use of Force #2

Lt. Brooks gave the orders for officers to disperse the crowd from the area. The majority of the demonstrators began to move north on 4th Av S from the SPOG office. During this movement an unknown suspect lit an explosive device, but it detonated in the crowd. It was important to keep the group moving at a steady, quick pace to prevent them the chance to light dangerous weapons such as explosive devices or Molotov cocktails (though it happened after my force encounter a Molotov cocktail was thrown at police officers during this demonstration). Some clusters in the group appeared to be intentionally moving slow to hinder the officer's legal actions. As the sergeant I was following behind the line of officers and providing them with directions and orders. At a point in this movement I saw a group of officers making an arrest of one of the demonstrators. As I approached, I saw 2 suspects attempting to pull the arrestee away from the officers.

**DE-ESCALATION**:

De-escalation was attempted on a large scale for this event. Officers were deployed in a large force in an attempt to dissuade any violent or destructive actions by the protesters. The incident commander attempted to use time and distance by keeping the units away from the targeted location to allow the demonstrators to peaceably protest. This action was no longer feasible when a suspect was identified carrying a Molotov cocktail. The risk to the occupants of the SPOG office was severe if that or other Molotov cocktails were deployed against the building. Immediate police action was necessary for life safety.

Use of Force #1

Upon being struck in the face multiple times de-escalation was not feasible.

Use of Force #2

The suspect was actively attempting to prevent an arrest being carried out. De-escalation was not feasible.

**DECISIONS MADE**:

Use of Force #1

I was able to see the suspect who punched me in the face. He was standing just in front of me and had his hands held in a fists, ahead of his body at torso level. I believed that this suspect was going to

assault me again and given the precarious situation I was in believed that I needed to take immediate and decisive action to defend myself from further assaults. I knew that there were officers in the area, but they were likely dealing with other violent demonstrators. I decided to strike the suspect who punched me in the face with what is called a "hammer punch".

Use of Force #2

As the officers were attempting to make the arrest, I saw 2 subjects holding onto his backpack and trying to pull him away from the officer physically arresting the suspect. I feared that their actions could injure both the officer and the arrestee. There was still a very large and hostile crowd a short distance away from where they were making the arrest. I felt it was reasonable and necessary to use proportional force to protect the officers and the arrestee. Of the force tools available to me I believed my MK-9 OC spray would be the best option to immediately stop the threat.

**THREAT ASSESSMENT**:

1. There was a credible report that there was at least one participant armed with a Molotov cocktail which was capable to producing great bodily harm if deployed.

2. The SPOG office was occupied by multiple persons and the demonstrator's actions placed them in jeopardy.

3. During my initial attempt to make the arrest I was surrounded by a very hostile crowd who were actively assaulting me.

4. This demonstration's focus was on the police and the group involved seek out physical and violent confrontations with law enforcement officers.

5. Officers were significantly outnumbered by the demonstrators.

6. This action occurred on a public street that was open to vehicular traffic. Further the demonstrators had vehicles as part of their protest, which posed a risk to officers involved.

7. Besides the Molotov cocktails this group in the past has thrown explosive devices at officers and they had one failed deployment this day.

8. As was typical with group dynamics violence by individuals encourages violence by the other participants.

9. It was known that members of the demonstrators have practiced in techniques to thwart our arrests.

10. Demonstrators were armed with makeshift weapons and shields, which shows their intent to engage in a violent conflict.

**FORCE USED**:

Use of Force #1

I closed my right hand into a fist and brought my arm above and behind my head. I swung forward and down in a quick motion, aiming for the suspect's face. My fist struck the suspect in the face with the bottom of my hand (pinky side) as the impact point. This force was immediately effective as that suspect turned away and fled. This force I used was likely to cause injury and/or pain, but it is unknown to me what the extent of that injury or pain was.

Use of Force #2

I quickly approached the subjects actively interfering in the arrest with my MK-9 OC spray in my left hand. I pointed it at the face of one of the subjects and deployed the OC from about 6 feet away. It appeared that the OC spray made contact with one of the subjects. The deployment of the OC was immediately effective as both subjects turned and fled. I have no knowledge of the extent of the injuries or pain as I did know of having any further contact with either subject. It was unlikely that the subjects sustained any injuries as the mechanism of the OC spray does not typically lead to injuries.

**MEDICAL AID AND EVALUATION**:

All subjects targeted by my Use of Force immediately fled after the force was used. It was unsafe and not feasible to locate these subjects after the fled. I do not know if medical aid or evaluation was offered.

**RESOLUTION**:

All subjects are at large.

**ADDITIONAL INFORMATION**:

A Molotov cocktail is typically made inside a glass bottle that contains a flammable substance and a wick coming from the top. The flammable substance may be as simple as an alcohol solution or gasoline. Typically, however, the flammable substance is made from a mixture of chemicals with the intent to create a more significant fire that adheres to surfaces. Substances such as motor oil, polystyrene, or rubber cement will be mixed with the flammable chemical to bolster the adherence. This means that if a person is struck by ignited contents the heat generated by the flames would cause continual damage to skin and the fumes would create a risk of asphyxiation. There is a history

of Molotov cocktails being used against police officers during riots and demonstrations.  Molotov cocktails pose a risk of significant injury or death.

EXHIBIT B(20)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Andrew Joy - 30057327

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 16:47 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58047 | 2020-261218 | 2020UOF-1417 |
| **Date/Time Entered** | | |
| 9/7/2020 22:56 | | |

## Incident Summary

EVENT/GO#: 2020-261218
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFFICER JOY #8409

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Domholt #7514. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Domholt #7514
B. ICV and/or BWV recorded: Not equipped with ICV, BWV recorded.

PRE-ARRIVAL DETAILS:
I am currently assigned to the North Precinct Bicycle Squad. I attended the 720-hour Basic Law Enforcement Academy, additional post-BLEA training and yearly trainings where I received additional defensive tactics and arrest training. I am CIT certified and at the time of the incident I was certified to use and was equipped with OC Spray and a Taser. I am an International Police Mountain Bicycle Association certified rider and have received yearly crowd control training since my certification. I have worked numerous demonstration and crowd management events as a bicycle officer.
On 09/07/2020 I was working a crowd management detail with the North Precinct bicycle squad. The "Labor Day March" gathered at the International District Light Rail Station at 1600 to prepare for a march to the SPOG office. Multiple bicycle squads, ACT teams and other department resources were staged and roving in the surrounding area for response to any violence or significant property destruction.
My squad was staged on the southwest corner of the intersection of S King St and Maynard Av S. Around 1634 hours Lt. Alcantara #5843 advised that she needed a bicycle team "TO MOVE IN TO MAKE AN ARREST,SUBJ WRNG BLU SWEATSHIRT,HITTING SUBJ PREACHING JESUS". The assault suspect was described as wearing a black sweatshirt with a blue square on the back and a white headband and Lt. Alcantara frequently updated the suspect's location.

ARRIVAL:
My squad moved northbound on Maynard Av S, westbound on S Jackson St and then southbound on 5 Av S. When we turned onto 5 Av S, Lt. Alcantara had updated that the suspect was continuing southbound and crossing to the east side of the roadway. Gathered on the west side of 5 Av S was a group of approximately 200 protesters gathering for the march to SPOG. Officer Lopez pointed out the suspect, identified by the distinct large blue square on the back of a black sweatshirt, walking eastbound across 5 Av S towards a group of three or four protesters on the east sidewalk just south of S King St.

LEGAL AUTHORITY & LAWFUL PURPOSE:
Legal Authority: The incident and arrest occurred on a city street/sidewalk open to the public.
Lawful Purpose: There was probable cause to arrest the suspect for assault.

CONTACT WITH SUBJECT:
Officer Lopez and I sped up our bicycles as we rode southbound towards the suspect. One of the people the suspect crossed the street to speak with directed the suspect's attention towards us. The suspect turned his head, briefly looked around for an avenue of escape and sprinted towards the large group of protesters on the west side of 5 Av S.

DE-ESCALATION:

I ordered the suspect to stop and told him that he was under arrest as I dismounted my bicycle and grabbed onto his jacket.
I made contact with the suspect in the middle of the street in an attempt to prevent the suspect from rejoining the large protest group, minimizing the risk of injury to the myself, other officers, the suspect and nearby persons, and to minimize the risk of others interfering with the arrest.
While Officer Lopez and I made the arrest, the remainder of my squad and other nearby police resources formed a circle around us to prevent others from getting involved and to minimize the risk of injury to bystanders.

DECISIONS MADE:
Based on the information provided by Lt. Alcantara we planned to make an arrest of the suspect for assault. We decided to arrest the suspect while he was outside of the main protest group to minimize the risk of injury and interference from others during the arrest.

THREAT ASSESSMENT:
During recent months, a large volume of those involved with this protest group have trained and spread information on how to protect each other from being arrested and how to "unarrest" those being arrested by police. Many of the protests have become violent as a persistent group of protesters has been willing to assault police officers with weapons varying from fists to rocks to explosives. Based on the suspect's flight directly toward the group of protesters I believe that if he entered the group there would be a significantly increased risk of injury to me, other officers and protesters and that more force may have been required to take the suspect into custody.

FORCE USED:
When the suspect saw me and Officer Lopez hurriedly riding towards him and he fled towards the large crowd on the west side of 5 Av S. I dismounted my bicycle and ordered the suspect to stop as I grabbed onto the right sleeve of his jacket. The suspect continued to try and flee and break free from my grasp. As I attempted to pull the suspect onto the ground I grabbed onto the collar of the suspect's jacket. Along with the suspect's collar I could feel a some of the suspect's hair in my hand. I continued to pull the suspect towards the ground by his collar and hair as he tried to flee. After several seconds of struggling, the suspect fell to the ground and immediately pulled both of his arms underneath him. I attempted to pull the suspect's left hand free by pulling his left elbow out and towards his shoulders while Officer Lopez attempted to apply a cross-face from the suspect's right side.
The suspect continued to struggle by shifting his weight back and forth, rolling himself from side to side. Another officer assisted with the arrest and controlled the suspect's feet and hips, preventing him from rolling.
I and other officers repeatedly ordered the suspect to place his hands behind his back. The suspect continued to refuse as he held his arms underneath him and holding them together. I eventually pried the suspect's left hand free and placed it behind his back. The suspect held his right hand underneath his torso tightly in a continued attempt to resist arrest. After the suspect's hands were freed from underneath his torso, I placed my knee across his back in a prone handcuffing position.
The suspect was secured in handcuffs which were gauged and double locked. The suspect was secured in a prisoner transport van and removed from the scene.

MEDICAL AID AND EVALUATION:
The suspect complained of pain to his head and had a small abrasion on his right elbow. According to the Mark43 report, the suspect received medical treatment for his injuries by SFD at the scene.
I received large abrasions to both of my knees during the arrest.

RESOLUTION:
The suspect was arrested and booked into King County Jail for misdemeanor assault.

ADDITIONAL INFORMATION:
The following are additional details recalled after reviewing my BWV of the incident:
The suspect was ordered multiple times to lay on his stomach and to place his hands behind his back as he pulled himself into a fetal position on his right side and pulling his arms tightly against his chest. The suspect repeatedly yelled "help" and "my brothers" as he was being arrested.
The suspect's legs were restrained by one officer while another placed a knee across the suspect's lower back/buttocks to further gain control and prevent the suspect from rolling while we secured the suspect in handcuffs.
I applied a modified prone handcuffing position with my left knee across the suspect's back as trained, but my right knee was upwards due to the large abrasion on my knee.

## Incident Location

- 400 block 5 Av S, Seattle, WA - Location of Occurrence: Demonstration - Precinct: K3 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |

| Weather Condition | Lighting Condition | Distance to Community Member |
|---|---|---|
| Clear | Daylight | 0 feet |

| Community Member Injured | Community Member Taken to Hospital | Community Member Arrested |
|---|---|---|
| Yes | No | Yes |

**More than 1 Community Member Involved**

No

| Community Member's Build | Community Member's Height |
|---|---|
| 125-175 pounds | 6'1" – 6'3" |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| Employee(s) Injured | Employee(s) Taken to Hospital |
|---|---|
| Yes | No |

## Reporting/Involved Community Member Information

**D█████ A████ S██████**

DOB: ███/2020   Race: White   Ethnicity:    Gender: Male

**Address**
- 1415 NE 43 St, Seattle, WA 98105

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Passive Noncompliance (including Verbal)
- Other (Specify in Narrative)
- Resist Handcuffing
- Personal Weapons – Bodyweight

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| Complaint of Pain Only | 1 | 1 |
| Abrasion | F | 2 |



**Charges against this Community Member**
- Misdemeanor-Person Crime

## Involved Employees

### Police Officer Andrew Joy - Serial: 30057327 - Badge Number: 8409
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage:** [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Verbal Commands - Was force effective: No
- Handcuffing - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Verbal Commands | No | | |
| Handcuffing | Yes | 6, D | 1, 2, 3 |



### Injuries sustained by this officer

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Abrasion | 11, 13 | 1, 2 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | Involved Officer Joy Type II UoF statement | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Andrew Joy |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 2:10 PM |
| **Instructions from Police Officer Andrew Joy to Police Lieutenant Seth Dietrich:** | |
| Involved Officer Joy Type II UoF statement | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Andrew Joy - 30057327

EXHIBIT B(21)

EVENT/GO#: 20-261218
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: E. LOPEZ #8343

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by SGT. J DOMHOLT #7514. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: SGT J. DOMHOLT #7514
B. ICV/BWV recorded: BWV & ICV (wagon) recorded

---

\*The following is a summary of a use of force that occurred during an arrest I made. Any discrepancies are unintentional; see body worn video for a full record of events. I wrote this statement from memory and with the assistance of CAD call notes.

**DETAILED NARRATIVE:**

**PRE-ARRIVAL DETAILS / BRIEFING**

I am currently assigned to the North Precinct Bike Squad at the Seattle Police Department. I have completed the 720-hour training at the Washington State Criminal Justice Training Center (WSCJTC). I have completed 40-hour Crisis Intervention Training at WSCJTC. I have completed a weeklong SPD bike school training which is certified by the International Police Mountain Bike Association (IPMBA). I have completed Seattle PD blast-ball training in 2019.

A significant portion of the SPD blast-ball training and the SPD bike school covered demonstration management which distinguished crowd management from crowd control. The goal for crowd management is to facilitate the first amendment rights of everyone at a peaceful event in a content neutral manner; this includes blocking traffic for marches, preventing violence by keeping opposing groups separate, etc. The goal of crowd control to identify and arrest any instigator(s) in the crowd who have committed violent acts or encourage the crowd to become violent. This distinction weighs heavily on use of force decision making for individual officers and the chain of command. Officers are authorized to independently use force in defense of self, others or significant property damage. I have worked many protests and demonstrations since 2017.

I was equipped with a black SPD bicycle uniform including gloves, eye protection, full face mountain bike helmet, and ballistic vest. My duty belt includes the following less lethal: baton, OC (MK9 & MK4), taser. I also carried cold-fire due to recent reports of Molotov cocktails used in Portland riots.

On 09/07/2020, while on duty as 2J89 with Officer A. JOY, I was assigned to a bike squad that worked multiple events/demonstrations for Labor Day. The roll call briefing at the West Precinct summarized the events and reiterated the use of force policy in light of the recent DOJ temporary restraining order. Officer JOY and I were the hands-on points for our bike squad.

At about 1600, over 100 Black Bloc assembled at the light rail station near the 400 block of 5 AV S for a march to the SPOG building. Those in the black bloc crowd wore full body armor, helmets,

masks, eye protection and carried shields. At about 1620 Lt. Alcontera on viewed an assault; a street preacher was chased and assaulted by an individual from the black bloc group. The suspect was described as a black clad male with a blue square on the back of his jacket. North Bikes and East Bikes initially responded to arrest the suspect.

**ARRIVAL**

Upon arrival, the suspect's location and direction of travel were updated by Lt. Alcontera. My partner and I spotted the suspect who was still engaged with the victim. As we approached the suspect walked EB back towards the Black Bloc crowd. Once the suspect noticed police, he tried to run into the crowd of black bloc. The black bloc crowd posed the greatest danger since they practice de-arrest techniques.

**LEGAL AUTHORITY & LAWFUL PURPOSE**

I was on uniformed duty in the city of Seattle. The suspect was contacted in public on a city street/sidewalk at a transit center. Probable cause existed for assault for the suspect and our exigency was heightened due to the hostile crowd of black bloc and the suspect who tried to run into said crowd.

**CONTACT WITH SUBJECT (S)**

Officer JOY and I contacted in the middle of the street at the 400 block of 5 AV S. Once the suspect noticed police, he tried to run into the crowd of black bloc to evade arrest. The crowd was over 100 and police rushed in for the arrest and to prevent any de-arrest attempts from the black bloc crowd.

**DE-ESCALATION**

The arrest was a coordinated effort amongst the various demonstration management units who worked that day which included several bike teams, ACT units and SWAT. The amount of officers on scene were meant to safely isolate and arrest the suspect. Since the suspect made the decision to run for the black bloc crowd, direct de-escalation was not feasible.

**DECISIONS MADE & ORDERS GIVEN AND RECEIVED**

SGT SYLVESTER announced that north bikes were in the area for the arrest. My partner and I spotted the assault suspect who attempted to run into the crowd of black bloc before any verbal orders were given.

**THREAT ASSESSMENT**

The suspect appeared unarmed and but had just assaulted a street preacher. The suspect sought to elude police by running into the crowd of black bloc. The black bloc crowd posed the greatest danger since they frequently practice de-arrest techniques.

**FORCE USED**

The suspect created exigency for the assault arrest as he darted towards the black bloc group which made police verbal commands not feasible. Officer JOY grabbed the suspect and we then took the suspect down to the ground together. The suspect pulled his arms towards his chest to prevent his arrest. I attempted to pull the suspect's right arm out from under him and evaluated that it was unsuccessful. I then transitioned to a cross-face for pain compliance and gave verbal orders for the suspect to get his hands out from under him. I evaluated that the cross-face was successful since the suspect's hands came out from under him. The suspect complied and I handed

the suspect's right arm to Officer J. McMullen who placed the suspect in handcuffs. The suspect complied with the arrest from thereafter.

**MEDICAL AID AND EVALUATION**

At the time of the arrest, I did not immediately notice any complaints of pain or apparent injuries. Lt. DYMENT ordered my partner and I to screen the arrest a few blocks away with SGT DOMHOLT #7514. Once we were clear from the dynamic scene, the suspect complained of head pain and had a minor abrasion to his right elbow. Per the CAD call notes, the suspect was treated by SFD.

I sustained minor abrasions to my left hand and my right knee.

**RESOLUTION**

The suspect was transported to the west precinct and later booked into KCJ for assault.

**ADDITIONAL INFORMATION**:

EXHIBIT B(22)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Ryan Beecroft - 30051535

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/9/2020 | 9/7/2020 | 18:23 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58103 | 2020-261291 | 2020UOF-1429 |
| **Date/Time Entered** | | |
| 9/9/2020 11:40 | | |

## Incident Summary

EVENT/GO#: 2020-261291
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: R. BEECROFT #7722
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police
Department manual order by Sgt. Domholt #7514. I DO invoke my Garrity rights prior to giving this
statement.
Preface:
A. In-person supervisor screening: Sgt. Kraus (on scene) Sgt. Domholt (West Pct)
B. ICV/BWV recorded: No vehicle for ICV. BWC worn and activated.

DETAILED NARRATIVE:

On 9/7/2020, I was assigned as unit 196 in full uniform. I am currently assigned to the FOCUS squad within
the West Act unit, which primarily addresses street level crime and quality of life issues within specific areas
of the downtown core. At approximately 1823hrs, I was working as a crowd control element for an event
labeled as, "Labor Day march calling for no more Police Unions."

Per the Incident Action Plan (IAP) provided prior to the event, our mission as the Seattle Police Department
was to enforce the law and preserve order. Our response priorities were life safety, incident stabilization,
property conservation, and crime scene preservation.

We had received information over radio that the crowd size was approximately 500 people. Many in the crowd
were dressed in all black, had makeshift armor, helmets, gas masks, and were carrying shields and
umbrellas. Based on my training and extensive experience in recent protests/riots, this is indicative of a
confrontational and often violent crowd.

At 1809hrs, we received further information via radio that a subject in the crowd was carrying a Molotov
cocktail. He was walking southbound on a public sidewalk/street. The march destination was the Seattle
Police Officer Guild (SPOG) Office, which was previously targeted during a coordinated attack with Molotov
cocktails on 8/24/2020. Per our IAP mission, this individual posed a substantial threat to life safety and
property destruction with an incendiary device at the ready and the coordination of an arrest was being
organized over radio.

Units who were observing this suspect developed probable cause and began to guide in bicycle and ACT
teams to effect an arrest. The subject was within the crowd in front of the SPOG office as arrest teams moved
in. As bicycle teams advanced toward the crowd to make the arrest, they met heavy resistance in the form of
a shield wall from numerous individuals in the crowd and additional subjects in the crowd began deploying
bear mace at officers. Officers immediately began taking rocks and other misc. projectiles from the hostile
crowd. I began running with the West ACT team towards the bicycle officers who were being assaulted from
3rd Av S.

I ran into the street (2900blk of 4th Av S) and positioned myself behind the bicycle officer line that was
established to protect several arrests that were being made. I was equipped with a department issued MK9

OC cannister that I was carrying in my right hand.

I approached the northeast side of the bicycle officers' line, maintaining my posture as a supporting element for the officers positioned in front, facing the hostile crowd. I observed several subjects within the crowd that were highly animated and yelling at officers. One subject caught my attention because was jumping up and down and moving side to side while staring directly at the bicycle officers. He appeared to be a black male, short black hair, 5'9", medium weight, wearing a red shirt and blue jeans. He had a water bottle in his right hand, which has been a common weapon to throw at officers and have been frozen during past riots with the intent to inflict serious injury to officers when thrown.

He stared intently at the bicycle officer line while holding the water bottle and shuffle jumping to his left. He then brought his two hands together, grabbed something I could not see out of his left hand with his right, and threw that object at a bicycle officer from approximately 20ft away. He threw the object directly at officers with the clear intent to cause harm. The unknown object appeared to be approximately the size of golf ball.

It was not safe or feasible to effect an arrest on the subject because of his location and the lack of time to coordinate an arrest team to perform the apprehension. I raised my Mk9 OC canister in his direction. He now had the water bottle back in his right hand. He raised it up behind his head and cocked it back in a throwing motion as he strafed back to his right.

I believed that an assault on officers was imminent, so I deployed my OC spray directly at him and him alone. Due to the imminency of the assault, it was not feasible to issue a verbal warning to him or others prior to OC spray deployment. Furthermore, because of the imminency of the assault it was not safe or feasible to attempt any form of de-escalation.

The deployment of spray was a short burst, less than one second long, because it was immediately evident the spray was not reaching the intended target due to the wind. The wind was blowing to the south as I faced north when I attempted to apply the OC spray to the suspect's face following training and policy. The suspect also immediately turned to run when I deployed, no longer presenting a clear target to his face.

It appeared an unknown bicycle officer also deployed OC toward the suspect at the same time. Although my deployment fell short it was unclear if the bicycle officer's spray had reached the suspect.

Once more, it was not safe or feasible to attempt an arrest due to the suspect's location in the crowd and I did not have enough members of my team to coordinate a safe and effective arrest effort.

I heard the bicycle officers call for a "double column" which is used to perform a coordinated movement of a bicycle team. Once the officers formed the double column, they pursued the suspect to make an arrest. The suspect fled, running north to evade apprehension.

I repositioned myself near the officers behind me who were making a separate arrest on the ground. I provided cover for these officers since the bicycle officers who were previously performing this role joined the double column arrest effort.

The suspect, later identified as S████ R. L████████, was apprehended by bicycle officers approximately two blocks north of the original incident location. As I progressed north bound, I observed the bicycle officers taking L██████ into custody. I joined the officers who surrounded the arrest in a protective circle as there was still a large, hostile crowd walking near us on the eastern sidewalk.

Since my OC deployment was clearly unsuccessful in reaching L████ at the time of the incident, I did not request a medical response since there was no exposure from my deployment.

Once L██████ was in custody and under control, I progressed northbound with my team to continue the crowd management effort. I did not speak to or assist in the physical arrest of L████. Once it was safe and feasible to do so, I screened the OC deployment in the field with Sgt. Kraus. I returned to the precinct later in the night and screened the incident again with Sgt. Domholt in the West Precinct write-up room.

The officers who arrested L██████ identified him. It is unknown how he was identified at the time of the arrest, but he was booked into King County Jail as S████ R. C████.

## Incident Location

• 2400 4 Ave S, Seattle, WA 98134 - Location of Occurrence: South - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| | | |
|---|---|---|
| **Reason for Use of Force** | **Service Being Rendered** | |
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | Greater than 20 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'7" – 5'9" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### S██████ R C██████

DOB: ████/1992  Race: Black  Ethnicity:   Gender: Male

**Address**
- 703 8 av s, Suite/Apt: 901, seattle, WA 98104

**Phone**
- (206) 488-1058

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Ryan Beecroft - Serial: 30051535 - Badge Number: 7722
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B112/West Pct 2Nd W - D M Relief B112V/West Pct 2Nd W - D M Relief B112V

**Video Footage:** Equipped - Activated

**Role**

- Secondary Officer

**Force used by this employee against the community member**
- Chemical Agent – OC Spray - Was force effective: No

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | No | X | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| |
|---|
| No tasks to show |

## Running Sheet Entries

| |
|---|
| No running sheet entries to show |

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | 2020-261291 Type 2 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Ryan Beecroft |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 3:46 PM |
| **Instructions from Police Officer Ryan Beecroft to Police Sergeant Jason Domholt:** | |
| 2020-261291 | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Ryan Beecroft - 30051535

EXHIBIT B(23)

EVENT/GO#: 2020-261291

DATE OF OCCURRENCE: 09/07/2020

STATEMENT OF: M. EASTMAN #7412

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Didier.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: This incident was screened on scene by Sgt Didier at the transport van.  Initially I was unaware of any injury to S/LIACASTIO.  When I returned to the West Precinct at the end of shift I was told that S/LIACASTIO had an abrasion on his arm and leg.

B. ICV and/or BWV recorded:  I am a bicycle patrol Officer and I do not carry ICV.  I was wearing a body worn camera and it was recording at the time of this use of force.

---

**PRE-ARRIVAL DETAILS:**

I reviewed my body camera prior to writing this report.

On 9/7/2020 I was working as unit 2K97 uniform bicycle patrol in the City of Seattle.  I was wearing a standard bicycle Officer uniform with black shorts, a black polo shirt and an external vest carrier.  I had Police Patches on my shoulders across my back and above my left breast.  I wore a bicycle helmet with a protective chin bar, safety glasses, gloves and kneepads.  I was assigned to the 2K90 bicycle squad under Sgt Didier.  On that day I was assigned as a linebacker.  A linebacker is responsible for assisting line Officers by providing the ability to go hands-on to make arrests and is also primarily responsible for the deployment of less lethal munitions.  The incident commander was West Precinct Captain Allen.  I was part of a large deployment of Officers assigned to the Labor Day protest and march that began at 1600hrs.  This was a pre-planned event and I had seen 3 flyers online that advertised the march.  I included the flyers with this report.  One flyer stated "workers unite against Police", another said "101 days of protest in Seattle, calling all workers no more Police union" and the last "Calling all workers 101 days of protests in Seattle! Labor Day march stand up against Police unions, cops aren't workers".  The flyers had some generic imagery of union workers and the time listed for the rally.





**MONDAY SEPT. 7TH**

**LABOR DAY MARCH**

**101 DAYS OF PROTEST IN SEATTLE**

**CALLING ALL WORKERS**

**NO MORE POLICE UNION**

**INTERNATIONAL DISTRICT LIGHTRAIL STATION**



**4:00 PM**



I attended the roll call before deployment and was given a copy of the incident action plan which included the commander's intent "***There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.***".  I was personally aware of a previous protest with similar attention the Police Union on 8/16/20 SPD case #2020-241783.  I worked that previous protest which resulted in multiple arrests with several Officers injured including myself.  While the previous protest did not dictate Police action on the current day it did factor into the increased deployment of Police resources for the 9/7/2020 event.

**ARRIVAL**:

I began the day deployed well away from the starting location of the rally.  My squad operated on standby until the march began, at which point we followed the march from several blocks away.  I

could see the march proceeding Southbound on 4 Ave S near S Royal Brougham Way blocking all lanes of vehicular traffic. It appeared to be around 300 people and there were several protester bicycles and cars accompanying the march. I could also see that the marchers were disregarding traffic signals. This was causing vehicular traffic congestion even with the light holiday traffic. I could see that Police were taking no action to direct or hinder the movement of the crowd.

Even from a distance I could see that members of the crowd were clothed in nearly all black clothing and some were wearing filter gas masks, protective helmets, goggles, carrying wooden or plastic shields and umbrellas. The black clothing is part of a coordinated tactic called "black bloc" which is meant to increase the anonymity of individuals in the crowd and decrease the chance of specific identification and arrests if crimes are committed. The filter gas masks were not a part of the COVID-19 precautionary measures that the general public has adopted but rather a specific choice to hinder and render ineffective the use of crowd control munitions used by Police should a riot be declared. The protective helmets, shields and umbrellas were also part of a calculated measure to block, hinder and obstruct law enforcement should crowd control munitions be used or attempts at arrest be made. Members of the crowd with shields/umbrellas will group closely together interlocking their shields/umbrellas to prevent Officers from entering the crowd to make arrests. The shields/umbrellas are also used to physically block or bounce back crowd control munitions and provide concealment for other members of the crowd to throw rocks or other items to assault Police. The composition of the crowd made me suspicious that some in the crowd planned to commit criminal acts.

My squad continued to monitor the march from a distance until the march reached 4 Ave S and S Holgate St. I heard over radio that Officers had seen a person in the crowd with a Molotov Cocktail. A Molotov Cocktail is an improvised incendiary device. It is made by using a glass bottle filled with gasoline or some other fuel and a cloth wick stuffed into the top. This is lit on fire and thrown shattering on impact an spreading the burning fuel over an area. Molotovs are unpredictable and dangerous weapons and it is a felony to possess one. My squad was ordered to group together with other squads and to move in to arrest the specific person who was carrying the Molotov. As My squad moved parallel to the march I listened for updates over my radio. I heard that they did not have a specific location yet for the suspect with the Molotov so we could not move in. My squad eventually linked up with several other bicycle Squads on 3 Ave S just behind 2949 4 Ave S. We waited for confirmation over radio of the suspect location. The above address is the Seattle Police Officer Guild building and the apparent destination of the march. The march had stopped and was spread out in front of the building on 4 Ave S. I could see that the marchers had seen Police Officers on 3 Ave. The marchers had created a line of people with wooden shields blocking the 4 Ave S exit of the Police Guild parking lot with interlocked shields. This appeared highly coordinated and I worried that the marchers would not cooperate with any Police action. At that point I heard over radio that the suspect with the Molotov was located directly in front of the Seattle Police Guild on the West side of 4 Ave S near a person with a yellow umbrella. From my location on 3 Ave S I could see only one yellow umbrella on the North end of the shield wall a few feet East of the West sidewalk. I heard the order given for the bike squads to move in and arrest the suspect. The 2K90 bicycle squad was the 2nd of I believe 4 bicycle squads that moved in from 3 Ave S to make the arrest.

I heard Officers give clear verbal commands to move back and to move out of the way to the marchers. It did not appear to me that more than a handful of the 300 people in the crowd complied. Not enough of the marchers moved to allow an arrest to be made. The marchers who had formed the shield wall did not move at all. I saw that the shield wall was supplemented by unfurled umbrellas at the tops of the shields further concealing the people behind. I saw a red pepper spray canister held up by the protesters above the shield and a yellow cloud shot out from the canister engulfing myself and other Officers. I knew that it was pepper spray because almost instantly I had pain in my eyes, and I began coughing. I was only able to keep one eye open while I assisted other Officers in moving

people away from the location of the Molotov suspect.  I gave repeated commands to protesters to move back, I had to physically push people back. When other Officers were assaulted, I deployed OC spray to protect myself and others and to prevent further assaults.  I was not able to arrest the specific persons that I deployed OC on.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

My legal authority was that I was working as a uniform Police Officer in the City of Seattle.  This incident occurred on a public street and attached sidewalks within the City of Seattle.

My lawful authority was that Officers had probable cause to arrest S/L█████ for investigation of assault on Sgt Didier.  While attempting to take S/L█████ into custody he resisted by breaking free of Officers grasp and running away disregarding all verbal commands.  He led Officers on an extended foot pursuit which required the involvement of many Officers to eventually catch him.  S/L████ did not stop running until force was used to stop him.

**CONTACT WITH SUBJECT**:

After clearing the immediate area in front of the Seattle Police Officers Guild I noticed that I had become separated from my squad.  I found my bicycle which I had left behind in the melee and then I saw that my squad was involved in a foot pursuit with a suspect through the crowd.  I mounted my bicycle and assisted in the pursuit.  Please see SPD case 2020-261291 for further details. After assisting in taking S/L████ into custody for felony assault my squad returned to addressing the crowd.  By then the crowd was Northbound on 4 Ave S.  I could hear dispersal orders being given over a loudspeaker.  I could see that the rioters were gathering again near 4 Ave S and S Forest St and they were not dispersing.  It appeared to me that they were preparing to assault Officers again.  The marchers had turned to face South and had a front line of shields and umbrellas.  Just minutes previous most of the crowd had been on the East Sidewalk and in the adjoining parking lots of 4 Ave S which could have afforded the marchers the ability to leave the area as per the dispersal order. When my squad arrived with other Officers, I saw several palm sized rocks being thrown from behind the new shield wall.  I did not see if the rocks hit any Officers, but I was nearly struck several times myself.

The rioters continued to throw rocks and other items to assault Officers until Officers deployed crowd control munitions.  I heard further dispersal orders being given by loudspeaker.  The crowd maintained its cohesion with a line of wooden shields and umbrellas facing Officers.   The shield wall was concealing the rioters that were throwing rocks.  This appeared to be a coordinated effort by the crowd to assault us.  I saw a smoking brown cardboard tube be thrown from behind the shields directly at me.  It landed next to my right foot and exploded spreading burning embers around me and causing me to go temporarily deaf with ringing in my ears.  It took several seconds for my hearing and equilibrium to return.  At that point I heard over radio that multiple arrests had been made and that several Officers were injured.

My squad worked in conjunction with other bicycle squads to control the crowd and move them Northbound on 4 Ave S until we reached S Holgate St.  Despite multiple dispersal orders and hundreds of verbal commands from Officers on the line the rioters did not disperse but remained in a

tight group. I saw several additional arrests be made. When we approached the intersection with S Holgate St, I saw a flaming glass bottle thrown at Officers. It missed and shattered on the ground spreading flaming fuel on the street. This was a Molotov cocktail. I assisted other squads in continuing to move the rioters, this time Eastbound on S Holgate St to move them away from the downtown area. I continued to give verbal commands to disperse and I heard a few more dispersal orders given over a loudspeaker. It appeared that these orders were also disregarded. I could see that there were several side streets and open unfenced parking lots that people could have dispersed into, but they were not utilized.

I continued to assist with moving the crowd Eastbound on S Holgate St then Northbound on 6 Ave. We turned Eastbound on S Dearborn St to Rainier Ave S. Once on Rainier Ave S we moved the Crowd Southbound until we were unable to restrict their movement and they fled Eastbound into the park at Interstate 90 to Judkins Park.

While moving the crowd they had continued to disregard verbal commands and it was only with the display of team tactics that the crowd moved. The team tactics mainly consisted of crossbow line formation movements. This is where a squad of bicycle Officers with move in a double column and ride towards the crowd. The Officers will split and fan out to the left and right covering the width of the street and then suddenly slide to a stop forming a line. This is done as a team in a uniform and controlled manner. The objective is to provide the crowd with the belief that Officers will contact them or is about to arrest someone but to not necessarily do so. This tactic can be used to make contact, but it is less effective if it does. The tactic is meant to be seen approaching and is accompanied by repeated verbal commands to move back. Due to the uniform and team nature of the movement there is a psychological effect on the crowd and most times the crowd does indeed move away from Officers. This team tactic was effective at moving the rioters. The rioters continued to occasionally throw items at Officers but the quicker that we forced them to move, the less items were thrown.

When the crowd reached Rainier Ave S at I-90 it appeared that it was beginning to disperse by running into the park. We were ordered to stop following the rioters and allow them to disperse. I remained in the area until released back to the West Precinct. I heard over radio that a total of 27 people had been arrested and that 10 Officers had been injured including one who was hospitalized with a broken bone. I saw that at least one of the rioters who had been arrested appeared injured and I heard that Seattle Fire was called to treat them. At first, I did not believe that I was involved with any injury to any rioter. Later I was informed that the one arrest I had been involved in at the beginning of the riot had an injury. I later completed the required use of force paperwork for the arrest. I also completed a general use of force for the event for using OC spray and OC blast balls. I did not receive medical attention for the bruises, abrasions, pepper spray or hearing damage I had been exposed to. I did notify my supervisor and the on-duty SPD EMTs of my injuries. I heard that several of the rioters had shown up in another area of the City and were being monitored by other Officers. I was not re-deployed that day and I was released to write paperwork.

**DE-ESCALATION**:

To my knowledge there was very little time to attempt any de-escalation. Probable cause was developed to arrest S/L███████ when he was observed to assault Sergeant Didier at the Police line. Officers made contact with S/L███████ but he broke away from Officers. S/L███████ would have known at that point he was the target of an arrest and he continued to run away from Officers. I

made eye contact with S/L ▮▮▮▮▮ at several points during the pursuit and he avoided me by changing directions several times clearly showing knowledge of his impending arrest.

**DECISIONS MADE**:

I made the decision to use my bicycle to take down S/L ▮▮▮▮▮ because no reasonable effective alternative appeared to exist. The foot pursuit of S/L ▮▮▮▮▮ had caused several Police Officers including myself to venture far away from the main body of Police resources. The longer the pursuit lasted the more I worried that myself or other Officers would be assaulted by the hostile crowd. I had seen that several other Officers on foot had failed to control S/L ▮▮▮▮▮ and that S/L ▮▮▮▮▮ was a very fast runner. I did not believe that if I dismounted and ran after him on foot that I would be fast enough to catch him. I used the mechanical advantage of my bicycle to overtake him.

**THREAT ASSESSMENT**:

During the course of this incident Officers were outnumbered and assaulted by the crowd. I believe that if given the opportunity the crowd would assault and injure any isolated Police Officers. The longer the foot pursuit of S/L ▮▮▮▮▮ lasted the more likely it became that Officers would become isolated. I was aware by way of radio broadcasts that Officers were injured at the time S/L ▮▮▮▮▮ was arrested. At the end of the night I was aware that ten Officers had received injuries and one Officer had been transported to the hospital.

**FORCE USED**:

This use of force was bookmarked on my body worn video.

At 1823hrs I was pursuing S/L ▮▮▮▮▮ who was running away from arresting Officers. I was on my bicycle and S/L ▮▮▮▮▮ was on foot. We were near 2949 4 Ave S in the middle of the street. This was after S/L ▮▮▮▮▮ had run North on the East sidewalk, hidden behind a car and then ran in a serpentine pattern to avoid pursuing Officers. I had ridden North of S/L ▮▮▮▮▮ and he changed direction to run West to try and get around me. I used an untrained method of stopping S/L ▮▮▮▮▮ from running. I intentionally rode my bicycle into the legs of S/L ▮▮▮▮▮ striking him with my front tire on his right leg while he ran. This caused S/L ▮▮▮▮▮ to be knocked off his feet and fall to the ground on his stomach. I believed that this action would cause pain to S/L ▮▮▮▮▮ and would most likely cause bruising to his leg. It was effective in stopping S/L ▮▮▮▮▮ and other pursuing Officers were able to take hold of him and place him in handcuffs while he was still on the ground. I did not witness if those other Officers used any force. Once I saw that other Officers were with S/L ▮▮▮▮▮ I immediately turned my attention to the crowd of 300 that were marching past our arrest scene. I stood by with arresting Officers until a transport vehicle arrived.

I heard S/L ▮▮▮▮▮ cry out in pain for a few minutes while waiting for transport. I could not see if he was injured in any way, only that he was yelling. It appeared that he was uninjured when he cooperated in walking over the transport vehicle. I heard that he had declined medical aid and the

transport van cleared the scene.  I returned to the riot line and had no further contact with S/L█████████.  I was not aware of any injury to S/L█████████ until the end of shift.

**MEDICAL AID AND EVALUATION**:

At the scene I was only aware of complaints of pain from S/L█████████.  I saw that other Officers with with S/L█████████ and I expected that had there been any injuries they would have called for SFD to respond.  I did not hear a SFD request at the scene.  I was told at the end of shift that abrasions were found on S/L█████████ at the West Precinct prior to booking.

**RESOLUTION**:

Due to the nature of the riot and the extended amount of time required for crowd control I did not return to the precinct until the end of shift.  When I was informed of the injury to S/L█████████ I completed a type 2 UOF statement.  I also completed another type 2 UOF statement for the use of crowd control munitions that day.

**ADDITIONAL INFORMATION**:

EXHIBIT B(24)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Caleb Howard - 30060526

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:48 |

| Record ID # | Case # | IA Pro Number |
|---|---|---|
| 58038 | 2020-261304 | 2020UOF-1381 |

**Date/Time Entered**

9/7/2020 21:34

## Incident Summary

EVENT/GO#: 2020-261304
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFFICER C. HOWARD
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Domholt. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening:
B. ICV recorded: Yes

DETAILED NARRATIVE: On the above listed date at approximately 1848 hours, I was assigned to the 2K90's bike squad and was working in that capacity in response to a demonstration that had been declared an "unlawful assembly". The demonstration was taking place outside of the SPOG office on 4th Ave S. in the City of Seattle. The reason we began interaction with the protestors was in order to disrupt and stop the unlawful assembly. Several of the protesters were seen assembling Molotov Cocktails with stated intent to burn down the SPOG building. In order to quell this issue it was determined that targeted arrests would be made on those participating in criminal activity and other officers in the area would begin using bike lines to move the crowd away from the arrests. While attempting to move subjects north on 4th Ave S, I encountered R█████ █████. He was a white male wearing all black clothing and carrying a backpack. He was given more than a dozen commands to move back and continued to stand his ground and at one point advanced toward the bike line with an umbrella and a shield. I attempted to push him back using my bike and it was at that time, he swung and struck me in the head with a closed fist. In response and predicated on the belief that if I did not respond I would be further injured, I struck R█████ with a closed fist on the right side of his face with my right hand. He was then assisted to the ground by other officers and we placed him in custody for assault on a police officer. At no time did █████ complain of pain or state that he had received any injury from my use of force against him. After the arrest was completed I asked him if he required medical attention and he stated that he did not. The arrest was screened on screened by Sgt Dumholt and he was transported by prisoner processing van #2.


ADDITIONAL INFORMATION:

## Incident Location

• 2700BLK 4th S, Seattle, WA 98100 - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Self | Demonstration | |

| Weather Condition | Lighting Condition | Distance to Community Member |
|---|---|---|

| | | |
|---|---|---|
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| Greater than 225 pounds | 6'1" – 6'3" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| | | |
|---|---|---|
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| Yes | No | |

## Reporting/Involved Community Member Information

R█████ F█████

DOB: ██/1989   Race: White   Ethnicity:   Gender: Male

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Personal Weapons – Punch/Elbow

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

#### Charges against this Community Member
- Felony-Person Crime

## Involved Employees

### Police Officer Caleb Howard - Serial: 30060526 - Badge Number: 8517
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/Southwest Pct B250/Southwest Pct 2Nd W B252/Southwest Pct 2Nd W - William B252W/Southwest Pct 2Nd W - William B252W

**Video Footage:** [No Response]

#### Role
- Secondary Officer

#### Force used by this employee against the community member
- Personal Weapons – Punch/Elbow - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Personal Weapons – Punch/Elbow | Yes | 1 | 1 |



### Injuries sustained by this officer

| Injury | Regions | Injury Locations |
|---|---|---|
| Complaint of Pain Only | 1 | 1 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 |
|---|

| | |
|---|---|
| Sent From: | Police Officer Caleb Howard |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/7/2020 10:01 PM |
| **Instructions from Police Officer Caleb Howard to Police Sergeant Jason Domholt:** | |
| Use of Force for 261304 | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Caleb Howard - 30060526

EXHIBIT B(25)

# Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Ryan Beecroft - 30051535

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/9/2020 | 9/7/2020 | 18:36 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58109 | 2020-261308 | 2020UOF-1418 |
| **Date/Time Entered** | | |
| 9/9/2020 16:22 | | |

## Incident Summary

On 9/7/2020, I was assigned as unit 196 in full uniform. I am currently assigned to the FOCUS squad within the West Act unit, which primarily addresses street level crime and quality of life issues within specific areas of the downtown core. At approximately 1823hrs, I was working as a crowd control element for an event labeled as, "Labor Day march calling for no more Police Unions."

Per the Incident Action Plan (IAP) provided prior to the event, our mission as the Seattle Police Department was to enforce the law and preserve order. Our response priorities were life safety, incident stabilization, property conservation, and crime scene preservation.

We had received information over radio that the crowd size was approximately 500 people. Many in the crowd were dressed in all black, had makeshift armor, helmets, gas masks, and were carrying shields and umbrellas. Based on my training and extensive experience in recent protests/riots, this is indicative of a confrontational and often violent crowd.

At 1809hrs, we received further information via radio that a subject in the crowd was carrying a Molotov cocktail. He was walking southbound on a public sidewalk/street. The march destination was the Seattle Police Officer Guild (SPOG) Office, which was previously targeted during a coordinated attack with Molotov cocktails on 8/24/2020. Per our IAP mission, this individual posed a substantial threat to life safety and property destruction with an incendiary device at the ready and the coordination of an arrest was being organized over radio.

Units who were observing this suspect developed probable cause and began to guide in bicycle and ACT teams to effect an arrest. The subject was within the crowd in front of the SPOG office as arrest teams moved in. As bicycle teams advanced toward the crowd to make the arrest, they met heavy resistance in the form of a shield wall from numerous individuals in the crowd and additional subjects in the crowd began deploying bear mace at officers. Officers immediately began taking rocks and other misc. projectiles from the hostile crowd. I began running with the West ACT team towards the bicycle officers who were being assaulted from 3rd Av S.

I ran into the street (2900blk of 4th Av S) and positioned myself behind the bicycle officer line that was established to protect several arrests that were being made. I was equipped with a department issued MK9 OC cannister that I was carrying in my right hand.

I approached the northeast side of the bicycle officers' line, maintaining my posture as a supporting element for the officers positioned in front, facing the hostile crowd. I observed several subjects within the crowd that were highly animated and yelling at officers. One subject caught my attention because was jumping up and down and moving side to side while staring directly at the bicycle officers. He appeared to be a black male, short black hair, 5'9", medium weight, wearing a red shirt and blue jeans. He had a water bottle in his right hand, which has been a common weapon to throw at officers and have been frozen during past riots with the intent to inflict serious injury to officers when thrown.

He stared intently at the bicycle officer line while holding the water bottle and shuffle jumping to his left. He then brought his two hands together, grabbed something I could not see out of his left hand with his right, and threw that object at a bicycle officer from approximately 20ft away. He threw the object directly at officers with the clear intent to cause harm. The unknown object appeared to be approximately the size of golf ball.

It was not safe or feasible to effect an arrest on the subject because of his location and the lack of time to coordinate an arrest team to perform the apprehension. I raised my Mk9 OC canister in his direction. He now had the water bottle back in his right hand. He raised it up behind his head and cocked it back in a throwing motion as he strafed back to his right.

I believed that an assault on officers was imminent, so I deployed my OC spray directly at him and him alone. Due to the immanency of the assault, it was not feasible to issue a verbal warning to him or others prior to OC spray deployment. Furthermore, because of the immanency of the assault it was not safe or feasible to attempt any form of de-escalation.

The deployment of spray was a short burst, less than one second long, because it was immediately evident the spray was not reaching the intended target due to the wind. The wind was blowing to the south as I faced north when I attempted to apply the OC spray to the suspect's face following training and policy. The suspect also immediately turned to run when I deployed, no longer presenting a clear target to his face.

It appeared an unknown bicycle officer also deployed OC toward the suspect at the same time. Although my deployment fell short it was unclear if the bicycle officer's spray had reached the suspect.

Once more, it was not safe or feasible to attempt an arrest due to the suspect's location in the crowd and I did not have enough members of my team to coordinate a safe and effective arrest effort.

I heard the bicycle officers call for a "double column" which is used to perform a coordinated movement of a bicycle team. Once the officers formed the double column, they pursued the suspect to make an arrest. The suspect fled, running north to evade apprehension.

I repositioned myself near the officers behind me who were making a separate arrest on the ground. I provided cover for these officers since the bicycle officers who were previously performing this role joined the double column arrest effort.

The suspect, later identified as S███ R. L███████, was apprehended by bicycle officers approximately two blocks north of the original incident location. As I progressed north bound, I observed the bicycle officers taking L██████ into custody. I joined the officers who surrounded the arrest in a protective circle as there was still a large, hostile crowd walking near us on the eastern sidewalk.

Since my OC deployment was clearly unsuccessful in reaching L██████ at the time of the incident, I did not request a medical response since there was no exposure from my deployment.

Once L██████ was in custody and under control, I progressed northbound with my team to continue the crowd management effort. I did not speak to or assist in the physical arrest of L██████. Once it was safe and feasible to do so, I screened the OC deployment in the field with Sgt. Kraus. I returned to the precinct later in the night and screened the incident again with Sgt. Domholt in the West Precinct write-up room.

The officers who arrested L██████ identified him. It is unknown how he was identified at the time of the arrest, but he was booked into King County Jail as S███ R. C███.

## Incident Location

• 4 Av S/S Stacy St, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
| --- | --- | --- |
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |

No

**Community Member's Build**          **Community Member's Height**

125-175 pounds                        5'4" – 5'6"

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

**Employee(s) Injured**               **Employee(s) Taken to Hospital**

Yes                                   No

## Reporting/Involved Community Member Information



DOB: ████ 2004   Race: Unknown   Ethnicity:    Gender: Male

### Address
• 2326 Minor Ave E, Seattle, WA 98102

### Role
• Suspect

**Types of Resistance Community Member Used Against Employee(s)**
• Resist Restraint/Control Hold See above.

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Laceration | 1 | 1 |



**Charges against this Community Member**
- Felony-Property Crime

## Involved Employees

### Police Officer Ryan Beecroft - Serial: 30051535 - Badge Number: 7722

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct
B110/West Pct 2Nd W B112/West Pct 2Nd W - D M Relief B112V/West Pct 2Nd W - D M Relief B112V

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Control Hold – Team Takedown - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Team Takedown | Yes | 13, J | 1, 2 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Abrasion | D, F | 1, 2 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | 2020-261291 Type 2 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Ryan Beecroft |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 3:05 PM |
| **Instructions from Police Officer Ryan Beecroft to Police Sergeant Jason Domholt:** | |
| 2020-261291 Type 2 | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____
Police Officer Ryan Beecroft - 30051535

EXHIBIT B(26)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Jorge Bourdon - 30040769

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:35 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58056 | 2020-261308 | 2020UOF-1376 |
| **Date/Time Entered** | | |
| 9/7/2020 23:53 | | |

## Incident Summary

EVENT/GO#: 2020-261308 & 2020-261072
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFC BOURDON #7523
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Kraus #5290. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Post event with Sgt Kraus.
B. ICV/BWV recorded: BWV and ICV equip. Force was use blocks away from the PIU.

DETAILED NARRATIVE: This report is intended as a summary of the events that occurred under case# 2020-261308 & 2020-261072. I have paraphrased conversations and do not include an exact sequencing of events. For any exact quotes or exact sequencing of events I would refer the reader to my body worn camera, as it was recording at the time of this incident. I also included for reference a Radio log that includes the timeline and descriptions of the events.

On 09-07-2020 I was working for the Seattle Police Department assigned to the West Precinct Anti-Crime Team. I was working as unit# 192 wearing black BDU's with Police markings. I was working in a four-officer vehicle. Our call sign was unit 192. Our un-marked vehicle was equipped with inside lights and sirens.

Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25.

More recently, on August 16, 2020, the protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On 8/24/2020, ENDD resulted in serious threats to Officer Safety. Notably, Quickrete was used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also, on 8/24/2020 Molotov cocktails were used in attempt to burn down the SPOG building. Remnants of a Molotov cocktail and two other Molotov devices were located at the scene. On 9/01/2020, a group of approximately 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct.

For the past several weeks, there has been nightly planned demonstrations, called "Every Night Direct Demonstration", which is being promoted on social media. During previous evening events, incidents of significant property damage have occurred.

I have been working the un-permitted marches since 05-29-2020 that were supposed to be a peaceful protest supporting George Floyd. The demonstrations turned violent against the officers working the events. I had witnessed protestors physically assaulting police officers and throwing projectiles at our lines. Some of those objects ended up injuring myself and other officers. I also observed protestors destroying, looting and vandalizing business and property causing significant property damage. Seattle Police Patrol cars were set on fire and a Seattle Police rifle was stolen from a police vehicle. The stolen rifle was then used to shoot the burned police vehicle. The protests events had to be dispersed by order of the Incident Commander due to

the violent altercations with Police and significant property damage caused to multiple businesses throughout the City.

During my approximately 11 years working at the Seattle Police Department, I have worked numerous large crowd events throughout the City of Seattle. Some of the events were protests/demonstrations, marches, parades, rallies and "May-Day" demonstrations. I have worked the above large crowd events as a bicycle officer, on the line as a foot squad member, and force protection assigned as a patrol officer in the East and West Precincts and as Rapid Deployment Force (RDF) on the West Precinct Anti-Crime Team. I have also performed the duties of linebacker and Acting-Sergeant during protest/demonstrations. During my employment, I have attended yearly mandatory department training on crowd/demo management and Chemical Agent Response Team (C.A.R.T) training. I have been trained on OC, CS and blast balls. My last C.A.R.T training was on 04-05-2019. This year I wasn't able to attend blast ball training due to be on active military status as part of the COVID-19 pandemic response. I however completed the 2020 online C.A.R.T training and certification.

As a member of RDF, some of our duties are to be mobile in vehicles for quick response and be readily available to maintain crowd management or to affect an arrest. We also support bicycle officers and patrol officers conducting crowd management and crowd control actions. It is our Department policy to facilitate free speech and assembly whenever possible. When the need to defend oneself or someone else and/or to prevent significant property damage we can utilize crowd control tactics which include rubber blast balls, OC spray.

The Incident Commander also has the authority to direct the use of blast balls and OC to disperse the crowd. For this incident, CPT Allen was the IC, Lt Brooks was the Operations Section Chief and Lt Dietrich was the designated UOF review Lieutenant.

During this demonstration, I was assigned the duties of linebacker for crowd/demo management. As a linebacker, my duties are to support and keep the line together, repeat the commands given by the Sergeant, watch officers' backs while on the line, affect arrests when necessary and provide C.A.R.T support when reasonable and necessary.

For this demonstration, I was equipped with a helmet and helmet shield, Mark-9 Oleoresin Capsicum solution (OC), rubber blast balls and a Cold Fire tactical can which is used to extinguished small fires.

Our RDF team for this demonstration was composed of West ACT team members and officers from the downtown Focus Squad. Our supervisor was Sgt Kraus and our Platoon Commander was Lt. Alcantara.

The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice.

Due to the above circumstances the marches were un-permitted but our Department still facilitated the rights of all gathered for the freedom to assemble and express their views within the limited conditions necessary to address public safety concerns.

We attended a briefing and roll call at the West Precinct for the schedule Labor Day Demonstration Events.

We were monitoring the crowd of approximately 150 protestors as they marched towards the SPOG building.

At approximately 1821 hrs; we had reports that a protestor was spotted carrying a Molotov cocktail in front of the SPOG building located at 2949 4 Av S. The suspect description was provided, and the command was given by Lt Brooks for bicycle squads and ACT teams to move in and affect the arrest of the suspect carrying the Molotov cocktail.

As we arrived in the area I observed as most of the protestors were wearing all black, gas masks, masks, protective eye wear, helmets and carrying homemade shields and umbrellas. With my experience working the riots and protests the umbrellas are used to conceal criminal activities, to assault police officers, to block OC spray and to conceal the launch of objects towards the police lines.

As our team was moving in bicycle officers were establishing fence lines to protect the arrest of the suspect and to push the violent protesters that were throwing explosives and assaulting officers.

The crowd was push to 4 Av S and away from the SPG building. The crowd was then pushed northbound on 4 Av S.

As the large crowd was push northbound, I observed multiple rocks being thrown at our line. I also observed smoke grenades, water bottles and even soda cans being thrown at our line. I believe the intent of the protestors throwing the heavy objects towards the direction of officers was to intentionally injure officers. I consider their actions to assault police officers whether or not they struck their intended target.

I observer as blast balls and OC spray were deployed out front. From my vantage point, I couldn't tell who the officers were deploying the less lethal.

At approximately 1831 hrs, Lt Brooks then gave the dispersal order.

We continue to push the violent protesters northbound on 4 Av S.

Officer Doaks then observed an arson suspect in the front of the crowd from the East Precinct attack that occurred on 9/01/2020. During that attack three Molotov cocktails were recovered that had been thrown at the East Precinct. It appeared that a group of protesters were protecting the arson suspect by surrounding him. The suspect was later identified as M████ A████.

Our team then move up forward to affect the arrest of Suspect A████. I observed as our team was trying to affect the arrest of the arson suspect a W/M wearing a pink bottom up shirt and kaki shorts was trying to intervene by pulling the suspect away from the officers.
At approximately 1835 hrs, I specifically deployed my MK-9 can of OC pepper spray onto the unknown W/M face that was wearing the pink bottom up shirt and khaki shorts that was trying to pull away the suspect. With my experience working demonstrations, I had suffered injuries in the past from the suspects actions as they were trying to physically un-arrest suspects.
An OC verbal warning wasn't feasible at the time due to the unknown suspect being actively trying to pull the suspect away from the officers.
My OC spray deployment was effective since the unknown W/M suspect immediately let go after the spray and ran away northbound on 4 Av S.
I wasn't aware of any reported injuries caused from my OC canisters deployment. Medical aid was not feasible, or an arrest couldn't be affected since the protester left the area.
We then re-deployed to the West Precinct and remained on standby.
I reported my less lethal OC deployment to Sgt Kraus.

ADDITIONAL INFORMATION: No

## Incident Location

• 2400 4 Av S, Seattle, WA 98134 - Location of Occurrence: Demonstration

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Defense of Others | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | No |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |

**Employee Assessment of Community Member Condition During Incident**

| Employee(s) Injured | Employee(s) Taken to Hospital |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

## John Doe

DOB:    Race: Unknown   Ethnicity:    Gender: Male

### Role
• Suspect

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Involved Employees

### Police Officer Jorge Bourdon - Serial: 30040769 - Badge Number: 7523

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct Ops B119/West Pct Ops - Act Night B119B/West Pct Ops - Act Night B119B

**Video Footage:** [No Response]

#### Role
• Secondary Officer

#### Force used by this employee against the community member
• Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | Yes | 1 | 1, 2 |



### Injuries sustained by this officer

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/8/2020 | Type II UOF | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
|  |  |  |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Jorge Bourdon |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/8/2020 2:03 AM |
| **Instructions from Police Officer Jorge Bourdon to Police Lieutenant Seth Dietrich:** | |
| Type II UOF | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt. Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:09 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Jorge Bourdon - 30040769

**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(27)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer James Kellett - 30051836

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:35 |

| Record ID # | Case # | IA Pro Number |
|---|---|---|
| 58055 | 2020-261308 | 2020UOF-1377 |

**Date/Time Entered**

9/7/2020 23:48

## Incident Summary

EVENT/GO#: 2020-261308
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: J. KELLETT #7732
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Domholt #7514. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt Domholt #7514
B. BWV recorded: BWV recorded incident, during incident BWV shutoff and was reactivated as soon as I observed this technological failure, this was screened by Sgt Domholt at the scene. I reviewed the BWV prior to this statement.


DETAILED NARRATIVE:
Prior to arrival at this large demonstration I attended a roll call/briefing at the West Precinct. During the briefing the Incident Commander was identified as Captain Allen and the Operation Section Chief was identified as LT Brooks. The commander's intent and other details regarding the event and use of force protocols were discussed in the briefing.
I have worked many demonstrations and received a variety of training in regards to crowd and demonstration management. I have worked demonstrations in both a bicycle officer capacity as well as an Anti-Crime Team officer. On this day 9/7/2020 I was working as a member of West ACT and was wearing a BDU uniform with all of my regular duty gear as well as a helmet, long baton, Mark 9 OC Canister and shin guards.
Immediately prior to our arrival in the 2900 block of 4 AV S, I heard radio broadcasts that there were multiple individuals walking near buildings with suspected incendiary devices.
We exited the ACT van in the 2900 block of 4 AV S, from this point the team I was with moved northbound on 4 AV S with a large crowd. At approximately the 2400 block of 4 AV S, Officer Doaks advised me that he observed an arson suspect from a recent arson incident that had occurred at the SPD East Precinct. Officer Doaks provided the team with a detailed description and also pointed out the suspect stating there was probable cause for his arrest.
The team moved forward toward the suspect who later verbally identified himself to me as M████ A. A████ DOB ███ 2004. As we moved towards A███ he walked backwards and appeared to attempt to conceal himself in the crowd. The individuals that were in the crowd in between officers and A███ began to lock arms creating a makeshift human shield between us and A███. Other officers and I yelled orders to move back. I was ordering this in an attempt to de-escalate so that the team and I could successfully affect the arrest without needing to use any force. At a point in time in which it seemed that we could reach out and touch A███ both Officer Muoio and I reached out, over other individuals and took hold of A███'s outer clothing. As soon as we took hold of A███ the others surrounding him started to push against officers in an apparent attempt to obstruct officers from arresting █████. As this occurred I slid my right arm over A███'s right shoulder and then as he continued to resist my control hold on him and actively resist arrest. I pulled A███ towards me and he ended up falling backwards on to me. I was on my back on the ground and he was ontop of me with his back in my chest. I then rolled him so that he was face down on the ground and I was on top of him with my chest on his back. At this point due to A███ continuing to resist arrest, I placed my right forearm across his face on top of the gas mask that A███ was wearing. The crossface is a trained tactic for controlling a suspect who is resisting arrest, this was trained by Seattle PD defensive tactics instructors. I ordered A███ multiple times to place his arms behind his back, he did not, I moved my chest off of A███'s back in order to give him more room to comply, he did not, instead he removed the gas mask that he was wearing from his face. Eventually officers and myself had to use physical pressure and strength to move

A███ 's arms behind his back to handcuff his wrists. At some point during this my body camera switched to an off position.
As soon as A███ was in handcuffs I stood up and then moved him into the left lateral recumbent position, (trained as the recovery position). I noticed that my body camera was off and reactivated it as soon as I noticed it.
A███ was bleeding from his nose and SFD was summoned to the scene, Engine #13 responded and evaluated A███, they stated that A███ did not need any emergent medical treatment. A███ was processed at the scene and was later transported to the West Precinct for prisoner processing.
Sgt Domholt #7514 screened the arrest at the scene, I informed him of my level 2 use of force.

## Incident Location

- 2400 4 AV S, Seattle, WA 98134 - Location of Occurrence: Demonstration

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| Yes | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'7" – 5'9" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
|---|---|
| No | No |

## Reporting/Involved Community Member Information

### M█████  A███  A███

DOB: ███ 2004   Race: Unknown   Ethnicity:     Gender: Male

#### Address
- 2326 Minor Ave E, Seattle, WA 98102

#### Role
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Resist Handcuffing
- Resist Restraint/Control Hold See above.

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| Soft Tissue Damage | 1 | 1 |



**Charges against this Community Member**
- Felony-Property Crime

## Involved Employees

### Police Officer James Kellett - Serial: 30051836 - Badge Number: 7732
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct Ops B119/West Pct Ops - Act Night B119B/West Pct Ops - Act Night B119B

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Control Hold – Team Takedown - Was force effective: Yes
- Control Hold – Restraint - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Team Takedown | Yes | 7 | 1 |
| Control Hold – Restraint | Yes | 1 | 2 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---------------|------------------------|-----------------|
| 9/8/2020 | PDF of LVL 2 UOF | pdf |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
| | | |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer James Kellett |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/8/2020 1:37 AM |
| **Instructions from Police Officer James Kellett to Police Lieutenant Seth Dietrich:** | |
| 2020-261308 | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt. Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:08 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Jason Domholt:** | |
| Sgt. Review | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer James Kellett - 30051836

**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich

EXHIBIT B(28)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Brian Muoio - 30056731

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/9/2020 | | 18:00 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58113 | 2020-261308 | |
| **Date/Time Entered** | | |
| 9/9/2020 20:06 | | |

## Incident Summary

.
EVENT/GO#: 2020-261308
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: OFC. MUOIO #8381

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by . I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Domholt #7514
B. ICV recorded: NO ICV. BWV activated and captured entire incident.

PRE-ARRIVAL DETAILS:
On 9/7/2020 I, Officer Muoio #8381, was working as unit 191 as part of the West Anti Crime Team. My direct supervisor was Sgt. Kraus and the group Supervisor for the Crowd Management was LT. Dyment. My unit was called in to monitor multiple events that was scheduled for the day. We were briefed on three specific events: "The Labor Day Caravan", "Labor Day March calling for no more Police Unions" and "Let us Worship" events. There have been numerous protests over the past several months throughout the City Of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. The commander's intent was to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. The commander's expectation was to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction was not going to be allowed. Officers were advised to look for specific acts of violence or property destruction and respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then a dispersal order would be given and coordinated crowd control tactics that are consistent with law, policy and training to restore order. Once the crowd is dispersed adequately and order is restored, personnel are expected to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct.
Some specific protests that resulted in significant property destruction or assaults on Officers include on August 16, when the protest was deemed a riot after the crowd assaulted offices with rocks, bottles and explosive devices the caused injuries to Officers. On 8/24/2020 the march resulted in serious threats to Officers safety. Notably, quickrete and other barricades were used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also on 8/24/2020, Molotov cocktails were used in attempt to burn down the SPOG building at 2949 4 Av. On 9/1/2020, a group of approx. 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct.
***A member of my squad, Ofc. Doaks #8662, reviewed hours of video footage from the many incidents of violence directed at Police Officers and their facilities, specifically the incident on 9/1/2020 where three Molotov cocktails were launched at the East Precinct. Through Ofc. Doaks' investigation he identified at least two individuals who threw Molotov cocktails that night and approx. 5 others who assisted in the arson/assault on officers all based on specific markers with their attire. Prior to this event Ofc. Doaks shared this information, including video and photos, with the squad and advised he had probable cause to effectuate an arrest on these members if they could be seen wearing the exact articles of clothing. ***
For this event at approx. 1520 hours Offices got intelligence that there was a crowd of approx. 500 people at the "Labor Day March calling for no more Police Unions" getting ready to march on 5 Av towards the SPOG

Office from Jackson St. Members in the crowd were seeing wearing all black clothing, gas masks, carrying heavy backpacks, trash bags, shields and other makeshift devices.

When the march approached the SPOG Office at 2949 4 Av an Officer spotted a male in the crowd with a Molotov cocktail. A description was provided and an arrest team was formed to effectuate the arrest of the male holding the Molotov cocktail.

ARRIVAL:
My squad and I arrived to assist the bicycle Officers after they got assaulted with large rocks, bottles and explosive devices in front of the SPOG Office located on 4 Av. The order was given by my chain of command to move the crowd North on 4 Av in an attempt to get the large unlawful unruly crowd to disperse. During this team movement on 4 Av Ofc. Beecroft, who is also in my squad, stated he has eyes on a person of interest from the arson at East Precinct that I mentioned above. He stated Convers and red bandanna. I surveyed the large crowd and located the suspect in question. The suspect, later identified as arrested/A██████, M██████, was seen wearing identical clothing seen in the video where he launched a Molotov cocktail at the east precinct, minus the pants, approx. 7 days prior. He was wearing the same brown knee pads, same black hoodie with a design over the left chest, a red bandanna, the same colored backpack with the same brown molly style pouch attached to the backpack, and the same black and white converse sneakers with white soles. The suspect's build and height also matched.

LEGAL AUTHORITY & LAWFUL PURPOSE: I am a sworn Police Officer for the City of Seattle. The incident occurred on a roadway open to the public. My lawful purpose was to apprehend a suspect wanted for Investigation of Arson on 9/1/2020 at the East PCT where he could be seen throwing a lit Molotov cocktail at the building with Officers inside.

CONTACT WITH SUBJECT:
I kept eyes on A██████ as my squad formed up to effectuate the apprehension. Due to the large crowd Officers did not want A██████ to be lost in the mix of everything so we formed quickly and moved in to apprehend the investigation of Arson suspect. While myself, Ofc. Beecroft, Ofc. Kellet and Ofc. Doaks advanced towards the front of the bicycle police line an unknown woman could be heard saying something to the effect of, "red bandanna, stay put!" It is unknown if that was an Officer or person in the corwd. At this time A██████ could be seen removing his red bandanna and moved behind two individuals who were seen trying to shield him with their bodies. Ofc. Doaks advised the bicycle Officers next to us that we were going to apprehend the suspect and gave the description.

DE-ESCALATION: We formulated a hasty arrest team with 4 Officers and advised the surrounding Officers of our planned actions. It was not feasible to directly yell out to the suspect before we placed hands on him as he could have easily ran deeper into the crowd making it almost impossible to effectuate a safe apprehension.

DECISIONS MADE: The decision was made to apprehend any and all involved suspects involved with the arson at the East PCT if it was safe and feasible prior to us arriving on scene. The plan was discussed in the office that if we see any of the suspects we had enough evidence based on the in-depth supplemental investigation conducted by Officer Doaks, to make a probable cause arrest. Again, Officer Doaks provided members of my squad with a detailed Power Point, video and photos of the suspects directly involved with the arson.

THREAT ASSESSMENT: The suspect was previously seen throwing a lit Molotov cocktail at a precinct filled with Officers. The crowd he was currently in was still throwing large rock and other items at officers, including explosive devices. It was imperative that we apprehended the suspect when he was not in the middle of the crowd and to not allow him to get back into the crowd.

FORCE USED:
The four of us advanced towards the suspect. He was walking north on 4 Av just past Forest St., in the middle of the roadway. He was being shielded by two individuals who had locked arms and his back was towards us. A██████ continuously looked back at us on our approach. Once we got within arms-reach of A██████ me and Ofc Kellet grabbed ahold of him. I was only able to grab the hood of his hooded sweatshirt since his bodyguards were blocking us. I attempted to pull him backwards out of the crowd while holding his sweatshirt. Ofc. Kellet grabbed ahold of A██████'s shoulders. The two individuals who were blocking him attempted to "un-arrest" A██████, a tactic that has become common during these demonstrations. This tactic is dangerous for the Officers and the suspect the Officers are trying to detain. A██████ got into an athletic stance and lowered his center of gravity by slightly bending at the knees with one leg forward of the other

and attempted to pull away from mine and Ofc. Kellet's grasps. At the same time his two bodyguards attempted to pull him away from offices. Ofc. Doaks and Ofc. Beecroft pushed and pulled the two suspects off of A██████, and in doing so made it possible for myself and Ofc. Kellet to pull A██████ backwards away from the crowd.

Myself and Ofc. Kellet fell backwards onto our backs. Ofc. Kellet had a bear type hug on A██████'s shoulders from behind causing A██████ to fall backwards onto Ofc. Kellet as he fell backwards. I lost my grasp at this point and could hear Ofc. Kellet tell A██████ to roll over to his stomach. The two can be seen rolling to their left with Ofc. Kellet now on top of A██████'s back. I briefly assisted Ofc. Doaks who was arrested a separate suspect for obstruction (the un-arrest attempt). I looked over at Ofc. Kellet and could see he applied the cross-face technique on A██████ telling him he was under arrest and to place his arms behind his back. The cross-face technique is a trained tactic we use to get compliance through pain. It is where the Officer uses their forearm, while on the back of the suspect, to apply positive pressure to the suspect's check bone area. After witnessing the struggle with Ofc. Kellet and A██████ I moved over and grabbed ahold of A██████'s left arm and placed it behind his back. A██████ kept trying to roll onto his back. Eventually Ofc. Kellet was able to gain pain compliance and I was able to apply handcuffs onto A██████. I gauged and double locked the cuffs. When I stood up I noticed A██████ had sustained a bloody nose. We rolled him into the recovery position. I asked A██████ if he wanted Fire to check his nose and he shook his head no. SFD was already on scene so I had them check A██████'s injuries.

MEDICAL AID AND EVALUATION: The subject had a bloody nose. It is believed to have happened due to the cross face technique being applied by Ofc. Kellet while A██████ was wearing a full face mask with shield. Seattle Fire department Engine 13 provided medical aid when it was feasible. They had to wait until after they transported a separate suspect who was having a seizure during a separate arrest near A██████'s arrest.

RESOLUTION: A██████ was transported to the West PCT for investigation of Arson. ABS attempted to interview the suspect but he invoked his rights and requested an attorney.

ADDITIONAL INFORMATION:

## Incident Location

• 4 av, SEattle, WA - Location of Occurrence: South

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Call for Service | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'7" – 5'9" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information



DOB: ▮▮▮▮2004  Race: Unknown  Ethnicity:    Gender: Male

#### Address
- 2326 Minor Ave E, Seattle, WA 98102

#### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Resist Restraint/Control Hold See above.
- Resist Handcuffing

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| Soft Tissue Damage | 1 | 1 |



#### Charges against this Community Member
- Felony-Property Crime
- Felony-Person Crime

## Involved Employees

## Police Officer Brian Muoio - Serial: 30056731 - Badge Number: 8381

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - David Beats B112A/West Pct 2Nd W - David Beats B112A

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Control Hold – Team Takedown - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Team Takedown | Yes | 6, D, G | 1, 2, 3, 4 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/9/2020 | 2020-261308 Type II UoF | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Brian Muoio |
| Sent To: | Police Sergeant Jason Domholt |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 8:18 PM |
| **Instructions from Police Officer Brian Muoio to Police Sergeant Jason Domholt:** | |
| Per instructed | |
| **Comments/Response from Police Sergeant Jason Domholt:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Brian Muoio - 30056731

EXHIBIT B(29)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked. The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement. Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed. This is a guide only.

At the bottom of this guide is the cut and paste section. Fill out your statement using the format included and then cut and paste your response into your Blue Team entry. If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If not, why not – Must be explained if no BWV or ICV

    C. Note if you reviewed and BWV, ICV, or other video prior to statement.

**Pre-Arrival:**

    A. Your relevant training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion. Weapons involved? Crime of Violence?

**Arrival:**

    A. Observations:
        i. People / other officers on scene. Activity occurring, dangers, citizens exposed…

      ii.     Buildings, vehicles

     iii.    Environmental factors: weather, lighting

B.  What was happening when you arrived or first observed the subject(s)?

**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):

      i.     Public area

      ii.    Consent

     iii.   Exigency

     iv.   Warrant

      v.    Community caretaking

B.  Lawful Purpose (Explain in Detail):

      i.     Social Contact

      ii.    Terry Stop

     iii.   Probable Cause for arrest

     iv.   Community Care-taking

**Note:**  Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.

**Contact with Subject(s):**

A.  How did you make your presence and authority clear?

      i.     Verbal identification, commands or instructions

      ii.    Did the subject say or do anything that indicated he/she knew you were the police?

B.  Contact with involved subject(s)

      i.     Observed Details

         - Physical/verbal reaction to officer

         - Tone of voice / statements made

         - Body posture / movement

         - Subjects size / strength vs. officer

         - Intoxication / mental state

      ii.    Information obtained from each subject

C.  Was there a frisk of any subject?

      i.     Reasons to believe subject was armed and currently dangerous

      ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A. Communication
- i. Verbal persuasion
- ii. Advisements and warnings (including Taser spark tests and warnings)
- iii. Clear instructions
- iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
- v. Avoiding language, such as taunting or insults, that could escalate the incident

    B. Time, Distance, Shielding
- i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
- ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
- iii. Did you utilize cover and concealment for tactical advantage

    C. If De-escalation was not safe or feasible, explain why not

**Decision Made:**

    A. Overall summary of information gained from investigation
    B. Decision based on information:
- i. Warning
- ii. Citation
- iii. Documentation
- iv. Arrest

    C. Include any Tactical Decisions and Scene Control you employed

**Threat Assessment:**

    A. Did the subject pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.

**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A. Words, Actions or Threat posed by subject that necessitated the use of force:
- i. Attempts to flee
- ii. Fight
- iii. Resist arrest

    B. De-escalation and continued attempts and the effect on the subject

       i.   Verbal de-escalation
- Warnings/commands to subject.
      ii.   Physical de-escalation
     iii.   If de-escalation was not feasible, you  must  explain why not

C.  Lawful purpose of the force used:
       i.   Gain control
      ii.   Protect yourself or others from a threat of immediate harm
     iii.   Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
       i.   Proportionality of force
      ii.   How did the totality of circumstances affect the force used?
     iii.   "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques
       i.   Was this a trained technique? Where were you instructed in this technique?
      ii.   Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
           •  Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
     iii.   When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid
       i.   Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
      ii.   Medical aid (who provided and where provided)
     iii.   Refusal of medical aid by subject
     iv.   Refusal to accept at jail - disposition
      v.   Injuries to yourself


**Resolution:**

A.  Search
       i.   Items recovered
B.  Transport and processing of subject:
       i.   Use of ICV
      ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**


**EVENT/GO#: 2020-261318**

**DATE OF OCCURRENCE: 9/7/20**

**STATEMENT OF: LAPIERRE #7786**

---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by SGT. CAMPBELL #6693. I invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: SGT. CAMPBELL
    B.  ICV recorded: BWV yes. No ICV due to being on a bicycle.

---

**PRE-ARRIVAL DETAILS:**

On 9/7/20 I was working uniformed bicycle patrol for the Seattle Police Department with the 2E80 units. I was assigned to the "Burn the SPOG" demonstration turned riot that originated at Hing Hay Park and made its way to the Seattle Police Officers Guild building located at 2949 4 AV S. This was approximately the 13th week of dealing with massive civil unrest to include riots. Many of these demonstrations have turned violent to include substantial property damage, looting, arson, assaults, and shootings. I carried a MK-9 OC spray canister. The MK-9 refers to the size of the canister and is used for crowd management/control for target specific application. During these past weeks, I have been assaulted many times to include having items such as rocks, bricks, bottles, and explosives thrown at me. I have been pushed, punched, kicked, tackled, had high powered lasers shined in my face, and threatened with bodily harm and death more times than I can recall.

I was not assigned to a patrol vehicle and therefore did not have ICV capabilities. I was equipped with a BWV that was periodically activated throughout the day if time and circumstance allowed. The BWV was not active throughout the whole day at direction of command staff and policy so as to avoid recording citizens constitutionally protected right to free speech and public assembly. I did activate my BWV when it was safe and feasible for me to do so and I was able to anticipate potential law enforcement action or criminal activity. Due to the violent and unpredictable nature of riot situations, it is possible that I was unable to activate my BWV during enforcement action or criminal activity.

Much of the crowd consisted of the same people that had been involved in previous protests and riots. They had evolved their tactics over the weeks in order to increase both their defensive and offensive abilities. The crowd was using umbrellas to deflect OC spray and obscure officers' vision. This created an officer safety risk as OC spray is used to disperse hostile crowds and focus on specific targets. The crowd had many weapons and improvised weapons and by obscuring their movements, they could be arming themselves without the officers seeing. Many were also wearing gas masks and goggles. They formed shield walls to block officers from conducting their objectives, improvised spike strips to pop the tires of bicycles and vehicles, barriers, and Molotov Cocktails. They would often use shield walls to prevent officers from advancing, then deploy Bear Spray and throw munitions at officers from behind the shield wall.

**ARRIVAL**:

My squad and I were assigned to parallel the crowd as they made their way through the city. We were staying far enough away in an attempt to prevent escalating the crowd by becoming the focal point of the march, but close enough that we could respond to any incident which required immediate police intervention. We made our way to the SPOG office and took a position around the corner. During the first SPOG riot on 8/19/20, the crowd immediately began throwing high powered mortar style fireworks at the building in an attempt to light it on fire. The crowd was permitted to march in front of the SPOG building during this event as it was a new day and they had not yet done anything which required police intervention, but the threat of it becoming another riot was high. The energy of the crowd was very hostile. They were yelling threats/insults towards us since they gathered in High Hay Park, and making threats/using fighting words in an attempt to spark a confrontation. The majority of them were dressed in all black, with protective gear such as helmets, gas masks, hard pads, shields, backpacks, and improvised weapons. This was an indication of the intent of the crowd as they were acting and dressed very differently than crowds which have historically been peaceful.

Information was provided of a suspect in the crowd with a Molotov Cocktail. This is a destructive device involving a container and fuel source. They are ignited and thrown at objects to include buildings and people. They burn hot and long and can cause serious property damage, injury, or death. Our intent was to arrest the individual with the Molotov Cocktail who was imbedded in the crowd.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

I had legal authority as a police officer as this riot was occurring on public streets, sidewalks, and other areas open to the public. My lawful purpose was crowd management/control and to protect life, property, and attempt to prevent assault on police officers and others. There was probable cause for the arrest of the male suspect for possessing a destructive device.

**CONTACT WITH SUBJECT**:

My squad and I were leading the group of officers. We began riding towards the crowd in an attempt to reach the suspect and arrest him, the crowd began forming a shield wall and blocking our path.

There was a line of people with shields in the front, and a group with umbrellas behind them. We began pushing our way through the crowd and were met with multiple assaults. The crowd was pushing officers, grabbing them, punching, and kicking. I watched multiple officers being punched in the head repeatedly and thrown around. This made us ineffective and our squad was split. I saw Ofc. Gaffney-Bills and Sgt. Ziemer grabbing onto the suspect with the Molotov Cocktail. He was able to escape with the assistance of the crowd and we were now dealing with an angry mob. Ofc. Gaffney-Bills was punched in the head by a suspect, later identified as A/H███████, ███████ G (███92). I deployed pepper spray in her face area to stop further assaults from her on officers. Ofc. Gaffney-Bills was knocked to the ground and kicked in the head by someone in the crowd. He was struggling with A/H████████ on the ground, but we were still severely outnumbered, and I did not feel comfortable going to the ground to assist him. This would have left him exposed to the crowd in a position of severe disadvantage. It was imperative that the crowd not be allowed to advance on officers while they are on their knees. The odds of an officer being disarmed or injured while at a position of advantage like this were severely increased.

**DE-ESCALATION**:

While riding to the crowd, officer were yelling "move back" in an effort to have the crowd disperse. Many of them chose to not only stay, but also interfere with officers, and even assault them. There were multiple avenues of escape and those who chose to stay made a conscious decision to involve themselves in a riot. Officers attempted to use team tactics and less-lethal munitions to disperse the crowd in an effort to quell the hostile crowd. Officers were being assaulted and de-escalation was no longer feasible. It was a chaotic scene and clear some of the rioters were focused on injuring police.

**DECISIONS MADE**:

I made the decision to deploy OC spray at A/H███████ after she had punched an officer in the head and continued to fight and resist.

**THREAT ASSESSMENT**:

There was a huge life safety risk. The crowd outnumbered officers by at least 2:1 and they were very aggressive and assaultive. I watched many officers being assaulted and ganged up on. The rioters had protective gear and weapons. Later in the day a Molotov Cocktail was thrown at us and landed approximately 20 feet from me. It created a fire that burned until extinguished by an officer. A box of Molotov Cocktails was later found in front of SPOG and it was likely those were going to be used against the SPOG office and officers.

**FORCE USED**:

I deployed my MK-9 OC spray into the face area of A/H███████ in order to stop further assaults from her on officers. She was wearing a helmet and I do not know how effective the force was. It was

chaotic and people were knocking against each other like a mosh pit. At one point the crowd attempted to de-arrest A/H █████████ by pulling on her and dragging her towards them. She was taken into custody by multiple officers.

**MEDICAL AID AND EVALUATION**:

A/H █████████ was left with Ofc. Gaffney-Bills as he was the arresting officer. There was riot occurring, so I did not have the luxury of staying with them as there were more pressing issues.

**RESOLUTION**:

A/H █████████ was booked into KCJ for felony assault on an officer.

**ADDITIONAL INFORMATION**:

During the beginning of the event, my BWV was in stand by mode. As we began riding towards the crowd to attempt an arrest, I attempted to activate it but it did not turn on. The beginning minutes of the event were not captured. Once things had momentarily calmed down, I looked at the camera out of habit to make sure it was activated. I saw that it was off and turned it on at this point. The UOF was not captured on my camera but was shown on other cameras.

EXHIBIT B(30)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV recorded: If  not, why not – Must be explained if no ICV

    C. Note if you reviewed ICV or other video prior to statement.

**Pre-Arrival:**

    A. Your relevant  training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?

**Arrival:**

    A.  Observations:
        i.    People / other officers on scene.  Activity occurring, dangers, citizens exposed…
        ii.   Buildings, vehicles
        iii.  Environmental factors: weather, lighting
    B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

    A.  Legal Authority (Explain in Detail):
        i.    Public area
        ii.   Consent
        iii.  Exigency
        iv.  Warrant
        v.   Community caretaking
    B.  Lawful Purpose (Explain in Detail):
        i.    Social Contact
        ii.   Terry Stop
        iii.  Probable Cause for arrest
        iv.  Community Care-taking

        **Note:**  Progression of Contact: Explain any change in your Legal Authority/Lawful
        Purpose during incident.

**Contact with Subject(s):**

    A.  How did you make your presence and authority clear?
        i.    Verbal identification, commands or instructions
        ii.   Did the subject say or do anything that indicated he/she knew you were the
            police?
    B.  Contact with involved subject(s)
        i.    Observed Details
              - Physical/verbal reaction to officer
              - Tone of voice / statements made
              - Body posture / movement
              - Subjects size / strength vs. officer
              - Intoxication / mental state
        ii.   Information obtained from each subject
    C.  Was there a frisk of any subject?
        i.    Reasons to believe subject was armed and currently dangerous
        ii.   Frisk Factors (Must be described in detail)

**Decision Made:**

    A.  Overall summary of information gained from investigation
    B.  Decision based on information:
        i.    Warning
        ii.   Citation
        iii.  Documentation
        iv.  Arrest


**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A.  Words, Actions or Threat posed by subject that necessitated the use of force:
        i.    Attempts to flee
        ii.   Fight
        iii.  Resist arrest
    B.  De-escalation attempts and the effect on the subject
        i.    Verbal de-escalation
              - Warnings/commands to subject.
        ii.   Physical de-escalation
        iii.  If de-escalation was not feasible, you  must  explain why not
    C.  Lawful purpose of the force used:
        i.    Gain control
        ii.   Protect yourself or others from a threat of immediate harm
        iii.  Stop a potential deadly threat
    D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options
        i.    Proportionality of force
        ii.   How did the totality of circumstances affect the force used?
        iii.  "No reasonably effective alternative…."
    E.  Explain effectiveness or lack of effectiveness of employed techniques
        i.    Was this a trained technique? Where were you instructed in this technique?
        ii.   Were you able to apply the technique properly? Explain why or why not.
              - If effective, describe assessment and modulation of force
                   • Describe control of or compliance of subject
              - If not effective, explain why not and how you progressed from there
        iii.  When and How was your force modulated?
    F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Resolution:**

    A.  Evaluation
- Injuries/Medical Aid
  - Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
  - Injuries to self
  - Medical aid (who provided and where provided)
  - Refusal of medical aid by subject
  - Refusal to accept at jail - disposition
  - Injuries to yourself

    B.  Search
- Items recovered

    C.  Transport and processing of subject:
        i.   Use of ICV
       ii.   Advisements


**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Timeline/Extension:**

Did you complete your statement and Blue Team entry prior to going out of service?  If not, why not and who approved the extension?

Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.

EVENT/GO#: 2020-261321

DATE OF OCCURRENCE: SEPTEMBER 7, 2020

STATEMENT OF: OFFICER BENJAMIN COOMER

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sergeant Campbell-6693.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: Screened in person, at the arrest location by Sergeant Campbell-6693. Screening occurred on September 7, 2020
B. ICV recorded: Yes, ICV and BWV recorded. However, BWV initially failed to activate. I activated again as soon as was feasible, and recording began at about the moment of handcuffing.

PRE-ARRIVAL DETAILS:

I completed the Basic Law Enforcement Academy, before being sworn as a Seattle Police Officer. BLEA consisted of over 720 hours of training in criminal/state law, arrest tactics, investigation procedures, de-escalation tactics, use of force tactics, responding to subjects in crisis, and other applicable training. Post BLEA I was trained in crowd control tactics by the Seattle Police Department.

I am CIT certified, meaning I completed the 40 hours CIT training. The training focuses on responding to persons in crisis, and de-escalating the situation.

I completed ICC (Integrated Combat and Control) training. The training focuses on uses of force, how to recognize when to use force, and modulate force appropriately.

I successfully completed the International Police Mountain Bike Association's weeklong training. The training consisted of tactics, mechanics, and UOF related to law enforcement with and from a bicycle. I was additionally trained in crowd control tactics using a bicycle.

Following the IPMBA training, I have been assigned to work multiple protests/demonstrations. During demonstrations I have moved crowds, made arrests, and utilized trained tactics.

ARRIVAL:

On September 7, 2020 I was working uniformed assignment as unit 2J83. I was assigned to work the Labor Day demonstrations as a bicycle officer.

This assignment is a general extension of the previous months of demonstrations. Of those demonstrations, numerous acts of violence occurred, including assaults on police officers, improvised explosions, and personal attacks.

The demonstrations had been in commencement for a number of hours, when I learned via radio broadcast, that the demonstrators were approaching the SPOG office at 2949 4 AV S. I was standing by on the west side of the office when the march arrived, coming from 4th AV S.

Just prior to making contact with the crowd, officers were informed that there was probable cause to arrest a suspect in the crowd. The suspect was said to be in possession of a Molotov Cocktail, a dangerous incendiary device, with no practical application outside of violence. The crowd was reported as arming themselves with shields and improvised weapons. Intel had informed officers that the crowd had created a "signal": smoke from the group would indicate that they intended to clash with police.

Once the decision was made to attempt an arrest of the suspect with a Molotov Cocktail, I rode up to the crowd, in order to assist the squad attempting an arrest. Officers in front of me had made an arrest (whether related to the original suspect I know not). I needed to push forward, in order to protect them from assault, as they were focused on their suspect and were vulnerable to assaults.

The crowd failed or refused to move as I attempted to move towards the aforementioned arrest. I responded by pushing the crowd and repeating "move back". The crowd began grabbing my bicycle and attempting to pull it away from me. I observed a large cloud of smoke appear from the protesters, who immediately went from passively resistant, to hostile.

While trying to retain control of my bicycle, I heard a blower to my right, and quickly felt a cloud of OC cover my face. I pulled back in pain and could see B████, holding a blower and wearing a gas mask. B████ was targeting police officers and blowing OC into their faces. OC is a painful substance which can temporarily impair someone's ability to see. At the time, I was unsure if the OC came from the crowd, or if B████ was repelling an officer's use of force. It was clear that B████ had come to the protest planning on reflecting, and protecting himself from OC, based on his appearance, and the blower.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

**Legal Authority:**

I was on the sidewalk of 4 AV S which is open to the public.

**Lawful Purpose:**

I had probable cause to arrest B████, R████ for felony assault, obstruction, and resisting arrest.

**DE- ESCALATION**:

I was wearing full uniform and was accompanied by multiple squads of officers (nearly 50 officers in total) who were all in full uniform. We were in front of the SPOG office, which is closely affiliated with the Seattle Police Department. As I approached, I ordered the crowd to move back. The group was aggressive and had arrived prepared to defy any order of movement. The members of the group were wearing all black clothes, gas masks, and a number of objects which could be used aggressively, such as umbrellas and shields.

**DECISIONS MADE**:

Officer Poole-8426 had approached B█████, while he was actively attempting to assault officers. B████ appeared larger than both Officer Poole and I. B████ began fighting with Officer Poole, and swinging the blower around, in order to prevent himself from being arrested. I determined that there was probable cause for assault and resisting arrest. I intervened to assist in controlling B████.

**FORCE USED:**

I took hold of B████, who was not yet on the ground. I used both hands to pull him down, I believe by his right arm. B████ was still holding onto the blower, and actively resisted being handcuffed by trying to free his arms. I took hold of the blower and attempted to remove it from B████'s control. B████ gripped harder and would not let go. I pressed my left knee against the back of B████'s arm (unsure which) pinning it to the ground. I then pull forcefully on the blower, which B████ then released. The removal of the blower was imperative, as that was a hard object, and was the tool used to assault me.

I placed the blower out of reach and went to B████'s left side. B████ was laying on his right side, but still actively pulling his arms away from officers, and trying to kick or stand up. Two other officers had arrived, and were attempting to take control of B████'s arms. I stood to B████'s left, took hold of his belt, just at the small of his back, and pull him towards me to place him in a prone position requisite for safe handcuffing. B████ pulled against any movement, but was eventually pulled into a prone position.

I then attempted to hold down B████'s legs (although I don't remember in any specific detail). At about this time, B████'s hands were behind his back. I heard an officer ask something to the effect of "who has handcuffs?". Officer Poole stated that he had sufficient control of B████'s legs, so I produced a pair of handcuffs, and handcuffed B████ while he laid prone. The handcuffs were gauged and double locked properly.

Once B████ was handcuffed, he was rolled onto his side.

**RESOLUTION:**

Once the arrest was completed, I observed that B████ had an injury on the right side of his face, which was bleeding. I did not know what caused the injury; nor was I in control of B████'s head during the arrest. B████ made no complaint of pain during my contact with him.

SFD was called to treat B████, but was significantly delayed. Ultimately, Sergeant Campbell screened the incident on scene, and determined that SFD would more quickly arrive to the West Precinct. B████ was transported via prisoner van, which marked the end of my contact with him.

**Later I was ordered to write a UOF, as the cause of injury could not be determined.**

**ADDITIONAL INFORMATION**:

None

**EXTENSION**:

N/A

EXHIBIT B(31)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Caleb Howard - 30060526

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/25/2020 | 9/7/2020 | 18:21 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58463 | 2020-261321 | 2020UOF-1533 |
| **Date/Time Entered** | | |
| 9/25/2020 17:27 | | |

## Incident Summary

EVENT/GO#:2020-261321
DATE OF OCCURRENCE:09/07/2020
STATEMENT OF: OFFICER C. HOWARD

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Campbell. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Yes
B. ICV recorded: Yes

PRE-ARRIVAL DETAILS: On 09/07/2020 I was patrolling as a bicycle Officer in response to a demonstration that took place at the Seattle Police Officer's Guild building at 2900 4th Ave S. I was attached to Sgt Sylvester's squad at the time of the incident.

ARRIVAL: Upon arrival, I was in formation with the bike squad in a "double Column". An order was given for the crowd to disperse as Officers moved toward a large crowd of people in an attempt to affect an arrest on an individual for carrying and attempting to use an incendiary device to damage the Guild Building. As officers moved toward the arrest the crowd moved toward the bicycle officers and began throwing items and deploying bear spray at all officers involved. I was hit with several items and also was greatly affected by the bear spray in my eyes, mouth, arms, and hands.

LEGAL AUTHORITY & LAWFUL PURPOSE: My legal authority to be on scene was that the "unlawful assembly" was taking place within the City of Seattle and I am a Sworn Police Officer in the city of Seattle. The lawful purpose for being at that location was first to maintain order through a presence until such time the crowd was declared unlawful. At that time due to the imminent danger to the Seattle Police Officer's Guild building (Property) as well as the individuals inside the building (Life Safety) from possible incendiary devices, it was determined that the best course of action was for police intervention to arrest those responsible for causing the imminent threat to property and life safety.

CONTACT WITH SUBJECT: During the initial arrest of the suspect with which I was not involved, I observed two officers struggling with a separate subject on the ground. It appeared that the subject who had a leaf blower (Used to blow chemical irritants into Officers faces) and was actively resisting arrest on the ground. The subject later identified as R█████ M B█████, appeared to attempt on multiple occasions to grab the arms and legs of the two officers attempting to affect the arrest. At that time I assisted the officers actively struggling with B█████.

DE-ESCALATION: I yelled several times at the subject to stop grabbing the officers and to stop resisting and place his arms behind his back. Other than those verbal commands I was unable to further de-escalate because of where the officers were in the arrest process when I began assisting.

DECISIONS MADE: I noticed that the subject was wearing a respirator over his face, I made the decision to remove the respirator in order to make it easier to identify the subject, and it would make it easier to hear

and speak with the subject during the arrest process. I used my right hand, grabbed the respirator by the filter and removed it from B████'s face. I noted no injuries and heard no complaints of pain or discomfort from B███ during this action.

THREAT ASSESSMENT: B████ is a large individual, I assessed that if he continued to fight and if the officers did not have additional assistance that he could possibly cause harm while grabbing and pulling at the officers while they attempted to take him into custody. It is my belief and opinion that B████ intended to at minimum release himself from the officer's custody and I also believe that he was intent on assaulting officers in the process.

FORCE USED: I used no notable force during this incident. After removing the respirator from his face, I assisted in the arrest by securing his right arm with my left hand and holding it in a handcuffing position behind his back until he was secured in handcuffs. It should be noted that Butler was writhing around on the ground and actively resisting arrest throughout the incident.

MEDICAL AID AND EVALUATION: I observed in my Body Worn Video that B████ had what appeared to be an abrasion on the right side of his face. On scene I did not hear any complaint of pain or discomfort from him and am unaware of any medical evaluation or treatment he received once in custody, as I was not the primary or even secondary officer.

RESOLUTION: After secured in handcuffs, I left the arrest scene to catch up and rejoin the crowd control efforts with the rest of my squad.

ADDITIONAL INFORMATION:

## Incident Location

• 2949 4th Ave. S, Suite/Apt: A, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| Greater than 225 pounds | 5'10" – 6'0" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

**R███  M██████  B████**

DOB: ████/1985  Race: White  Ethnicity:    Gender: Male

### Address
- 19635 NE 50th St, Redmond, WA 98053

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Personal Weapons – Bodyweight
- Resist Handcuffing

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|--------|---------|------------------|
| Abrasion | 1 | 1 |



### Charges against this Community Member
- Misdemeanor-Person Crime

## Involved Employees

## Police Officer Caleb Howard - Serial: 30060526 - Badge Number: 8517

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/Southwest Pct B250/Southwest Pct 2Nd W B252/Southwest Pct 2Nd W - William B252W/Southwest Pct 2Nd W - William B252W

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Verbal Commands - Was force effective: No
- Control Hold – Restraint - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Verbal Commands | No | 4 | 1 |
| Control Hold – Restraint | Yes | 4 | 2 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Caleb Howard |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/25/2020 5:55 PM |
| **Instructions from Police Officer Caleb Howard to Police Sergeant Ronald Campbell:** | |
| Completed as ordered | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Caleb Howard - 30060526

EXHIBIT B(32)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| **Instructions:** |
| :--- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location

    B. ICV and BWV recorded: If  not, why not – Must be explained if no BWV or ICV

    C. Note if you reviewed and BWV, ICV, or other video prior to statement.


**Pre-Arrival:**

    A. Your relevant  training/experience (brief biography)

    B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo

    C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?


**Arrival:**

    A. Observations:
        i. People / other officers on scene.  Activity occurring, dangers, citizens exposed…

    ii.    Buildings, vehicles
    iii.   Environmental factors: weather, lighting

B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):
    i.    Public area
    ii.   Consent
    iii.  Exigency
    iv.  Warrant
    v.   Community caretaking

B.  Lawful Purpose (Explain in Detail):
    i.    Social Contact
    ii.   Terry Stop
    iii.  Probable Cause for arrest
    iv.  Community Care-taking

    **Note:**  Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A.  How did you make your presence and authority clear?
    i.    Verbal identification, commands or instructions
    ii.   Did the subject say or do anything that indicated he/she knew you were the police?

B.  Contact with involved subject(s)
    i.    Observed Details
        - Physical/verbal reaction to officer
        - Tone of voice / statements made
        - Body posture / movement
        - Subjects size / strength vs. officer
        - Intoxication / mental state
    ii.   Information obtained from each subject

C.  Was there a frisk of any subject?
    i.    Reasons to believe subject was armed and currently dangerous
    ii.   Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A. Communication
        i. Verbal persuasion
        ii. Advisements and warnings (including Taser spark tests and warnings)
        iii. Clear instructions
        iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
        v. Avoiding language, such as taunting or insults, that could escalate the incident
    B. Time, Distance, Shielding
        i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
        ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
        iii. Did you utilize cover and concealment for tactical advantage
    C. If De-escalation was not safe or feasible, explain why not

**Decision Made:**

    A. Overall summary of information gained from investigation
    B. Decision based on information:
        i. Warning
        ii. Citation
        iii. Documentation
        iv. Arrest
    C. Include any Tactical Decisions and Scene Control you employed

**Threat Assessment:**

    A. Did the subject pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.

**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A. Words, Actions or Threat posed by subject that necessitated the use of force:
        i. Attempts to flee
        ii. Fight
        iii. Resist arrest
    B. De-escalation and continued attempts and the effect on the subject

      i.    Verbal de-escalation

            - Warnings/commands to subject.

      ii.   Physical de-escalation

      iii.  If de-escalation was not feasible, you  must  explain why not

C.  Lawful purpose of the force used:

      i.    Gain control

      ii.   Protect yourself or others from a threat of immediate harm

      iii.  Stop a potential deadly threat

D.  Explain your decision to use a technique or Less Lethal Device, based on feasible options

      i.    Proportionality of force

      ii.   How did the totality of circumstances affect the force used?

      iii.  "No reasonably effective alternative…."

E.  Explain effectiveness or lack of effectiveness of employed techniques

      i.    Was this a trained technique? Where were you instructed in this technique?

      ii.   Were you able to apply the technique properly? Explain why or why not.

           - If effective, describe assessment and modulation of force

               • Describe control of or compliance of subject

           - If not effective, explain why not and how you progressed from there

      iii.  When and How was your force modulated?

F.  Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

A.  Injuries/Medical Aid

      i.    Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)

      ii.   Medical aid (who provided and where provided)

      iii.  Refusal of medical aid by subject

      iv.  Refusal to accept at jail - disposition

      v.   Injuries to yourself


**Resolution:**

A.  Search

      i.    Items recovered

B.  Transport and processing of subject:

      i.    Use of ICV

      ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.


**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**


**EVENT/GO#: 2020-261321**

**DATE OF OCCURRENCE: 9/7/2020**

**STATEMENT OF: LAPIERRE #7786**


---

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by SGT. CAMPBELL #6693. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: SGT. CAMPBELL
    B.  ICV recorded: BWV yes. No ICV due to being on a bicycle.

---


---

**PRE-ARRIVAL DETAILS:**

On 9/7/20 I was working uniformed bicycle patrol for the Seattle Police Department with the 2E80 units. I was assigned to the "Burn the SPOG" demonstration turned riot that originated at Hing Hay Park and made its way to the Seattle Police Officers Guild building located at 2949 4 AV S. This was approximately the 13th week of dealing with massive civil unrest to include riots. Many of these demonstrations have turned violent to include substantial property damage, looting, arson, assaults, and shootings. I carried a MK-9 OC spray canister. The MK-9 refers to the size of the canister and is used for crowd management/control for target specific application. During these past weeks, I have been assaulted many times to include having items such as rocks, bricks, bottles, and explosives thrown at me. I have been pushed, punched, kicked, tackled, had high powered lasers shined in my face, and threatened with bodily harm and death more times than I can recall.

I was not assigned to a patrol vehicle and therefore did not have ICV capabilities. I was equipped with a BWV that was periodically activated throughout the day if time and circumstance allowed. The BWV was not active throughout the whole day at direction of command staff and policy so as to avoid recording citizens constitutionally protected right to free speech and public assembly. I did activate my BWV when it was safe and feasible for me to do so and I was able to anticipate potential law enforcement action or criminal activity. Due to the violent and unpredictable nature of riot situations, it is possible that I was unable to activate my BWV during enforcement action or criminal activity.

---

Much of the crowd consisted of the same people that had been involved in previous protests and riots. They had evolved their tactics over the weeks in order to increase both their defensive and offensive abilities. The crowd was using umbrellas to deflect OC spray and obscure officers' vision. This created an officer safety risk as OC spray is used to disperse hostile crowds and focus on specific targets. The crowd had many weapons and improvised weapons and by obscuring their movements, they could be arming themselves without the officers seeing. Many were also wearing gas masks and goggles. They formed shield walls to block officers from conducting their objectives, improvised spike strips to pop the tires of bicycles and vehicles, barriers, and Molotov Cocktails. They would often use shield walls to prevent officers from advancing, then deploy Bear Spray and throw munitions at officers from behind the shield wall.

**ARRIVAL**:

My squad and I were assigned to parallel the crowd as they made their way through the city. We were staying far enough away in an attempt to prevent escalating the crowd by becoming the focal point of the march, but close enough that we could respond to any incident which required immediate police intervention. We made our way to the SPOG office and took a position around the corner. During the first SPOG riot on 8/19/20, the crowd immediately began throwing high powered mortar style fireworks at the building in an attempt to light it on fire. The crowd was permitted to march in front of the SPOG building during this event as it was a new day and they had not yet done anything which required police intervention, but the threat of it becoming another riot was high. The energy of the crowd was very hostile. They were yelling threats/insults towards us since they gathered in High Hay Park, and making threats/using fighting words in an attempt to spark a confrontation. The majority of them were dressed in all black, with protective gear such as helmets, gas masks, hard pads, shields, backpacks, and improvised weapons. This was an indication of the intent of the crowd as they were acting and dressed very differently than crowds which have historically been peaceful.

Information was provided of a suspect in the crowd with a Molotov Cocktail. This is a destructive device involving a container and fuel source. They are ignited and thrown at objects to include buildings and people. They burn hot and long and can cause serious property damage, injury, or death. Our intent was to arrest the individual with the Molotov Cocktail who was imbedded in the crowd.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

I had legal authority as a police officer as this riot was occurring on public streets, sidewalks, and other areas open to the public. My lawful purpose was crowd management/control and to protect life, property, and attempt to prevent assault on police officers and others. There was probable cause for the arrest of the male suspect for possessing a destructive device.

**CONTACT WITH SUBJECT**:

My squad and I were leading the group of officers. We began riding towards the crowd in an attempt to reach the suspect and arrest him, the crowd began forming a shield wall and blocking our path.

**CONTACT WIT**

There was a line of people with shields in the front, and a group with umbrellas behind them. We began pushing our way through the crowd and were met with multiple assaults. The crowd was pushing officers, grabbing them, punching, and kicking. I watched multiple officers being punched in the head repeatedly and thrown around. This made us ineffective and our squad was split. I saw Ofc. Gaffney-Bills and Sgt. Ziemer grabbing onto the suspect with the Molotov Cocktail. He was able to escape with the assistance of the crowd and we were now dealing with an angry mob. We were still severely outnumbered, and officers were fighting on the ground with suspect while still surrounded by the riot crowd. This left them him exposed to the crowd in a position of severe disadvantage. It was imperative that the crowd not be allowed to advance on officers while they are on their knees. The odds of an officer being disarmed or injured while at a position of advantage like this were severely increased. I saw officers being kicked while they were on the ground. I was later kicked in the head by a suspect after I was knocked to the ground. The likelihood of injury due to this is great.

**DE-ESCALATION**:

While riding to the crowd, officers were yelling "move back" in an effort to have the crowd disperse. Many of them chose to not only stay, but also interfere with officers, and even assault them. There were multiple avenues of escape and those who chose to stay made a conscious decision to involve themselves in a riot. Officers attempted to use team tactics and less-lethal munitions to disperse the crowd in an effort to quell the hostile crowd. Officers were being assaulted and de-escalation was no longer feasible. It was a chaotic scene and clear some of the rioters were focused on injuring police.

**DECISIONS MADE**:

A small group of officers were attempting to hold the crowd back while officers were trying to make arrests. There were multiple scrums taking place with officers struggling with suspects. I saw three officers attempting to take someone into custody and made the decision to assist them.

**THREAT ASSESSMENT**:

There was a huge life safety risk. The crowd outnumbered officers by at least 2:1 and they were very aggressive and assaultive. I watched many officers being assaulted and ganged up on. They had completely surrounded officers to the point the arrest vans were unable to get in to retrieve arrestees. The rioters had protective gear and weapons. Later in the day a Molotov Cocktail was thrown at us and landed approximately 20 feet from me. It created a fire that burned until extinguished by an officer. A box of Molotov Cocktails was later found in front of SPOG and it was likely those were going to be used against the SPOG office and officers.

**FORCE USED**:

I saw the suspect, later identified as A/B███████, R██████ M (██████-85), struggling on the ground with officers. Earlier he had a leaf blower and was attempting to blow OC spray at officers. There were

three officers attempting to gain control of him but they were struggling to do so. His hands were underneath him and I could not see him. I did not know if he was armed but believed he likely was since most of the rioters in the past have been. He could have taken his hands out from underneath him at any point and complied with officers but chose not to. Based on how the officers were bracing their legs and knees, it appeared that A/B█████ was attempting to stand up and resist their efforts to arrest him. There was still a riot taking place and due to how few officers there were compared to rioters, it was imperative that suspects been taken into custody as soon as possible in order to return officers to dealing with the active riot.

It appeared to me that A/B█████ was actively resisting and I was looking for how I could assist the struggling officers. I was unable to target his body as three officers were around him covering it, and I could not use a trained cross-face technique since I could not get into the appropriate position. I had OC spray in my hand but did not feel that was an appropriate force option based on the circumstances. Three officers were unable to overcome the resistance provided by A/B█████ and the longer the struggle went on, the more likely both he and officers were going to be injured.

I punched A/B█████ in the left side of his face one time with a closed fist in order to distract him and obtain pain compliance. Since the three officers were unable to pull A/B█████'S hands free from underneath him, I believed the force needed to be modulated in order to overcome his resistance. It was not feasible to continue to pull on A/B█████S arms in hopes that they would come free. This would give him more time to potentially arm himself, improve his position, and think about a plan. A/B█████ immediately took his hand out from under him after being struck, and I was able to assist with taking him into custody without further issue. I believed this action prevented the struggle from going on longer, which reduced the injury risk and force used.

**MEDICAL AID AND EVALUATION**:

When A/B█████ was taken into custody, I left him with the original officers and went to join back with the officers still dealing with the active riot.

**RESOLUTION**:

A/B█████ was arrested and booked into KCJ.

**ADDITIONAL INFORMATION**:

N/A.

EXHIBIT B(33)

# Seattle Police Department
# Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Tyler Poole - 30057651

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/10/2020 | 9/7/2020 | 18:22 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58127 | 2020-261321 | 2020UOF-1427 |
| **Date/Time Entered** | | |
| 9/10/2020 13:33 | | |

## Incident Summary

EVENT/GO#: 2020-261321
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: OFFICER POOLE

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by SGT R. CAMPBELL #6693. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: SGT R. Campbell #6693
B. ICV recorded: Bikes, No ICV.

PRE-ARRIVAL DETAILS:

I am a commissioned Peace Officer with the Seattle Police Department. I was hired in 2016 with the Seattle Police Department. I attended the lateral academy at CJTC and was certified as a Peace Officer in the state of Washington. I was also a commissioned police officer in another state from 2007-2016. Upon graduation from the CJTC lateral academy, I was assigned to the Seattle Police Departments Advanced Training Unit for additional SPD related training. Once passing field training I was assigned to the North Precinct. I have completed the 40-hour crisis intervention training. I additionally passed the SPD Police Mountain Bike School and certified as a trained IPMBA bike officer. During the SPD bike school, I was trained in crowd tactics and movements. I have attended several annual crowd control classes and have worked numerous demonstrations to include marches, protests and riots. I have been assigned to the bike squad since 2017.

On this date, I was working a demonstration in the South Precinct. I was assigned to the event as a uniformed bike officer. I was wearing a marked SPD uniform and vest carrier. Both my badge, ID and SPD patches were visible. My vest carrier in addition to my bike are both marked with "POLICE" in visible writing.

Since 05/29/2020, there have been multiple major demonstrations in the city of Seattle as well as throughout the United States of America. Most of the events throughout the country have turned into riots where significant property damage, looting, and violent crime against citizens and police officers has occurred. On 5/30/2020 the city of Seattle had a demonstration that spiraled out of control and was deemed a riot. There was mass looting and numerous accounts of significant property damage to include several police vehicles and businesses being set on fire. The demonstrators were very energized and hostile towards law enforcement. The WA National Guard was also mobilized and deployed to the city. Demonstrators had thrown glass bottles, both frozen and unfrozen water bottles, rocks and incendiary objects at officers. The Mayor also had implemented a city-wide curfew for the ongoing civil emergency. Since then the city has had ongoing demonstrations in which many turned violent.

ARRIVAL: On 09/07/2020 I was assigned with my bicycle squad to the South Precinct to assist with a demonstration in the city of Seattle. The event was a promoted as a Labor Day March to stand up to police unions that cops are not workers. We were a rapid deployment unit with other units to respond and address incidents of life safety emergencies, stop significant property damage and to protect ourselves or others. There have been recent demonstrations at the Seattle Police Officer Guild (SPOG) where explosives and Molotov cocktails were thrown. At this demonstration there was estimated to be 500 people, most of whom were dressed in all black clothing, carrying backpacks, umbrellas, makeshift shields, goggles and respirators.

Based on my experience working demonstrations, individuals wear and use these items in order to hide their identities and defeat police tactics while committing crimes or shielding other who are committing crimes.

While officers were staged behind the SPOG building, officers were giving the description of an individual in the crowd who had a Molotov cocktail. Bikes officers were ordered to move in and attempt to make an arrest on the suspect as there was PC for that individual. While moving in with the other bike squads I noticed a wall of protesters who had shields and umbrellas facing west towards us. As I approached, I assisted in establishing a line and moving individuals backward. Multiple people were actively pushing the bike line backwards. I witnessed someone in the crowd deploy what I believed to be a fire extinguisher towards the bike line. Additionally, I believe there was also another irritant coming from the crowd which I believed to be some sort of OC or bear mace.

LEGAL AUTHORITY & LAWFUL PURPOSE:
This incident occurred on a public street in the city of Seattle, WA. The lawful purpose was to effect the arrest on B█████ for assault on officers and obstruction.

CONTACT WITH SUBJECT:
While assisting with reinforcing the bike line and yelling for the crowd to move back, I noticed the listed subject B█████ to my right. He was wearing a yellow hard hat, respirator, and goggles. The reason he drew my attention was because I noticed him shoving an umbrella and cordless leaf blower into the face of a bike officer on the line. It appeared the subject was refusing to move back, and I believed that he was attempting to assault the officer, later identified as T. TRYKAR 7616. B█████ was blowing all the airborne irritants, including OC and suspected bear mace as well as fire extinguisher dust back into the faces of officers.

DE-ESCALATION:
It appeared that B█████ was not moving back and was actively standing Infront of bike officers attempting to move the crowd back while yelling for the crowd to move back. He was also using an activated leaf blower and umbrella to actively assault officers. There was no de-escalation feasible at that time.

DECISIONS MADE:
When I heard and witnessed B█████ actively assaulting an officer, I moved in to effect the arrest on B█████ for obstruction and assault.

THREAT ASSESSMENT:
Prior to moving towards the demonstrators, there was knowledge that the group was very anti law enforcement. Most members of the group were dressed in all black clothing, carrying backpacks, umbrellas, makeshift shields, goggles and respirators. The crowd was large and became violent and hostile once officers moved in to arrest the individual with the Molotov cocktail. There were individuals from with in the crowd who were spraying airborne irritants towards officers. I among other officers were exposed to those irritants. B█████ was wearing protective gear and had an umbrella and a large cordless leaf blower. There were multiple arrests occurring around B█████ and the crowd.

FORCE USED:
I moved in to effect the arrest on B█████ and to stop the active assault on officers. I grabbed B█████ by his shoulder and backpack area in an attempt to take him to the ground. He actively resisted me and would not go to the ground. I ordered B█████ to go to the ground which he did not comply and continued to remain standing. Another officer then assisted me in taking B█████ to the ground. Once on the ground he continued to resist and not comply. Additional officers then assisted us in attempting to place B█████ into custody. While resisting he continued to use the leaf blower towards officers. I heard an officer yelling for B█████ to stop grabbing him and to get on his stomach. B█████ continued to resist officers. At one point I removed the respirator which was hanging off B█████S head area. I was near his legs, so I assisted COOMER in controlling his legs while other officers gained control of his arms. I took over leg control as COOMER placed B█████ into custody. I used open hand control techniques throughout the arrest.

MEDICAL AID AND EVALUATION:
Once in handcuffs B█████ was placed into a recovery position and then sat up. I noticed a small laceration under his right eye area. I do not know what caused the laceration but at the time of his arrest he was wearing a large commercial respirator. I remember seeing the respirator after the arrest and noticed blood on it. Once at the transport wagon, I contacted dispatch to have SFD respond for the laceration. Despite numerous attempts to contact SFD through dispatch they never responded. SGT CAMPBELL 6693 screened the arrest and I informed him that SFD was contacted. Eventually SGT CAMPBELL instructed me to have SFD respond to the west precinct to check B█████ there. I informed the fire battalion chief on scene and he updated their dispatch to have a unit respond to west.

RESOLUTION:
B█████ was taken into custody and transported to KCJ. B█████ was rejected at KCJ and then taken to HMC.

He was treated and released back to KCJ where he was booked.

ADDITIONAL INFORMATION:
It was determined after the arrest that officer COOMER, TRYKAR and I were all exposed to OC and irritants
that were blown back at officers by the cordless leaf blower being used by B███████.

## Incident Location

- 2900 4 AV S, Seattle, WA - Location of Occurrence: South - Precinct: O1 | OCEAN | SOUTH

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | Yes | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| Greater than 225 pounds | 5'10" – 6'0" | |

**Employee Assessment of Community Member Condition During Incident**

| Employee(s) Injured | Employee(s) Taken to Hospital |
|---|---|
| Yes | No |

## Reporting/Involved Community Member Information


R███████ M██████ B██████

DOB: ███████1985   Race: White   Ethnicity:   Gender: Male

### Address
- 19635 NE 50th St, Redmond, WA 98053

### Role
- Suspect

### Types of Resistance Community Member Used Against Employee(s)
- Other (Specify in Narrative)
- Personal Weapons – Bodyweight
- Resist Handcuffing

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| Laceration | 1 | 1 |



**Charges against this Community Member**
- Felony-Person Crime
- Obstructing Charge
- Misdemeanor-Person Crime

## Involved Employees

### Police Officer Tyler Poole - Serial: 30057651 - Badge Number: 8426

**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage:** [No Response]

**Role**
-

## Employee Witnesses

### Police Officer Benjamin Coomer - Serial: 30058250 - Badge Number: 8443

**Video Footage:** [No Response]

**Role**
- Secondary Officer

### Police Officer Tomas Trykar - Serial: 30046967 - Badge Number: 7616

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

## Tasks

| No tasks to show |
| --- |

## Running Sheet Entries

| No running sheet entries to show |
| --- |

## Attachments

| No attachments |
| --- |

## Assignment History

| Sent Dt | From | To |
| --- | --- | --- |

## Chain of Command History

| Routing #1 | |
| --- | --- |
| Sent From: | Police Officer Tyler Poole |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 6:46 PM |
| **Instructions from Police Officer Tyler Poole to Police Sergeant Ronald Campbell:** | |
| UOF 20-261321 | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Tyler Poole - 30057651

Case 2:20-cv-00887-RAJ     Document 146-2     Filed 11/02/20     Page 236 of 303

EXHIBIT B(34)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Tomas Trykar - 30046967

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 18:23 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58037 | 2020-261321 | |
| **Date/Time Entered** | | |
| 9/7/2020 21:27 | | |

## Incident Summary

EVENT/GO#: 2020-261321
DATE OF OCCURRENCE: 09/07/2020
STATEMENT OF: T. TRYKAR #7616

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. Sylvester #5644. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Sgt. Sylvester #5644 / Sgt. R. Campbell #6693
B. ICV recorded: Bike patrol, not ICV equipped. Recorded on BWC.

PRE-ARRIVAL DETAILS:
I am assigned to the North Precinct bicycle squad. I have been full time in the squad for about 6 years and have attended all mandatory training, including bike school and the use of pepper spray. During my time in the squad, I have worked many events including numerous marches and protests. Since 05/30/2020, I have been working with the squad in a full time crowd management capacity, in response to the nationwide protests because of the incident in Minneapolis. During these protests (in Seattle), multiple officers had already been injured and assaulted and multiple police cars burned. In the more recent protest events, large explosives / fireworks have been thrown directly at officers, causing injuries. In addition, Molotov cocktails have been thrown at police buildings.

Today, we were assigned to work a Labor Day march at the light rail station in the International District. This event had been heavily promoted on public access social media with the theme of "cops aren't workers" and "no more police union". Some of the public online media posts encouraged large numbers and to "bloc up", and were advertised under the labels "#ACAB (which stands for all cops are bastards), "tearitdown" and "#fuckspd". It was anticipated the march would head to the Seattle Police Officers Guild (SPOG) building, which had already been attacked and attempted to be set on fire in a previous event. After the event started, it was estimated around 500 demonstrators were present, with a large number of them dressed in all black, carrying heavy backpacks, umbrellas and wearing helmets, goggles, respirators and shields. In my experience working these events, subjects coming to demonstrations with this attire and equipment use it to hide their identities and attempt to defeat police tactics while they commit crimes, or shield others committing crimes.

After the march started and headed towards the SPOG building, most police units stayed out of view as to not agitate the crowd. As the march continued, we were advised via radio that a participant of the march was in possession of a Molotov cocktail. We were advised there was probable cause to arrest this person as he was carrying an incendiary device, and a description of the suspect and his location within the crowd was given. When the march reached SPOG, the incident commanders had officers stage on the west side of the building, in preparation to make an arrest of the above listed suspect. Somebody on the radio also reported the smell of gas (which I assumed was gasoline).

ARRIVAL:
When Staged behind the SPOG building, we were ordered to move in and make an arrest of the suspect with the Molotov cocktail. I saw a wall of hundreds of protesters in-front of the building as we moved in. When the first line of officers entered the crowd, I saw some sort of aerosol being deployed at officers from the crowd. I did not know at the time if it was a fire extinguisher or other chemical irritant but as I got closer my face started stinging. As I approached the line, I saw officers trying to push the crowd back, and multiple officers

on the ground (some struggling with suspects) trying to effect multiple arrests.

LEGAL AUTHORITY & LAWFUL PURPOSE:
This incident occurred on a public city street. Our initial purpose was to protect the officers trying to effect the arrest. As the movement progressed, multiple arrests were now being attempted for obstruction, assaults and other crimes.

CONTACT WITH SUBJECT:
As I made my way to the front of the line, I, with other officers, were yelling "move back" instructing the crowd to move out of the area. Many demonstrators on the front line had umbrellas and shields facing us. I saw physical confrontations between the demonstrators and officers around me, and saw the majority of the crowd moving, or being pushed back. One subject in particular (B███) caught my attention, as the majority of the crowd had moved back, except for him, and he was now behind the police line. In addition, officers were on the ground attempting to make arrests beside and behind him. B███ was wearing a hard hat, goggles, respirator and had an open umbrella. As I approached B███, I was yelling move back. B███ took a few steps back but then stopped and pushed the umbrella against me and my bike. I yelled "get back" directly at B███ multiple times, with my pepper spray aimed at him, but he stayed in place with his umbrella in my face. I then saw B███ had a big green object in his left hand that he began to push right towards my face, making me think he was about to hit me with it. I ducked out of the way and then felt wind blowing in my face.

DE-ESCALATION:
I ordered B███ to "move back" and "get back" but he did not comply. Other officers were already making arrests and on the ground around B███ and I. During this, B███ took an offensive action against me and further de-escalation was not feasible. B███ could have turned around and walked away but did not.

DECISIONS MADE:
B███ did not move back when ordered to multiple times and held an umbrella against me, effectively blocking me from reaching the officer on the ground behind him and obscuring my view. B███ also shoved a leaf blower towards my face and activated it, blowing all airborne particles in my face. B███ was much larger than me and wearing protective gear, and I determined the fastest and safest way to move B███ and protect myself from any further assault (by B███) was to deploy my pepper spray directly at B███.

THREAT ASSESSMENT:
Prior to going into the crowd, I had knowledge that at least one suspect had a Molotov cocktail, and an officer could smell gas (I assumed gasoline). The crowd had already made it clear they were anti-police, and many were dressed in black, hiding their identities and wearing gear such as helmets, goggles, gasmasks or respirators and had shields and umbrellas. The crowd was very large, and when officers attempted to make the arrest, the crowd became hostile. I saw smoke being deployed towards officers, and I felt stinging on my face. Multiple officers were on the ground trying to take subjects into custody, with their sole focus on the arrest. They were surrounded by the hostile crowd, and I needed to push the crowd away from the officers so they would not be assaulted. Most of the subjects around B███ moved away, but B███ stayed after only taking a few steps back. There were several arrests going on around B███, including behind him, and my intent was to get B███ out of the way/area so I could assist the officer struggling with someone behind B███. B███ could have turned around and walked away, but instead held his ground and shoved his umbrella into me. B███ also shoved a leaf blower towards my face and turned it on, blowing all airborne irritants at me. I initially thought B███ was going to hit me with the leaf blower (at the time I didn't know what he was holding) and I ducked out of the way.

FORCE USED:
I brought up my department issued pepper spray and attempted to spray B███, but the OC did not deploy. A few seconds later (after B███ swung and activated the leaf blower at my face) I deployed one short burst of my OC directed only at B███ (this time the OC deployed). My intent was to stop B███ from assaulting me, and to get B███ out of the way so I could advance the line and assist other officers (whom he was blocking me from). After I deployed my OC, B███ tuned slightly and stopped. Officer Poole pulled B███ out of the way and other Officers assisted Officer Poole with taking B███ into custody. I was then able to advance the line, and saw by then, the other officers appeared to be under control now. I then continued advancing the police line, and did not have any further contact with B███.

MEDICAL AID AND EVALUATION:
SFD screened and treated B███ at the West Precinct.

RESOLUTION:
B███ was taken into custody and booked into the King County Jail.

ADDITIONAL INFORMATION:
In reviewing my body worn video, I saw the officer on the ground behind B███ gets kicked in the head by a suspect who turns and runs away. This again demonstrates the importance of advancing and creating an "arrest circle" around officers focused on an arrest. The arrest circle is utilized to attempt to prevent assaults such as this.

After my OC application, I moved on and did not have any further contact with B█████. I later learned through the primary officer that B█████ sustained a small laceration on his cheek during the arrest made by other officers. I was also advised he was treated and released at HMC for the laceration.

## Incident Location

- 2949 4 Ave S, Seattle, WA 98134 - Location of Occurrence: Demonstration - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
| --- | --- | --- |
| Defense of Self | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| Greater than 225 pounds | 6'1" – 6'3" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### R█████ M█████ B█████

DOB: ████/1985  Race: White  Ethnicity:    Gender: Male

#### Address
- 19635 NE 50th St, Redmond, WA 98053

#### Role
- Suspect

#### Types of Resistance Community Member Used Against Employee(s)
- Other (Specify in Narrative)

#### Charges against this Community Member
- Obstructing Charge

## Involved Employees

### Police Officer Tomas Trykar - Serial: 30046967 - Badge Number: 7616
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/North Pct

B120/North Pct 2Nd W - NE B122/North Pct 2Nd Watch - North Beats B122A/North Pct 2Nd Watch - North Beats B122A

**Video Footage:** [No Response]

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Chemical Agent – OC Spray - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Chemical Agent – OC Spray | Yes | 1 | 1 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | 2020-261321 | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Tomas Trykar |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 5:44 PM |
| **Instructions from Police Officer Tomas Trykar to Police Sergeant Ronald Campbell:** | |
| 2020-261321 | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Tomas Trykar - 30046967

EXHIBIT B(35)

# TYPE II USE OF FORCE
# INVOLVED OFFICER
## STATEMENT GUIDE

| Instructions: |
| --- |
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**<u>Preface:</u>**

A. In-person supervisor screening:
- Supervisor's name/rank/serial number, date/time/location
B. ICV and BWV recorded: If  not, why not – Must be explained if no BWV or ICV
C. Note if you reviewed and BWV, ICV, or other video prior to statement.


**<u>Pre-Arrival:</u>**

A. Your relevant  training/experience (brief biography)
B. Sworn SPD Officer, marked/unmarked, uniform, duties & assignments, partner/solo
C. Location: Where you went and why you went there (dispatched, on-view).

Information: From dispatcher, complainant, MDC, Details of the Calls or your Reasonable Suspicion.  Weapons involved?  Crime of Violence?


**<u>Arrival:</u>**

A. Observations:
   i. People / other officers on scene.  Activity occurring, dangers, citizens exposed…

     ii.    Buildings, vehicles

    iii.   Environmental factors: weather, lighting

B.  What was happening when you arrived or first observed the subject(s)?


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):

     i.    Public area

    ii.    Consent

    iii.   Exigency

    iv.   Warrant

     v.   Community caretaking

B.  Lawful Purpose (Explain in Detail):

     i.    Social Contact

    ii.    Terry Stop

    iii.   Probable Cause for arrest

    iv.   Community Care-taking

> **Note:** Progression of Contact: Explain any change in your Legal Authority/Lawful Purpose during incident.


**Contact with Subject(s):**

A.  How did you make your presence and authority clear?

     i.    Verbal identification, commands or instructions

    ii.    Did the subject say or do anything that indicated he/she knew you were the police?

B.  Contact with involved subject(s)

     i.    Observed Details

         - Physical/verbal reaction to officer

         - Tone of voice / statements made

         - Body posture / movement

         - Subjects size / strength vs. officer

         - Intoxication / mental state

    ii.    Information obtained from each subject

C.  Was there a frisk of any subject?

     i.    Reasons to believe subject was armed and currently dangerous

    ii.    Frisk Factors (Must be described in detail)

**De-Escalation Techniques Employed:**

    A. Communication
        i. Verbal persuasion
        ii. Advisements and warnings (including Taser spark tests and warnings)
        iii. Clear instructions
        iv. Using verbal techniques, LEED, or techniques to calm an agitated subject and promote rational decision making
        v. Avoiding language, such as taunting or insults, that could escalate the incident
    B. Time, Distance, Shielding
        i. How did you attempt to slow down or stabilize the situation so that more time, options and resources are available for incident resolution.
        ii. How did you Maxime your tactical advantage by increasing distance to allow for greater reaction time
        iii. Did you utilize cover and concealment for tactical advantage
    C. If De-escalation was not safe or feasible, explain why not

**Decision Made:**

    A. Overall summary of information gained from investigation
    B. Decision based on information:
        i. Warning
        ii. Citation
        iii. Documentation
        iv. Arrest
    C. Include any Tactical Decisions and Scene Control you employed

**Threat Assessment:**

    A. Did the subject pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.

**Use of Force:**

Detailed description of the force used by you during the incident and any force you clearly observed used by other officers.

    A. Words, Actions or Threat posed by subject that necessitated the use of force:
        i. Attempts to flee
        ii. Fight
        iii. Resist arrest
    B. De-escalation and continued attempts and the effect on the subject

     i.   Verbal de-escalation
- Warnings/commands to subject.
    ii.   Physical de-escalation
   iii.   If de-escalation was not feasible, you  must  explain why not

C. Lawful purpose of the force used:
    i.   Gain control
    ii.   Protect yourself or others from a threat of immediate harm
   iii.   Stop a potential deadly threat

D. Explain your decision to use a technique or Less Lethal Device, based on feasible options
    i.   Proportionality of force
    ii.   How did the totality of circumstances affect the force used?
   iii.   "No reasonably effective alternative…."

E. Explain effectiveness or lack of effectiveness of employed techniques
    i.   Was this a trained technique? Where were you instructed in this technique?
    ii.   Were you able to apply the technique properly? Explain why or why not.
- If effective, describe assessment and modulation of force
     •   Describe control of or compliance of subject
- If not effective, explain why not and how you progressed from there
   iii.   When and How was your force modulated?

F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)

**Medical Aid and Evaluation:**

A. Injuries/Medical Aid
    i.   Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
    ii.   Medical aid (who provided and where provided)
   iii.   Refusal of medical aid by subject
   iv.   Refusal to accept at jail - disposition
    v.   Injuries to yourself

**Resolution:**

A. Search
    i.   Items recovered
B. Transport and processing of subject:
    i.   Use of ICV
    ii.   Advisements

**Additional information:**

    A.  Anything you believe is pertinent to this incident but not covered above.

**Copy and Paste Template Below. Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

EVENT/GO#: 2020-261325

**DATE OF OCCURRENCE: 9/7/20**

**STATEMENT OF: LAPIERRE #7786**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by SGT. CAMPBELL #6693. I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: SGT. CAMPBELL.
    B.  ICV recorded: BWV yes. No ICV due to being on a bicycle.

**PRE-ARRIVAL DETAILS:**

On 9/7/20 I was working uniformed bicycle patrol for the Seattle Police Department with the 2E80 units. I was assigned to the "Burn the SPOG" demonstration turned riot that originated at Hing Hay Park and made its way to the Seattle Police Officers Guild building located at 2949 4 AV S. This was approximately the 13th week of dealing with massive civil unrest to include riots. Many of these demonstrations have turned violent to include substantial property damage, looting, arson, assaults, and shootings. I carried a MK-9 OC spray canister. The MK-9 refers to the size of the canister and is used for crowd management/control for target specific application. During these past weeks, I have been assaulted many times to include having items such as rocks, bricks, bottles, and explosives thrown at me. I have been pushed, punched, kicked, tackled, had high powered lasers shined in my face, and threatened with bodily harm and death more times than I can recall.

I was not assigned to a patrol vehicle and therefore did not have ICV capabilities. I was equipped with a BWV that was periodically activated throughout the day if time and circumstance allowed. The BWV was not active throughout the whole day at direction of command staff and policy so as to avoid recording citizens constitutionally protected right to free speech and public assembly. I did activate my BWV when it was safe and feasible for me to do so and I was able to anticipate potential law enforcement action or criminal activity. Due to the violent and unpredictable nature of riot situations, it is possible that I was unable to activate my BWV during enforcement action or criminal activity.

Much of the crowd consisted of the same people that had been involved in previous protests and riots. They had evolved their tactics over the weeks in order to increase both their defensive and offensive abilities. The crowd was using umbrellas to deflect OC spray and obscure officers' vision. This created an officer safety risk as OC spray is used to disperse hostile crowds and focus on specific targets. The crowd had many weapons and improvised weapons and by obscuring their movements, they could be arming themselves without the officers seeing. Many were also wearing gas masks and goggles. They formed shield walls to block officers from conducting their objectives, improvised spike strips to pop the tires of bicycles and vehicles, barriers, and Molotov Cocktails. They would often use shield walls to prevent officers from advancing, then deploy Bear Spray and throw munitions at officers from behind the shield wall.

**ARRIVAL**:

My squad and I were assigned to parallel the crowd as they made their way through the city. We were staying far enough away in an attempt to prevent escalating the crowd by becoming the focal point of the march, but close enough that we could respond to any incident which required immediate police intervention. We made our way to the SPOG office and took a position around the corner. During the first SPOG riot on 8/19/20, the crowd immediately began throwing high powered mortar style fireworks at the building in an attempt to light it on fire. The crowd was permitted to march in front of the SPOG building during this event as it was a new day and they had not yet done anything which required police intervention, but the threat of it becoming another riot was high. The energy of the crowd was very hostile. They were yelling threats/insults towards us since they gathered in High Hay Park, and making threats/using fighting words in an attempt to spark a confrontation. The majority of them were dressed in all black, with protective gear such as helmets, gas masks, hard pads, shields, backpacks, and improvised weapons. This was an indication of the intent of the crowd as they were acting and dressed very differently than crowds which have historically been peaceful.

Information was provided of a suspect in the crowd with a Molotov Cocktail. This is a destructive device involving a container and fuel source. They are ignited and thrown at objects to include buildings and people. They burn hot and long and can cause serious property damage, injury, or death. Our intent was to arrest the individual with the Molotov Cocktail who was imbedded in the crowd.

**LEGAL AUTHORITY & LAWFUL PURPOSE**:

I had legal authority as a police officer as this riot was occurring on public streets, sidewalks, and other areas open to the public. My lawful purpose was crowd management/control and to protect life, property, and attempt to prevent assault on police officers and others. There was probable cause for the arrest of the male suspect for possessing a destructive device.

**CONTACT WITH SUBJECT**:

My squad and I were leading the group of officers. We began riding towards the crowd in an attempt to reach the suspect and arrest him, the crowd began forming a shield wall and blocking our path.

There was a line of people with shields in the front, and a group with umbrellas behind them. We began pushing our way through the crowd and were met with multiple assaults. The crowd was pushing officers, grabbing them, punching, and kicking. I watched multiple officers being punched in the head repeatedly and thrown around. This made us ineffective and our squad was split. I saw Ofc. Gaffney-Bills and Sgt. Ziemer grabbing onto the suspect with the Molotov Cocktail. He was able to escape with the assistance of the crowd and we were now dealing with an angry mob. We were still severely outnumbered, and officers were fighting on the ground with suspect while still surrounded by the riot crowd. This left them exposed to the crowd in a position of severe disadvantage. It was imperative that the crowd not be allowed to advance on officers while they are on their knees. The odds of an officer being disarmed or injured while at a position of advantage like this were severely increased. I saw officers being kicked while they were on the ground. I was later kicked in the head by a suspect after I was knocked to the ground. The likelihood of injury due to this is great.

**DE-ESCALATION**:

While riding to the crowd, officers were yelling "move back" in an effort to have the crowd disperse. Many of them chose to not only stay, but also interfere with officers, and even assault them. There were multiple avenues of escape and those who chose to stay made a conscious decision to involve themselves in a riot. Officers attempted to use team tactics and less-lethal munitions to disperse the crowd in an effort to quell the hostile crowd. Officers were being assaulted and de-escalation was no longer feasible. It was a chaotic scene and clear some of the rioters were focused on injuring police.

**DECISIONS MADE**:

The crowd had broken off into multiple groups at this point and multiple arrests were made. While collecting my belongings from the ground and attempting to get my bicycle back in working condition, I saw a suspect, only known as A/DOE, JOHN at this point, kicking officers as they were on the ground. I made the decision to go to their aid and arrest him.

**THREAT ASSESSMENT**:

There was a huge life safety risk. The crowd outnumbered officers by at least 2:1 and they were very aggressive and assaultive. I watched many officers being assaulted and ganged up on. They had completely surrounded officers to the point the arrest vans were unable to get in to retrieve arrestees. The rioters had protective gear and weapons. Later in the day a Molotov Cocktail was thrown at us and landed approximately 20 feet from me. It created a fire that burned until extinguished by an officer. A box of Molotov Cocktails was later found in front of SPOG and it was likely those were going to be used against the SPOG office and officers.

**FORCE USED**:

A smaller group of rioters and officers had broken off into the parking lot to the east of the SPOG office. The officers were attempting to make arrests and were being attacked from behind by a group of rioters. I specifically saw A/DOE kicking officers in the body/head as they were down on the ground. I began riding my bike towards them with the intention of arresting A/DOE for felony assault.

I was approximately 100 feet away from the group at this point and began riding towards them. As I rode closer and was about to dismount my bicycle to grab A/DOE, he suddenly turned around and faced me. I was going relatively fast on my bike at this point and was unable to stop. A/DOE saw me coming and squared up in a fighting stance. It appeared that instead of fleeing, he chose to plant his feet with one in front of the other and square his shoulders to me. I believed an assault was imminent based on his body language, as well as the fact that I had just seem him attacking officers.

As I approached, someone fell into my front bike tire and knocked me off balance as I was still in forward motion. The front tire of my bike struck A/DOE but he seemed unaffected by it. I was rapidly launched from my bike over the handle-bars. As I was falling, I reached out and attempted to grab A/DOE. My right forearm contacted the left side of his face/head. A/DOE was able to juke me and temporarily escape. I ended up fracturing my knee/leg as a result.

I fell to the ground and someone else fell on top of me. While I was pinned on the ground with someone siting on top of me, A/DOE ran back and kicked me in the head. After the person was removed from on top of me, I was still pinned under my bike and it took a few seconds to free myself. A/DOE began to run and was taken into custody by other officers.

**MEDICAL AID AND EVALUATION**:

I do not know who arrested him or what happened to him after as the riot was still occurring and I needed to get back to dealing with that. He was left with the arresting officer. I do not know if he was injured from the bike collision or if he complained of pain.

I ended up going to the hospital and it was determined I had a fractured knee/leg. I also had neck and head pain from getting kick in the head while down on the ground.

**RESOLUTION**:

He was booked for felony assault. I do not know his real identity at this point.

**ADDITIONAL INFORMATION**:

N/A.

EXHIBIT B(36)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

**Instructions:**

Please provide a detailed narrative answer to each of the questions asked. The listed bullet points are not specific to your incident and may or may not apply.

By SPD Policy you must document every use of force throughout the incident. This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution. You may do this in one statement, but you must provide these details and reasoning for each use of force.

Please read the following for information on what you might include in your statement. Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed. This is a guide only.

At the bottom of this guide is the cut and paste section. Fill out your statement using the format included and then cut and paste your response into your Blue Team entry. If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

A. In-person supervisor screening:

Supervisor's name/rank/serial number, date/time/location

B. ICV and BWV recorded: If not, explain why not
C. Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

A. Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
B. Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C. Location
D. Information received from briefing/supervisor
E. What was happening when you arrived/first observed the demonstrators?
    a. People / other officers on scene, activity occurring, dangers
    b. Buildings, vehicles
    c. Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

A. Legal Authority (Explain in Detail):
    i. Public area, Street, Park, Open to public
    ii. Exigency
B. Lawful Purpose (Explain in Detail):
    a. Riot
    b. Looting
    c. Assault


**Contact with Subject(s): (If feasible)**

A. How did you make your presence and authority clear?
    i. Uniform – UO Gear
    ii. Verbal identification, commands, instructions, orders, PA announcements
B. Describe contact with involved subject(s)
    i. Observed details
        - Physical/verbal reaction to officer
        - Verbal actions / statements made
        - Size of crowd / movement
    ii. During line movements, provide details
        - Your actions
        - Subject's response


**De-Escalation Techniques Employed:**

A. Communication
    i. Advisements/warnings. If no warning, explain why.
    ii. Describe instructions given
    iii. Dispersal orders you heard
B. Time, Distance, or Shielding employed
C. If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
            - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
            - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
            - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-261325**

**DATE OF OCCURRENCE: 09/07/2020**

**STATEMENT OF: TAYLOR MORELAND**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Campbell.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

   A.  In-person supervisor screening: Sgt Campbell
   B.  ICV/BWV recorded: BWV only

**DETAILED NARRATIVE:**

PRE-ARRIVAL

This incident was audio and video recorded using my BWV system. I did not have any ICV as I was in a vehicle that does not have a computer.

On 09-07-2020 at approximately 1820hrs I was working as 491, a uniformed officer with the East Precinct Anti-Crime Team. East ACT was assigned to work a planned demonstration that was advertised on social media as being a Labor Day March against police unions. The group of protesters gathered near the International District Light Rail Station. There were approximately 250-300 people dressed in all black clothing with shields, helmets, gas masks, umbrellas, and body armor. Based off my training and experience, these items are not carried or worn by protesters with the intention of being peaceful, but rather individuals ready for violence and destruction.

The group marched towards the Seattle Police Guild Office located in the 2900 block of 4 Av S. It was found that there was a suspect in the crowd that had a Molotov Cocktail and probable cause was developed for their arrest. A plan was formulated that the bicycle squads were going to move in to arrest the suspect and the Anti-Crime Teams would follow in support.

ARRIVAL

I arrived in the 2900 block of 4 Av S with the rest of East ACT at approximately 1821hrs. I acted as a support officer while several officers were making arrests once they met the group of protesters. I saw several assaults on officers taking place to include a large cloud of bear spray being deployed by the protesters. The group of protesters broke up and ran in multiple directions. In the parking lot to the east of the Seattle Police Guild Office, I could see a few bicycle officers attempting to make arrests. I saw as the officers began to get surrounded by a group of protesters. I told my supervisor A/SGT Blackburn that we needed to move over to the parking lot to assist. As we began to form a group to head over I saw OFC LaPierre attempting to make an arrest on the ground. I then saw a male – later identified as B█, █ D. B/M█████-1987 – in a red sweatshirt appear to stumble near OFC LaPierre. At this point I was approximately 30 yards away from the incident. After █ stumbled, he looked directly at OFC LaPierre who was on the ground, wound up, and kicked OFC LaPierre one time in the head. I then saw as █ turned away from OFC LaPierre and attempted to run away.

LEGAL AUTHORITY / LAWFUL PURPOSE

At this point, I was on a city street and parking lot that is open to the public. I had probable cause to arrest B█ for RCW 9A.36.031 Assault in the third degree. OFC LaPierre was in full police uniform that includes his badge and Seattle Police Department patches. OFC LaPierre was also wearing a bicycle helmet that has police markings on it. It is not reasonable to argue that B█ did not know that OFC LaPierre was a police officer at the time that he kicked him.

DE-ESCALATION TECHNIQUES EMPLOYED

It was very evident that there were a large contingency of police officers in the area in fully marked uniforms. Officers in the area had told protesters to move back away from the parking lot. It was not feasible for me to provide any de-escalation to B█ prior to my contact with him as I was too far away to say anything and my first contact with him I instantly was attempting to place him into custody. While I was placing B█ into custody I told him that he was under arrest and instructed him several times to place his hands behind his back.

THREAT ASSESSMENT / DECISION MADE

I assessed B█ to be a high threat to the safety of officers and the public. He had just committed a violent felony on an officer by kicking him in the head. A kick to the head has the potential to cause an officer to go unconscious and/or cause damage to their brain/spine. As soon as I saw the assault happen, I sprinted with the intent to arrest B█ as quick as possible so that nobody else would be hurt by his violent actions.

USE OF FORCE

Following the kick, B█ attempted to flee from the group of officers and travel westbound through the parking lot back towards 4 Av S. I saw several officers attempt to grab ahold of B█ but he was able to defeat their grasps. Right as I was approximately 5 feet from B█, an officer grabbed ahold of B█, stopping him from running away. This officer pushed B█ backwards and he fell on the ground landing on his butt/back. At this point, I grabbed ahold of B█ near his right shoulder and we were able to roll him onto his left side. B█ yelled, "Get the fuck off me!" I grabbed onto the side of B█'s head and pinned it to the ground as I could feel B█ was using his muscles to attempt to get up off the ground to escape from being arrested. B█ was attempting to push me off him with his right arm. I could see that B█ had something long and skinny with a pointed end in his right hand. I did not know exactly what it was at the time.

At this point, I grabbed ahold of B█'s right wrist and attempted to pin his hand to the ground. My left hand was on B█'s back and I used this hand to push B█ towards the ground so that he would not be able to get up. B█ then "turtled" his right arm, pulling it towards his chest and I again used my right hand to grab his wrist and pin it to the ground. I told B█ that he was under arrest. B█ responded by saying, "Why?" indicating to me that he had heard my statement and understood what I was saying. I told B█ to put his hands behind his back. B█ refused to do this and was pulling his arm towards his chest when I attempted to move his wrist behind his back. At this point I had ahold of B█'s right wrist with my right hand and B█'s right elbow with my left hand. B█ was partially on his stomach and partially rolled on his left side. I repeated my instruction to B█ to place his hands behind his back but he kept repeating, "Why?" I again attempted to pull B█'s right wrist behind his back but he was using muscle tension to prevent me from doing this. Eventually I over powered B█ and got his right wrist behind his back. I then placed my right knee diagonally across B█'s back as properly trained and instructed by the SPD Defensive Tactics section during prone handcuffing. I had ahold of B█'s right hand with my right hand and could see that B█ still had the unknown object inside of his grasped fist. I said, "He has something in his right hand." When B█ heard me say this, he opened his hand and said, "I have a fucking vape pen." OFC Brownlee removed the vape pen from his hand.

B█ repeated, "Why?" another time. This time I felt it was feasible to tell him that he had just assaulted an officer and that is why he was under arrest. Another officer handed me a pair of handcuffs and I was able to place both B█'s right and left hands into handcuffs. I gauged both sides of the handcuffs that they were applied properly and then double locked the handcuffs.

MEDICAL AID AND EVALUATION

We rolled B█ onto his side in the recovery position. I then walked away from B█ in order to further investigate the crime. When I was in contact with B█ he did not complain of any injuries. I did not see any apparent injuries to B█ but most of my direct contact with him was during the process of handcuffing. I sustained cuts and abrasions to my fingers and left knee. I did not seek medical treatment.

RESOLUTION

I returned to B█ and informed him again that he was under arrest for felony assault because he kicked an officer. I read B█ his Miranda Rights from the back of my SPD MIR card. I asked B█ if he

understood his rights and he said, "Lawyer." B█ was turned over to prisoner processing on scene and was later booked into KCJ for Investigation of Assault.

**ADDITIONAL INFORMATION**:

EXHIBIT B(37)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Steven Stewart - 30030562

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/10/2020 | 9/7/2020 | 18:26 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58132 | 2020-261325 | 2020UOF-1426 |
| **Date/Time Entered** | | |
| 9/10/2020 16:25 | | |

## Incident Summary

EVENT/GO#: 2020-261325
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: OFFICER STEVEN STEWART #6823
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt. R. Campbell #6693. I DO invoke my Garrity rights prior to giving this statement.
Preface:
In-person supervisor screening: Sgt. Campbell #6693 screened the listed use of force in person on 9/7/20 at approximately 1835hrs in the 2900blk of 4th Av S.
BWV recorded: The listed use of force is captured on my BWV. I reviewed BWV prior to completing this statement to determine the timeline of events.

Pre-Arrival/Arrival
On 9/7/2020 I was employed as a Seattle Police Officer assigned to the Southwest Precinct Anti-Crime Team (ACT) as unit 592. I was in full SPD uniform. I was a passenger in our SPD issued raid van along with 4 of my teammates. I have completed all required SPD Crowd Management Training to include training in 2020. I was equipped with BWV. My BWV was activated during the listed arrest. On this date, I was assigned to the Crowd Management Section for the Demonstration/Protest that was to occur in the City of Seattle.
Per the Incident Action Plan for 9/7/2020 the following applied:
"The Seattle Police Department is currently operating under a Stage 2 Mobilization and has instituted Precinct Area Command to address operational needs during the current COVID-19 pandemic. Due to the state of emergency created by this pandemic, the Washington State Governor issued a Stay at Home Order on February 29 through May 4, 2020. Governor Inslee has extended this order indefinitely. Additionally, the Mayor of Seattle suspended all permitted events on April 6 until further notice.

Since May 30, 2020, SPD has needed to deploy significant resources to help manage protests, demonstrations, and marches that have been occurring throughout the City following the in-custody death of George Floyd in Minneapolis. Some events have involved numbers up to 50,000 people and have occurred without violence or significant property damage. Notable exceptions have been rioting which involved violent acts, setting of fires, and looting in downtown Seattle on May 30 and ongoing skirmishes between protestors and police in the area of the East Precinct building and Cal Anderson Park area that occurred during the first 9 days of June. Acts of violence, injuries to Officers, and significant property damage has occurred during protests on Sunday July 19th and Saturday July 25.

More recently, on August 16 2020, the protest was deemed a riot after the crowd assaulted officers with rocks, bottles, and explosive devices that caused injuries to officers. On 8/24/2020, ENDD resulted in serious threats to Officer Safety. Notably, quickrete and other barricades were used to block exterior East Precinct doors as plywood shields were burned outside the precinct. Also, on 8/24/2020, Molotov cocktails were used in attempt to burn down the SPOG building at 2949 4th Ave. Remnants of a Molotov cocktail and two other Molotov devices were located at the scene. On 9/1/2020, a group of approximately 75 rioters attacked the East Precinct. Three Molotov cocktails were recovered that had been thrown at the East Precinct.

For the past several weeks, there has been nightly planned demonstrations, called "Every Night Direct Demonstration", which is being promoted on social media. During previous evening events, incidents of significant property damage have occurred.

Commanders Intent:

There have been numerous protests over the past several months throughout the City of Seattle wherein many participants have remained peaceful. However, there have been other protests wherein many participants have engaged in assaultive behavior against police officers and/or committed significant property destruction and/or vandalism against public and private property. My intent is to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. My expectation is to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct. Acts of violence or significant property destruction will not be allowed. If there are acts of violence or significant property destruction occurring, I expect our personnel to respond by identifying, isolating, and arresting the offenders if/when it is safe and feasible so those activities are not allowed to corrupt the lawful conduct of others. If/when it is no longer safe or feasible to hold people personally accountable for criminal conduct and/or the crowd presents an imminent risk to public safety or significant property destruction appears likely, then I expect our personnel to utilize dispersal orders and coordinated crowd control tactics that are consistent with law, policy, and training to restore order. Once the crowd is dispersed adequately and order is restored, I expect our personnel to resume efforts to maintain a minimal police presence at a safe distance to facilitate the protester's lawful conduct."

Legal Authority/Lawful Purpose

On 9/7/20 at approximately 1800hrs our team was ordered to stage south of the SPD Guild office building located at 2949 4th Av S. A large crowd was marching from the International District towards the listed location.

Many in the large crowd were dressed in all black and were wearing helmets and gas masks. Surveillance officers provided updates regarding the group's actions and movement. Officers were able to observe an individual that appeared to be preparing a Molotov Cocktail. The "black clad" individuals at the front of the group had opened umbrellas and positioned shields as they were adjacent to the SPOG building. This is usually done in preparation for police interaction based the crowd's actions.

At approximately 1820hrs officers were ordered to move in and address the dangerous and violent crowd. The crowd had gathered directly in front of the SPOG building and were standing in the roadway on 4th Av S. Members within the crowd began throwing dangerous items at officers and sprayed officers with an unknown type of spray while officers were contacting them.

I did not have initial contact with the crowd and came into the area on foot as the crowd was slowly retreating E/B and N/B. The crowd was moved at the direction of the Incident Commander.

Contact with Subject(s)/De-Escalation Techniques

I remained in the 2900blk of 4th Av S. to assist in providing overall scene security as the majority of the group continued moving N/B.

Our team repositioned as SPD bicycle officers were preventing the group from coming back onto 4th Av S. I began walking towards the SODO Gateway parking lot. This lot is directly east of the SPOG building.

At approximately 1826hrs I observed a melee of activity in the middle of the listed parking lot. I observed an unknown male wearing a red sweatshirt and red shoes. The male stood out to me as most everyone else in the area was wearing dark colored clothing. The male was later identified by King County Jail staff as ▓ D. B▓ (B/M/▓-87).

I was approximately 25 yards west of the melee however I clearly observed B▓ kick someone that was on the ground. I was unaware of whom had been kicked at the time. I then observed B▓ quickly run W/B in a very obvious attempt to flee from officers that were right there trying to apprehend him.

I did not have time to engage in dialogue or verbally de-escalate the situation with B▓ as he was actively running away from officers.

Threat Assessment/Decision Made

I had run into the area to assist officers. It was very apparent B▓ was wanted by officers and reasonable to believe B▓ was wanted for kicking an officer that was on the ground.

Based on the fact officers were attempting to detain B▓ I quickly determined it was reasonable to believe probable cause existed for the arrest of B▓.

Use of Force

██ turned left while running away from officers. ██ ran directly into my path as I was running into assist with his apprehension.

I dipped my right shoulder and struck ██ in an attempt to tackle him to the ground. The hit was forceful as we were both running towards each other at the time of impact.

██ and I struck each other square on with one another. The impact caused ██ to fall backwards. I partially held onto ██ during the impact. ██ did not appear to land hard on the ground. ██ moved into a fetal position on his left side while two other officers attempted to move ██ into a prone position for handcuffing.

I assisted in attempting to move ██ into a prone position for handcuffing. ██ yelled multiple times, "Get the fuck off of me!" One officer verbally instructed ██ to get onto his stomach. ██ remained in a fetal position and was very difficult to control. One officer was at ██'s legs while the other was trying to control ██'s right hand that was semi-tucked beneath himself.

I was positioned behind ██ while trying to gain control of his left arm. ██ was actively resisting our efforts to place him under arrest. ██ remained very tense making it very difficult to gain control of him. ██ kept yelling, "Why are you neutralizing me?"

I was not yet able to gain control of ██'s left arm. I was concerned ██ might be able to reposition himself to a position that might allow him to escape our grasp even while on the ground. ██ has an athletic build and I consider him to be rather strong.

In order to prevent ██ from attempting to get up from the ground I took hold of the upper portion of his sweatshirt in an attempt to keep him on the ground. I then tried to gain control of his left arm. My right forearm was positioned on ██'s upper right back area while I grasped his sweatshirt in my right hand. I did this to assist in controlling his upper body. I told ██ to stop resisting. ██ continued yelling, "Why!" ██ continued moving and resisting our efforts to place him into custody. We had already been struggling with ██ for a significant period of time in terms of taking a suspect into custody.

I attempted to take better control of ██'s left arm. I felt significant resistance coming from ██. ██ raised his head up and turned to look in my direction. ██'s movement caused my right hand to briefly shift to the rear of his neck area. ██ continued yelling and in no way was I attempting to use a neck restraint or neck maneuver of any kind. I was attempting to control ██'s upper body preventing him from escaping our control.

I was able to move ██'s left arm out to his side and ██ was now in more of a prone position.

Officers told ██ he was under arrest. One officer advised ██ had something in his right hand.

I removed my cuffs and handed them to one of the officers. The officer placed ██'s right hand into handcuffs. I then took control of ██'s left arm and assisted in placing his left hand into cuffs.

██ later complained of pain from handcuffs while we switched his cuffs out.

Medical Aid and Evaluation

I assisted in walking ██ over to the transport van. I asked ██ if he was injured and he replied, "Hell yeah I'm injured." ██ did not appear injured. Time did not allow for me to fully evaluate ██'s injuries as our team was still needed to address the listed violent crowd that had relocated. I was later informed ██ complained of right knee, right shoulder, and bilateral knuckle pain. I am unsure if ██ was medically evaluated at the West Precinct.

Resolution

It was determined ██ had kicked an officer that had fallen down. ██ was later booked into KCJ for Assault under John DOE. KCJ staff later identified him as ██.

## Incident Location

- 2900blk 4 Av S., Seattle, WA - Location of Occurrence: South - Precinct: O2 | OCEAN | SOUTH

## Use of Force Specific Information

| **Reason for Use of Force** | **Service Being Rendered** | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Daylight | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'4" – 5'6" | |

**Employee Assessment of Community Member Condition During Incident**

Unimpaired

| **Employee(s) Injured** | **Employee(s) Taken to Hospital** |
|---|---|
| Yes | No |

## Reporting/Involved Community Member Information

### J█████ D█████ B███

DOB: ████/1987   Race: Black   Ethnicity:   Gender: Male

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Other (Specify in Narrative)

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| Complaint of Pain Only | 10, 3, 4, 6 | 1, 2, 3, 4, 5 |

## Charges against this Community Member
- Felony-Person Crime

## Involved Employees

### Police Officer Steven Stewart - Serial: 30030562 - Badge Number: 6823
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/Southwest Pct B250/Southwest Pct Ops B259/Southwest Pct Ops - Night Act B259B/Southwest Pct Ops - Night Act B259B

**Video Footage:** [No Response]

**Role**
- Secondary Officer

## Force used by this employee against the community member
- Control Hold – Takedown - Was force effective: Yes
- Control Hold – Restraint - Was force effective: Yes
- Control Hold – Restraint - Was force effective: Yes
- Control Hold – Restraint - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Takedown | Yes | 7 | 1 |

| Control Hold – Restraint | Yes | 5 | 2 |
|---|---|---|---|
| Control Hold – Restraint | Yes | G | 3 |
| Control Hold – Restraint | Yes | B | 4 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| Abrasion | 1 | 1 |



## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

No attachments

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 |
|---|

| Sent From: | Police Officer Steven Stewart |
|---|---|
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 4:40 PM |
| **Instructions from Police Officer Steven Stewart to Police Sergeant Ronald Campbell:** | |
| Type 2 use of force for 2020-261325 9/7/20 Stewart #6823 | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Steven Stewart - 30030562

EXHIBIT B(38)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked. The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>. This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution. You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement. Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed. This is a guide only.

At the bottom of this guide is the cut and paste section. Fill out your statement using the format included and then cut and paste your response into your Blue Team entry. If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

    A.  In-person supervisor screening:

        Supervisor's name/rank/serial number, date/time/location

    B.  ICV and BWV recorded: If not, explain why not
    C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

    A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
    B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

C.  Location
D.  Information received from briefing/supervisor
E.  What was happening when you arrived/first observed the demonstrators?
   a.  People / other officers on scene, activity occurring, dangers
   b.  Buildings, vehicles
   c.  Environmental factors: weather, lighting


**Legal Authority / Lawful Purpose:**

A.  Legal Authority (Explain in Detail):
   i.  Public area, Street, Park, Open to public
   ii.  Exigency
B.  Lawful Purpose (Explain in Detail):
   a.  Riot
   b.  Looting
   c.  Assault


**Contact with Subject(s): (If feasible)**

A.  How did you make your presence and authority clear?
   i.  Uniform – UO Gear
   ii.  Verbal identification, commands, instructions, orders, PA announcements
B.  Describe contact with involved subject(s)
   i.  Observed details
      - Physical/verbal reaction to officer
      - Verbal actions / statements made
      - Size of crowd / movement
   ii.  During line movements, provide details
      - Your actions
      - Subject's response


**De-Escalation Techniques Employed:**

A.  Communication
   i.  Advisements/warnings. If no warning, explain why.
   ii.  Describe instructions given
   iii.  Dispersal orders you heard
B.  Time, Distance, or Shielding employed
C.  If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
           - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
           - If effective, describe assessment and modulation of force
                • Describe control of or compliance of subject
           - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| PRE-ARRIVAL DETAILS / BRIEFING | | DECISIONS MADE & ORDERS GIVEN AND RECEIVED | |
| ARRIVAL | | THREAT ASSESSMENT | |
| LEGAL AUTHORITY & LAWFUL PURPOSE | | FORCE USED | |
| CONTACT WITH SUBJECT (S) | | MEDICAL AID AND EVALUATION | |
| DE-ESCALATION | | RESOLUTION | |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#:2020-261341**

**DATE OF OCCURRENCE:09-07-2020**

**STATEMENT OF:M CLARK #8310**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by A/SGT Eastman #7412          .  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

    A.  In-person supervisor screening: not feasible due to the ongoing bicycle maneuvers and arrests

    B.  ICV/BWV recorded:  BWV was active, we do not possess ICV as a bicycle officers.

**DETAILED NARRATIVE:** The details of this event are remembered in bits and pieces due to the chaotic scene. I have referred to my BWV which was active at the time of my pepper spray deployment. Please refer to my BWV for an exact sequencing of events.

On 09-07-2020 I was working as unit 2K95, a single-officer bicycle unit in the city of Seattle. We were assigned to a major protest event with a couple hundred suspected attendees. I have been present for approximately 100-150 protests over the course of the 4 years I have been bicycle patrol trained. During the course of those different protests which have ranged from peaceful facilitation of first amendment rights to freedom of speech, to violent altercations to include the destruction of property as well as assaults.

Leading up to this event I had personal observed several posts on social media calling for the attendees to "Bloc up." This means to wear all black in attire to provide anonymity at the event. This tactic is commonly used to allow persons in attendance to commit acts of violence, to include assaults, property destruction as well as arson. The flyer that was posted on social media depicted an SPD patrol vehicle on fire. This made me believe that just like the prior attempted assault at the Seattle's police officers guild the groups sole intent was to commit property destruction. The groups planned route was from the international district at 5Th Av S and S Jackson St through an industrial area to the 2900 block of 4 Av S. Traditional protests/marches go through densely populated areas like neighborhoods or heavily patronized business areas to raise awareness of their message. This march path had neither of those goals in mind which added to my personal belief of desired property destruction.

At approximately 1700 hours I was deployed with my bike squad to the international district. We were advised in roll call by LT Brooks that due to the increase in violence in demonstrations across the country. We were briefed that a number of Molotov cocktails had been used by protesters in Portland and in Seattle. We were specifically briefed on SPOG being the target of a Molotov cocktail attack a couple of days prior to todays event.

At 1725 hours the group begin there march southbound on 5th Av S, the estimated size of the group was 500. During this march the group blocked all lanes of traffic both northbound and southbound. They had an accompaniment of 8-10 vehicles blocking traffic. This created a very active hazardous situation for all the citizens as they are a group of unknown people redirecting traffic. The group put up a sign on the I-90 overpass which said, "all of my hero's kill cops." Again, reiterating to me that people in the crowd had a deep hate towards police officers. Additionally, I believed it was very likely that people in the crowd intended to harm and my even try and kill a police officer.

While the group was marching, we followed behind by a couple of blocks to observe any possible criminal acts. I personally observed a large number of protesters with black umbrellas as well as makeshift shields. It was very hot that day and the skies were clear. This again was a clear indication to me that the group intended to use the umbrellas as cover for criminal acts to include property destruction and hiding the criminal actors who were committing the crimes. The shields have been used in the past to stop officers from affecting arrests of suspects committing crimes. I had observed at the last SPOG rally the group of protesters use the shields mimicking the way officers move as a cohesive group to limit exposure. At that rally the group with the shields worked in concert with the umbrella wielding protesters to form a wall preventing officers from seeing what was happening behind the protesters.

While en-route to the SPOG building everyone was notified over radio that a member in the crowd was in possession of Molotov cocktail. As the protest group got closer to the SPOG building we were updated of the approximate location of the suspect with the Molotov cocktails.

I recognized the severity of the situation as we were being informed of the Molotov cocktails in the crowd. At this time, I felt it vitally important to make sure all of the officers and citizens were protected from these weapons that can cause great bodily harm and death. Additionally, I was aware of a SPOG barbecue that was taking place at the SPOG office.

Upon arrival to SPOG in the 2900 block of 4 Av S we were staged in the alley behind the SPOG office building. As we arrived, we were being provided active information that the suspect armed with the Molotov cocktail had a tan jacket and was carrying a black trash bag. Due to the large number of protesters staged right in front of the SPOG building it was hard to see where about the suspect was. Command ordered officers to move in and affect an arrest on the suspect. Again, it was very difficult to see into the crowd and locate the suspect armed with the Molotov cocktails.

East day bikes moved into the approximate location of where the suspect was located in the group. I heard the east bike officers providing lawful orders for the crowd to move back. As we followed behind and I also gave a lawful order for the crowd to move back.

As we arrived at the front of the crowd the protesters were armed with shields and umbrellas, blocking our access to the suspect. As our bike line was slowed down, I yelled for the bike squad to push. I said this so we could move the protesters out of the immediate area of the person armed with the Molotov cocktail. Also, I was concerned that myself and my squad being 5 to 10 feet from the protesters would result in getting injured from a Molotov cocktail. I believed it was in our best interest to move into the crowd and force the crowd to move so we could apprehend the suspect with the Molotov.

As we attempted to push through the protesters, they immediately started jabbing their umbrellas at officers. I was struck with a makeshift shield a couple of times. I then grabbed the shield and ripped it out of the hands of the assailant.

After I removed the shield, I observed a large number of protesters interlocking arms to prevent arrests from taking place.

Most of the protesters when confronted by officers left the immediate area and went to the east side of 4 Av S. This left approximate 50-60 protesters armed with shields and umbrella's who chose to ignore lawful orders. At some point I was pepper sprayed.

An arrest was ordered by SGT Diddier for an assault on an officer. Once that arrest was affected in the middle of the street on 4 Av S, the riot group reorganized a shield and umbrella line at 4 Av S and S Forest St face us.

Consistent with my training we were ordered to perform a crossbow line into the front line of the rioters. This is a common technique we use to make the violent rioters have to move. While on the move it is much harder for the crowd to assault officers with objects like fireworks, water bottles, rocks and Molotov cocktails.

As we performed our crossbow line up to the line of protesters, they stood firm and refused to move even as our squad ordered them to move back. Due to my concern over being assaulted again by an umbrella I removed a black umbrella from a protester and followed that up with a deployment of pepper spray.

At the time of the deployment of pepper spray I was concerned over the three protesters in front of me refusing to move and then blocking my view of what was happening in the crowd. I knew there was a very real threat of Molotov cocktails in the crowd and It was a danger to myself and all of my coworkers. I felt it was imperative to get the crowd moving away from officers and continuing to move northbound on 4 Av S.

Consistent with my training I deployed the pepper spray stream towards the suspects forehead and down across his face. Due to the suspect wearing a mask and goggles I don't believe it was as affective as it could have been.

The riot group had shown they would be confrontational and assault officers when given the opportunity to do so. My job was to keep the crowd moving to prevent further assaults on officers.

My pepper spray deployment had the desired affects as the male who no longer had his umbrella and had to hide behind another subject with an umbrella. This caused the group to move 10- 15 feet of space between our bike line and the protesters as they continue to walk northbound on 4 Av S. The male was hard to distinguish because all of the rioters were dressed in all black and he disappeared into the crowd once I made the deployment.

Additionally, there were several blast balls exploding in the area which provided the desired effect of getting the crowd moving. I am unaware of who made those deployments as I was oriented north on 4 Av S towards the protesters and I believed the deployments came from behind me.

Of note: approxiamtley 20 after my peppery spray deployment a Molotov cocktail was thrown at officers and landed about 10 feet from myself and my squad.

   This concludes my UOF reporting for this event.

**ADDITIONAL INFORMATION**:

EXHIBIT B(39)

# TYPE II USE OF FORCE
# <mark>CROWD MANAGEMENT</mark>
# INVOLVED OFFICER STATEMENT GUIDE

| Instructions: |
|---|
| Please provide a detailed narrative answer to each of the questions asked.  The listed bullet points are not specific to your incident and may or may not apply.<br><br>By SPD Policy you must <u>document every use of force throughout the incident</u>.  This includes your Lawful Authority/Lawful Purpose for the contact, De-escalation, Threat Assessment/ Decisions made, Force used, Medical Aid, and Resolution.  You may do this in one statement, but you must provide these details and reasoning for each use of force. |

Please read the following for information on what you might include in your statement.  Every incident is different so not everything will apply and your use of force might have information that should be included that is not listed.  This is a guide only.

At the bottom of this guide is the cut and paste section.  Fill out your statement using the format included and then cut and paste your response into your Blue Team entry.  If your response exceeds the character limits, save the entire statement and attach a .pdf or Word copy of it to your Blue Team entry after having it reviewed by a supervisor.

**Preface:**

   A.  In-person supervisor screening:

   Supervisor's name/rank/serial number, date/time/location

   B.  ICV and BWV recorded: If not, explain why not
   C.  Note if you reviewed BWV, ICV, or other video prior to statement

**Pre-Arrival/Arrival**

   A.  Your relevant training/experience – please include any crowd management training and/or experience with demonstrations in the past (keep it brief).
   B.  Describe your assignment and uniform. (List gear if more than in uniform such as Helmet, Chest protector, Baton, etc.)

    C.  Location
    D.  Information received from briefing/supervisor
    E.  What was happening when you arrived/first observed the demonstrators?
        a.  People / other officers on scene, activity occurring, dangers
        b.  Buildings, vehicles
        c.  Environmental factors: weather, lighting

**Legal Authority / Lawful Purpose:**

    A.  Legal Authority (Explain in Detail):
        i.  Public area, Street, Park, Open to public
        ii.  Exigency
    B.  Lawful Purpose (Explain in Detail):
        a.  Riot
        b.  Looting
        c.  Assault

**Contact with Subject(s): (If feasible)**

    A.  How did you make your presence and authority clear?
        i.  Uniform – UO Gear
        ii.  Verbal identification, commands, instructions, orders, PA announcements
    B.  Describe contact with involved subject(s)
        i.  Observed details
            - Physical/verbal reaction to officer
            - Verbal actions / statements made
            - Size of crowd / movement
        ii.  During line movements, provide details
            - Your actions
            - Subject's response

**De-Escalation Techniques Employed:**

    A.  Communication
        i.  Advisements/warnings. If no warning, explain why.
        ii.  Describe instructions given
        iii.  Dispersal orders you heard
    B.  Time, Distance, or Shielding employed
    C.  If De-escalation was not safe or feasible, explain why not

**Threat Assessment/Decision Made**

    A. Did the subject(s) pose a threat to you, another person, or another officer?
    B. Describe the threat in detail or why you believed there was a threat.
    C. Describe your decision regarding force and how you came to that decision
    D. Include any tactical decisions and scene control you employed


**Use of Force:**

Detailed description of the force used by you during the incident <u>and any force you clearly observed used by other officers (identify those officers and where they were in relation to you).</u>

    A. Words, actions or threat posed by subject prior to, during, and after the use of force:
    B. Continued de-escalation attempts and the subject(s) response if feasible
        i. Verbal de-escalation
          - Warnings/commands to subject, if applicable.
    C. Describe the force used and lawful purpose of the force used:
        i. Describe any warning given. If none were given, explain why not.
    D. Explain your decision to use a technique or less lethal tool, based on feasible options
        i. Describe proportionality of force
        ii. How did the totality of circumstances affect the force used?
        iii. If force was necessary, explain why
    E. Explain effectiveness or lack of effectiveness of employed techniques
        i. Was this a trained technique? Where were you instructed in this technique?
        ii. Were you able to apply the technique properly? Explain why or why not.
          - If effective, describe assessment and modulation of force
            • Describe control of or compliance of subject
          - If not effective, explain why not and how you progressed from there
        iii. When and how was your force modulated?
    F. Restraint of subject. (handcuffs gauged/double-locked, hobbles, full restraint position)


**Medical Aid and Evaluation:**

    A. Injuries/Medical Aid
        i. Any complaint of pain, complaint of injury, apparent injury, or absence of injury to subject (before and after the force was used)
        ii. Did you offer Medical aid (who provided and where provided)? Why not offered?
        iii. Did the subject refuse medical aid or flee?
        iv. Describe any injuries to yourself

**Resolution:**

If subject arrested, where were they transported?

**Reference Checklist: (Make sure you include these elements in your detailed narrative for each use of force):**

| TOPIC | ✔ | TOPIC | ✔ |
|---|---|---|---|
| **PRE-ARRIVAL DETAILS / BRIEFING** | X | **DECISIONS MADE & ORDERS GIVEN AND RECEIVED** | X |
| **ARRIVAL** | X | **THREAT ASSESSMENT** | X |
| **LEGAL AUTHORITY & LAWFUL PURPOSE** | X | **FORCE USED** | X |
| **CONTACT WITH SUBJECT (S)** | X | **MEDICAL AID AND EVALUATION** | X |
| **DE-ESCALATION** | X | **RESOLUTION** | X |

**Copy and Paste Template Below.  Using the above guide as a reference, please write your narrative below and cut and paste it into your Blue Team entry after having it reviewed by a supervisor.**

**EVENT/GO#: 2020-261341**

**DATE OF OCCURRENCE: 9-7-20**

**STATEMENT OF: SGT MATT DIDIER**

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Dumholt.  I DO invoke my Garrity rights prior to giving this statement.

**Preface**:

A. In-person supervisor screening: LTs Alcantara, Brooks, and Dyment
B. ICV/BWV recorded: Yes


Legal Authority: We were on public sidewalks and streets.
Lawful Purpose: Prevent acts of violence, significant property damage, criminal mischief while affecting lawful arrests, and protecting protesters and officers.

**DETAILED NARRATIVE:**

I am writing this Use of Force statement from memory.  I have not reviewed my BWV at this time, but my BWV was activated during this event.  I am summarizing the incidents as I recall them.  For specifics, I refer the reader to the BWV.  This situation was highly dynamic, and violent.

I have been an SPD employee for nearly 12 years and am currently a sergeant.  From 2012-2018, I was a mountain bike officers, and specialized in crowd/demonstration management.  I have participated in managing several hundred crowd incidents.  I assisted in creating the SPD Crowd Management ISDM and was a primary instructor for crowd management.

On September 7, I was assigned as 2K90, the sergeant, for the 2K90 bike squad.  The squad was assigned to crowd Management Platoon one and assigned to protests that were calling for the removal the Seattle Police Guild as a labor union.  There was intelligence that indicated that elements within the protest groups were hoping to cause damage to buildings, injury to officers, and the use of Molotov cocktails was likely.  All of the officers in the squad were wearing SPD Bike Uniforms that displayed SPD patches, clearly stated Police on them, had our names and badges.

We began monitoring the crowd at approximately 1600 when they began meeting near the International District Transit Station.  Many in the crowd were wearing body armor, and gas masks.  Some were carrying shields and umbrellas.  Eventually the crowd began moving south on 4 Ave S toward the SPOG offices.  We continued to monitor.

While monitoring the crowd, and protestor was arrested for assaulted a street preacher.  This indicated that members of the crowd were agitated and willing to act violently.

At approximately 1800hrs, officers were able to positively identify a subject in the crowd who was in possession of a Molotov Cocktail.  It was determined that an arrest of that subject would be done when feasible.  The crowd was very near to the SPOG offices at this time.

When the subject with the Molotov Cocktail was on the south side of the SPOG Offices it was determined that an arrest would be attempted.  The 2E80s moved in for the arrest, and the K90s moved to support the arrest and move the crowd back.

Upon contact with the crowd, assaultive acts began to occur by crowd members.  These acts included but were not limited to using bear spray, throwing rocks, pushing, hitting with person weapons(fists), hitting with improvised weapons (sticks).

Despite a dispersal order not yet being given, I utilized my pepper spray to move specific individuals back from the arrest area.  Numerous other officers and I were repeatedly ordering the crowd to move back.  I did this to prevent assaults on officers which could occur if the crowd was allowed to remain stagnant and move within close quarters of officers.  Historically, if we allow the crowd to move in on arrest projectiles begin to be thrown and officers assaulted.  Officers who were attempting to arrest the subject with the Molotov Cocktail were in a struggle, and the crowd needed to be moved back to prevent assaults, give the officers enough space to effectively make arrests, and make the situation safe for all involved.  One female in particular refused to move back.  I gave her one quick burst from my M-9 pepper spray.  She moved back.  I did not observe her again.  This was a highly dynamic situation, and I used my M-9 pepper spray on other individuals, but these sprays were not indiscriminate and were used to continue to move the crowd away from the arrests.

Immediately following that pepper spray incident, a male threw a stick at me.  The stick struck me in or around the face.  The highly dynamic situation made it difficult to be certain.  I used my M-9 pepper Spray to repel that subject, and eventually made an arrest on him.  I do not know if the

pepper spray affected him. His arrest took approximately 3 minutes due to him running through the crowd. At one point he ran at me and knowing he had already assaulted me, I used my M-9 directed at him, but it did not affect him. He never complained to me of pepper spray injury, and I observed no pepper spray residue on him. I asked him if he was injured after his arrest, and he had told me that he just wanted to be sure he wasn't bleeding. He, also, apologized for throwing the stick.

Once The K90s and other bike squads were able to regroup, we continued to move the crowd north on 4 Ave S. At this approximate time, a dispersal order was given. The crowd repeatedly reformed and would coalesce on officers. We had to push the crowd north on 4 Ave S to prevent assaults and projectiles. At one point, the crowd began creating shield lines to obstruct or movements, and our view of their actions. I could not allow these shields to block our movement and mask subjects who were preparing to assault officers. I took three shields from the crowd, and peppered sprayed protester/rioters who were pushing officers with their shields. These pepper spray uses were done in defense of officers, directed at the individuals who were holding the shields, and successful in keeping the crowd moving. While all of this was occurring, officers were continuing to be assaulted by other protesters (hit, punched, pepper sprayed). I was pepper sprayed (possibly bear sprayed) by a member of the crowd. The crowd began throwing rocks. I deployed blast balls to move the crowd. I believe I used two blast balls at this approximate time. Due to officers being in front of me, and the way protesters were linking shields, I used an over hand lob deployment. I did this to ensure that the blast balls were directed that the appropriate individuals (an underhand roll would have likely deflected the blast ball at unintended targets). Both blast balls went off while on the ground. I used pepper spray to move individuals in the crowd who were not moving with the majority of the crowd. I used pepper spray on the shield bearers to keep them from preventing our movements and allowing subject to prepare to assault officers. All of my actions were in direct response to actions that could become threats or actual threats.

The other bike sergeants and I coordinated to begin to utilize crossbow lines to keep the crowd moving. We did this to increase the urgency of the crowd to move, and disrupt their ability to plan attacks (rocks, bottles, bear spray) against officers.

We were able to move the crowd north on 4th Ave S. As we approached S Holgate St, the North bikes conducted a crossbow arrest on a subject who had assaulted an officer. The K90s provided support to that arrest. We conducted a tactical pause and slowed our movement of the crowd to ensure that we had appropriate assets to handle the arrest. During this pause, someone in the crowd threw a Molotov cocktail. The cocktail exploded within 20 feet of me and closer to other officers. This escalated the level of threat to officers, and to continue the crowd's movement I utilized additional blast balls. These were underhand rolls because there was space between me and the crowd and no shields to deflect the blast ball.

The crowd then turned east on S Holgate St, as they crossed the train tracks. We were able to regroup and continue our bounding crossbow lines to continue to move the crowd. The crowd moved west on S Holgate and then north on 6 Ave S. During this push we took some bottle and rocks, but they became fewer and fewer. As we approached S Royal Brougham Wy on 6 Ave S, we no longer needed to utilize bounding crossbows to move the crowd. The crowd was moving on their own.

The OPs Lieutenant then decided that we could use vehicles and dismounted officers to encourage crowd movement, and bikes transitioned to a management roll. We managed the crowd's direction by flanking the crowd and preventing them from leaving the route we chose. Using bounding flanking, we guided the crowd the Dearborn St, and then east on Dearborn to Rainier Ave, and then south on Rainier.

The crowd was able to get ahead of our eastern bike squads on Rainier, and attempted to turn east on S Charles St.  About 25% of the crowd turned east on S Charles St, before I was able to lead the K90s (in a single column) to block that street.  During this time, a subject attempted to block my movement.  I ordered him to move back.  He did not do so, and aggressively leaned into me to block my path.  I attempted to arrest him for obstruction, but he broke my grip and fled.  I was then able to get across the street and successfully prevent the crowd from moving east.

We then moved to the I90 off ramp to prevent the crowd from entering the freeway.  The crowd chose to enter Judkins Park and walk eastbound on the pedestrian path.

We disengaged the crowd at this time, regrouped at the Goodwill on Dearborn, and eventually returned to the West Precinct to complete paperwork.  I had no additional contact with protestors/rioters.

The majority of force and aggressive bike tactics were utilized in the first 20-30 minutes of attempting the arrest on the initial Molotov cocktail subject.

**ADDITIONAL INFORMATION**:

- During Rollcall the Rules of Engagement prioritized Acts of violence, significant property damage, Criminal Mischief, obstruction, and failing to disperse.  These priorities guided my commands to my squad, and my decisions for arrests and use of force.
- Throughout our crowd control and crowd management, I gave repeated orders to move back, and when feasible warned people of when force would be used or an arrest made.  The times I did this were too numerable to count.
- During this event, I utilized four blast balls, and one M-9 pepper Spray.  These less lethal, force multiplier tools were used to maintain officer and crowd safety, and only when threats to officers were likely due to either actual assaultive actions or stagnation of the crowd after a dispersal order which would, more likely than not, create safety issues for all involved.
- Base on the dynamic and complicated nature of this event (also, restrictions on OT), Lt Dyment authorized me to not complete my use of Force on the day of.  I completed my use of force as quickly as I could during my normal working hours.

EXHIBIT B(40)

## Seattle Police Department
## Level 1 - Use Of Force Report

**Incident Entered By:** Police Officer Ryan Beecroft - 30051535

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/10/2020 | 9/7/2020 | 21:03 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58125 | 2020-261357 | |
| **Date/Time Entered** | | |
| 9/10/2020 13:25 | | |

## Incident Summary

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual, ordered by Sgt. Campbell. I DO invoke my Garrity rights prior to giving this statement. This statement is for (mark all that apply):

_X_ Complaint of Pain/Disorientation
__ Handcuffing Pain Only
__ Pointing a Firearm
__ NFDD (SWAT Only)
__ Hobble

Summary of the incident/Legal Authority & Lawful Purpose:

On 9/7/2020, I was assigned as unit 196 in full uniform. I am currently assigned to the FOCUS squad within the West Act unit, which primarily addresses street level crime and quality of life issues within specific areas of the downtown core. At approximately 2058hrs, we responded to 14 Av S/Rainier AV S after a confrontational crowd was forming and yelling at officers attempting to impound a vehicle.

Shortly after arrival, a male suspect was taken into custody for an assault on an officer. That suspect was being processed on a public sidewalk at the front of a police vehicle. A female, later identified as T████ P. S███, became highly confrontational and attempted to run towards the male who was in custody. Several officers had formed a line to cover the officers processing the arrest behind them. She ran straight towards the arrested subject and tried to run through the officers in the line protecting them. She was stopped and given orders to move back. She continued to try to get through the officer line while screaming angrily and calling officers vulgar names. Several individuals with her were holding her back as she vehemently attempted to run through officers again.

She continued this behavior, while walking through the middle of the city street, and circled around the far side of the arrest location, clearly trying to get around the officer line. She attempted to reach the arrested subject, but I stepped in front of her to block her from obstructing with the investigation. She was still highly confrontational at this time and had been told countless times prior to our interaction to back away.

Officer Culbertson was standing next to me and put both his hands up, palms facing out, advising S███ not to come any closer. She then said, "Fuck you! Move your fuckin' hands!". As she yelled this, she smacked Officer Culbertson's left hand with an open right hand. After observing this assault, discretion was used not to arrest at that time in an effort to de-escalate her behavior. I advised her that she was "pushing it" referring to her continuous actions to disrupt the arrest and the escalation of assaulting an officer. My intent was to highlight that if she continued her actions it was going to lead to enforcement action. Unfortunately, she responded by yelling, "Shut the fuck up! You are really fucking pushing it you piece of shit!". She then pulled down her face mask, cocked her head back, and aggressively spit on me. A substantial amount of spit hit my person. I was not sure where it had hit me at the time. I immediately moved in to effect the arrest.

Description of the Type I force used:

I grasped her left arm near the wrist and she was advised she was under arrest for assault. She resisted by pushing up against the wall next to her, attempting to pull her arm away, and stiffened her legs. I ordered her to get on the ground. I pulled her down towards the ground by guiding her left arm downward, where she then laid on her stomach. I moved her left hand behind her back and Ofc. Silvagni did the same with her

right. I placed her in handcuffs which were gauged and double locked.

Officer Silvagni asked her to roll onto her back so we could assist her to her feet. She responded by screaming, "I fucking can't, you fucking hurt me!". She did not clarify how or what was hurt. I did not observe any visible injuries and did not hear any further complaints of pain.

Why was the force necessary?

To effect an arrest of a resistive suspect who committed a felony assault on an officer. An assault that was completed by spitting on the officer during a pandemic.

Who screened the force and where?

Sgt. Campbell screened the force at the West Precinct.

ICV and/or BWV of UOF (Yes or No)? If no, why not? If Yes, verify it was uploaded and Flagged per Policy.
No vehicle for ICV. BWV was worn and activated.

Anything else noteworthy?
n/a

## Incident Location

• 14 Av S/Ranier Av S, Seattle, WA 98144 - Location of Occurrence: West - Precinct: K3 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Street Lights | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'0" – 5'3" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

 T█████ P███ S█████

DOB: ██/2020  Race: Black  Ethnicity:  Gender: Female

### Address
• 2411 SW 330th St, Federal Way, WA 98023

### Phone
• (206) 829-0762

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Resist Restraint/Control Hold See above.

**Injuries sustained by this citizen**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Ryan Beecroft - Serial: 30051535 - Badge Number: 7722
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B112/West Pct 2Nd W - D M Relief B112V/West Pct 2Nd W - D M Relief B112V

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Control Hold – Team Takedown - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Team Takedown | Yes | 6, D | 1, 2 |



### Injuries sustained by this officer

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Employee Witnesses

### Police Officer Michael Silvagni - Serial: 30051540 - Badge Number: 7727

**Video Footage:** Equipped - Activated

**Role**
• Primary Officer

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/10/2020 | 2020-261357 Type 1 UOF | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Ryan Beecroft |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/10/2020 2:45 PM |
| **Instructions from Police Officer Ryan Beecroft to Police Sergeant Ronald Campbell:** | |
| 2020-216357 Type 1 UOF | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____
Police Officer Ryan Beecroft - 30051535

EXHIBIT B(41)

## Seattle Police Department
## Level 1 - Use Of Force Report

**Incident Entered By:** Police Officer Michael Silvagni - 30051540

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/8/2020 | 9/7/2020 | 21:30 |
| **Record ID #** | **Case #** | **IA Pro Number** |
| 58063 | 2020-261357 | |
| **Date/Time Entered** | | |
| 9/8/2020 01:49 | | |

## Incident Summary

This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual, ordered by Sgt. CAMPBELL # 6693. I DO invoke my Garrity rights prior to giving this statement.
This statement is for (mark all that apply):

_X_ Complaint of Pain/Disorientation
__ Handcuffing Pain Only
__ Pointing a Firearm
__ NFDD (SWAT Only)

Summary of the incident/Legal Authority & Lawful Purpose:

*** BWC & DICV AVAILABLE***

This report is intended as a summary event. I have paraphrased conversations and do not include an exact sequencing of events. For any exact quotes or exact sequencing of events, I would refer the reader to my body worn camera, as it was activated and recording at the time of this incident.

On September 7, 2020, I was working uniform patrol for the Seattle Police Department, in the City of Seattle. I was in full uniform driving in a subdued police interceptor utility vehicle that was equipped with emergency lights and siren. I was working with the West Precinct Anti-Crime Team (ACT) designated as unit 192.

I was as a rapid deployment unit for a series of demonstrations that were scheduled to take place in the City of Seattle. The demonstrations were organized and coordinated on social media in relation to Labor Day and a belief that the demonstrators held that the work of Seattle Police Department Officers does not qualify (officers) for a labor union. The demonstrators plan as conveyed on social media, was to meet at the Seattle Police Officers Guild (SPOG) office and cause destruction or to possibly light the building on fire. Anarchists had attempted, the preceding few weeks, to ignite the Seattle Police Department's East Precinct and the SPOG office by throwing incendiary devices at the building. The primary incident number for the demonstration is 2020-261072.

After the initial demonstrations at the SPOG office, Officers broadcast needing additional resources near the intersection of 14 Ave S and Rainier Ave S, in dealing with a large hostile crowd. Upon arrival to the area of 14 Ave S and Rainier Ave S, at approximately 2056 hours. I exited my patrol car and almost immediately, I heard officers shouting for an individual to stop when I observed a male subject run near where I had parked my patrol vehicle. I heard the officers shouting for the male to stop and when he refused, I got in my patrol car so as to be able to follow the individual. The individual was apprehended a short distance away and I later learned that the subject was wanted for having assaulted an officer (See SPD case number 2020-261435).

While the individual was being taken into custody a group of female subjects ran to the scene where the suspect was taken into custody. I observed one of the female subjects, later identified as S███, T███████, P███ DOB ████-1999, to be highly emotionally charged and aggravated, at what I perceived to be as a result of the male subject having been arrested. S███ was behaving aggressively and continually charged the line that officers had formed as a barrier to prevent the crowd from encroaching on the officers, as the arrest and subsequent search was affected. S███ however, seemed intent on circumventing the line of officers in order to get close to the male subject. I observed S███ as she walked down the roadway and

obstructed vehicular traffic. S█████ was warned by officers, to include being warned by Officer CULBERTSON # 7662m to exit the roadway les she be subject to arrest.

S████ walked to the opposite side of the sidewalk, the west side of the scene, from where the main line of officers had formed and again was warned by Officer CLUBERTSON not to interfere or she may be subject to arrest. At that point, S█████ slapped Officer CULBERTSON's left hand. Officer BEECROFT # 7722 then, in an attempt to gain voluntary compliance from S█████, advised her that she needed to calm down (as she had just assaulted an officer) and indicated that continued aggression would lead to enforcement action.

At that time, S█████ shouted profanely at Officer BEECROFT and then intentionally gathered sputum from her mouth and spat, intentionally and specifically, on Officer BEECROFT. It is of note that this occurred during the COVID-19 pandemic wherein a highly contagious virus which is believed to be transmitted, in part, by droplets or particulates from an individual's nose or mouth. Additionally, it is noteworthy that Officer BEECROFT has health conditions that the Centers for Disease Control has listed as potentially placing him at an increased risk for serious consequences were, he to contract COVID-19.

At that time, Officer BEECROFT was standing on a public sidewalk, that is open to the public. Officer BEECROFT was in full uniform and clearly identifiable as a police officer. Probable cause for S█████'s arrest existed due to the fact that she had just assaulted Officers CULBERTSON and BEECROFT.


Description of the Type I force used:


After S███N had proven her intent was to assault officers, it was imperative for the safety of the other officers on scene to physically control S█████'s movements. After she spat on Officer Beecroft, my intent was to take her into custody for the assault. With my right hand I grabbed S█████ on her right arm, near her wrist. Officer BEECROFT had taken control of S█████'s left arm. S█████ immediately resisted. She was pulling her arms away, flexing her muscles in an apparent attempt to free herself. Officer BEECROFT was trying to gain physical control of S█████'s left arm, I had positioned myself so as to gain physical control of her right arm. However, S█████ was using her legs to build a strong base to continue her resistance to our control. At that point I heard Officer BEECROFT say to take S█████ to the ground. This is a commonly trained tactic to use the ground as a barrier to aid in officer's ability gain physical control. At that time, Officer BEECROFT and I conducted a controlled takedown of S█████ and lowered her to the ground, in a controlled manner. Both of S█████'s arms were then able to be brought behind her back for handcuffing. Officer BEECROFT was then able to place S█████ into handcuffs. The handcuffs were properly gauged and double locked to assure handcuffs did not tighten.

During this time, S█████ made no complaint(s) of pain.

While attempting to roll S█████ onto her backside, in order to assist her to a standing position, S█████ refused to comply. S█████ then made a complaint of pain or discomfort. At that point, Officer JONES # 6935, walked over and assisted S█████ to her feet.

S█████ was then escorted to the front of a patrol car where she was searched incident to her arrest.

Why was the force necessary?

Officers responded to the report of a hostile crowd near the intersection of 14 Ave S and Rainier Ave S, in the City of Seattle. Once there a member of this volatile crowd assaulted multiple officers. After giving multiple warnings and advisements, S█████ refused to comply with directions decided to become assaultive to officers. At that point no alternative to the force appeared to exist and based on S█████'s assault on officers, it was necessary for the safety of all involved to use the ground take her into custody thus preventing her from being able to continue her assaultive behavior and possibly injure officers.

Who screened the force and where?

Due to the hostile crowd, this incident was unable to be screened on scene. This incident screened at the West Precinct in the holding cell area by Sgt. CAMPBELL # 6693.

ICV of UOF (Yes or No)? If Yes, verify it was uploaded and Flagged per Policy. Note: Supervisors do not have review ICV for Type I Only reports.

Yes. DICV was activated at the time of this incident. I am equipped with BWC and it was activated. The video was uploaded.


Anything else noteworthy?
Not at this time.

## Incident Location

- 1200 S JACKSON St, Seattle, WA 98104 - Location of Occurrence: West - Precinct: K3 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Darkness | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| No | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'4" – 5'6" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information



DOB: ██/2020  Race: Black  Ethnicity:   Gender: Female

**Address**
- 2411 SW 330th St, Federal Way, WA 98023

**Phone**
- (206) 829-0762

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Resist Handcuffing
- Control Hold – Restraint
- Personal Weapons – Open Hand Strike
- Control Hold – Takedown

### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| Complaint of Pain Only | X | 1 |



**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Michael Silvagni - Serial: 30051540 - Badge Number: 7727
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 2Nd W B1122/West Pct 2Nd W - David Beats B112A/West Pct 2Nd W - David Beats B112A

**Video Footage:** Equipped - Activated

**Role**
- Secondary Officer

**Force used by this employee against the community member**
- Control Hold – Team Takedown - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Team Takedown | Yes | 3, 4, E, F | 1, 2, 3, 4 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

| No tasks to show |
|---|

## Running Sheet Entries

| No running sheet entries to show |
|---|

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/8/2020 | SWAN complaint of Pain -type I | docx |

## Assignment History

| Sent Dt | From | To |
|---|---|---|
|  |  |  |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Michael Silvagni |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/8/2020 2:00 AM |
| **Instructions from Police Officer Michael Silvagni to Police Sergeant Ronald Campbell:** | |
| SPD Offense 2020-261357 | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments: [Open routing] | |

**Author Signature Line**

_____

Police Officer Michael Silvagni - 30051540

EXHIBIT B(42)

## Seattle Police Department
## Level 2 - Use Of Force Report

**Incident Entered By:** Police Officer Kalin Todorov - 30050710

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 9/7/2020 | 9/7/2020 | 21:09 |

| Record ID # | Case # | IA Pro Number |
|---|---|---|
| 58057 | 2020-261423 | 2020UOF-1384 |

**Date/Time Entered**

9/7/2020 23:53

## Incident Summary

EVENT/GO#: 2020-261423
DATE OF OCCURRENCE: 9/7/2020
STATEMENT OF: K. TODOROV
This is a true and involuntary statement given by me in compliance with Section 8.400 of the Seattle Police Department manual order by Sgt Campbell. I DO invoke my Garrity rights prior to giving this statement.
Preface:
A. In-person supervisor screening: Yes
B. ICV/BWV recorded: ICV-not Equipped/ BWV-YES

DETAILED NARRATIVE: On 9/7/20 at approximately 2110 hours, I was working with the West Anti-Crime team as unit 192. I responded to 14 Ave S/ S Jackson St regarding a hostile crowd interfering with an SPD traffic stop. Units on scene were requesting additional officers and advised approximately 30-person group at 14 Ave S/ S Jackson St. Upon arrival I saw a shirtless white male running westbound on S Jackson St. I heard other officers shout "stop that man". Officer Culbertson ran after the suspect and placed him in custody. I caught up to Officers Culbertson in case he needed assistance.

While assisting Officer Culbertson, I saw a group of approximately 20 people running towards us. The crowd appeared hostile and shouted profanities. It appeared that the crowd was unhappy with arrest we had made. Other officers attempted to prevent the crowd from coming closer, but they appeared outnumbered. I joined a line of officers and assumed the role of scene security. Multiple people attempted to push through me in an attempted to interfere with the arrest. I was able to keep the crowd back and explain to them why they were not allowed to cross the police line.

A subject, later identified as arrested B████r, T█████ L (DOB: ████-82), began shouting at me from afar. B████ was shouting "I'll shoot your ass bitch" and "you can suck a dick". B████ then began walking briskly towards me while saying "move your ass out of my mother fucking way". I told █████ to go around and he entered a parking lot to the north. B████ pushed a "sawhorse" style barricade and continued yelling profanities.

B████ was approximately 20 feet away from me when he said, "I got a gun to shoot you bitch" and "do you want me to pull my gun out and shoot your ass?" B████ returned to my position, picked up the sawhorse barricade and threw it at me. The barricade was made of 2x4 lumber. The barricade struck the left side of my body after being thrown by B████ who began to walk away eastbound on S Jackson St. I ran after B████ and grabbed onto his backpack and arm. I told B████ to get on the ground while assisting him in a downwards motion. B████ sat down on his buttocks and began saying "I am sorry". The parking lot was covered with asphalt and I did not observe debris or rocks. I instructed B████ to put his arms behind his back once on the ground. B████ rolled on the ground and eventually relaxed his arms, allowing me to handcuff him. I gauged and double locked the handcuffs. B████ did not complain of pain at that time.

I stood B████ up and walked him to the prisoner transport van. I told B████ why he was under arrest and advised him of his Miranda warnings. I located a WA state ID for B████ in his backpack. I screened the arrest with Sgt Campbell prior to B████ being transported to the West PCT by prisoner processing.

I returned to the West PCT where Sgt Campbell informed me that B████ had a small abrasion/scrape to his left knee and right elbow. It was possible that the injury was sustained during the prone handcuffing.

ADDITIONAL INFORMATION: During the takedown, a grey sedan was in the parking lot next to where the arrest took place. I noticed that I made contact with the front passenger side while trying to effect the arrest. I made a note of the vehicle on my BWV. I intended to return to the sedan after handing arrested B███ to prisoner processing. However, the vehicle had left prior to me leaving a business card and copying down the license plate.

## Incident Location

- 1228 S Jackson St, Seattle, WA - Location of Occurrence: Demonstration - Precinct: K3 | KING | WEST

## Use of Force Specific Information

| Reason for Use of Force | Service Being Rendered | |
|---|---|---|
| Arrest | Demonstration | |
| **Weather Condition** | **Lighting Condition** | **Distance to Community Member** |
| Clear | Street Lights | 0 feet |
| **Community Member Injured** | **Community Member Taken to Hospital** | **Community Member Arrested** |
| Yes | No | Yes |
| **More than 1 Community Member Involved** | | |
| No | | |
| **Community Member's Build** | **Community Member's Height** | |
| 125-175 pounds | 5'10" – 6'0" | |
| **Employee Assessment of Community Member Condition During Incident** | | |
| Unimpaired | | |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | No | |

## Reporting/Involved Community Member Information

### T████ L B████ 

DOB: ███/1982   Race: Black   Ethnicity:   Gender: Male

**Address**
- 9061 Seward Park Av S, Seattle, WA 98118

**Phone**
- (206) 858-6430

**Role**
- Suspect

**Types of Resistance Community Member Used Against Employee(s)**
- Passive Noncompliance (including Verbal)

#### Injuries sustained by this citizen

| Injury | Regions | Injury Locations |
|---|---|---|
| Abrasion | 12, F | 1, 2 |



**Charges against this Community Member**
- Felony-Person Crime

## Involved Employees

### Police Officer Kalin Todorov - Serial: 30050710 - Badge Number: 7694
**Assignment at time of incident:** Title: Police Officer Chief of Police A000/Operations Bureau B100/West Pct B110/West Pct 3Rd W B113/West Pct 3Rd W - David B113D/West Pct 3Rd W - David B113D

**Video Footage:** [No Response]

**Role**
- Primary Officer

**Force used by this employee against the community member**
- Control Hold – Takedown - Was force effective: Yes

| Force Used | Effective? | Regions | Points of contact |
|---|---|---|---|
| Control Hold – Takedown | Yes | 5, 6 | 1, 2, 3 |



**Injuries sustained by this officer**

| Injury | Regions | Injury Locations |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Type |
|---|---|---|
| 9/8/2020 | type 2 UOF/ 12 Ave S/ S Jackson St | docx |

## Assignment History

| Sent Dt | From | To |
|---------|------|-----|
|         |      |     |

## Chain of Command History

| Routing #1 | |
|---|---|
| Sent From: | Police Officer Kalin Todorov |
| Sent To: | Police Lieutenant Seth Dietrich |
| CC: | (none) |
| Sent Date/Time: | 9/8/2020 2:20 AM |
| **Instructions from Police Officer Kalin Todorov to Police Lieutenant Seth Dietrich:** | |
| Type 2 UOF 12 Ave S/ S Jackson St | |
| **Comments/Response from Police Lieutenant Seth Dietrich:** | |
| Approved: Approved | |
| Reason: | |
| Comments:<br>Sgt Review | |

| Routing #2 | |
|---|---|
| Sent From: | Police Lieutenant Seth Dietrich |
| Sent To: | Police Sergeant Ronald Campbell |
| CC: | (none) |
| Sent Date/Time: | 9/9/2020 7:10 AM |
| **Instructions from Police Lieutenant Seth Dietrich to Police Sergeant Ronald Campbell:** | |
| Sgt Review | |
| **Comments/Response from Police Sergeant Ronald Campbell:** | |
| Approved: | |
| Reason: | |
| Comments:<br>[Open routing] | |

**Author Signature Line**

_____

Police Officer Kalin Todorov - 30050710

**Chain of Command Signature Lines**

_____

Police Lieutenant Seth Dietrich