HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLACK LIVES MATTER SEATTLE-KING
COUNTY, ABIE EKENEZAR, SHARON
SAKAMOTO, MURACO KYASHNA-
TOCHA, ALEXANDER WOLDEAB,
NATHALIE GRAHAM, AND
ALEXANDRA CHEN,

        Plaintiffs,

    v.

CITY OF SEATTLE, SEATTLE POLICE
DEPARTMENT,

        Defendant.

Case No.  2:20-cv-00887-RAJ

ORDER

## I.   INTRODUCTION

Four weapons and four protests.  This Order covers Seattle Police Department's use of four weapons (pepper spray, pepper balls, blast balls, and paintballs) during four protests (August 26, September 7, September 22, and September 23).  The Court's duty is simple: it must determine which uses were fair and which were in violation of the Court's preliminary injunction orders.

In their briefing, Plaintiffs raise a range of concerns, from general police conduct and demeanor to specific SPD tactics, such as the use of bicycles to move crowds from

ORDER – 1

location to location, the towing of protestor vehicles blocking roads, and the playing of loud country music during an arrest.  Plaintiffs contend that they included these details for context.  For clarity, however, the Court states here:  Those tactics were not and are not before this Court.  They were not part of the Court's temporary restraining order, and they are not part of the Court's operative preliminary injunctions.

To be sure, the protests were much more complex and dynamic than set forth in this Order.  Hundreds of protestors, dozens of police officers, and countless projectiles exchanged between them make it nearly impossible to render a comprehensive factual account.  And the evidence provided to this Court, though robust, is imperfect.  Still, despite the grey, the Court must determine by clear and convincing evidence whether the City violated this Court's previous orders and should thereby be held in contempt.

Having reviewed the parties' briefing and the relevant record and having heard oral argument, the Court **GRANTS in part** and **DENIES in part** Plaintiff's (Second) Motion for Order to Show Cause Why City of Seattle Should Not Be Held in Contempt, Dkt. # 114, and **HOLDS** the City in civil contempt for the specific violations of the preliminary injunction orders explained below.

## II.  BACKGROUND

### A.  Procedural History

In June of this year, Plaintiffs obtained a temporary restraining order against Defendant City of Seattle ("City").  Dkt. # 34.  Under that order, the City, Seattle Police Department ("SPD"), and its officers were enjoined from employing "chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations."  *Id.* at 11.  Some irritants and projectiles included CS gas (tear gas), OC spray (pepper spray), flash-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles (collectively, "less lethal weapons").  *Id.*  The order did not prevent officers from using such weapons in certain limited cases.  *Id.*  Days after it granted the temporary restraining order, this Court entered a stipulated preliminary

ORDER – 2

injunction with nearly identical terms.  Dkt. # 42.

A month later, after a confrontation between protestors and SPD on July 25, 2020, Plaintiffs moved for an order to show cause why the City should not be held in contempt of the preliminary injunction.  Dkt. # 51.  The Court set that matter for an evidentiary hearing, Dkt. # 88, 90, but the hearing did not take place.  Instead, the parties entered a stipulation, amending the previous preliminary injunction.  Dkt. # 109.  The amendment added certain protections for journalists, medics, and legal observers.  *Id.* at 3-4.  It also imposed additional obligations on SPD and additional limitations on its use of less lethal weapons.  *Id.* at 3-6.  The Court entered the amended preliminary injunction the day it was filed.  Dkt. # 110.  The original and amended preliminary injunctions are collectively referred to as the "Orders."  Dkt. ## 42, 110.

## B.      Second Contempt Motion

On September 30, 2020, Plaintiffs filed their second contempt motion.  Dkt. # 114. The motion is based on protests that occurred on August 26, September 7, September 22, and September 23 of this year.  *Id.* at 3-10.  Plaintiffs argue that on these days SPD deployed less lethal weapons in violation of the Orders.  *Id.* at 3.  Plaintiffs and the City agreed to forego an evidentiary hearing, asking the Court instead to consider the motion based entirely on written submissions without any live testimony.  Dkt. # 141 at 2.  The written submissions included scores of video evidence.  Both parties compiled their respective video evidence onto flash drives and submitted the flash drives to the Court. Dkt. ## 149, 154.

### i.    August 26, 2020 Protest

Many months ago, in early July, Summer Taylor was killed during a protest when a driver struck Taylor with his car.  Dkt. # 114 at 3.  On August 26, 2020, to commemorate Taylor's death, protestors held a vigil on a sidewalk outside the Washington State Patrol station near Roanoke Street and East Broadway.  Dkt. # 148 ¶ 16.  Gathering around a memorial, vigil attendees shared their feelings and a moment of

ORDER – 3

silence.  Dkt. # 116 ¶ 4.  To shield attendees from traffic, protestors formed a "car brigade" [1] behind them.  *Id.* ¶ 7; Dkt. # 134 ¶ 4.

According to SPD, however, the car brigade created several public safety hazards. The dozen or so vehicles in the brigade were parked in front of the Washington State Patrol station and the Seattle Fire station, blocking emergency vehicles from entering and exiting.  Dkt. # 148 ¶ 16.  The brigade also blocked a highway off-ramp, endangering motorists exiting the highway at high speeds.  *Id.*

SPD instructed the brigade drivers to move their vehicles and told them that, if they did not comply, their vehicles would be towed and impounded.  Dkt. # 145-1 Ex. A (8/26 Video) at 1:30 to 2:07.[2]  Shortly after, SPD moved into the street and formed a police line.  Dkt. # 116 ¶ 6; Dkt. # 148 ¶ 17.  The police line then advanced, pushing protestors with batons while chanting "move back."  Dkt. # 117 ¶ 8.  SPD pushed the protestors westbound.  Dkt. # 148 ¶ 17.  During the push, the protestors resisted, using umbrellas as shields and deploying "pyrotechnics" and "smoke devices."  *Id.*  One protestor was arrested for shining a laser pointer into an officer's eyes.  *Id.*  Other protestors tried to de-arrest the protestor with the laser pointer, prompting SPD to use OC spray on them.  *Id.*

Eventually, SPD steered the crowd north on Harvard Avenue.  Dkt. # 148 ¶ 20. There, an SPD officer observed a suspect throw "two spherical objects" at officers, which he thought could be explosive devices.  *Id.* ¶ 19.  In response, the officer threw a blast ball.  *Id.* ¶¶ 19-20.  The officer claimed that he tried to throw the blast ball towards the

---

[1]  Car brigades are when protestors form a barricade with their parked vehicles.  *See* Dkt. # 116 ¶ 7; Dkt. # 134 ¶ 4.

[2]  The City has provided three video compilations for the August 26, September 7, and September 23 protests.  Those compilations are attached to the declaration of Robert L. Christie as Exhibits A (8/26 protest), B (9/7 protest), and C (9/23 protest).  Dkt. # 145 ¶¶ 4-6; Dkt. # 145-1 at 1.  Throughout this Order, the Court refers to specific portions of those compilations and other video evidence.  Those references are in the following format—[hour]:[minute]:[second] or [minute]:[second].

ORDER – 4

protestor but that it accidentally bounced off another protestor's shield.  Dkt. # 146-1 at 4-5.

On the night of Summer Taylor's vigil, OC spray was used multiple times.  *See, e.g.*, Dkt. # 145-1 Ex. A (8/26 Video) at 1:12:23 to 1:12:40, 1:17:20 to 1:17:35.  In their brief, Plaintiffs assert that "a number of blast balls" were used that night.  Dkt. # 152 at 5; *see also* Dkt. # 134 ¶¶ 6-7.  But at oral argument the City represented that only one blast ball was used (the one discussed above), to which Plaintiffs did not object.

### ii.  September 7, 2020 Protest

On Labor Day, September 7, 2020, hundreds of protestors gathered at the light rail station in the International District.  Dkt. # 120 ¶ 3; Dkt. # 148 ¶ 22.  Calling for the abolishment of SPD's police union, the protestors marched south from the rail station to the Seattle Police Officers Guild ("SPOG") in SoDo.  Dkt. # 122 ¶ 3; Dkt. # 123 ¶ 7; Dkt. # 148 ¶ 22.  SPD monitored them and received reports that a member of the crowd possessed a Molotov cocktail.  *Id.* ¶ 23.

When the protestors reached the SPOG building, they formed a crowd at the head of an alleyway next to it.  Dkt. # 145-1 Ex. B (9/7 Video) at 4:21 to 8:15.  SPD spotted the Molotov cocktail suspect in the crowd.  Dkt. # 148 ¶ 25.  Dozens of SPD officers on bicycles emerged from the alleyway and stormed one side of the crowd to arrest the suspect.  *Id.* ¶ 25; Dkt. # 120 ¶ 10.  A melee broke out, protestors on one side and SPD on the other.  Dkt. # 145-1 Ex. B (9/7 Video) at 23:23 to 25:33.  Protestors threw projectiles, discharged a fire extinguisher, and hid behind makeshift shields and umbrellas.  Dkt. # 120 ¶ 10.  SPD threw blast balls, used OC spray, and made several arrests.  *Id.*

SPD then pushed the crowd north, where the conflict continued.  Dkt. # 148 ¶ 26.  During their retreat, several protestors saw SPD use less lethal weapons, including OC spray, blast balls, and a pepper ball gun.  Based on their observations, they thought the deployments were random and unprovoked.  *See, e.g.*, Dkt. # 116 ¶¶ 47-48; Dkt. # 117 ¶¶ 23-27; Dkt. # 122 ¶¶ 12-18.  SPD said it used these weapons, however, because

ORDER – 5

protestors were throwing projectiles at officers, such as rocks, bottles, improvised explosive devices, and smoke grenades. Dkt. # 148 ¶ 26. One protestor, from deep within a crowd, even threw a lit Molotov cocktail. *Id.* ¶ 27. It nearly hit Plaintiff Alexandra Chen and another protestor before exploding in the street and setting a portion of the street on fire. Dkt. # 145-1 Ex. B (9/7 Video) at 56:50 to 57:55. After the protest ended, SPD recovered a box of 12 unlit Molotov cocktails. *Id.* ¶ 28; Dkt. # 145-1 at 46-48.

In total, SPD used three less lethal weapons that day: OC spray, blast balls, and pepper balls.

### iii. September 22, 2020 Protest

On the evening of September 22, 2020, after Seattle City Council voted to cut SPD's budget, a small group of protestors gathered in Capitol Hill. Dkt. # 132 ¶ 4. They were calling for the defunding and abolishing of SPD. *Id.*

SPD used vehicles to direct the protestors north on 12th Avenue, away from the SPD East Precinct. Dkt. # 148 ¶ 30. Surrounding the protestors, SPD vehicles directed protestors from behind, and further up the street there were SPD vehicles driving backwards in front of the protestors. Dkt. # 131 ¶ 7. SPD turned on their lights and sirens, and pedestrian traffic was limited. *Id.* ¶¶ 4-6. After a few blocks, the protestors reversed course and headed south, back to the East Precinct. Dkt. # 148 ¶ 30. Protestors shined strobe lights into the SPD vehicles in front of them; one even shined a laser-pointer. *Id.* ¶ 31; *see also id.* Ex. F. They pounded on the windows of one vehicle and "used lit cigarettes to damage the hood." *Id.* ¶ 31. SPD warned the protestors not to interfere with the vehicles, which they ignored. *Id.* ¶¶ 31-32.

Nearing the East Precinct, Lieutenant John Brooks ordered another officer to use a blast ball "to create separation" between the officers and crowd once they reached the intersection in front of the precinct. Dkt. # 148 ¶ 32; *see also id.* Exs. E & F. The officer who received the command was on a bicycle. *Id.* Ex. E. She rode to and parked at the

ORDER – 6

corner of the intersection, waiting for the crowd and SPD vehicles to catch up. *Id.* When the protestors reached the middle of the intersection, they were feet away from an SPD vehicle. *Id.* The bicycle officer then deployed a blast ball in the middle of the crowd, which exploded and caused the protestors to turn into another street. *Id.*

SPD justified its use of the blast ball on public safety grounds. It said that the strobe lights shined into SPD vehicles created an "obvious hazard for the driver," who was driving in reverse. Dkt. # 148 ¶ 33. Only a few of the many protestors had or used strobe lights that night. *Id.* Ex. F.

In total, only one less lethal weapon was used, a single blast ball.

### iv. September 23, 2020 Protest

Breonna Taylor was an African-American woman who, earlier this year, was shot and killed in her apartment by police officers in Louisville, Kentucky. On September 23, 2020, a grand jury decided not to charge any officer for her death, prompting several protests in Seattle later that evening. Dkt. # 117 ¶ 34; Dkt. # 122 ¶ 23; Dkt. # 133 ¶ 3; Dkt. # 139 ¶¶ 5, 7. Of the protests, Plaintiffs' motion focuses only on the one held at Cal Anderson Park in Capitol Hill, just down the street from the SPD East Precinct. Dkt. # 114 at 9-10.

The Cal Anderson Park protest began at 7:00 p.m. Dkt. # 139 ¶ 5. For hours, SPD monitored the protestors as they marched about Capitol Hill and as some protestors vandalized property and threw objects at police. *Id.* ¶¶ 10-22. Eventually, the crowd of protestors settled at 11th Avenue and East Pine Street (the southeast corner of Cal Anderson Park and a block away from the East Precinct). *Id.* ¶ 22. SPD monitored the crowd from a distance. *Id.* But soon after, a protestor threw a firework into the East Precinct, where officers were present. *Id.* ¶ 23-24; Dkt. # 117 ¶ 41.

Officers identified the protestor who threw the firework and tried to arrest him. Dkt. # 139 ¶ 25. In their attempt, officers on bicycle, on foot, and in vehicles left the East Precinct, pursued the protestor, and maneuvered into the crowd at 11th Avenue and East

ORDER – 7

Pine Street.  Dkt. # 145-1 Ex. C (9/23 Video) at 14:47 to 24:29.  Some protestors threw objects at officers, and some officers sprayed protestors with OC spray.  *Id.*  Afterwards, SPD retreated to the East Precinct.  Dkt. # 139 ¶¶ 26, 29.  During that retreat, an officer was hit in the head with a bat.  *Id.* ¶ 28; *see infra* Section IV.C.ii.1

SPD monitored the protest from its new position.  *Id.* ¶ 26.  Not long after, several protestors started a fire in the middle of the road, between the officers at the East Precinct and the crowd at 11th Avenue and East Pine Street.  *Id.* ¶ 29; Dkt. # 120 ¶ 37; Dkt. # 133 ¶ 10.  The fire grew, as did SPD's concern for the safety of surrounding businesses and residences.  Dkt. # 139 ¶ 29.  SPD re-engaged the crowd and ordered them to disperse. *Id.* ¶¶ 29-30.  Like the previous engagement, several protestors threw objects at SPD, and SPD responded with OC spray and blast balls.  Dkt. # 145-1 Ex. C (9/23 Video) at 31:30 to 32:15.

For more than an hour, SPD pushed the crowd back and steered protestors throughout the Capitol Hill neighborhood.  Dkt. # 139 ¶¶ 31-38; Dkt. # 122 ¶¶ 34, 41-42. During that push, SPD used OC spray, blast balls, and paintballs, while protestors threw rocks, fireworks, improvised explosive devices, and other projectiles.  The constant that night: SPD's throwing of blast balls and protestors' throwing of projectiles.  *See, e.g.*, Dkt. # 145-1 Ex. C (9/23 Video) at 1:11:55 to 1:13:25.

In total, SPD used three less lethal weapons that evening: OC spray, blast balls, and paintballs.

### III.  LEGAL STANDARD

Civil contempt occurs when a party disobeys a "specific and definite court order" by "fail[ing] to take all reasonable steps within the party's power to comply."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  "A court has wide latitude in determining whether there has been contemptuous defiance of its order."  *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984).

A party alleging civil contempt must establish that the other party (1) violated a

ORDER – 8

court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.  *Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (citing *Dual-Deck*, 10 F.3d at 695).  As to "substantial compliance," if a violating party has taken "all reasonable steps" to comply with an order, then "technical or inadvertent violations" will not support a civil contempt finding.  *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).  And regarding the "clear and convincing" evidentiary standard, it is higher than the preponderance of the evidence standard but less stringent than beyond a reasonable doubt.  *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989).

## IV.  DISCUSSION

### A.    *Monell*

The City argues that the Court must not only apply the traditional civil contempt analysis; it says that the Court must also apply the municipal liability analysis articulated in *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Dkt. # 144 at 4-5.  According to the City, just as a municipality cannot be held *liable* for the actions of an individual tortfeasor, it cannot be held in *contempt* for the actions of an individual tortfeasor.  *Id.*  In effect, the City asks the Court to fuse the civil contempt analysis with *Monell*.

The City's approach, though novel and innovative, is nowhere to be found in the "well-settled" civil contempt case law.  *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (holding that the "standard for finding a party in civil contempt is well-settled").  Moreover, whether an individual officer's actions may be fairly imputed to the City is not at issue.  Both Orders—stipulated to by the City—provide that the City "including the *Seattle Police Department and any other officers*" are enjoined by the terms of the Orders.  Dkt. # 42 at 2 (emphasis added); *see also* Dkt. # 110 at 3.  Thus, the City has already agreed that violations by individual officers are nonetheless violations of

ORDER – 9

the Orders.  For these reasons, *Monell* does not apply.

## B.    Preliminary Injunction Orders

Two questions are before this Court: (1) whether the City violated the Orders and (2) if so, whether those violations were beyond substantial compliance and not based on a good faith and reasonable interpretation.  Plaintiffs must answer those questions in the affirmative by clear and convincing evidence.  For clarity, the Court will first summarize the terms of the Orders and then resolve those two questions.

### i.   Preliminary Injunction

Under the Stipulated Order Entering a Preliminary Injunction, SPD and its officers are enjoined from using less lethal weapons against "persons peacefully engaging in protests or demonstrations."  Dkt. # 42 ¶ 1.  But individual officers are not enjoined from taking "*necessary*, *reasonable*, *proportional*, and *targeted* action to protect against a specific *imminent threat of physical harm* to themselves or identifiable others or to respond to *specific acts of violence or destruction* of property."  *Id.* (emphasis added).  Put differently, if an officer uses a less lethal weapon, then the use must be necessary, reasonable, proportional, and targeted.  *Id.*  And the use is only justified if it is to protect against a specific imminent threat of harm or to respond to acts of violence or destruction. *Id.*

### ii.  Amended Preliminary Injunction

The Stipulated Clarification of Preliminary Injunction adds several new terms to the initial preliminary injunction.  Dkt. # 110.  Only a few are relevant here.

Some new terms address specific SPD tactics, such as "re-routing" protests.  SPD and its officers are enjoined from using less lethal weapons to re-route a protest, unless re-routing is "necessary to prevent specific imminent threat of physical harm to themselves or identifiable others, or to respond to specific acts of violence or destruction of property."  *Id.*  ¶ 6(1)(a).

Other terms impose additional obligations on SPD and its officers and further

ORDER – 10

restrict their use of less lethal weapons.  For example, SPD and its officers are enjoined from using less lethal weapons without, when feasible, first issuing a warning.  *Id.* ¶ 6(1)(b).  Further, if they use less lethal weapons in accordance with the Orders, they must not deploy the weapons "indiscriminately into a crowd."  *Id.* ¶ 6(7).

Finally, some terms address the use of certain less lethal weapons.  Specifically, the City shall not be liable under either preliminary injunction order "if blast balls are used for reasons consistent with th[e Orders] but directed to an open space near the target individual(s) rather than at individuals."  *Id.* ¶ 6(5).

In sum, the Orders—stipulated to by both parties—outline the circumstances and manner in which less lethal weapons may be used.  To determine if the City is in contempt, the Court must compare SPD's actual deployments against the terms of the Orders.

### C.    Violation of the Orders

Four less lethal weapons were used during the protests: pepper balls, paintballs, OC spray, and blast balls.  The Court analyzes SPD's deployment of each weapon in turn.

#### i.    Pepper Balls & Paintballs

The FN 303 is a "pressurized launcher that fires a .68 caliber 8.5[-]gram polystyrene projectile."  Dkt. # 146-4 at 14.  The projectile is filled with either yellow paint or "powdered O.C."  Dkt. # 146-2 at 8.  Put more plainly, the FN 303 shoots balls filled with paint or pepper powder.  The weapon is covered under the Orders, which specifically apply to "pepper balls" and "projectiles of any kind."  Dkt. # 42 ¶ 1.  SPD fired the FN 303 on only two of the four protests, September 7 and September 23.

During the September 7 protest, a female protestor holding a large traffic cone in each hand ran towards officers.  Dkt. # 146-2 at 8-10.  One officer, carrying an FN 303 loaded with pepper balls, noticed the protestor and believed that she posed a threat.  *Id.* The protestor threw one of the cones at a different officer, and as she prepared to throw the other, the officer carrying the FN 303 fired five pepper ball rounds at her.  *Id.*; *see*

ORDER – 11

*also* Dkt. # 145-1 Ex. B (9/7 Video) at 42:45 to 44:11; Dkt. # 120 ¶ 16 at 0:38 to 0:46. Based on the officer's observations, all five rounds hit her. *See* Dkt. # 146-2 at 10-11.

Similarly, on September 23, SPD fired yellow paintballs at a protestor threatening officers with a broken umbrella, the fabric having been ripped away and the metal ribs twirling about freely. Dkt. # 146-4 at 14-15. The protestor taunted and threatened the officers with the umbrella by raising it to the officers' eye level. *Id.* As SPD pushed the crowd back, the protestor with the umbrella again raised it inches away from an officer's head. *Id.* That officer tried to seize the umbrella, but the protestor clung to it and fell. *Id.* When the protestor fell, a different officer, carrying an FN 303 with yellow paintballs, fired five rounds at the protestor. *Id.* The protestor released the umbrella and retreated. *Id.*; *see also* Dkt. # 145-1 Ex. C (9/23 Video) at 56:00 to 59:20. Based on the officer's observations, all five rounds hit the protestor. *See* Dkt. # 146-4 at 15-17.

Clearly, these two deployments are compliant with the Orders. On both occasions, the protestors posed a "specific imminent threat of physical harm" to officers. Dkt. # 42 ¶ 1. One officer claimed that the traffic cone "could have struck [officers] in the head, face or other body part" and could have "injure[d] [or] incapacitate[d]" them. Dkt. # 146-2 at 10. The other officer said that the umbrella's "multiple sharp rigid [ribs] could [have] cause[d] serious injury, especially to the face." Dkt. # 146-4 at 15. Plaintiffs do not suggest that these threats lack credibility or that they were insufficiently grave. Also, on both occasions, the officer's actions were "necessary, reasonable, proportional, and targeted." Dkt. # 42 ¶ 1. Stopping an assault on other officers was reasonable and necessary. Striking only the protestors posing a threat, and no others, was targeted. And firing only as many rounds as necessary to disable the threat, as the officers did, was proportional.

Thus, SPD's deployment of pepper balls and paintballs on September 7 and September 23 complied with the Orders.

ORDER – 12

### ii. OC Spray

Pepper spray ("oleoresin capsicum" or "OC" spray) is a less lethal weapon covered by the Orders. Dkt. # 42 ¶ 1. It was deployed on several occasions during the August 26, September 7, and September 23 protests. Exactly how many times it was deployed the parties do not say. They also do not say whether every use of OC spray has been captured by their declarations and video evidence or whether some uses have been missed or omitted. The Court can only evaluate the evidence presented to it. And it has indeed reviewed every declaration and video evidence submitted. But the Court will not be able to account for every single use of OC spray on those days, to the extent those uses have not been included in the parties' submissions.

Based on the evidence available, the Court has identified one clear violation of the Orders. The Court has also found one use that was clearly compliant with the Orders. The Court refers to uses such as these as a "compliant uses." The remaining uses are arguable and are therefore not "clear and convincing" violations.

### (1) Compliant Use

On September 23, a protestor hit a retreating officer in the back of the head with a metal baseball bat; the officer deployed OC spray in response. Dkt. # 145-1 Ex. C (9/23 Video) at 25:20 to 27:09. This was a compliant use. The video evidence is clear and convincing that, immediately before the attack, an officer riding a bicycle was retreating to an SPD line formation. *Id.* He fell off his bicycle, and a protestor threw a traffic cone at him and another tried to grab his bicycle. *Id.* While the officer was distracted, a third protestor approached from behind, stepped forward, and struck the officer with a full swing to the back of the head with the bat. *Id.*; *see also* Dkt. # 145-1 at 27. The officer sprayed these three protestors before fleeing. Dkt. # 145-1 Ex. C (9/23 Video) at 25:20 to 27:09.[3] This use was plainly permitted by the Orders. The officer was "respond[ing] to

---

[3] Before this incident, the officer deployed OC spray a few other times. Dkt. # 145-1 Ex. C (9/23 Video) at 25:20 to 25:52. These earlier sprays and their surrounding context are

ORDER – 13

1    specific acts of violence" against him or, at the very least, "specific imminent threat[s]"
2    of harm.  Dkt. # 42 ¶ 1.  And given that he had just been assaulted and that he sprayed
3    those attacking him, his actions were necessary, reasonable, proportional, and targeted.
4    *Id.*

5         During his retreat, the officer also sprayed protestors apparently uninvolved in his
6    attack.  Dkt. # 145-1 Ex. C (9/23 Video) at 26:15 to 26:27.  After he was hit with the bat
7    and after he sprayed his three attackers, the officer rushed back to the police line
8    formation, dragging his bicycle in one hand and holding his OC cannister in the other.
9    *Id.* at 26:30 to 26:47.  He ran into a few protestors who were standing between him and
10   the police line formation.  *Id.*  These protestors did not appear to be involved in his
11   attack, yet the officer briefly sprayed them as he passed by before reaching the police
12   line.  *Id.* 26:15 to 26:27.

13        The Court neither condones nor endorses the use of less lethal weapons on random
14   protestors who pose no risk of imminent physical harm.  But given the extreme
15   circumstances presented here, the Court must find this deployment permissible.  The
16   officer was under a "specific imminent threat of physical harm" when he sprayed the
17   unrelated protestors.  Dkt. # 42 ¶ 1.  He had just been attacked by three different
18   protestors and had just been hit in the head with a baseball bat.  During that incident,
19   nearby protestors were approaching him.  Dkt. # 145-1 Ex. C (9/23 Video) at 25:20 to
20   27:09.  Once he fled, the officer was still under a threat—the threat that protestors in the
21   vicinity, even unrelated protestors like the ones here, might also attack.  That threat was
22   legitimate.  Further, the officer's brief deployment was not excessive.  He sprayed the
23   unrelated protestors only until he reached the police line, and then he stopped.  The Court
24   finds that, under these specific circumstances, there was no violation of the Orders.

25
26
     ─────────────────
27   poorly documented.  Therefore, they fall under the "remaining uses" category explained
     in Section IV.C.ii.3 *infra*.
28   ORDER – 14

### (2) Violation

On the other hand, the Court has identified one clear violation of the Orders.  On September 7, while officers were pushing protestors away from SPOG, an officer on a bicycle rode up behind several retreating protestors.  Dkt. # 145-1 Ex. B (9/7 Video) at 26:40 to 26:55.  The protestors were moving northbound as instructed.  *Id.*  Yet, for no apparent reason, the officer sprayed them in the face with OC spray.  *Id.*  This was a plain violation of the Orders.  There was no specific imminent threat of physical harm.  Because the officer approached from behind, the protestors had their backs facing the officer at the time.  Dkt. # 145-1 Ex. B (9/7 Video) at 26:40 to 26:55.  At no time was the officer under attack or under threat of attack.  *Id.*  Therefore, his use of OC spray was unnecessary, unreasonable, and disproportionate.  Dkt. # 42 ¶ 1.  The Court further notes that the officer did not account for this use in his use of force report.  Dkt. # 146-2 at 281-84.  That the entire incident was brief and that the discharge of OC spray was minimal are irrelevant.  It was a prohibited and needless action under the Orders.

### (3) Remaining Uses

All other OC spray deployments before this Court are too close to call.  The Court refers to these as "remaining uses."  Some deployments are poorly documented; the Court cannot see what SPD was responding to.  For example, during the September 7 protest, once SPD charged the crowd of protestors in front of SPOG to arrest the Molotov cocktail suspect, a melee broke out.  *See, e.g.*, Dkt. # 145-1 Ex. B (9/7 Video) at 23:23 to 25:33.  During that melee, several officers sprayed protestors with OC spray.  *Id.* at 24:45 to 24:58.  Exactly what threat each officer was responding to is unclear, and the parties do not say.  Given the dynamic and chaotic nature of the melee, even the best available evidence (body worn video footage of officers inside the melee) is unhelpful and inconclusive.  *See id.* at 49:15 to 49:51, 55:39 to 56:40.  Some footage for other deployments share similar deficiencies.  Plaintiffs have the burden of showing that the City violated the Orders using evidence that is clear and convincing: for uses such as

ORDER – 15

these, where the evidence is unhelpful and inconclusive, that burden is not met.

Not all OC spray uses, however, were shrouded by chaos. Some uses are well-documented, and the Court has adequate context to identify and assess both threat and response.

Plaintiff Alexandra Chen, for example, was sprayed with OC spray during the September 7 protest. For that incident, the Court has footage from the perspective of both Ms. Chen and the officer that sprayed her. Dkt. # 145-1 Ex. B (9/7 Video) at 23:23 to 25:33. Both accounts reveal that, during SPD's initial charge of the crowd, one officer began establishing a police line formation. *Id.* The officer repeatedly commanded the protestors to move back. *Id.* Ms. Chen initially complied. *Id.* A different protestor, however, ignored the command and approached the police line to film the officers. *Id.* The officer who yelled at protestors to move back sprayed the encroaching protestor who then retreated and fell. *Id.* Several other protestors, including Ms. Chen, rushed to that protestor. *Id.* Although Ms. Chen's efforts could be considered rendering aide, she was nonetheless disobeying the officer's command to move back. *Id.* The officer moved forward and forced the protestors even farther back. *Id.* Ms. Chen, with both hands on her phone, was filming the officer as she retreated slowly. *Id.* The officer then sprayed her with OC spray. *Id.* The officer also sprayed another protestor behind her because that protestor was throwing an object at the officer. *Id.*

Unlike the melee footage, this use of OC spray is clear; the Court can see what the officer was responding to. But what is not clear is whether, all things considered, Ms. Chen posed a "specific imminent threat of physical harm" at the time. Dkt. # 42 ¶ 1. The Court doubts that she did. At no time did Ms. Chen threaten the officer with harm. In fact, Ms. Chen retreated at first, as instructed, and announced to the officer that she was moving backwards. And throughout the whole incident both her hands were visibly gripping her phone.

That said, the Court must be mindful of the circumstances: The protestor who

ORDER – 16

encroached on the officers just disobeyed the officer's loud and continuous commands to move back.  Once that protestor was sprayed and on the ground, Ms. Chen also disobeyed the officer's command by rushing towards the downed protestor.  When Ms. Chen rose, she was slow to comply with the officer's repeated commands to move back.  What is more, the exchange between Ms. Chen and the officer did not occur in a vacuum.  Behind the officer was a melee between SPD and protestors—OC spray, fire extinguishers, makeshift shields, projectiles, and all.  Behind Ms. Chen was a different protestor throwing an object at the officer.  In isolation, the Court doubts that Ms. Chen posed an imminent threat of harm.  In context, reasonable minds could disagree when considering the totality of the circumstances at the time of discharge.

This incident is like many others, in which it is unclear whether an officer at the time of deployment was facing "a specific imminent threat of physical harm" or responding to "specific acts of violence or destruction of property."  Dkt. # 42 ¶ 1.  The examples are plenty.  *See, e.g.*, Dkt. # 145-1 Ex. A (8/26 Video) at 1:17:20 to 1:17:35 (depicting officer using OC spray on protestor who refused to move back and who grabbed another officer's baton); *id.* at 1:12:15 to 1:12:50 (depicting officers using OC spray while trying to arrest a protestor who shined a laser pointer at officers); Dkt. # 119 ¶ 3 (8/26 Video) at 20:00 to 20:50 (same but from protestors' perspective); Dkt. # 145-1 Ex. B (9/7 Video) at 30:20 to 30:33 (depicting officers using OC spray on protestors rushing to de-arrest other protestors).

In these cases, whether an officer was under a "specific imminent threat of harm" or "responding to a specific act of violence" is unclear.  The threat from a protestor who rushes to de-arrest another or the threat from a protestor who refuses to move back despite an officer's commands is arguable.  *See* Dkt. # 148 ¶ 10 (explaining dangers of de-arrest tactics).  Arguable is not the standard.  Plaintiff has the burden to prove a violation of the Orders by clear and convincing evidence.  For these remaining uses, the Plaintiffs fail to meet that burden.

ORDER – 17

To be clear, the circumstances above do not automatically authorize use of OC spray. True, they are not clear and convincing violations. But that does not make them *compliant uses* all the same. The Court's holding is limited to the facts presented in this motion. The Court provides no bright-line rule for any future uses of OC spray, which, if challenged, must be resolved on a case-by-case basis.

### iii. Blast Balls

Blast balls are a "light and sound diversion device." Dkt. # 148 ¶ 7. When they explode they emit sound, heat, light, and OC powder. Dkt. # 146-2 at 92, 104. At oral argument, the City represented that the deployment of blast balls is not a perfect science. They are not perfectly round, which limits their precision, and they can bounce unpredictably. *See, e.g*., Dkt. # 146-1 at 4. They were used on all four days of protests.

Of the less lethal weapons, the Court is most concerned about SPD's use of blast balls, the most indiscriminate of the four. As explained below, SPD has often hurled blast balls into crowds of protestors. In many cases, the accuracy of these baseball-style throws is suspect. And when blast balls explode, they explode in all directions and kick OC powder in the air. Given their indiscriminate nature, blast balls pose a greater collateral danger to peaceful protestors than, for example, the FN 303 launcher. For those reasons, independent from the determinations below, the City should take special care to ensure that any future blast ball uses adhere to the Orders.

In any event, based on the available evidence of blast ball usage, the Court has identified one compliant use and several violations of the Orders. As explained in the previous section, the remaining uses are arguable and are therefore not "clear and convincing" violations.

### (1) Compliant Use

On September 7, while SPD pushed protestors north and away from SPOG, throngs of protestors hurried along a sidewalk. Dkt. # 145-1 Ex. B (9/7 Video) at 56:50 to 57:55. From deep within the crowd, a protestor launched a Molotov cocktail at

ORDER – 18

officers riding their bicycles in the middle of the street.  *Id.*  The Molotov cocktail nearly hit Ms. Chen, who was walking in the street at the time, before shattering and setting the asphalt on fire.  *Id.*  In response, SPD deployed several blast balls.  *Id.* at 33:30 to 34:10, 56:50 to 57:55.  They deployed the blast balls next to the sidewalk, near the protestors but still on the street.  *Id.*  As a result, the protestors turned east when they reached an intersection.  *Id.*  One of the officers who threw a blast ball claimed that she was ordered by Lieutenant Brooks to use blast balls to "continue pushing the crowd" and to steer them eastward.  Dkt. # 146-2 at 43.

These blast ball uses were clearly permitted by the Orders.[4]  They were used in response to a "specific act[] of violence."  Dkt. # 42 ¶ 1.  Molotov cocktails pose a grave danger,[5] and the use of one towards officers or protestors is no doubt a violent act. Further, the magnitude of harm presented by a Molotov cocktail made blast balls "necessary, reasonable, [and] proportional" to prevent future harm.  *Id.*  The officers threw the blast balls in the direction of the protestor who threw the Molotov cocktail, making their deployments also "targeted."  *Id.*

Although the blast balls do not appear to have been deployed specifically at the Molotov cocktail thrower, they were "directed to an open space near the target individual[]," which is permitted under the Orders.  Dkt. # 110 ¶ 6(5).  SPD threw the blast balls in an open area on the street, next to a crowd of protestors who were primarily on the sidewalk.  Based on the evidence, the Molotov cocktail thrower was likely in or near that crowd.  Finally, even though less lethal weapons may not usually be used to "re-

---

[4]  Though these uses may comply with the Orders, the Court makes no determination on whether they comply with SPD's own training manuals or policies.  The parties have not provided such evidence or argument to the Court.
[5]  "Molotov cocktails can cause significant property damage, substantial injury, or death. They can cause a person's clothing to burn, and, if one hits a person on their head or shoulder, the smoke is capable of blocking their airways before the fire can be extinguished.  They are also inaccurate and, if thrown, may not hit their intended target. Debris from inside the bottle can also escape mid-air, posing additional hazards to those nearby."  Dkt. # 148 ¶ 12

ORDER – 19

route" a protest, SPD may do so when necessary to prevent harm or to respond to specific acts of violence, as was the case here.  *Id.* ¶ 6(1)(a).  Thus, this was a clear compliant use.

### (2) Violations

By contrast, the Court has found three clear violations of the Orders.  The violations can be divided into two categories: throwing blast balls indiscriminately into a crowd and using blast balls to "create space" without any threat of imminent harm.

On at least two separate occasions, officers have thrown blast balls indiscriminately into crowds.  During the September 7 protest, on the push north, protestors lined across an intersection.  Dkt. # 145-1 Ex. B (9/7 Video) at 27:55 to 28:40.  SPD formed their own line several feet opposite the protestors.  *Id.*  When one officer rode up on a bicycle and stopped several feet behind the police line, a glass shattered.  *Id.*  He asked another officer, "Who threw it?" to which another officer responded, "I don't know."  *Id.*  A third officer threw a blast ball overhand to the front of the protestor line.  *Id.*  The officer who asked who threw the glass dismounted his bicycle and threw a blast ball deep into the crowd of protestors.  *Id.*  He threw the blast ball at a different area than the officer who first threw a blast ball.  *Id.*  He did not account for this use in his use of force report.  Dkt. # 146-2 at 281-84.

Weeks later at the September 23 protest, while SPD pushed protestors throughout Capitol Hill, one officer was walking several rows back from the front of the police line.  Dkt. # 145-1 Ex. C (9/23 Video) at 49:15 to 50:10.  He grabbed a blast ball and then threw it overhand into a crowd of protestors.  *Id.*  At the time, he was behind several rows of officers.  *Id.*  When he threw the ball, he immediately turned around to retrieve his bicycle and because of that, his body worn video footage does not reveal where the blast ball exploded.  *Id.*  He did not account for this use in his use of force report.  Dkt. # 146-4 at 128-38.

Under the Orders, officers may use less lethal weapons in certain circumstances.  Dkt. # 42 ¶ 1.  But even when those circumstances are met, SPD must not deploy the

ORDER – 20

weapons "indiscriminately into a crowd." Dkt. # 110 ¶ 6(7).  Here, blast ball uses could have been justified as a response to a specific imminent threat.  Though the Court does not know for sure because, in both cases, the footage is limited.  But even if they were justified, they were plain violations of the command that less lethal weapons should not be deployed indiscriminately into a crowd.

On September 7, the officer who threw the blast ball did not know which protestor threw the glass.  Yet he threw a blast ball into a crowd of protestors anyway.  That throw was not sufficiently targeted to nullify a threat—the source of which the officer did not know.  In fact, when he threw the blast ball, he did not throw it at the same spot as the officer who just threw a blast ball right before him, again betraying that he did not know the source of the threat.  Thus, this was an indiscriminate deployment into a crowd.

On September 23, the officer who threw the blast ball threw it in a crowd of protestors and immediately turned around.  This demonstrates a clear lack of care for where the blast ball landed.  Any threat of harm or violence that this officer was responding to was not *targeted* in any meaningful way.  This too was an indiscriminate deployment into a crowd.

In both cases, the officers stood a great distance from protestors, used overhand throws, and threw blast balls deep into a crowd.  These indiscriminate deployments were thus clear violations of the Orders.

Indiscriminate deployment aside, SPD has also used blast balls to "create separation," absent any specific threat of imminent harm.  The Court has found two such instances, one on September 22 and another on September 23.

As explained above, during a march through Capitol Hill on September 22, Dkt. # 132 ¶¶ 4-9, SPD vehicles trailed protestors from the front and back, Dkt. # 131 ¶ 7.  Driving in reverse, the SPD vehicles in front of the protestors trailed the protestors closely.  *See, e.g.*, Dkt. # 148 Exs. E & F.  The protestors shined lights into the vehicles in front of them.  *Id.*; Dkt. # 148 ¶ 31, Ex. F.  Lieutenant John Brooks ordered a bicycle

ORDER – 21

officer to deploy a blast ball when the protestors reached the intersection near the East Precinct. *Id.* ¶ 33, Ex. E at 0:19 to 0:30. As instructed, the bicycle officer threw a blast ball in the middle of the crowd. *Id.* Ex. E at 0:36 to 1:30. The protestors then moved away from the SPD vehicle. *Id.* SPD claims that the strobe lights created an "obvious hazard for the driver" and that the blast ball was used to "create separation between officers and the crowd." *Id.* ¶¶ 32, 33.

The need for "separation" is not an authorized basis to use less lethal weapons under the Orders. *See* Dkt. ## 42, 110. Thus, SPD must show that it was under a specific imminent threat of physical harm when it deployed the blast ball. *Id.* Based on the evidence, it cannot.

On September 22, there was no apparent physical threat to officers. At most, the protestors pounded on windows, stood in the way of vehicles, and used "lit cigarettes to damage the hood" of a vehicle. Dkt. # 148 ¶ 31. The City's claim that protestors' strobe lights created an "obvious hazard for the driver" is simply not credible. Dkt. # 148 ¶ 33. Though the strobe lights may have been a nuisance, they posed no serious threat to the SPD vehicles or officers. First, only a few of the many protestors had strobe lights, and at times they were several yards away, leaving much of the officers' field of view unobscured. Second, because the SPD vehicles had their sirens and lights on, pedestrian traffic appeared to yield to them. Given that the vehicles were crawling in reverse at walking speed, any traffic hazard was thus greatly diminished. Under those circumstances, the hazard to the driver was insignificant and did not justify the use of a blast ball. SPD's claimed threat of imminent harm is unconvincing, and its use of a blast ball was disproportional.

### (3) Remaining Uses

For all other uses, the Court has insufficient evidence. Most officers claim that they used blast balls to stop certain protestors from throwing objects at police. *See, e.g.*, Dkt. # 146-1 at 4-5 (8/26 protest) (explaining that officer threw blast ball at protestor who

ORDER – 22

threw two items towards officers); Dkt. # 146-2 at 2-3 (9/7 protest) (same but protestors throwing rocks); Dkt. # 146-4 (9/23 protest) (same but protestors throwing glass bottles and "other miscellaneous projectiles").

These officer accounts are generally credible. That many protestors have tried to pelt officers with projectiles is indisputable, and the list of projectiles is long: water bottles, glass bottles, Molotov cocktails, improvised explosive devices, fireworks, rocks, and more. *See, e.g.*, Dkt. # 145-1 Ex. B (9/7 Video) at 24:28 to 24:32; *id.* at 36:40 to 37:05 (rock); *id.* at 52:20 to 52:55 (improvised explosive device); *id.* at 56:10 to 56:35 (water bottle and improvised explosive device); *id.* at 56:55 to 57:33 (Molotov cocktail); *id.* at 1:03:45 to 1:03:55 (firework); Dkt. # 145-1 Ex. C (9/23 Video) at 18:30 to 18:40 (glass bottle); *id.* at 21:25 to 21:35 (glass bottle); *id.* at 37:30 to 37:40; *id.* at 1:11:55 to 1:12:25 (improvised explosive device); *id.* at 1:13:00 to 1:13:20 (firework). Based on the video evidence, these do not appear to be isolated incidents.

But for most blast ball uses, it is unclear what *specific* threat a given officer was responding to. *See, e.g.*, Dkt. # 145-1 Ex. B (9/7 Video) at 1:01:30 to 1:03:00 (depicting officers throwing blast balls after rocks were thrown at them); Dkt. # 145-1 Ex. C (9/23 Video) at 31:30 to 32:15 (depicting several blast balls after protestors in a crowd threw objects). For example, on August 26, one blast ball was deployed. The officer who threw the blast ball claimed that a protestor threw two "unidentifiable spherical items" towards officers and that, in response, he tried to throw a blast ball at the protestor. Dkt. # 146-1 at 4. Plaintiffs say that the officer's justification in his use of force report is "plainly inconsistent with video evidence." Dkt. # 152 at 5. The video evidence, however, is inconclusive. Dkt. # 145-1 Ex. A (8/26 Video) at 41:15 to 42:07. Because the body worn camera was not mounted at eye level and because the protest occurred at night, it is hard to know whether the officer indeed saw a protestor throwing projectiles. This incident is paradigmatic of the remaining blast ball uses where the evidence falls short. *See, e.g.*, Dkt. # 145-1 Ex. C (9/23 Video) at 42:00 to 44:30.

ORDER – 23

Without sufficient evidence, the Court cannot assess the degree of threat that an officer was under when a blast ball was deployed and therefore cannot determine if the use was necessary, reasonable, proportional, and targeted. Again, Plaintiffs have the burden of showing that the City violated the Orders by clear and convincing evidence. For most blast ball uses, the evidence is simply neither clear nor convincing, so Plaintiffs fail to meet their burden.

The Court's previous admonition on OC spray applies equally to blast balls: Although these remaining blast ball uses are not clear violations, they are also not clearly *compliant* with the Orders. The Court's holding is limited to the facts presented in this motion. And the Court provides no bright-line rule for any future blast ball uses.

In all, Plaintiffs have demonstrated four violations of the Orders by clear and convincing evidence: one OC spray violation and three blast ball violations. All other examples that they have raised do not meet that bar. To that extent, this prong is met.

## D.   Substantial Compliance

"'Substantial compliance' with [a] court order . . . is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).

For the clear violations above, Plaintiffs have shown that the City violated the Orders beyond substantial compliance. First, the clear violations were not necessarily "few" in number. In total, there were four. And those are only the violations that were presented to this Court. As Plaintiffs argue, many blast balls were used at the September 23 protest (at oral argument, the City estimated around 30), yet the City has not provided body worn video footage for many of these deployments. Dkt. # 152 at 5-6. Of course, the Court cannot say for sure how many of these unaccounted-for blast ball uses would have been compliant uses, clear violations, or remaining uses. And the Court will not

engage in speculation. But the Court notes that the four clear violations here do not include the unaccounted-for blast ball uses on September 23.

Second, the violations were not "technical violations." The violations above are clear, in part, because they fundamentally defy the Court's Orders and the purpose behind them. They were not at the boundary, overstepping ever so slightly or "technically." They violated the substantive terms of the Orders by a clear and convincing margin.

Surely, compared to its uses of less lethal weapons earlier this year when this action was first brought, SPD's uses at these four protests appear to be more restrained. Deployments generally appear to be more targeted and proportional than before. And SPD on its own volition has informed its officers of this Court's orders on multiple occasions. Under the amended preliminary injunction, the City had to distribute a copy of the order to all SPD officers via email within 24 hours of entry, which it did. Dkt. # 110 ¶ 6(6); Dkt. # 112. But the City has gone beyond that. Before each shift in which officers are expected to provide crowd control management, SPD holds mandatory briefings, reminding officers of the contents of the Orders and their duty to follow them. Dkt. # 148 ¶¶ 3, 14; Dkt. # 147-1 at 20. Further, SPD has not used tear gas of any kind on any of the four protests. Dkt. # 148 ¶ 35.

But the Court cannot ignore the clear violations above. Substantial compliance shields a party from a few technical violations when that party has made every reasonable effort to comply with a court order. Again, the violations here are not technical; they are substantive. And the City has not shown that it has made every reasonable effort to comply.

Some might say that four clear violations—out of four days of protests and countless uses of less lethal weapons—must surely be insufficient to "vitiate" the City's otherwise substantial compliance. But this is misguided. The relevant comparison is not between the four clear violations and every single deployment. (For most deployments, the Court lacks sufficient basis to deem them either a compliant use or a violation.) For

ORDER – 25

substantial compliance, the appropriate comparison must be between the times the City was compliant[6] and the times it was not compliant.  On that score, the Court has found that the City was clearly in compliance with the Orders four times and was clearly not in compliance with the Orders four times.  Put that way, the four clear violations are significant and must be given their due weight.  For those reasons, this prong is met.

### E.    Good Faith and Reasonable Interpretation

In the civil contempt context, contempt need not be willful, and there is no good faith exception.  *Dual-Deck*, 10 F.3d 693 at 695.  But a party should not be held in contempt if its actions appear to be "based on a good faith and reasonable interpretation" of a court's order.  *Id.* (quoting *Vertex*, 689 F.2d at 889).

Like substantial compliance, the clear violations above are clear, in part, because they plainly violate the text of the Orders.  No good faith or reasonable interpretation could bring such violations under the Orders' ambit.  For example, no good faith or reasonable interpretation of the phrase "[less lethal weapons] shall not be deployed indiscriminately into a crowd," Dkt. # 110 ¶ 6(7), could save the City from indiscriminate deployments of blast balls into crowds, *see supra* Section IV.C.iii.2.  The same is true for the remaining violations.  Thus, for the clear violations, Plaintiffs have met their burden for this prong.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[6]  As explained above, the Court has identified four uses that comply with the Orders: the two uses of the FN 303, the use of OC spray when the officer was hit in the head with a bat, and the use of blast balls to re-route protestors after a Molotov cocktail was thrown.

## V.   CONCLUSION

For the reasons stated above, Plaintiff's (Second) Motion for Order to Show Cause Why City of Seattle Should Not Be Held in Contempt is **GRANTED in part** and **DENIED in part**.  Dkt. # 114.  Based on the submissions of the parties, the Court **HOLDS** the City in civil contempt for the reasons stated above.  Now that the City is held in contempt, the Court must determine the appropriate sanction.  To that end, Plaintiffs shall submit a brief and proposed order explaining their proposed sanction. That brief shall not exceed six pages and shall be filed on or before December 11, 2020. Defendants may file a response brief, not to exceed six pages, and a proposed order on or before December 18, 2020.

DATED this 7th day of December, 2020.

_Richard A Jones_

The Honorable Richard A. Jones
United States District Judge

ORDER – 27