1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____

4                              )
     BLACK LIVES MATTER          ) C20-00887-RAJ
5    SEATTLE-KING COUNTY,        )
                                 ) SEATTLE, WASHINGTON
6              Plaintiffs,       )
                                 ) November 18, 2020
7    v.                          )
                                 ) 9:00 a.m.
8    CITY OF SEATTLE,            )
                                 ) Status Hearing
9              Defendant.        ) Held by Zoom.Gov
                                 )
10                               )
    _____

11

12          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE RICHARD A. JONES
           UNITED STATES DISTRICT JUDGE
13   _____

14

15   APPEARANCES:

16

17    For the Plaintiffs:    Rachel Ayn Smith Haney
                             Perkins Coie
18                           1201 3rd Avenue
                             Suite 4900
19                           Seattle, WA 98101

20                           Lisa Nowlin
                             ACLU of Washington
21                           901 Fifth Avenue
                             Suite 630
22                           Seattle, WA 98111

23                           Robert Chang
                             Ronald A. Peterson Law Clinic
24                           Seattle University School of Law
                             1112 E. Columbia Street
25                           Seattle, WA 98122

1    For the Defendant:       Ghazal Sharifi
                              Seattle City Attorney's Office
2                             701 Fifth Avenue
                              Suite 2050
3                             Seattle, WA  98104

4                             Robert L. Christie
                              Thomas P. Miller
5                             Christie Law Group PLLC
                              2100 Westlake Avenue North
6                             Suite 206
                              Seattle, WA 98109
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          THE CLERK:  Thank you, Your Honor.  We are here in

3    the matter of Black Lives Matter Seattle King County, et al.,

4    v. City of Seattle, Cause No. C20-887, assigned to this

5    court.  If counsel, first for the plaintiffs, could please

6    make your appearances for the record.

7          MS. NOWLIN:  Yes, Your Honor.  Lisa Nowlin for the

8    ACLU of Washington, for plaintiff.

9          THE COURT:  Good morning.

10         THE CLERK:  And counsel for defendants, if you could

11   please make your appearances for the record.

12      Mr. Christie, you are muted.

13         MR. CHRISTIE:  Good morning, Your Honor, Bob Christie

14   on behalf of the City of Seattle.

15         THE COURT:  Good morning to you as well.

16         MR. MILLER:  Tom Miller on behalf of the City of

17   Seattle.

18         THE COURT:  Good morning.

19         MS. SHARIFI:  Good morning, Your Honor, Ghazal

20   Sharifi on behalf of the City.  And I believe Mr. Chang and

21   Ms. Haney are also here for the plaintiffs.

22         THE CLERK:  Your Honor, we're also joined by our

23   court reporter, Debbie Zurn.

24         THE COURT:  All right.  With that, good morning,

25   everyone.  We are here on the plaintiffs' motion for contempt

1    for alleged violations of the court's preliminary injunction

2    on the dates of August 26th, September 7th, September 22nd

3    and September 23rd.

4        In the last hearing before the court, the court clarified

5    that I was treating the plaintiffs' motion in a bifurcated

6    manner.  Today we ask the question and assess the question of

7    whether or not the violations occurred.  Separate and apart,

8    if the court finds that such violations occurred, then we

9    address sanctions.

10        Now, I don't want anyone to get their hopes up high that

11    at the conclusion of today's proceedings that I'm going to

12    rule from the bench.  The reason we set this hearing was to

13    give you the opportunity to make your oral argument and

14    clarify issues, and those are of great value for the court in

15    making its final determinations.

16        I do expect, however, to get an order out in a relatively

17    short amount of time, in just a few days.  But I want to

18    clarify what you can expect and what you should not be

19    expecting.

20        I would also like to give some guidance to the parties,

21    especially for the plaintiffs, where to focus your argument.

22    And by that I mean, identify the specific provision of the

23    order alleged to have been violated, and connect that to the

24    claim of contempt.

25        Now, I also want you to understand that this court sees a

1  distinction between what issues are before this court and

2  those of the consent decree litigation before the Honorable

3  James Robart.

4      Now, the standard the court will apply in these

5  proceedings is whether or not clear and convincing evidence

6  has been presented to demonstrate the City violated a

7  specific and definite order of the court.  The case authority

8  for that is *FTC v. Affordable Media*, 179 F3d at 1228, Ninth

9  Circuit 1999.

10      For the benefit of those joining in, I want you to

11  understand that the parties have agreed that this motion may

12  be heard on the basis of declarations and video evidence from

13  a variety of sources.  That means there will be no live

14  testimony.  And that's by agreement of the parties.

15      I do, however, wish to thank the parties, after some

16  encouragement from the court, on resubmitting the videos on

17  two separate flash drives.  That made it much easier for the

18  court to navigate the high volume of materials submitted for

19  the court.

20      I also want to clarify at the beginning that while you may

21  believe when you submitted the videos that they were crystal

22  clear, some were clear, some were not.  And to be honest, on

23  some of the videos I felt like I was in an instant-replay

24  booth, trying to make a determination and making the right

25  call on a particular play.  But nonetheless, the court gave

1  its best effort in reviewing all the evidence that you

2  submitted to make sure I have a clear understanding of the

3  context and arguments that you will be making.

4      Now, several lawyers appear today. And I received

5  advanced warning that only two will be making argument on

6  behalf of the motion. It's my understanding that Lisa Nowlin

7  will be arguing on behalf of the plaintiffs, and Bob Christie

8  will be arguing on behalf of the defendants.

9      It's no problem with this court if another lawyer from

10 your position needs to address a particularized issue. Just

11 make sure you let the court know, and for the benefit of the

12 court reporter, also clarify when and at what point that's

13 taking place; and certainly as a courtesy to the court, ask

14 the court for permission before you engage in that process.

15     So, let's begin. Counsel for the plaintiffs, as you know,

16 whether it's by my reputation or having been before the court

17 in the past on this motion, I start this process not by

18 giving you the opportunity to begin speaking, but with my

19 asking a lot of questions. And that practice is not going to

20 be varied from today. And usually by the time I get finished

21 asking all the questions that I like to have answered,

22 there's not much more that the parties wish to add; but

23 that's not to suggest that you won't have a full opportunity

24 to make your case to the court. But I want you to know we'll

25 begin by my asking some questions.

1    Now, my first question, Ms. Nowlin, is that -- and this is

2    from the defendant's briefing -- is that the defendants

3    contend you take issue in the contempt motion with police

4    conduct in general, officer demeanor, use of bikes to move

5    crowds, police tactics to move crowds from location to

6    location, and the decision to not allow cars to block roads

7    and music played by SPOG members.  For the court reporter

8    that's S-P-O-G.  The defendants take issue with these

9    allegations, because they contend they were not governed by

10   the court order, or constitute excessive force.

11       So, Ms. Nowlin, how would you wish to respond to that

12   argument made by the defense in this case?

13       MS. NOWLIN:  Thank you, Your Honor.  Yes, a lot of

14   those issues are not before the court right now, and were

15   submitted to the court to add context to what was happening

16   when the less-lethal weapon was used.  But we do agree that

17   only the deployment of less-lethal weapons are before the

18   court in this contempt motion.

19       THE COURT:  The next question is, over the four days

20   of protests which specific uses of crowd-control weapons were

21   the most egregious -- in other words, the ones which most

22   plainly violate the preliminary injunction -- and why

23   shouldn't the court view these merely as a few technical

24   violations?

25       Now, I don't want you to think that I'm referring to

1  anything as a technical violation, it's actually language

2  that comes out of a Ninth Circuit opinion.  So I want to give

3  you the benefit of responding to just narrowing down or

4  focusing on the most egregious ones that plainly violate the

5  court's preliminary injunction.

6        MS. NOWLIN:  Yes.  Thank you, Your Honor.  We're not

7  talking about a single incident or a rogue officer, we're

8  talking about multiple instances over multiple days.  And so

9  I'll start with September 23rd.  First of all, the City has

10  not provided a lot -- any justification for several of these

11  blast balls.  So there were at least 25 blast balls deployed

12  on September 23rd.  The City did not provide body-worn video

13  for 22 of them, despite the use-of-force reports making it

14  clear that they do have the body-worn video for at least 18

15  of them.

16        So the City provided over an hour and a half of evidence

17  on that day, including body-worn video for 11 officers, but

18  in its list of evidence submitted, lists no video evidence

19  relating to the use of blast balls on September 23rd.

20        Some of those blast-ball deployments from September 23rd

21  are mentioned in the use-of-force reports with no

22  corresponding explanation.  For example, Officer West says he

23  threw five blast balls that day, but gives no explanation for

24  two of them.  And an unnamed officer says they threw one at

25  midnight, but gives no further explanation.  So right there

1    there are three blast balls, where the City has given no

2    explanation for why they were used.  There's no video and

3    there's explanation in the use-of-force report, and the City

4    does not address it in its response.

5        On August 26th you see video of pepper spray being used

6    and officers there saying that they're using it simply to

7    move the crowd.  For example, one officer explains in the

8    use-of-force report -- and this is at ECF 146-1 at page 49 --

9    that, "When police move forward and tell the crowd to move

10   back, common sense would indicate by now that the crowd

11   should move back or there are consequences.  Before I sprayed

12   OC I yelled at the shield bearers to move back as well."

13   That's a clear violation.  And it is not in response to a

14   specific imminent threat of harm, but simply too move people

15   back.

16       Similarly, the City's response is that people were sprayed

17   for engaging in physical resistance with officers moving the

18   crowd, and the videos show that this just means that the

19   protestors weren't moving as quickly as the officers wanted

20   them to.

21       On September 7th, the only justification the City provides

22   for sending 50 bike officers and 30 foot officers out of

23   hiding to ambush a peaceful crowd without warning, was to

24   arrest one person who they heard had a Molotov cocktail.  And

25   police cars simultaneously drove up to the south part of the

1    street to block it off.  There was immediate mayhem, and OC

2    spray was deployed, as were blast balls.  This is clear

3    violation of the order, that this peaceful protest was

4    immediately dispersed and met with less-lethal weapons.

5         Police sprayed plaintiff Chen for failing to move back.

6    And the video clearly shows that she was not a threat.  She

7    was filming what was happening.  She was moving back.  And

8    they don't allege that she was a threat, they only allege

9    that she failed to move back.

10        In that same video you see another protestor filming the

11   police, several feet away, moving back, and also gets pepper

12   sprayed.  Again, the police do not allege that this person

13   was a threat, only that they were failing to move back.

14        THE COURT:  Just to make sure, counsel, I think the

15   second protestor you're referring to is a woman wearing all

16   black, and I think she has a red cell phone.  Is that the

17   same person?

18        MS. NOWLIN:  I think so.  It is the first person that

19   you see pepper sprayed in that video, and it's the one that

20   plaintiff Chen goes to assist, to help up, shortly before she

21   is pepper sprayed as well.

22        THE COURT:  And Chen has the white cell phone?

23        MS. NOWLIN:  I don't recall the color of the cell

24   phone, Your Honor.  But I think the City does identify

25   plaintiff Chen in the video.

1        THE COURT:  Okay.

2        MS. NOWLIN:  There were blast balls that were also

3   used just to move people back.  And, you know, additional

4   pepper spray on the video for September 7, at the 26 minute

5   48 second mark, you see Sergeant Didier ride his bike up

6   behind people and spray them from behind, for no reason.  And

7   that is also a clear violation.  These people did not pose a

8   specific imminent threat of harm; and, in fact, were

9   attempting to retreat.  And this continues for several

10  minutes in the video where you see multiple retreating

11  protestors being pepper sprayed.

12       You also see blast balls being used on September 7, simply

13  to move protestors back.  Sergeant Didier, again, used at

14  least three, as he explained in his use-of-force report, to

15  move the crowd.  On the video at the 46 minute, 40 second

16  mark, you see an officer in the lower corner also throw a

17  blast ball into the crowd.  And this is at the south end of

18  the protests.  So the group has been divided into two parts.

19  You see the sprays and the blast balls from Sergeant Didier

20  on the north end.  This is on the south end where a blast

21  ball, again, is just thrown into the crowd for no reason.

22       And in the use-of-force report Officer Fleck says she used

23  a blast ball, "To continue pushing the crowd."  These are not

24  specific imminent threats of harm that would justify the use

25  of blast balls and pepper spray under this court's order.

1    Another clear example is September 22nd.  That blast ball

2  was thrown into the crowd.  The crowd was, you know, a crowd

3  of approximately 40 people that had marched from the precinct

4  up 12th Avenue to John and back.  They were flanked on all

5  sides by patrol cars.  And there is no allegation that there

6  was an immediate threat of harm, other than the fact that the

7  crowd was just nearing the precinct.

8    Lieutenant Brooks ordered an officer to throw a blast ball

9  into the crowd to, quote, create space between the protestors

10  and patrol cars.  This is a violation for a number of

11  reasons.  Again, there was not a specific imminent threat of

12  harm.  This is not a necessary, reasonable, proportional and

13  targeted response.  And it was also not a decision made by

14  the individual officer, but was, in fact, ordered by a

15  superior officer.

16    On September 23rd, some of the clear violations -- in

17  addition to the blast balls that we have no explanation for

18  from the City -- are the use-of-force reports saying that

19  blast balls were thrown to keep protestors from organizing a

20  shield wall, and to move a crowd.  And these are ECF 146-4,

21  at 165 and 88.

22    Another use-of-force report says that the officers

23  continued to move the crowd with munitions, when necessary.

24  And another says the use of blast balls was necessary because

25  there was no other feasible method to move the crowd.  Again,

1  these less-lethal weapons, these explosives and pepper spray,

2  were being used simply to move people.

3      And another incident on September 23rd in the use-of-force

4  report, a man with a skateboard was pepper sprayed simply for

5  crouching behind a bus.  And the use-of-force report -- and

6  this is ECF 146-4, at 155, the officer writes, "As I broke

7  the plane of the bus, I extended my OC canister and yelled

8  'move back,' and deployed OC at the suspect."

9      Also on that day protestors were pushing a dumpster in the

10  road and hiding behind it and that's why the officer threw a

11  blast ball at them.  And this is also at ECF 146-4 at

12  page 48.

13      Again, in all of these situations, OC spray and blast

14  balls were used not because these people were specific

15  imminent threats of harm, but in the officer's own words,

16  simply to move people or because they were hiding.

17      So I think, Your Honor, those are some of what we think

18  are the clearest violations.  I can provide more if you'd

19  like.  But it's fairly undisputed what the facts are in those

20  situations, and that they are clear violations.

21          THE COURT:  My next question, counsel, and I want to

22  talk about the concept of substantial compliance.  So I'll

23  need help from both parties.

24      Let me give you a little bit of background.  I've seen

25  cases where substantial compliance is part of the plaintiffs'

1     burden of proof. And I'll give you an example out of the

2     case of *Labor Community Strategy Center*, 564 F3d 1115, a

3     Ninth Circuit case, 2009. That case involved a consent

4     decree on load-factor targets. And in enunciating its

5     opinion, the court started going through what the

6     requirements were to establish substantial compliance.

7        And the first factor is that the plaintiff has to, or the

8     moving party has to show that there was a violation of the

9     order. The very next element that they identify is that the

10    violation was beyond substantial compliance. So, in that

11    case it states and suggests that that's the plaintiffs'

12    burden of proof.

13        Now, on the other hand, there have been cases where they

14    characterize substantial compliance as a defense. For

15    example, in In Re: *Dual-Deck Video Cassette Recorder*

16    Antitrust Litigation, that's found at 10 F3d 693, a Ninth

17    Circuit opinion, 1993, in that court's analysis, substantial

18    compliance with the court order is a defense to civil

19    contempt and is not vitiated by a few technical violations,

20    where every reasonable effort has been made to comply.

21        So my question is -- or to put it differently, is

22    substantial compliance an element of the Black Lives movement

23    case in chief, or is it a defense raised by the City where

24    the burden is shifted to them?

25          MS. NOWLIN: Your Honor, I believe the City in their

1    response said that -- they cited *Balla v. Idaho State Board*

2    *of Corrections*, and said that substantial compliance is a

3    defense in an action for civil contempt.

4            THE COURT:  Right.

5            MS. NOWLIN:  So by the City's own acknowledgment, it

6    is a defense.  I'd also say that I think either way here, I

7    don't think it impacts the outcome of this case, in that the

8    City is arguing actually 100 percent compliance.  They are

9    arguing that none of their actions are out of compliance with

10   the PI.  And that's clearly not the case.

11       And I would also argue that they have not substantially

12   complied.  I think the credit that they get for all the

13   instances that they don't deploy less-lethal weapons against

14   protestors is very limited.  And we've now seen five

15   occasions, if you include our first motion for contempt,

16   where these less-lethal weapons were deployed against

17   peaceful protestors.  And, again, it's not a rogue officer,

18   it's not -- with the exception of September 22nd -- a single

19   deployment.  These are numerous deployments over these days.

20       And the City continues to maintain that they are in full

21   compliance with the PI, and that they have not made any

22   changes in response to these violations of the order.

23           THE COURT:  I have another question, counsel.  And

24   that is, it's helpful for me to have a clear idea of what

25   your interpretation of the phrase, "Necessary, reasonable,

1  proportional and targeted action to protect against a

2  specific imminent threat of physical harm to themselves or

3  identifiable others, or respond to specific acts of violence

4  or destruction of property."

5      This is language that comes out of the order that the

6  court signed, the injunctive relief.  So, I'd like to get

7  your interpretation of what that means.  It was agreed to by

8  plaintiffs and defendants.  But if you give me context of how

9  you envision those circumstances to be present that would

10 justify that type of action being taken by law enforcement.

11      MS. NOWLIN:  Yes, Your Honor.  I think as an initial

12 matter, each use of force has to be all of those things.  It

13 has to be necessary.  It also has to be reasonable.  It also

14 has to be proportional.  And it also has to be targeted.  And

15 those words were chosen, because at the beginning of the

16 summer we saw these weapons being deployed in a manner that

17 was unnecessary, unreasonable, disproportionate and

18 indiscriminate.

19      And so taking each one that, you know -- or maybe it's

20 useful to give examples, right?

21      So, if there's somebody that throws a plastic water

22 bottle, right, or an empty plastic water bottle at the

23 police, we don't condone that behavior.  But responding with

24 a blast ball does not seem necessary.  It does not seem

25 reasonable, especially when the blast ball is into the entire

 1  crowd, right?  And it doesn't seem proportionate.  It's a

 2  disproportionate response to that act.  And it's also not

 3  targeted.  It impacts people in a very large radius, many of

 4  whom are peaceful.

 5      So the goal with these is to have responses that are

 6  proportional, necessary, and specific to the person who is

 7  causing that harm.

 8      And there are some instances of that, that I think the

 9  City may have identified, right?  But there are -- that is

10  heavily outweighed by the number where that is not the case.

11          THE COURT:  Let me ask you this, counsel.  We're

12  dealing with this in a vacuum.  I want to put it back in the

13  street.  You're a law enforcement officer, and you have the

14  protestors, as some of the video has demonstrated clearly,

15  and have you seen any examples where you believe an officer

16  has engaged in good faith and reasonable interpretation of

17  the circumstances to justify or warrant the use of blast

18  balls or other type of chemical weapons?

19          MS. NOWLIN:  Your Honor, I think there were some

20  instances in the videos, right, where there were people who

21  were clearly causing harm; and those people were addressed

22  specifically.  And, you know, I'd say I think some of those

23  are still a gray area.  I wouldn't say that it's, you know,

24  fully in compliance.  But it's much closer, right, that you

25  see somebody throwing a rock and the officers go to arrest

1    that single person, right?  The officers have other tools

2    besides less-lethal weapons, as well, to engage with these

3    people.

4         And so if you're targeting that person, then maybe the use

5    of OC spray could be justified in that instance.  But here,

6    you know, there are so many clear examples that we don't need

7    to get into that.  There are clear examples of these weapons

8    being used, simply because people aren't moving back, or

9    they're too close to the officers, or they're hiding from the

10   officers.

11        THE COURT:  Now, let's -- when you say hiding from

12   the officers, because you gave an example earlier where you

13   suggested an officer came upon someone who was hiding behind

14   a garbage bin, or some type of bin of some sort.  Would an

15   officer be justified in those circumstances to use any type

16   of device or equipment to control or respond to that person's

17   conduct?

18        MS. NOWLIN:  I think we would need to know a little

19   bit more information.  The information in the use-of-force

20   report is limited.  But hiding is not a specific imminent

21   threat of harm or violence.  And so I'm not sure what the

22   officer's goal in that moment is.  But, you know, if the

23   person is simply hiding, then, Your Honor, I would say no.

24        THE COURT:  Let's go -- counsel, you started off

25   going into some of the dates.  I want to drill down a little

1    bit more on some of those dates.  So let's begin with the

2    August 26, 2020 protest.  I want to start with a little bit

3    of context before I ask the question.

4        Officer Claxton said that he threw the blast ball because

5    a protestor threw two unidentified items toward the officers.

6    He says he threw it at the protestor.  Now, that's Officer

7    Claxton's representation.

8        Now, if we assume that Officer Claxton indeed observed the

9    protestor throwing things at the police, does Black Lives

10   Matter believe that Officer Claxton's deployment of a blast

11   ball on August 26, 2020 was not a necessary and reasonable,

12   proportional and targeted action?

13       MS. NOWLIN:  Yes, Your Honor, I think that is

14   correct.

15       If you watch that video, there is a large huddle of

16   protestors retreating.  And so that blast ball was thrown

17   into that entire group, right?  These were people who were at

18   a peaceful vigil, and were suddenly being moved back without

19   warning.  And the dispersal order was issued just moments

20   before that.  And so I think it is not proportional or

21   targeted, right?  So, you see in that video there are other

22   instances where the officers are able to target the

23   individuals that are causing harm, right?  So earlier in the

24   video you see the officers arrest a single person that had

25   been shining a laser pointer, without using a blast ball.

1    This is not necessary, reasonable, proportional and

2    targeted to OC spray the entire group as they're retreating,

3    because one person threw a rock.

4         THE COURT:  Now, in the last question we assumed that

5    it was true that Officer Claxton had observed the protestor

6    throwing things.  And, again, I say "assumed" because this is

7    one of those videos that wasn't the best lighting for the

8    court to be able to make an assessment, and that's why I made

9    the analogy of being in an instant replay box, because you

10   don't have the best footage from any source to be able to see

11   exactly what's going on.

12   But, if officers are, in fact, being pelted by projectiles

13   thrown by protestors, and let's say that that protestor

14   happens to be in a group of individuals, and let's say that

15   that protestor is deeper into the crowd -- in other words if

16   there's ten rows of protestors in a group, or a lot more rows

17   than that, but just say in the middle of the beginning rows,

18   and that section behind the group of umbrellas, starts to

19   throw rocks over the protective shields, law enforcement

20   officers can't necessarily see behind those umbrellas, or see

21   the specific individuals.  What's your position in terms of

22   the ability of the officers to respond and what equipment

23   would they be entitled to use, would that be including blast

24   balls?

25        MS. NOWLIN:  Your Honor, I agree that that's a harder

1    question.  I don't think that's what we saw on August 26th,

2    and I don't think that's what we saw on the other days as

3    well.  The City points on September 23rd to a lot of items

4    being thrown.  But they don't actually attempt to connect any

5    of the deployments of blast balls or pepper spray to those

6    actions.

7        But to your question, you know, I think the officers are

8    obliged to try other tactics first, right?  They're trying to

9    protect people; and that includes the other protestors who

10   are retreating.  And so, yes, there might be a situation

11   where that would be warranted, the use of a blast ball.  But

12   that's not what we're looking at here.

13           THE COURT:  Then can you think of any situation where

14   the officer would be entitled to use a blast ball?

15           MS. NOWLIN:  I mean, I think it's a really high bar,

16   Your Honor.  It's called a less-lethal weapon for a reason.

17   When they're supposed to use it, they're supposed to throw it

18   in an underhand manner, and into an empty space, if possible.

19   And that's also not how it's being used.  So it's not about

20   the entitlement to be able to use it, but how it's used.

21       So, Your Honor, I find it very difficult to think of a

22   situation where it's justified to throw an explosive full of

23   pepper spray into a crowd of people.

24           THE COURT:  How about an open space?  Is that

25   permitted?

1    MS. NOWLIN:  I think that is more permissible in the

2    scenario that Your Honor offered where there's rocks being

3    thrown, and it's hard to identify the person, then, maybe.

4    And I think that that is definitely preferable than being

5    thrown into the open crowd.

6    THE COURT:  What about if an individual is a couple

7    rows back and the officer is trying to get there, can the

8    officer throw one of these blast balls, if they see and are

9    throwing it in the direction of the individual throwing the

10   projectile?

11   MS. NOWLIN:  I would ask what the goal of the blast

12   ball is in that moment?  Is it to punish the person that

13   threw the item?  Is it to deter?  Is it to -- what is the

14   goal?  And it's not clear to me what that is.

15   THE COURT:  Let me give you another example, counsel.

16   In many of the videos we see, some that you provided on this

17   occasion and those in the past, protestors are attempting to

18   engage in what the officers have characterized as de-arrest

19   an individual.  And I could give you examples, whether you

20   remember them or not.  But what about when protestors try and

21   de-arrest people in the protests?  Are those individuals

22   creating the type of specific threat or physical harm when

23   they're pulling away from the officer and wrestling with the

24   officer to try and prevent the arrest?

25   And you've seen the videos where someone is pulling

1  someone, multiple people are pulling, and it almost gets into

2  a melee situation.  Are those the type of imminent threats of

3  physical harm that would justify the officer taking more

4  aggressive action against the individuals trying to prevent

5  the arrest?

6         MS. NOWLIN:  I think that it can be.  I think it's a

7  very fact-specific inquiry.  I think a lot of these, quote

8  unquote, de-arrest situations are also just the officers

9  pushing the crowd back, and they're not able to move back in

10 the way the officers want, because there's so many people

11 behind them.  But if it is an actual situation where

12 protestors are actively trying to pull somebody away from the

13 officers, and they believe that there's an imminent threat of

14 harm to themselves or another person, then, yes, that might

15 be a situation where escalated actions could be justified.

16     Again, that's not what we're seeing in a lot of these

17 situations on these four days, right, that it's actually the

18 officers pushing into the crowd, and the crowd being unable

19 to move back, and therefore being pepper sprayed.

20        THE COURT:  Let's transition now, Ms. Nowlin, to the

21 September 7, 2020 protest.  And this is about the use of the

22 Molotov cocktails, because they appear to increase the stakes

23 significantly.  It's a lot different when someone throws an

24 empty water bottle, or a bottle even with water, stakes go up

25 higher when someone is throwing, or at least the officers

1   have reasonable cause of suspicion that a person is throwing

2   Molotov cocktails.

3      Does the presence, threat or use of Molotov cocktails

4   change the analysis at all?

5        MS. NOWLIN:  Well, I would distinguish between the

6   presence and the use of them, Your Honor.

7      And so at the beginning of the video you see that there's

8   a peaceful crowd.  There's not really a dispute that that

9   crowd is not causing harm or violence or destruction of

10   property.  And suddenly 80 officers descend upon them,

11   because they've heard that one person allegedly has, in their

12   possession, a Molotov cocktail that has not been used.

13      And there are several deployments of blast balls and

14   pepper spray against these peaceful protestors, before the

15   Molotov cocktail is used, before any dispersal order is

16   given.  And I would say that all of those deployments that we

17   saw are a violation of the PI, right, against plaintiff Chen,

18   against another protestor retreating, you know, people pepper

19   sprayed in the back of their head while they're walking away.

20      But I would agree that a Molotov cocktail is clearly a

21   specific imminent threat of harm that could justify the use

22   of less-lethal weapons.  But it still needs to be necessary,

23   reasonable, proportional and targeted.  And what we see in

24   the video is that there's a column of people pushed up

25   against the building, retreating as quickly as they can, and

1 that there are six blast balls thrown at them within a

2 12-second period, even though it's not clear who threw the

3 Molotov cocktail, and the crowd has shifted in that time.

4 　　　So people who were at the back and nowhere near the

5 thrower are getting blasted as they're retreating. So I

6 think there is a specific imminent threat of harm and serious

7 violence there. But I do not think that the response was

8 necessary, reasonable, proportional and targeted.

9 　　　　　THE COURT: Again, counsel, I'm not trying to create

10 any code for the officers to use for future conduct, I'm just

11 trying to ask questions that's helpful for me to understand

12 the strength of your position and be able to make assessments

13 of what's reasonable and necessary and appropriate and

14 proportional force.

15 　　　If the individual you characterized that had the Molotov

16 cocktail -- and I don't know if they did or they didn't, but

17 let's assume that they did, because of the reports that have

18 come in -- assume they have a Molotov cocktail and they are a

19 little bit buried into the peaceful protestors, as in this

20 vigil, and the officers get aggressive and start to use some

21 of this equipment to try and get to that individual, if the

22 individuals who suffer the, I'll call it, "collateral injury"

23 because the officers are trying to go after this targeted

24 person, is the harm to other individuals, is that included in

25 what you're asking the court to hold the police in contempt

1 for?

2      MS. NOWLIN:  It is, Your Honor.  Allowing one person,

3 who allegedly has a Molotov cocktail in their possession,

4 that they have not used, to be the cause for the violent

5 dispersal of an otherwise 400-person peaceful protest, is

6 problematic.

7      There was a woman there with her five-year-old child, who

8 was literally blowing bubbles while the cops came in and were

9 spraying pepper spray, and he got pepper sprayed in his eyes,

10 right?  That cannot be acceptable, to prevent just that one

11 person who has this on their possession, and is not violent,

12 that 80 police officers can ambush a crowd with pepper spray

13 and blast balls is not necessary, reasonable, proportional

14 and targeted.

15      THE COURT:  Another question, counsel, because of

16 what happened, I saw one video on September 7th where one

17 protestor tried to throw cones at the Seattle Police

18 Department, and an officer shot her with pepper balls.  Is

19 Black Lives Matter claiming that this is a violation of the

20 court's order.

21      MS. NOWLIN:  I don't think so, Your Honor.  I think

22 it's a gray area.  But I think there are so many other clear

23 violations that that's not one that we need to dispute over.

24      THE COURT:  Counsel, you'll be happy to note that

25 this is the last question I'll ask you before you give your

1 presentation.

2     On the September 23, 2020 protest, one protestor was

3 prodding a police officer in the face with a broken umbrella

4 shaft. When the officer tried to seize the shaft, the

5 protestor fell, and another officer shot the protestor with

6 several rounds of paintball. Is Black Lives Matter claiming

7 that this is a violation of the court's order.

8     MS. NOWLIN: Your Honor, I think, again, there are so

9 many other clear violations that we are not -- you know, I

10 would argue that it's not necessary to shoot somebody on the

11 ground multiple times with rubber bullets. But we are not

12 claiming that as part of this contempt motion. There are

13 numerous other clear violations on that day.

14     THE COURT: Okay. And, Ms. Nowlin, those are the

15 questions I have. Are there additional remarks you'd like to

16 make at this time?

17     MS. NOWLIN: Yes, Your Honor. Thank you.

18     I just wanted to say that, you know, again, there are 22

19 blast balls on September 23rd that the City has offered no

20 video for. And I think the inference of that is that it does

21 not bode well for them. They offered plenty of other video.

22 They did offer one video of blast balls being thrown, but it

23 is concerning they did not see fit to provide the body-worn

24 video for 22 blast balls.

25     And I say, despite these unexplained deployments, the

1   City's attempts to justify the use of less-lethal weapons for

2   reasons other than specific imminent threats of harm, and

3   SPD's indiscriminate deployments of OC spray and blast balls,

4   the City continues to maintain that it's use of less-lethal

5   weapons has been entirely consistent with the preliminary

6   injunction, which is concerning.

7       When plaintiffs allege that the City has violated this

8   court's PI, we're not talking about one isolated incident

9   where a rogue officer is throwing a blast ball.  Again, we're

10  talking about 80 officers coming out of hiding on

11  September 7th, to descend upon and disperse a peaceful

12  protest, with pepper spray and blast balls, under the guise

13  of arresting a single individual.

14      We're talking about plaintiff Chen being OC sprayed in the

15  face, with no argument from the City that she posed a

16  specific imminent threat of harm, or that she had caused

17  violence or destruction of property.

18      Many of the explanations offered by the City that someone

19  was in hiding or at one point that someone picked something

20  up off the ground and might have thrown it after, as

21  justification for a blast ball, do not meet the narrow

22  exception of the PI.

23      Again, it's not disputed what happened on September 22nd.

24  Lieutenant Brooks ordered an officer to throw a blast ball at

25  a crowd, just to create separation.  Again, not a targeted

1 response, and not in response to a specific imminent threat

2 of harm. And on August 26th we're talking about police

3 disrupting a peaceful vigil, forcing the protestors to

4 retreat and not allowing them to disperse, and then using OC

5 spray and a blast ball when they didn't comply with the

6 orders to move back as quickly or as fully as the police

7 wanted.

8 So the City's police officers have repeatedly deployed

9 chemical irritants and projectiles, without justification,

10 and in a manner that is not necessary, reasonable,

11 proportional and targeted; and, therefore, in violation of

12 the preliminary injunction. And I ask that the court find

13 the City in contempt.

14 THE COURT: Thank you, counsel.

15 We'll now transition to the City. Good morning, again,

16 Mr. Christie.

17 MR. CHRISTIE: Good morning, Your Honor.

18 THE COURT: So, Mr. Christie, first of all I'd like

19 to begin where Ms. Nowlin completed her statements or

20 concluded in the last comments, and she mentioned it earlier

21 as well, is that there was use of blast balls without body

22 camera videos attached to the same. And there was quite a

23 bit of footage that you did provide.

24 So I'm just curious if you have a reason or explanation

25 about the absence or lack of body-cam videos around the

1  circumstances of the use of blast-ball equipment.

2       MR. CHRISTIE:  Thank you, Your Honor.

3     With respect to specifics of September 23rd, I'm going to

4  ask Mr. Miller to speak to that, with the court's permission.

5  But let me speak more broadly, just about the assembly of

6  what we provided to the court.

7     First of all, it's a bit unprecedented to produce all of

8  these reports in the draft fashion in which they have been

9  prepared.  It is the practice, as outlined in the declaration

10 of Deputy Cordner, that officers had the opportunity to

11 review all the body-worn video in order to complete their

12 reports, and explain in their written report every use of

13 force that they see they deployed during the course of these

14 dynamic events.  That didn't happen here, in the interests of

15 time.  And under the circumstances here, all of these reports

16 have been produced in their draft fashion.

17    I can say this unequivocally.  There is hundreds of hours

18 of videotape on each of these days.  There was no effort to

19 select out, purposefully select out deployment of a

20 less-lethal weapon in order to somehow trick the court into

21 believing that that particular deployment did not occur.

22 That absolutely was not the intent.

23    Significantly, I would make this point, Your Honor.  You

24 requested, and we provided, 30 seconds of video on either

25 side of every cut made from any body-worn that ended up in

1  our compilation.  Those compilations obviously are long, in

2  and of themselves, they're in excess of an hour, and we were

3  sensitive to not providing the court with multiple hours from

4  each day.

5       In their reply, they did not provide you with one second

6  of the extra video.  So they can't possibly now stand here

7  and claim that we have somehow tried to pull the wool over

8  your eyes by making a cut in advance, or taking something out

9  that would have been in the run-up to or following where we

10  terminated that.

11       THE COURT:  All right.  Mr. Christie, I'll tell you

12  what, I know you wanted Tom Miller to jump in at this point

13  in time, but I have several other general questions.  Because

14  my plan, likewise, is to go through date by date.  And

15  certainly you'll have a chance to jump in at that time.

16       So, Mr. Miller, if you could be patient, you'll certainly

17  have your chance to participate in the proceedings as well.

18       So, Mr. Christie, I'm going to come back and ask you some

19  of the same questions that I asked of Ms. Nowlin.  And the

20  first is the issue of substantial compliance.  And Ms. Nowlin

21  referenced that, well, the City admitted that that's just a

22  defense, it's not an affirmative obligation.  You heard my

23  preliminary colloquy about how there is different cases that

24  interpret substantial compliance, that being the plaintiffs'

25  burden of proof, or just purely a defense.  I wanted to

1  confirm with you, on the record, your exact position on

2  substantial compliance, if it's a defense only, and that's

3  how the court should treat it, or should the court treat it

4  as part of the burden of proof of the plaintiffs?

5         MR. CHRISTIE:  Your Honor, consistent with our

6  obligations to the court, we cannot ignore authority that

7  speaks to it, the mixed authority, some whom speak to it as

8  an affirmative defense.  But we think the authority, the

9  persuasive authority makes it an element of proof of the

10  plaintiffs' claim.  And, frankly, the plaintiffs acknowledge

11  that.  If you look at their reply brief, I think it's

12  footnote six, they cite the case of *Labor Community Strategy*

13  *Center v. Los Angeles City Metro Authority*.  It's at 564 F3d

14  1115.

15         THE COURT:  That's the same one I referenced.

16         MR. CHRISTIE:  Yes.  And, Your Honor, that very

17  clearly articulates what we believe is the burden of the

18  plaintiffs here.  And if I can state that burden completely.

19  They must prove here that the City, not individual officers,

20  that the City violated the court's orders at ECF 34, 42 and

21  110.  They must prove that the City's actions went beyond

22  substantial compliance.  They must prove that the City's

23  actions, not the individual officer's actions, that the

24  City's actions were not based on a good-faith and reasonable

25  interpretation of that order.

1    And they must prove each of those three elements by clear

2    and convincing evidence, evidence that would lead you to a

3    belief or conviction that is highly probable that the factual

4    contentions in their materials are true.

5    We believe that is the burden that is applicable to this

6    particular hearing.

7    THE COURT: My next question, counsel, is -- and I

8    asked the same of Black Lives Matter's counsel -- what's the

9    City's interpretation of the phrase, "Necessary, reasonable,

10   proportional and targeted action to protect against a

11   specific imminent threat of physical harm to themselves, or

12   identifiable others, or to respond to specific acts of

13   violence or destruction of property"? Again, language that

14   comes from the preliminary injunction order.

15   What's your interpretation of what that's supposed to mean

16   and the scope?

17   MR. CHRISTIE: Thank you, Your Honor. That's an

18   excellent question and it certainly goes to the heart of this

19   matter.

20   This court, in crafting those orders, was very, very

21   careful in recognizing that you were striking a balance. And

22   the balance that you were striking -- and this is from ECF

23   34, if I may reference it, because I think it's highly

24   applicable here. And this is at page 2 of your order.

25   "Police cannot interfere with orderly, nonviolent protests,

1    because they disagree with the content of the speech.  At the

2    same time this court must balance these interests with

3    violent offenders that choose to disrupt constitutionally

4    protected activities."

5         The other thing -- and I'm answering the question, but I

6    want to provide this context -- the other thing the court

7    recognized in its initial order, and this is the court's

8    language:  That to protect person and property, police

9    officers must make split-second decisions, while often in

10   harm's way.

11        I believe -- we believe that statement is very profound,

12   given the four events that they have selected to put before

13   you in this motion.  Because we believe that every specific

14   instance of conduct that plaintiffs have focused on,

15   including those highlighted here in argument today, are in

16   circumstances where it is exactly what the court recognized,

17   police officers making split-second decisions while in harm's

18   way.

19        And that's a critical distinction.  Because contextually,

20   this court's language fashioned in its order, was in the

21   context of peaceful protests.  Without exception -- without

22   exception, the uses of pepper spray and blast balls, which

23   are now, as I understand the concessions, the only two

24   less-lethal weapons that are the subject of this hearing,

25   were in the context of police response to violence.  And that

1  violence, as the court has highlighted in its questions, is

2  not always easily identifiable as a person immediately in

3  front of the officer.

4      And so what is necessary, what is proportionate, those are

5  all contextual to the split-second decision, that the officer

6  makes that decision.

7      So, if a police officer can respond to a threat of force,

8  violence against them, immediately in front of them, then

9  they need to, as much as reasonably possible, target the

10  individual directly in front of them. That's clear. We

11  believe they've done that.

12      But what is also clear from this court's orders is that if

13  it is not reasonably possible to use proportionate force

14  against someone that may be deeper in the crowd throwing a

15  rock, throwing a water bottle, which is a felony, it is an

16  assault on a police officer, that if an officer can't get to

17  that person, the question then becomes, what tools are

18  available to them?

19      And in this case pepper spray is not going to get you deep

20  into the crowd. Crowd movement is officer and public safety,

21  because when a crowd is moving they cannot formulate attack

22  plans the way a stationary crowd can. That's uncontested.

23  That's set forth in Lieutenant Allen's declaration. He

24  explains exactly why and under what circumstances blast balls

25  are used.

1    So, to answer your question, it is contextual. And that's

2  why we provided the court with not just the reports, which,

3  again, in draft form, almost without exception, the officers

4  describe -- because they're held accountable to describe --

5  how and why they used a less-lethal weapon.

6    So what we ask this court to do in the context of this

7  motion, given the plaintiffs' burden, is to look at the

8  standards you articulated in your order, in the context of

9  peaceful protests, and evaluate their application, where

10  almost without exception, these are in situations where loud

11  dispersal orders have been given.

12    When a dispersal order is given -- and those orders are

13  not being challenged in this proceeding -- when a dispersal

14  order is given, it is illegal to stand in place. It is

15  illegal to form a phalanx line with shields and umbrellas.

16  It is illegal to hide behind a dumpster; because you create a

17  danger, an element of surprise. It is illegal to not move.

18    And walking backwards at a slow pace, in a phalanx, so

19  that people deep in the crowd can continue to assault

20  officers, throw, lob things over the shield line in front,

21  that is not dispersement, consistent with the law. And so

22  that is the context of virtually all the force applications

23  that we're talking about here.

24    I know we'll address the initial officer entry into the

25  crowd on September 7th. I'll wait for your question on that.

1    Thank you, Your Honor.

2        THE COURT:  Let's go date-by-date, counsel,

3    protest-by-protest, just as I did with Ms. Nowlin.

4        MR. CHRISTIE:  Okay.

5        THE COURT:  Let's start with August 26, 2020.  There

6    we have the benefit of Officer Claxton's report.  Now,

7    background or context, which I'm sure you're quite familiar

8    with, Officer Claxton said that he threw the blast ball

9    because a protestor threw two unidentifiable items toward the

10   officers and that he threw it at the protestor.

11       Assuming that what he stated is an accurate

12   representation -- because I have to be honest with you, this

13   is one of those dark videos at nighttime that was difficult

14   to see with clarity exactly what took place or what was

15   coming from an incoming standpoint -- but as I said, assuming

16   that Officer Claxton's representations are accurate, that he

17   did, in fact, observe a protestor throwing things at Seattle

18   police officers, is it your position that he was entitled to

19   be able to throw that device deep into the crowd?

20       MR. CHRISTIE:  Thank you, Your Honor.

21       Very specifically, we believe that Officer Claxton's

22   deployment was appropriate and consistent with the court's

23   order, under the circumstances, where a dispersal order had

24   been given and they were trying to move a crowd, as described

25   in his report.

1    With the court's permission, the specifics of Officer

2  Claxton's deployment is something that Mr. Miller has focused

3  on in his preparation.  And if it's okay, I would like to

4  yield to him to answer that question in more detail.

5         THE COURT:  Let me ask you one more question --

6         MR. CHRISTIE:  Ask me as many as you like, Your

7  Honor.

8         THE COURT:  I'm trying to keep it in segments of who

9  I am asking questions of and avoid toggling back and forth.

10  One of the things you raise, counsel, is that the court must

11  fuse the *Monell* analysis from municipal liability with the

12  civil-contempt analysis.  My experience, counsel, is *Monell*

13  is applied only in the context of violations of 1983 civil

14  litigation.  Are you aware of any court that has fused the

15  *Monell* analysis from municipal liability with the

16  civil-contempt analysis?

17         MR. CHRISTIE:  That's a great question, because,

18  believe me, we looked.  And in our response brief we provide

19  the best authority that we could find.  And it was not

20  exactly in this -- in a contempt proceeding.  It was with

21  respect to an initial motion for temporary restraining order.

22    But let me, if I may, comment just a bit further on that,

23  Your Honor.  There has been nothing cited by our friends on

24  the other side that would instruct this court that it is not

25  to use the *Monell* standard.  And if I may illuminate that

1    just a little bit.  The reason we are here is because of a

2    lawsuit that has only been brought against the City.  This

3    court's initial temporary restraining order was premised on a

4    legal determination that there was a substantial likelihood

5    of the plaintiffs prevailing on the causes of action that

6    they articulated in their complaint.

7        By definition, the legal framework for a claim against a

8    city under the Federal Civil Rights Act, whether you're

9    asserting First Amendment or Fourth Amendment, has to be

10   under the *Monell* analysis.  It has to be.

11       And so what they're asking this court to do, which I

12   submit is just, respectfully, incorrect, is ignore the legal

13   framework that got us here.  Because, again, we're only

14   asking for -- they're asking only for the City to be held in

15   contempt.  And so what we believe, given the way that we got

16   here, that what has to be shown is that they need to

17   demonstrate a violation of the orders on the part of the

18   City, by showing that either the officers were acting

19   consistent or pursuant to an unconstitutional policy or

20   custom, that that was the moving force behind their action,

21   or they need to demonstrate that the City was deliberately

22   indifferent to an obvious need to better train or supervise

23   its officers.

24       We think that focus should be on what the City did, again,

25   because this is a federal civil rights claim premised against

1   the City only.

2       If their argument is that these isolated events, as

3   they've articulated, are indicative of a widespread

4   deliberate indifference on the part of the city, to making

5   sure its officers knew and understood your orders, then they

6   should make that argument.  Because that is the only way, we

7   believe, that they can get to a contempt finding against the

8   entire city.  And we submit, based on this record, that

9   rather than deliberate indifference, there is deliberate

10  persistence on the part of the police department in making

11  sure it's officers understood these orders.

12      Without dispute, every one of these officers, every

13  officer in the Seattle Police Department, received your

14  orders.  And we provided you with details about the briefing

15  materials that are received on every one of the four days in

16  question, which include a detailed description of the rules

17  of engagement with respect to these less-lethal tools -- so,

18  a longwinded answer, I apologize for that, Your Honor -- we

19  do believe these, factored in here, we don't have a specific

20  case that articulates that, nor do they.

21          THE COURT:  And you agree, counsel, that nowhere in

22  the *Monell* case itself is there any reference or analysis in

23  a contempt proceeding, correct?

24          MR. CHRISTIE:  That is absolutely correct, Your

25  Honor.

1          THE COURT:  All right.

2      I'm not sure if Mr. Miller wanted to jump in right now,

3   because my next question was going to go to the August 26th

4   issue of blast balls.

5          MR. CHRISTIE:  I'll yield to him, Your Honor.  And he

6   can speak to those issues, particularly.

7          THE COURT:  All right, Mr. Miller, it's your turn.

8   Talk to me about August 26th.

9      First of all, do you have any idea, from your review of

10  the records, how many blast balls were deployed on August 26,

11  2020?  The plaintiffs in this case have articulated and

12  identified a number of blast ball references.  What's the

13  City's position on the number that were deployed on that

14  particular day?

15         MR. MILLER:  Your Honor, on August 26th there was

16  just one by Officer Claxton, which you have just asked about

17  earlier.  Are you referencing September 23rd, perhaps, where

18  there were numerous, about 25?

19         THE COURT:  Well, I'm looking at, I think Black Lives

20  Matter says that a number of blast balls were deployed that

21  night, reference to Docket No. 152, at page 5.  And the

22  City's footage of that night only addresses one blast ball,

23  and that's in reference to Officer Claxton.  And that's out

24  of Docket 145-1 at pages 3 to 4.  So that's the specific

25  context I'm looking at, counsel.

1          MR. MILLER:  Your Honor, I reviewed -- there were

2    about 80 body-worn videos from that evening, the average

3    length of which was about an hour and fifteen to an hour and

4    a half.  I was able to review about 60 of those.  You start

5    seeing the same footage, just from a slightly different

6    perspective of a different officer.  There was only one blast

7    ball deployment on August 26th, that was either reported or

8    seen in the video.

9       Now, in the compilation video, that's Exhibit A to

10   Mr. Christie's declaration at Docket 145, we show the same

11   deployment from a few different angles.  Notably is the angle

12   from Officer Cage's body-worn video, which is at 109-42 of

13   our compilation at Docket 145, Exhibit A.

14      And that shows that Officer Claxton deployed that blast

15   ball completely appropriately, consistent with his training

16   and consistent with this court's order.  He had seen two

17   spherical objects thrown from a subject in the crowd.  He

18   describes in his report how he was deploying the blast ball

19   to target that individual, to disrupt this assaultive

20   behavior.

21      And that is critical, in the context of all demonstration

22   management, and what has been somewhat glossed over by

23   Ms. Nowlin, which is, the point of blast balls is not simply

24   to move the crowd.  You move the crowd because you need to

25   disrupt these violent acts.  Blast balls are the most

1  effective way to do that.  Each and every officer on

2  September 23rd articulates that their blast-ball deployments

3  were in response to projectiles and assaults on officers.

4  And that is their proper use.

5      And she was unable to identify one blast-ball deployment

6  on September 23rd that she thought was improper.  I think

7  that's quite notable.

8      But going back to August 26th.  Officer Claxton's

9  deployment is clearly articulated.  And there's nothing in

10  this record that disputes the propriety of that.

11      Now, what happened was, he had the intent of deploying it

12  at the subjects who threw the two spherical objects.

13  Unfortunately, due to the fact that these protestors are now

14  using shields along their lines and they're forming what is

15  literally a hardened line with shields, making it impossible

16  not only for police to get in and perhaps arrest a suspect,

17  but also to see projectiles coming at them, and it also

18  defeats their OC, as Captain Allen and Lieutenant Brooks have

19  both described in their declarations.

20      So when Officer Claxton deployed the blast ball, it

21  actually bounced off a shield.  The only people affected by

22  it, and you'll see that in the video of Exhibit A, were the

23  officers.  It deployed right at Officer Claxton's feet.  No

24  protestor was adversely affected, at all, by that blast-ball

25  deployment.  And it had its intended effect.  The space was

1   created.  And that was literally the last force incident of

2   that evening.

3        After that, the crowd continued to move down Harvard, and

4   there were no further contacts, attempted arrests, no further

5   OC deployments, and no blast-ball deployments.

6        THE COURT:  Counsel, what's your interpretation of

7   when officers are permitted to use blast balls in open-space

8   areas?

9        MR. MILLER:  And, again -- and we saw some examples

10  of that, where they're doing that in response to threats and

11  assaults.  And as this court observed in its order, Docket

12  110 at paragraph 5:  If blast balls are used for reasons

13  consistent with this order or the court's preliminary

14  injunction, but directed to an open space near the target

15  individual, the City shall not be liable.

16       And, you know, this is not a perfect science, right?

17  We've got officers that are virtually throwing a non-round

18  object.  Blast balls are not perfectly round, so they're not

19  predictable in which way they bounce or deflect once they hit

20  the ground.  But they are effective tools, and they're the

21  best tools that our department, who manages more

22  demonstrations than perhaps any department in this country,

23  have found that these tools are the most effective and least

24  intrusive way to affect crowd movement, which is a training

25  tactic for preventing ongoing assaults.

1        So, by the time we have blast balls deployed in open

2    spaces to move crowds, that is because officers are taking

3    projectiles, they are taking bottles, there are fireworks

4    thrown at them, as we've seen on September 23rd, and they may

5    deploy to those open spaces to affect that movement to

6    disrupt those assaults.

7        So it all goes back to disrupting the assaults.  It's not

8    throwing blast balls for the sake of just moving the crowd

9    for the heck of it.  It's to move the crowd to prevent

10   ongoing harm to officers.

11          THE COURT:  Counsel, in the use of those blast

12   balls -- and I don't want to use this term, but I think it's

13   the most helpful and descriptive term -- is the collateral

14   consequences of using the blast balls against the peaceful

15   protestors.  And, if you have the peaceful protestors, but

16   you have the one who is engaged in throwing these types of

17   devices, what happens when the peaceful protestors are

18   collateral consequences or collateral damage, I should say?

19          MR. MILLER:  Well, backing up before that.  In each

20   of these instances, on these evenings, dispersal orders had

21   been given.  So we have Lieutenant Brooks and Captain Allen

22   who did a really, really good job of explaining to the

23   protestors, not only that this was no longer a lawful

24   assembly and they needed to disperse the area; they would

25   give them direction, leave the area -- and Captain Allen, I

1  think, even gave direction on where to go.  Anyone who is

2  remaining on that scene after those lawful orders are given

3  is not there lawfully.

4       Now, I know there's a distinction between not being there

5  lawfully and committing violent assaults.  But the officers

6  -- I mean, these tools, the blast ball cannot distinguish

7  between someone, you know -- the quote-unquote nonviolent

8  person might be right next to somebody who just threw the

9  device.  It is incumbent largely on those people, to move.

10 If they see people committing assaults, they need to vacate

11 the area, as ordered by the police.

12      And this court's order recognizes that it's not always

13 possible to affect the deployment directly at the person.

14 That's why it's "to the extent reasonably possible," is the

15 language used in paragraph 7 of this court's order, Docket

16 110.  But that does not -- the fact that someone might be

17 incidentally adversely affected by one of these tools, does

18 not mean that the force used was unreasonable.

19           THE COURT:  Let's talk about what I would talk about

20 as not collateral consequences, but let's talk about people

21 that are actively engaged in trying to help protestors, and

22 when you talk about the de-arrest situations.  And you've

23 seen the videos.  I recall one where I believe a woman was

24 wearing blue hospital garb, that was by Seattle Central

25 Community College, that is one that immediately comes to my

1  mind, her -- or many other times individuals are going in to

2  aid of the other protestors, and they're trying to pull that

3  individual away.  Are you suggesting that those type of

4  circumstances would justify more aggressive action by the

5  police?  Is that a specific imminent threat that would

6  warrant or justify an escalation of dealing with those

7  individuals?

8      MR. MILLER:  It absolutely can be.  And, again, it

9  would depend on the circumstances.  But by de-arresting, a

10 number of things are happening.  You are interfering and

11 obstructing with an officer's lawful duties of arresting

12 somebody.  You're also arguably assaulting those officers.

13 You're rendering them vulnerable to further assault or

14 attack, by diverting their attention away from the subject

15 that they're trying to arrest.  It creates the *Graham*, tense,

16 uncertain, rapidly evolving situation.

17     People are not lawfully allowed to de-arrest someone when

18 police are contacting them.  That is simply not permitted.

19 And depending on the circumstances, it would be entirely

20 appropriate to use a short burst of OC spray, for instance,

21 to prevent people from getting too close.  And we saw that on

22 August 26th where, when the officers moved in to arrest the

23 laser-pointer subject, a number of people came in and started

24 de-arresting.  And that was why we saw a number of people

25 going to the ground and being arrested, because they were

1  actually de-arresting and interfering with the lawful process

2  of arresting somebody.

3       Now, these declarants may not have known that that's why

4  the police went in, is kind of entirely the point.  The

5  analysis has to be based on the totality of the circumstances

6  known to the officers.  And that's what we've provided you

7  with our use-of-force reports and the videos.  The protestors

8  that are there don't know that gentleman was shining a green

9  laser in the officers' eyes, and the officers had been

10  planning to arrest that person.  So when they move in to

11  arrest him, it looks sudden, unprovoked and unplanned.

12  That's not what it is.  It's a targeted move to get in and

13  get an individual into custody for a felony crime.

14       THE COURT:  Let's transition to September 7th.  And

15  I'm assuming, as I'm going through these dates, Mr. Miller,

16  that we're going to continue to stay with you; is that

17  correct?

18       MR. MILLER:  Mr. Christie was prepared to speak to

19  September 7th.  I hate to keep juggling.

20       THE COURT:  That's fine.  I just want to be clear

21  who's addressing the court.

22       Mr. Christie, on the September 7th protest, is it fair to

23  say that on some occasions Seattle Police have used blast

24  balls to stimulate crowd movement or to steer protestors in

25  certain directions?  Would you agree with that or not?

1    MR. CHRISTIE:  I believe that what you can see in

2    those videos, and you can see it on September 7th, since

3    we're speaking of that, there were clear deployments of blast

4    balls in open space, as officers were moving the crowd

5    southbound on Fourth Avenue and getting them to turn to the

6    east.

7        They're clearly articulated in Sergeant Didier's report,

8    which was mentioned in the opening remarks by counsel.  And I

9    invite the court to look at that.  Because if you look

10   frame-by-frame at the moment of his deployment, what you will

11   see is that following the near miss, frankly, the near miss

12   of Ms. Chen -- she became very close to being harmed or

13   killed by that Molotov cocktail that exploded in the middle

14   of the street -- following that, there is elevated concern on

15   the part of the officers about the safety of the entire

16   group.

17       And you can hear it in the tone of the voices of the

18   officers in the body-worn that we've provided.  And they are

19   actively trying to move the crowd more quickly.  And they are

20   trying to get them to turn east.  And, yes, there are

21   blast-ball deployments in open space, completely consistent

22   with this court's order, paragraph 5, as Mr. Miller

23   mentioned.

24       So, yes, there are, Your Honor.

25           THE COURT:  Now, does that comply with the court's

1   order concerning pushing the crowd not being an authorized

2   use for those type of devices?

3          MR. CHRISTIE:  I believe -- we believe it fully

4   complies with the order; and I'll tell you why.  The order

5   was crafted in the context of peaceful protests.  And the

6   order specifically took on this issue of -- in fact, it was

7   in the last order by the court, part of the clarification

8   order at 110, if there's been a declaration that it is an

9   unlawful assembly, that's spoken to in paragraph 7, what you

10  say is, "Does not exempt the City from its obligation to

11  comply with the order.  And it requires officers to be

12  reasonable, necessary, targeted and proportional, to the

13  extent possible."

14      The deployments that you're now talking about and what we

15  see on September 7th, are all deployments after a lawful

16  dispersement order had been given.  And to the maximum extent

17  possible, what the video shows are deployments in open space.

18  There's one particular deployment that really caught my eye,

19  when I read the plaintiffs' reply brief.  They accuse

20  Sergeant Didier of throwing a blast ball into a crowd.

21      And I looked at that very carefully.  What you will see --

22  and I'll try to give the court a time stamp on that -- what

23  you will see is a deployment in open space.  In particular,

24  it's in a parking lot of a fast food restaurant.  It is a lob

25  shot that goes over the heads of everyone.  I believe that

1  you will see it at time mark 29:04.  And it's described in

2  his report, which is at Exhibit 146B, on page 283 of 303.

3  It's a perfect example, I think, of what I'm trying to

4  highlight by way of answer to the court's question.

5          THE COURT:  Can you give me that citation once again,

6  counsel?

7          MR. CHRISTIE:  Yes, Your Honor.  If you look

8  specifically at -- so, what the plaintiffs claimed, they

9  claim at 28:12 -- so I'll give you that time mark -- their

10  statement says:  Showing Didier throwing blast ball into the

11  crowd after he asked who threw a rock?  And another officer

12  responding he did not know.  What the video shows is a very

13  purposeful deployment.  If you look, the precise release

14  point of his deployment is at 28:28, time mark.  You can

15  actually hear the blast ball rolling on the ground before it

16  detonates.  It detonates, as best that we can determine, in

17  front of the crowd.  It had the intended effect, in that the

18  crowd started moving.

19     There's a second deployment -- and let me give the cite to

20  that, Your Honor.  And I'll repeat the cite I gave earlier.

21          THE COURT:  Now, this is September 22nd, right,

22  counsel?

23          MR. CHRISTIE:  This is on September 7th, Your Honor,

24  yes.

25          THE COURT:  Okay.  All right.

1           MR. CHRISTIE:  At 29:04 on September 7th you will see

2    him lob a second blast ball that lands in an open space in

3    this parking lot of this restaurant, as I'm indicating.  And

4    he describes that on page -- again, this is Exhibit 146B, and

5    it's on page 283 where he describes that.

6       This is what he says -- to complete this he says, "I was

7    pepper sprayed, possibly bear sprayed by a member of the

8    crowd.  The crowd began throwing rocks.  I deployed blast

9    balls to move the crowd.   I believe I used two blast balls

10   at this approximate time.  Due to officers being in front of

11   me and the way protestors were linking shields, I used an

12   overhand lob deployment.  I did this to ensure the blast

13   balls were directed at the appropriate individuals."  Again

14   this is not perfectly written because it's a draft report.

15   "Both blast balls went off while on the ground."

16      So that's Didier's deployment of blast balls.

17           THE COURT:  Well, counsel, let me ask you a question.

18   Unless you have an officer that has Russell Wilson skills

19   with a blast ball, how does he know the accuracy of where

20   that blast ball is going?

21           MR. CHRISTIE:  I would say this:  No one that hasn't

22   been trained is authorized to even carry blast balls.  Every

23   officer with blast balls has been trained.

24      Now, none of them are Russell Wilson, but they have been

25   specifically trained on how to deploy them, the method of

1  deployment, and how best to control what is -- as Mr. Miller

2  pointed out, and I think you can't argue otherwise -- is an

3  imperfect round sphere for deployment.

4      So what they do know is that, as Mr. Miller pointed out,

5  the purpose of a blast ball, it's certainly not to punish

6  someone, as mentioned in the opening remarks.  And, frankly,

7  if a police officer from Seattle is using a blast ball to

8  punish someone, he's not only -- he or she is not only going

9  to be held accountable, that would not be consistent with

10  this court's orders.  Punishment is not what we're talking

11  about here.

12      But blast balls deployed as close as possible to a

13  targeted individual that's throwing something, that's a

14  proper deployment.  And we think it's a targeted, necessary

15  deployment, proportionate, consistent with the court's order.

16          THE COURT:  Counsel, you referenced officer training.

17  According to the police, either crowd-control training, the

18  crowd-control management component of the training manual,

19  what does that manual direct or provide in terms of how an

20  officer is supposed to deploy or use a blast ball?  Does that

21  permit an overhand throw, a lob, rolling on the ground, or

22  what's that training manual specifically provide for?

23          MR. CHRISTIE:  Your Honor, with the court's

24  permission I'd like to hand this back to Mr. Miller, who is

25  more conversant with the details.  I'm quite conversant, but

1    I'd rather have him speak to it more directly, if that's

2    appropriate.

3           THE COURT:  That's fine.  Mr. Miller?

4           MR. MILLER:  Your Honor, the manual says the

5    preferred deployment is underhand.  However, it acknowledges

6    that there are circumstances, largely the ones that we're

7    seeing in each of these nights that are at issue here, where

8    an overhand deployment is not only permitted, but necessary,

9    in order to get the blast ball, either over the police line

10   in front of the officer deploying it, or deeper into the

11   crowd to target the individuals that are throwing

12   projectiles.

13      And part and parcel with that is the point, in response to

14   your earlier question about just using a blast ball to move

15   the crowd, as I mentioned earlier, the crowd movement is to

16   prevent the assaults.  So the blast-ball deployment is used

17   to move the crowd in response to assaults, to prevent further

18   assaults from happening.

19      So it's not just moving a crowd to move a crowd down a

20   road for the sole purpose of making people walk.  The

21   deployments of the blast balls are to keep the crowd moving,

22   which in and of itself prevents further assaults from

23   happening.  It lowers the likelihood that someone is going to

24   be able to stop, set up, pull a rock up from the ground, take

25   something out of their backpack, like a Molotov cocktail,

1   light it, and throw it at the police.

2      The police have found, over years of managing

3   demonstrations like this, starting with, you know, Mardi Gras

4   even, or May Day 2012, or May Day 2015, when things got quite

5   violent, that movement is safety.  It's safety for the

6   protestors, including the peaceful protestors, and it's

7   safety for the officers and general public.

8      And the reason that is so is because, when they're moving,

9   they cannot formulate plans, they cannot stop, pick objects

10  up and throw them at police.  So you keep them off balance,

11  you keep them moving to prevent the assaults.  And that's why

12  blast balls are used in that regard.  And they're far more

13  effective and far less intrusive than alternate means, like

14  batons and the like.

15      THE COURT:  This takes us to September 22nd, then,

16  counsel.  And, looking at the video that you provided, and

17  I'm looking at the context -- or I think the timeframe is

18  27:55, my numbers might be slightly off, it's hard to stop it

19  precisely where they begin -- but if my understanding is

20  correct in viewing that section, is that someone throws an

21  object, I think Mr. Christie referred to this earlier, and

22  you can hear an officer say:  Who threw it?  The other

23  officer indicates, I don't know.  And then, thereafter, two

24  officers hurl blast balls into the crowd.

25      Does that comport with the training of law enforcement

1  officers that if you hear or heard someone say that somebody

2  threw something, you don't know who threw it, and you start

3  hurling blast balls back into the crowd?  Is that a specific

4  imminent threat that you're targeting, or is that just

5  retaliation or a retaliatory move?

6      MR. CHRISTIE:  Your Honor, may I speak to that

7  initially, because I did make comment on that.  But that was

8  in the context of something on September 2nd, or September

9  7th.  And so if we want to talk about September 7th, I can

10  speak specifically to that event.

11      The citations that I just gave to you in my last response,

12  by Sergeant Didier, are his deployment of two blast balls

13  following that remark.  And in both cases, those blast balls

14  were deployed purposefully, as he describes.

15      To answer your question, which is a bit hypothetically,

16  respectfully, but it would not be -- in isolation of other

17  events -- it would not be appropriate to effectively try to

18  retaliate against someone with a blast ball.

19      However, a person throwing objects at police to the extent

20  that they could be targeted and disrupted and forced to move

21  by a blast ball deployment, that would be appropriate, and we

22  believe completely consistent with this court's order.

23      And as Mr. Miller mentioned, and I want to highlight that

24  here, these objects create space, they create separation.

25  Without space and separation between police and individuals

1  that are using violence against police, without that, they

2  are left in close quarters where they are now left with

3  either OC spray, or batons, or fists.  This elimination of

4  this key tool, that is one that creates space by definition

5  and makes the separation that I'm talking about, it

6  necessarily fosters close-quarter contact, which police know

7  to be the most violent, most dangerous, to not only those

8  that are peaceful, but to those that are actively resisting

9  the officers, and certainly to the officers themselves.

10       THE COURT:  Counsel, we're almost at 10:30.  And I

11  know, despite the capabilities of our outstanding court

12  reporter, Debbie, I don't want to exhaust her, because a lot

13  of people are talking, she's the only one typing.  So we'll

14  take our traditional recess for 15 minutes at this time.

15  We'll resume at 10:45.  We'll be in recess.

16                         (Recess.)

17       THE CLERK:  Is everybody ready to proceed?  All

18  right.  I will let Judge Jones know.  Thank you.

19       THE COURT:  Counsel, we are all back on the record.

20  From my observation of the screen, it appears that all the

21  parties are present as before.

22     And, counsel, I want to go back to September 7th, just for

23  a couple more questions.  We made reference to Ms. Chen, and

24  also the woman who was in the -- wearing the black hoodie.

25  And maybe these are questions I asked of Ms. Nowlin as

1 opposed to the City. And I'm talking now about the use of

2 the spray. And, for example, the use of the spray, the

3 pepper spray, there's a woman, and I think this is at 24:13

4 on the exhibit for September 7th, there's a woman in a black

5 hoodie, and I describe her as having a black cell phone. And

6 she seems to be moving in a lateral fashion across the police

7 line, but some distance behind the protest group as they were

8 moving forward. And she is sprayed.

9 I see, I believe it's at 24:26, when the woman who is

10 identified as Ms. Chen also has a cell phone, I believe it's

11 a white cell phone -- it helps me remember what I was looking

12 at -- and Chen is moving across, again in a lateral movement,

13 across the police line. Again, a little bit of distance.

14 It's difficult for me to tell how far from the police line

15 and how far back from the protestors. But nonetheless, there

16 appears to be distance from both of those. And yet both of

17 them appear to be blasted with pepper spray. And the only

18 thing that they have in their hand at that time is just their

19 cell phones. And there doesn't appear to be any aggressive

20 movement by them, and the action that they took was not

21 moving fast enough.

22 So, I'm asking the City, your response to the

23 justification in those two instances?

24 MR. CHRISTIE: Thank you, Your Honor. I'll speak to

25 that, very specifically.

1  What you see at -- and I'll give time references as I

2  answer this.

3       THE COURT:  That's helpful.

4       MR. CHRISTIE:  I do have it cued up, if the court

5  wants to watch any.  But I want to be respectful of time and

6  efficiency.  At 24:07 in the video you can hear Officer

7  Didier telling people -- yelling, "Move back."  And he

8  repeats this.  And what you see, with respect to the woman in

9  the hoodie, and this is obvious not only from his camera, but

10  it is very obvious from the surveillance cameras as well, she

11  is completely alone in not getting back.  And to the

12  contrary, she moves -- and you can see her do this -- she

13  rushes directly up towards Sergeant Didier, with his line, as

14  he is moving forward with other bike officers and telling

15  people, exhorting people to move back.

16  So, objectively, I don't know what's in Officer Didier's

17  mind, because I can't read it.  But what I can see

18  objectively is that she is the only person at that point that

19  is not doing what he is telling people to do, and she rushes

20  into him.

21  That is a specific threat to the officer.  It detracts his

22  attention from directing his troops in a movement.  It is

23  necessary at that point to get her to move back, exactly what

24  he is demanding she do.  And there isn't any question about

25  the lawfulness of that order.  She needs to get back.  She

1    rushes in and she is pepper sprayed.  It's a short burst,

2    single burst.  And you can tell she's close, because you can

3    see how the condensed stream makes contact with her.

4        At 24:17, Ms. Chen rushes, along with some other people,

5    to that person in the hoodie that had taken a few steps back

6    and fell down.  Didier again yells, "Move back."

7        At 24:23, Didier has twice more yelled, "Move back."  Some

8    of the crowd complies.  But Ms. Chen stays squarely in front

9    of Sergeant Didier.  And this is significant -- from his

10   perspective, I submit, and for assessing this -- no one is

11   behind her.  Nothing is preventing her from moving back.

12   This isn't one of those scenarios where, I'm moving as fast

13   as I can, but I can't move fast because there are people

14   behind her.  She is standing alone.

15       And I'll make this point, Your Honor.  At 24:23, this is

16   many seconds after she makes the statement, "I'm moving.  I'm

17   moving."  So his application of pepper spray to her is

18   disconnected in time to her statement, "I'm moving.  I'm

19   moving."  That was quite a bit earlier.

20       She takes a step towards Didier to film, at 24:24.  And

21   there's a still shot of that, that we actually included in

22   that video for that day.

23           THE COURT:  I saw that, counsel.

24           MR. CHRISTIE:  And, again, if you look at that still

25   shot, there is nothing behind her.  Everyone else has turned

1　and is moving away.  She is the only one facing Sergeant

2　Didier.  And she is squared up in his view.  And that's very

3　obvious, not just from his perspective, but from her video as

4　well.  You can see.  He is full frame.  So, there is a burst.

5　That burst is targeted.  It only strikes her.  And the strike

6　that you can see, the first strike is at 24:28.

7　　　Now, if I can make some comments about Ms. Chen's video.

8　Chen's video shows her move to stay close to Didier.  She

9　does not move back, but she comes up from where the other

10　protestor had gone down.  That protestor can be seen moving

11　-- well, again, the protestor in the hoodie could be seen

12　moving directly towards him.

13　　　But back to Ms. Chen.  She does get a micro burst.  If you

14　look at the following time increments between 25:18 and 25:20

15　on her video, at 25:18 there is a command, and you can see

16　his mouth moving, Didier is commanding, "Move back."  And she

17　does not move.  That's clear from her camera.  At 25:19 he

18　deploys a burst.  And at 25:20, you can tell how close she

19　was, because the burst is so targeted and so concentrated,

20　that her screen goes yellow/orange at 25:20.

21　　　So, the burst lasts less than a second.  She did then move

22　back.  And he does not deploy any more OC at her, because she

23　complied and moved.  So that is a targeted, necessary,

24　appropriate application of pepper spray under the dynamic

25　circumstances presented.

1        THE COURT:  Thank you, counsel.

2    And just one more time, counsel.  On the September 22nd

3    situation, is it your position -- I'm asking this question,

4    because Lieutenant John Brooks said that he ordered the

5    deployment of one blast ball to create separation between the

6    officers and the crowd.  That's Docket 148 at 19.

7        My question is, is creating separation an authorized use

8    of that type of equipment, under the orders?

9        MR. CHRISTIE:  Your Honor, with the court's

10   permission, I'd like to have Mr. Miller speak to that, so

11   we're not double teaming.  I won't give any answer, I'll

12   stand on his response, if that's appropriate.

13        THE COURT:  That's fine.  Mr. Miller?

14        MR. MILLER:  It absolutely is, Your Honor.

15   He needed to create that space due to the imminent threat

16   posed by these individuals who are now surrounding a police

17   car, shining not only bright strobe lights into the driver's

18   eyes, but also laser pointers into the driver's eyes.  That

19   endangers the driver, the pedestrians, the protestors

20   themselves.  It posed a serious life-safety threat.  And in

21   response to that it would be completely consistent with SPD

22   policy and this court's order to deploy one blast ball to

23   create the separation.

24    Again, it goes back to the mantra that space is safety.

25   And in this case it's safety between a moving vehicle.  This

1  is a phenomenal event, in many ways, where people are

2  surrounding a police car and taking active steps to actually

3  make it difficult to operate that car.  That is, in and of

4  itself, a very dangerous situation that demands a response to

5  stop it.  They were not listening to commands to stop.

6  And what's telling is Lieutenant Brooks advised them over

7  the PA that he was going to authorize the deployment of a

8  blast ball.  So there was a clear warning to these people,

9  get away from the car or there will be a blast ball.  They

10  had the opportunity to leave.  They didn't.  One blast ball

11  was deployed.  And contrary to the angle shown from the

12  plaintiffs' video submission, it was far away from any of the

13  people.  It detonated in the air, some 10 or 15 feet past the

14  people around the car.

15  So there was no adverse impact on anybody from that.  And

16  it achieved its intended purpose.  As soon as it detonated,

17  the protestors left the car alone, and no more force was

18  used.

19  THE COURT:  Now, again, counsel, I'm not condoning by

20  any means or justifying the action of the individual who had

21  the -- I believe it was a strobe light into the vehicle, I

22  don't know that there's any allegation that was a laser.  So,

23  operating on the assumption it was just a strobe light, and I

24  think you agree, my question is:  Was this not a hazard of

25  the police department's own making?  In other words, the

1  close proximity of how close they decided to trail behind the

2  protesters to create this situation to justify the hurling of

3  this type of a blast ball?

4      MR. MILLER:  No, it's not.  And the reason for that

5  is that the police were following the protestors, but they

6  then turned -- and you'll see in the video, the car is

7  backing up, it is trying to create space.  And it's moving

8  slowly and deliberately, for the very obvious reason that

9  they don't want to move quickly and risk running somebody

10 over, inadvertently.  But they had been following them, as

11 they were lawfully able to do, and providing PA commands,

12 telling them what they want the crowd to do.

13    But then the crowd turned back on the car and took an

14 aggressive posture towards the car, prompting the driver to

15 start backing the car up, again, trying to deescalate this

16 situation, and appropriately so.  But it wasn't working.

17    So the next step, failing that deescalation, was to use

18 one targeted blast ball to disperse this crowd.

19      THE COURT:  And, again, counsel, this may be in kind

20 of the same line.  If the officers had essentially sandwiched

21 the protestors from the front and the rear, wouldn't that

22 mean which ever direction the protestors tried to walk, they

23 would be encroaching on Seattle police officer vehicles?

24      MR. MILLER:  Well that, in a vacuum, possibly.  But

25 that's not what occurred here.

1    As you can see in the video, there's plenty of room for

2   these people to disperse, to their left, to their right, or

3   behind them.  There's no vehicle crushing them up against the

4   vehicle that's backing up, from which the video, Exhibit F,

5   is shot.  I believe that's Exhibit F to Lieutenant Brooks'

6   declaration.

7            THE COURT:  Okay.  And then the last thing I want to

8   cover, the last protest, counsel, is September 23rd.

9    In your count, how many blast balls were used on

10  September 23rd?  This isn't a hide-the-ball question, because

11  I'll indicate that there are nine use-of-force reports for

12  the balls that night.  And my question is really specifically

13  designed to find out where the corresponding body cams or

14  video footage for these deployments are, and were there more

15  blast balls on the 23rd, in your estimation, than just the

16  nine from the reports?

17           MR. MILLER:  No.  My understanding as we sit here

18  today is that all the blue team reports that have been

19  submitted, are all the reports that document using blast

20  balls, and those are all the blast balls deployed.  So that

21  count from those reports -- I didn't actually tally it -- but

22  I have them listed, and I can take a moment to tally it up,

23  if the court would like.  But you may have already done that.

24    But there were a lot of noises and explosions.  And in our

25  video compilations, obviously there's repetition, because

1  it's the same events shown from different angles.  But what

2  plaintiffs failed to account for is the number of fireworks,

3  signs slapping down onto the payment, there are other things

4  making loud noises, other than blast balls, during this very

5  chaotic event of September 23rd.

6          THE COURT:  Counsel, I'll give you the chance, why

7  don't you go ahead and count up the number of blast balls.

8  And I'll give you the time.

9          MR. MILLER:  I have 32, total.

10          THE COURT:  Go ahead.

11          MR. MILLER:  I was just going to clarify, early on in

12  her argument, I think it was one of the first points

13  Ms. Nowlin made, she stated that Officer West in his blue

14  team report, which is at 146-4, page 94, did not account for

15  two of his blast ball deployments.  And that is not accurate.

16  At the top of page 94, he states, "In all I deployed about

17  five blast balls."

18      And on the prior page he had given specifics with respect

19  to the first three of them.  And he said, "In all, I deployed

20  about five blast balls in the area to defend officers and

21  address the suspects that were assaulting or in the middle of

22  the act of assaulting.  The deployment of the blast balls

23  seemed effective moving the suspects south, until they

24  regathered at the end of the street.  Also during this

25  movement I witnessed large rocks, bottles, fireworks, being

1    thrown towards myself and officers at the scene."

2        I apologize to the court reporter for reading that a

3    little bit fast.  But he clearly articulated in that

4    paragraph why he deployed those blast balls.  They were all

5    in response to projectiles and/or assaults on the officers

6    with objects.

7            THE COURT:  Again, counsel, this is in the context of

8    September 23rd, and some times it beyond this area, the video

9    evidence reveals that on several occasions officers threw the

10   blast balls, but that was several moments after removing the

11   pin.  And on some occasions it looked like the officer was

12   struggling to even get the pin out.  Then they would throw

13   the devices overhand, deep into the crowd, and then

14   immediately turn away.  That question specifically is about

15   the 23rd.

16       My concern is, if the language of the court talks about

17   the imminent nature of the activity, and an officer has the

18   time to pull the pin out, or is fumbling in trying it get the

19   pin out, then holds onto the device for a period of time,

20   it's almost -- I don't want to get into the analogy of malice

21   aforethought, how much time do you have to think about

22   something before it becomes intentional, with ill

23   intentions -- so my question is, if he held onto the device

24   for a period of time and had a chance to contemplate:  Do I

25   need to throw that, and then throws it, is the circumstance

1  really that imminent to justify it?

2      MR. MILLER:  I would say yes.  And the fact that the

3  officer holds the blast ball and doesn't deploy it, you know,

4  if there's a struggle getting the pin out, which can happen,

5  these are difficult fuses to manipulate where they've got

6  very solid pins that are in, and the ends are bent out, so

7  sometimes the officers have to manually pinch the pin then

8  pull it.  That shows restraint and it shows compliance with

9  the court's order.  Because they're then waiting to see if

10  the attacks continue.

11      And, again, on the 23rd, this was a dynamic situation.

12  Officers are taking projectiles, particularly from about

13  11:43 p.m. onward, in such an incessant and continuous

14  fashion, there is no stop to it.

15      And so the officer, when they pull the pin, if they do

16  wait, they're waiting to see, perhaps, if they can get a

17  visual -- if they can visually acquire the person who is

18  throwing it.  So that might account for some delay.  Or they

19  may say:  Okay, I've pulled the pin, I'm not taking an

20  object, they seem to have abated momentarily.  They wait.

21  Another projectile comes, then they deploy.

22      So, waiting does not equate to malice aforethought, as you

23  phrased it.  It actually is quite the opposite.  It amounts

24  to discipline, following training, and following this court's

25  order.

1          THE COURT:  Counsel, if we use our common sense and

2     application to what the officers were confronting before they

3     threw the blast ball -- and in this particular occasion I

4     looked carefully to see if I could see what the incoming

5     projectiles were -- when the officer finally got the pin out

6     and was holding onto it, I didn't notice or observe any

7     incoming activity or projectiles coming towards the officer.

8     And I'm looking specifically at around the 49:25 and 50:10,

9     in that arena, of that video, because it didn't look like the

10    officer was necessarily looking or targeting, but he had more

11    than a moment in time to think about what he was doing.

12         But if there wasn't any current or simultaneous activity,

13    and I couldn't tell from the officer's facial reactions, or

14    body gestures, or anybody flinching at the moment, which

15    would indicate, this is the reason why the officer threw the

16    ball, or the blast ball, wouldn't that be a violation of the

17    court's order, in terms of the indiscriminate throwing of it?

18         MR. MILLER:  No.  And the court must bear in mind

19    that these body-worn videos are at chest level.  It's a

20    camera mounted at the officer's chest.  It does not

21    necessarily capture everything in that officer's field of

22    vision.  In fact, they've got quite a limited field of

23    vision.  So just because something doesn't show up on the

24    camera, it doesn't mean that the officer didn't see

25    something, perceive something, and react to something.  And

1  that could have been, you know, the blast ball that you're

2  talking about could have been a deployment where somebody

3  threw a projectile in the opposite direction, on the other

4  side of the road towards a different officer, either to the

5  officer's left or right, the officer saw where that came

6  from, and deployed the blast ball in response to that.

7      It might not have showed up on that officer's body-worn,

8  but that does not mean that that blast-ball deployment was

9  not in response to an imminent threat of serious physical

10  harm or property damage.

11          THE COURT:  All right.  Counsel, that covers all the

12  specific questions that I have.  But I want to give you the

13  opportunity, if you wish, or co-counsel wishes to add to the

14  record.  I think I've covered a lot of ground.  But if

15  there's another area or other argument that you'd like to

16  make, I'll extend the same to you as I extended to

17  Ms. Nowlin.

18          MR. CHRISTIE:  Thank you, Your Honor.  I'll pick up

19  the mantle at that point and appreciate the court's

20  indulgence with time.

21      If there's not going to be any follow-up, I guess I will

22  do what I would call my kind of wrap-up.  It sounds to me

23  that's kind of what the court is asking for at this point.

24  Is that accurate?

25          THE COURT:  Counsel, I know time is always of concern

1    to a court, but these are important issues.  And they're of

2    significant importance.  You notice that the court did not

3    put time limitations on the lawyers.  The court appreciated

4    the fact that both parties agreed to submit this by way of

5    declaration.  So I don't want you or Ms. Nowlin to feel that

6    you are being pressured, or rushed in any way to be able to

7    make your argument to the court.  This is your chance to make

8    your argument.  And I want to give you the chance to do that.

9    I've asked a lot of questions.  I've covered a lot of ground.

10   But I want to make sure that when you leave and close this

11   Zoom call, you can say:  I made all the points I needed to

12   make.

13        MR. CHRISTIE:  Thank you, Your Honor, for that

14   clarification.

15        I will start with this statement, which I think is quite

16   clear:  The case that I cited to you, the *Labor Community*

17   *Strategy Center v. Los Angeles City Metro Authority* case,

18   that's a 2009 case, that makes reference to the *Dual-Dec*

19   decision.  In our view, that case decides, definitively in

20   the Ninth Circuit, that substantial compliance is an element

21   of proof by the plaintiff.  That is part of their burden of

22   proof.

23        And so the question before you is whether or not the

24   plaintiffs, in their piecemeal characterization of particular

25   events by individual officers, whether or not they have

1  demonstrated by clear and convincing evidence that the

2  City -- the City, not individual officers -- have violated

3  this court's order, that they have failed to substantially

4  comply with this court's order, and that the City's actions

5  in terms of how it instructed and trained its officers, were

6  not based on a good faith and reasonable interpretation of

7  this court's order.

8      We do believe that because of the claim being only against

9  the City, that *Monell* has to factor into the court's

10  analysis.  We think the focus has to be on whether the City

11  itself was sufficient in terms of their instructions to the

12  officers.

13      And, candidly, that has not been challenged here at all.

14  There is no challenge that these officers have not been

15  clearly instructed on what to do.  And there's not a

16  challenge that says there is a pattern and practice on the

17  part of these officers that would demonstrate that the City

18  is deliberately indifferent to an obvious need to train or

19  educate its officers further.  What we're left with are

20  anecdotal perspectives by individuals.

21      The declarations that were filed are telling in this

22  respect.  They speak to what an individual can see within

23  their limited perspective.  Of course every police officer --

24  and, frankly, that's why we provided you, in the

25  declarations, with the actual detailed incident packet that

1   is provided by the command staff to the officers.  Because

2   what it informs those officers about are what they can

3   anticipate, what intelligence have they received.

4       Now, when we started out this motion, it sounded like we

5   were talking about more than just blast balls and OC spray.

6   But it's clear from the candid concessions made during the

7   course of the argument, that we are only talking about blast

8   balls and OC spray, not projectiles.

9       None of the declarants are in an information position of

10  the officers on the scene.  They don't have the intelligence

11  collected about potential threats of violence.  They don't

12  know the details of some of the participants that they're

13  going to be standing with.  They don't know what is going on

14  beyond their view.  They don't know if criminal suspects are

15  intermingled with them.  They don't understand the whole

16  legal import of a dispersal order.  They don't necessarily

17  understand the level of training and accountability that each

18  of these officers is held to.

19      They don't understand the nature and extent of violence

20  that is being directed against officers, and the level of

21  damage that is being done to property.  And they don't

22  understand the level of risk to public safety that comes

23  from, for example, blocking public streets and freeway exits.

24      So, what has the City done to ensure compliance with this

25  court's orders?

1    Far from being, as I said earlier, deliberately

2   indifferent about the court's order, the City has been

3   deliberately persistent in taking steps to ensure that every

4   officer addressing every protest at issue, was completely

5   familiar with the rules of engagement for use of the four

6   types of crowd-control weapons that were originally at issue,

7   and certainly with respect to OC spray and blast balls.

8    Now, there have been almost daily protests in Seattle

9   since this court's first order, entered on June 12th.  Most

10   of them involve no police involvement at all, or very limited

11   police involvement.  The character, the level of

12   confrontation, the level of violence directed at the police

13   in the four events that the plaintiffs have brought before

14   you, are dramatically different than where we were when this

15   court first addressed this issue in June.

16    These four events involve large numbers of participants

17   that are dressed and armed for battle -- battle specifically

18   with the police.  They're organized tactically.  They're

19   dressed protectively.  And it is obvious they work cohesively

20   to damage and destroy property and injure police.

21    And what are their tactics?  We saw them in every one of

22   these.  They have an umbrella and shield phalanx that they

23   place at the front of the line.

24    Remember this, too, in this context, Your Honor, on

25   September 7th there was a peaceful protest of marchers that

1  march for almost an hour before they ever arrived at SPOG.

2  And they were not interfered with in any way at all.

3      When they got to SPOG, where there had been weapons

4  distributed along the way that were picked up, there was an

5  umbrella and phalanx shield, as you saw.  They were hiding

6  those that had committed crimes.

7      I need to address the Molotov cocktail issue, because it

8  was candidly dismissive in terms of how it was talked about

9  in the opening comments.

10     This is a lethal weapon.  If the court looks -- and I'll

11 try to give you the time reference on September 7th, because

12 we didn't highlight this in the video, because I didn't see

13 it until afterwards -- if this court looks at the time stamp

14 14:32 on September 7th, you will see an individual carrying a

15 box.  It's frankly, I think, a half case of beer.  The

16 problem is, that box is loaded with Molotov cocktails.  That

17 is the same box that ended up being found afterwards.  And I

18 make reference to that, Your Honor, as Exhibit H to my

19 declaration, specifically referenced in my paragraph 11.

20     Now, if I can continue on.  The actual suspect who had a

21 Molotov cocktail had been identified by intelligence and was

22 identified as being in that crowd gathered on September 7th,

23 outside of SPOG, with the intent of setting fire to that

24 building.  He was identified by dress.  He had a tan dress

25 and a pink bandana.  He was identified as standing behind a

1    person with a yellow umbrella.

2    There was a very targeted response by officers to try to

3    get ahold of him before he could escape.  He did escape.  The

4    whole idea of there being a barrage of officers for no reason

5    coming into this crowd, is fundamentally incorrect.  It was

6    critical that that person, who had been identified through

7    intelligence as planning to deploy a fire device, a device

8    that could kill people in the crowd, that he be arrested

9    immediately.  And it was not going to work to walk up and

10   say:  Sir, deep in the crowd, you are under arrest.  They

11   knew that.

12   What is, I think, very instructive about September 7th.

13   There is no blast ball ever deployed until after the officers

14   attempted to make this arrest and were met with a barrage of

15   weapons.  These people in this crowd -- I know nothing about

16   the mom with a kid blowing bubbles, that's not part of the

17   plaintiffs' record, and she may well have been mixed in that

18   crowd -- but there were people intending to do violence and

19   injury to police, because they are immediately struck with

20   objects being thrown at them.

21   One officer, and we featured that in our video, is struck

22   in the head with a pipe.  Another officer is hit with bear

23   mace.  Another thing that is dramatic in that initial

24   encounter on September 7th, is that someone had anticipated

25   and brought a fire extinguisher, which was shot off in order

1    to create a distraction.

2         Now, in the declarations that you see on September 7th,

3    you see that attributed to the police.  That's not police

4    officers.  That is intentional conduct on the part of people

5    that were prepared and planning to do violence.

6         And so the movement that we see on these days are

7    virtually all in the context of officers not helping peaceful

8    protests, but rather responding to violence that is directed

9    against them.  And it is illegal to throw things at police

10   officers.  It is illegal to stay in place when you are

11   directed, legally, to disperse.

12        And so, the reasonableness and necessity of the officers'

13   actions, their ability to be targeted and proportional, all

14   have to be viewed in the dynamic situation that was presented

15   in each of these four events that they've brought forward for

16   you to evaluate.

17        If you want just to get a flavor of what these officers

18   faced when they initially, on September 7th, engaged the

19   crowd to try to make this arrest, I would direct you to the

20   report of Officer Valerie Fleck.  It's found at ECF 146-2.

21   And on page 42 she describes exactly what she was trying to

22   do to make that arrest.

23        And if the court will indulge me, I'll just read a bit of

24   that, because I think it makes the point.

25        "At 18:09 intel units broadcast the following:  In the

1    crowd there is male with Molotov, tan dress and pink bandana.

2    No eyes on yet.  East side of group.  There was probable

3    cause for the possession of an incendiary device.  The

4    description was updated.  Suspect west side of march, towards

5    front, six rows back, behind yellow umbrella.  As we

6    approached the group to make the arrest, I was shouting 'move

7    back,' several times loudly and clearly.  The group

8    positioned their shields to prevent officers from moving to

9    make the arrest."

10        I'll break out of the quote and say that that is illegal.

11   Back into the quote.  "I used my bike to push the shield and

12   umbrella holders back to create space for incoming bike

13   officers, and to push the crowd away from the SPOG building,

14   to prevent the damage from incendiary devices.  I was struck

15   by a yellow umbrella several times.  An unidentified suspect

16   pulled my bike away from me, and into the crowd, via the

17   handle bar.  Another person sprayed a fire extinguisher at

18   the officers."

19        So this demonstrates the contentious nature of the

20   environment in which the officers are functioning, in the

21   events at issue before you.  They're the ones that chose

22   these four, to highlight for you something that, as I

23   understand the argument, is, at best, anecdotal and isolated

24   incidents that they claim are inconsistent with this court's

25   order.

1    And I'll start fundamentally with this.  That is legally

2  insufficient, in this context, with this burden, to establish

3  substantial -- that the City did not substantially comply by

4  clear and convincing evidence with a good-faith

5  interpretation of this order.

6    And I will close with this, Your Honor.  If you look

7  carefully, as I know you are, at the interaction of the

8  officers when they're at close quarters with these

9  protestors, you can see:  One, the level of their

10  organization; two, you can see the violence that they direct

11  against officers; and three, I think it's immediately obvious

12  why they need to create space, why there is safety in space.

13    I want to make this point clear as well, Your Honor,

14  because of the time press, we provided the court with draft

15  reports.  Again, this is outside the norm.  Chief Gordon

16  clearly articulated what the typical process would be.  So it

17  is routine that officers will review their body-worn video in

18  order to complete their reports and fill out any other uses

19  of force that aren't identified in their initial draft.

20    This much is clear and undisputed.  Every officer in

21  Seattle, on every occasion, is required to document all

22  applications of the type of force that is at issue in the

23  court's orders.  In terms of accountability, there is no

24  police department in this country that requires more

25  accountability by police officers to document force.  Every

1  officer on the line had body-worn video cameras activated the

2  entire time, hence the volume of body-worn video.  And

3  everyone undertook, in good faith, to document, after the

4  fact, their uses of a blast ball or the use of pepper spray.

5      When we heard the arguments here this morning about all

6  these blast balls that were supposedly deployed on

7  August 26th, we're scratching our head.  We don't understand

8  what they're talking about.  There was one blast ball

9  deployed on August 26th.  They're not hidden.  They're not in

10  some body-worn that we haven't shown you.

11     So here today plaintiffs would have this court look at

12  very selective events during the course of very long,

13  hours'-long protest activity.  And they focus, again, on a

14  handful of events.  They make statements like, "There were

15  blast balls everywhere."

16     As Mr. Miller pointed out, the individuals that

17  anecdotally hear noise, have no idea whether it's a blast

18  ball, or an explosive, or an IED, many of which we have

19  documented in the video, are thrown at officers.  And

20  candidly, the order does not prohibit the use of blast balls.

21  It does provide parameters for their deployment.

22     There is no First Amendment right to throw a projectile, a

23  rock, or an IED at officers, and there is no First Amendment

24  right to stab an officer with an umbrella, or set fire to

25  trash.

1    Dispersement orders in this case were given on all four of

2  these, and they are not challenged in this proceeding.  And

3  when a dispersement order is given, individuals need to leave

4  the area.  Public-safety concerns take priority.  Now the

5  officers are functioning in a heightened public-safety

6  emergency.  We are outside of the First Amendment.  And we're

7  really exclusively dealing with Fourth Amendment issues.

8    And this much is also very clear.  Seattle Police

9  Department does not make declarations of dispersement at a

10  low threshold.  They make it at one of the highest thresholds

11  of any department in the country.

12    This court's order focuses the police department's

13  deployment of -- in the words of the order -- chemical

14  irritants or projectiles of any kind, against persons

15  peacefully engaging in protest or demonstration.  That's the

16  language out of this court's order.

17    Plaintiffs, we submit, have fundamentally failed in their

18  burden of proof on every element, that the City violated the

19  court's orders, that the City went beyond substantial

20  compliance, that the City's actions were not based on a good

21  faith and reasonable interpretation of the order, and that

22  they have proven each of those by clear and convincing

23  evidence.  They have not.

24    This court should deny plaintiffs' motion for the

25  following reasons:  The City cannot be held in contempt,

1  based on isolated activities on the part of individual

2  officers without showing, we submit, that the City was

3  deliberately indifferent or that there was a widespread

4  pattern or practice of acts in violation of this court's

5  order.

6     We also submit that the plaintiffs [sic] use of force were

7  reasonable under the Fourth Amendment.  You would effectively

8  have to find, Your Honor, that the plaintiffs, on this

9  record, have demonstrated, to the summary judgment standard,

10 that an officer acted objectively unreasonable, in violation

11 of the Fourth Amendment.  Effectively, that this proceeding

12 constitutes a mini trial on an individual use of force, and

13 whether or not it is in violation of the Fourth Amendment.

14 That's what you would have to find in order to take that

15 event and find it to be in violation of your order, which is

16 framed on the basis of *Graham v. Connor*.  The court cites

17 that in its initial order.

18     They also have to prove that the City -- and if we're

19 looking at the actions of individual officers, that that

20 individual officer acted without good faith, and acted beyond

21 the scope of a reasonable interpretation of this court's

22 language.  You would have to make that determination in the

23 context of this record.

24     And, finally, they have to demonstrate that the City -- it

25 is their burden to demonstrate that the City has not

1    substantially complied with this court's orders, where the
2    undisputed evidence concerning how officers were repeatedly
3    instructed on the content of this court's order, demonstrates
4    to the contrary.
5        With that, Your Honor, we would respectfully request that
6    the court enter an order denying plaintiffs' motion for
7    contempt.
8        Thank you.
9            THE COURT:  Thank you, counsel.
10       Ms. Nowlin, we come back to you, again, this morning.
11   And, just a couple questions I wanted you to focus upon, in
12   light of the arguments made by counsel.
13       One is -- and counsel has renewed the same argument he had
14   made earlier in response to the court's questions about
15   *Monell*.  How do you respond to the argument that *Monell*
16   should factor in the contempt analysis?
17           MS. NOWLIN:  Thank you, Your Honor.
18       Counsel cites zero cases for why *Monell* should apply to
19   this contempt motion, and, in fact, raises this not in the
20   initial response to the TRO or in response to our first
21   contempt motion, or in its response -- or its first response
22   to our second contempt motion, but only on its second
23   response to our second contempt motion, with no case law for
24   why it should apply to a contempt motion.
25       And further, Your Honor, the City has twice stipulated

1    that this preliminary injunction applies to the City and to

2    the police officers, clearly binding the actions of the

3    officers.  And so it's clear the *Monell* standard does not

4    apply and that plaintiffs need only prove by clear and

5    convincing evidence that the actions of the Seattle Police

6    Department violated this court's order.

7            THE COURT:  And, counsel, both sides disagree on the

8    interpretation of the court's orders, but the question is,

9    was the City's interpretation unreasonable or in bad faith,

10   and why?

11           MS. NOWLIN:  Your Honor, I'm not fully following what

12   you mean by its interpretation.  I'm assuming you mean

13   that --

14           THE COURT:  The context of the arguments that

15   Mr. Christie just made, he's suggesting that all the actions

16   were reasonable, all the actions were in good faith.  And in

17   support of that he cross references the training that's been

18   provided to the officers, the fact that the officers have

19   been debriefed on the precise orders that had been given by

20   this court, and a litany of other things the City's police

21   department had done to show good faith.  I think that's an

22   accurate summary of what counsel had argued.

23       So I'm trying to probe into your thought process of

24   whether or not the City has demonstrated unreasonable --

25   sufficient basis to show the conduct was reasonable and in

1   good faith.

2        MS. NOWLIN:  Your Honor, the City is reiterating a

3   lot of the arguments they made for the justification for the

4   use of blast balls, that were made in response to our initial

5   motion for a temporary restraining order.  The protests have

6   not gotten more serious since then, or different in

7   character.  And Your Honor entered a temporary restraining

8   order banning the use of the less-lethal weapons, except in

9   very narrow circumstances.

10       The City and the Seattle Police Department continued to

11  use those weapons, we believe, in violation of that order,

12  and later the stipulated preliminary injunction.

13       We filed a motion for contempt and worked with the City to

14  come up with a clarified stipulated preliminary injunction to

15  make it more clear what exactly that order meant.  The City

16  continues to maintain that none of its actions were in

17  violation of that order, and that by virtue of giving the

18  order to the police officers, that it's met its burden.

19       Your Honor, what is reasonable is not static.  So we've

20  been informing the City of each time we think it's been

21  violating this order.  And it continues to maintain it hasn't

22  violated the order, and that giving the officers a copy of

23  the order is sufficient.  Nothing has changed.  And so I do

24  think it is unreasonable to say that it is substantial

25  compliance to just merely give the officers the order, while

1  maintaining that there have been no violations of the order.

2      THE COURT:  All right.

3      And, counsel, this is the opportunity for rebuttal.  And

4  those are the only questions I had.  So if there is something

5  that you'd like to add to the argument previously made, this

6  would be your opportunity to do so.

7      MS. NOWLIN:  Thank you, Your Honor.  I do have a

8  couple of points.

9      So, many of the arguments that counsel has made refers to

10  people failing to comply with an order, or not moving back

11  fast enough, or doing something illegal.  And that is not an

12  exception under this court's preliminary injunction, and the

13  stipulated preliminary injunction that the City agreed to.

14      The injunction is very clear, that the exception is only

15  for individual officers who have determined that they are

16  responding to a specific imminent threat of harm, and that

17  they're taking necessary, reasonable, proportional and

18  targeted action.  So Ms. Chen, not moving back, that failure

19  to comply with that order does not rise to the level of an

20  exception under that PI.

21      And to be clear, there had been no dispersal order at that

22  point.  But even if there had, the clarified PI makes it very

23  clear that an order to disperse does not change SPD's

24  obligations under the preliminary injunction, and when that

25  narrow exception applies.

1     And it also makes it very clear that these less-lethal

2     weapons should not be used purely to move people or to

3     reroute a protest.  And counsel seems to ignore that, right,

4     that these are arguments that they've been making since prior

5     to the TRO which Your Honor implemented, the stipulated PI.

6     It can't be that any act that's not in compliance with an

7     officer's order, or the law, is sufficient to justify the use

8     of less-lethal weapons against that protestor and against the

9     crowd.

10     A couple other things that I noticed that counsel had

11     mentioned was using shields as a justification for

12     less-lethal weapons.  People protecting themselves from harm

13     is not a specific imminent threat of violence, and it should

14     not invite more violence from the police.  Mr. Miller

15     mentioned that movement is safety for protestors; and in the

16     context was suggesting that throwing explosive devices full

17     of pepper spray into retreating protestors, was actually for

18     their own safety.  And that cannot be the case, Your Honor.

19     I did want to clarify in response to Mr. Christie's

20     comment about conceding about the rubber bullets, that when I

21     spoke to Your Honor about that previously, my understanding

22     was that I was conceding that was a targeted response.  I did

23     not necessarily mean to concede that that was also necessary

24     and proportional.  And specifically, in relation to

25     September 7th, the video shows that individual, you know,

1  kind of listlessly threw a traffic cone in the direction of
2  the police.  And I do not believe that less-lethal weapons
3  against that person were necessary and proportional, though
4  they were targeted.

5      Your Honor, on September 7th there was a crowd of 400
6  people protesting at SPOG.  And Mr. Christie is correct, the
7  people in the crowd did not know that there was someone there
8  with a Molotov cocktail, right?  They were writing in chalk
9  on the sidewalk, as I believe Ms. Robinson said in her
10  declaration, her five-year-old son was blowing bubbles.  They
11  had no warning.  There was no dispersal order before 80
12  police officers came from a block away and suddenly descended
13  upon the crowd and started pushing them back, and deploying
14  pepper spray and blast balls.

15      And a lot of those deployments were prior to any sort of
16  dispersal order, and to the Molotov cocktail that was
17  actually thrown later.

18      Further, Your Honor, on September 23rd, Mr. Miller said
19  that there were 32 blast balls deployed on that date.  We've
20  only been provided body-worn video for two of those.  And
21  Your Honor expressed some concerns about that video.  And it
22  was unclear what the officer was responding to, and held the
23  blast ball in his hand for quite a period of time before
24  throwing it.  It is concerning that the City did not see fit
25  to provide those videos, and the context of those uses of

1　less-lethal weapons.

2　　　Mr. Miller and Mr. Christie mentioned that there were

3　fireworks thrown on September 23rd, as well as objects

4　thrown.  We do not dispute that those were thrown, and I

5　think the video evidence makes it clear that there were

6　fireworks.  That doesn't mean that the plaintiffs were

7　confused as to whether or not they were hit with flash bangs,

8　or hit with fireworks, but it's still up to the City to show

9　that their deployments of less-lethal weapons were in

10　response to those fireworks and to those thrown objects.

11　It's not enough that they were just thrown, over the course

12　of the protests, which took place over, you know, I think

13　approximately ten blocks all the way up and down Broadway.

14　　　The deployments of less-lethal weapons need to be in

15　response to specific imminent threats of harm.  And so the

16　fact that a firework occurred at one place, does not justify

17　all of the uses of blast balls.  And, in fact, the City has

18　made little effort to justify the uses of blast balls on that

19　day, relying entirely on the use-of-force reports.

20　　　Mr. West refers to his deployment of five blast balls.  He

21　uses specifics in, I believe, three of them.  But it's not

22　enough for him to make a conclusory statement that he threw

23　five blast balls to protect officers.  There is a preliminary

24　injunction enjoining the use of these weapons.  And it's upon

25　him to show that his deployments were in compliance and in

1   response to a specific imminent threat of harm, particularly

2   in light of plaintiffs' declarations and the evidence that

3   has been submitted showing that they were retreating while

4   they were hit with these less-lethal weapons.

5       So for all of these reasons, Your Honor, we think it's

6   very clear that the video evidence submitted, the

7   declarations from plaintiffs, and the use-of-force reports

8   show that these less-lethal weapons were used against

9   protestors who were retreating, who did not pose a specific

10  imminent threat of harm, that these less-lethal weapons were

11  used in a disproportionate and indiscriminate manner, that

12  they were used to move protestors and to reroute a protest,

13  in violation of the second clarified preliminary injunction,

14  and that they were also used without a dispersal order, and

15  giving people a chance to disperse for their own safety in

16  advance of that.

17      And for these reasons, we believe that plaintiff has shown

18  by clear and convincing evidence, that the City has violated

19  the preliminary injunction.

20          THE COURT:  All right.  Thank you, counsel.  I'm

21  about to bring this to a close.  And what I can tell you,

22  each of you has most capably represented your clients.

23  Regardless of the outcome of the orders that may be issued by

24  this court, the court always appreciates well-prepared and

25  briefed arguments provided to this court.  You've done an

1  admirable job, and I compliment all of the lawyers in this

2  case, in terms of the advocacy that you provided to this

3  court.  So your clients can know that they were

4  well-represented in this proceeding before this court.

5          MR. CHRISTIE:  Thank you, Your Honor.

6          THE COURT:  To bring this to a close, I would like

7  you to know again, I don't plan on issuing any oral rulings

8  from the bench.  There's been an enormous amount of argument

9  presented to this court, and it's helped clarify and

10 crystallize some of the points the court tried to raise, or

11 questions that I've had.  And they've all been answered.  So

12 with that, counsel, stay safe.  And we will be in recess.

13                      (Adjourned.)

14

15               C E R T I F I C A T E

16

17     I certify that the foregoing is a correct transcript from

18 the record of proceedings in the above-entitled matter.

19

20

21

22 /s/ Debbie Zurn

23 DEBBIE ZURN
   COURT REPORTER

24

25