THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BLACK LIVES MATTER SEATTLE-KING COUNTY, ABIE EKENEZAR, SHARON SAKAMOTO, MURACO KYASHNA-TOCHA, ALEXANDER WOLDEAB, NATHALIE GRAHAM, and ALEXANDRA CHEN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | NO. 2:20-cv-00887<br><br>SUPPLEMENTAL DECLARATION OF JOHN BROOKS |

I, JOHN BROOKS, hereby declare as follows:

1. I am over the age of 18 years old and am a citizen of the United States. I have personal knowledge of the facts set forth herein and am competent to testify to them at trial.

2. I am a Lieutenant with the Seattle Police Department (SPD). I am providing this supplemental declaration to give the Court further information about my decision to order the deployment of a single blast ball on September 22, 2020 in response to the life-safety threat posed

SUPPLEMENTAL DECLARATION OF JOHN BROOKS - 1

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

by the group of individuals surrounding a Seattle police patrol vehicle. This declaration augments my November 2, 2020 declaration, filed at docket number 148.

3. In paragraph 32 of my November 2, 2020 declaration, I stated that I ordered the deployment of one blast ball on September 22, 2020 to "create separation between the officers and the crowd." At the time I ordered this deployment, I believed that the creation of separation between the crowd and the patrol car was a necessary and crucial safety measure in order to avoid an imminent threat of physical harm to the involved officers, as well as members of the public nearby. At the time I ordered this deployment, I had been observing the crowd's actions from another vehicle and I had also been communicating with officers via radio transmissions. Due to the prior actions of the crowd around the officer's patrol car, I feared that they were planning to encircle the car again and attack the officer in some way, or that they would possibly be run over by either the patrol car or other cars. We had not been able to close the road to traffic behind us, so it was entirely possible that cars would drive through the area. If the crowd had managed to actually surround the patrol vehicle once again, we likely would have been required to use even more force to minimize the threat to officer and public safety posed by that action.

4. During this time frame, the precinct had been attacked with Molotov Cocktails and attempted arsons. Police vehicles had also been set on fire in prior demonstrations. On prior occasions, demonstrators dressed in the same black bloc attire had assaulted officers, used coordinated tactics to damage property, and demonstrated intent to harm officers. They had even publicized their actions and intent through social media postings. I worried that if officers exited the car, they would be exposed to physical attack, likely leading to substantial injury or potentially

SUPPLEMENTAL DECLARATION OF JOHN BROOKS - 2

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

death. While they were in their patrol cars, the officers had minimal protection, while also being easy to target. The responding officers also had limited tactical options, there were minimal numbers of officers on scene while they waited for additional officers to respond, and moving the cars became exceedingly difficult with demonstrators surrounding the vehicles and moving amongst the patrol cars. As we tried to back the cars up, it was very difficult to see anyone on foot. The patrol cars have very limited visibility, and we often rely on a small camera to avoid a collision. This was very difficult as the crowd pounded on cars, distracted drivers with strobe lights, and tried to damage the vehicle. I was very worried someone on the street would get injured if the patrol cars had to move to avoid officer injury or attack. If we did not get space, I felt an officer or a community member would get injured. I gave several verbal warnings and commands over the public address system in my vehicle, directing the crowd not to interfere with vehicles, not to shine strobes in the eyes of officers driving cars backward, and notifying them they were creating a public safety hazard. However, the crowd ignored these warnings and continued to engage in conduct that threatened officer and public safety.

5. Officers had initiated the group movement to stop what was thought to be an attempted arson of the precinct. The rationale to move the group was to stop an attack on an occupied police facility which could have injured those inside. This movement was felt to be exigent based on the prior attacks on the building. Patrol cars were used to minimize officer exposure and reduce the potential of using force. We did not have the resources necessary to use other tactics to move the crowd away from the exterior without relying on less lethal tools. Once distance from the precinct had been achieved, it was hoped the crowd would leave the area,

reducing potential for other attacks. Instead, the crowd turned on officers and indicated they wanted more confrontation. They pounded on cars, tried to damage property, threatened assault, tried to burn the hood of a car, and took other actions that presented an imminent threat of harm to the officers in the patrol cars. As noted, confrontations with this crowd over an extended period of time had shown their desire to assault, injure, and threaten officers. Our focus, when outnumbered, was to disengage and gather additional resources. The crowd elected to escalate and create the confrontation. They closed and surrounded patrol cars, creating an imminent risk of harm to officers, the community, and themselves.

6. I made the decision to order another officer to deploy a single blast ball in order to stop what I perceived as the crowd's intent to assault officers. The blast ball deployment was intended to stop an imminent threat of an attack on officers and to halt substantial property damage to the patrol cars on scene. The blast ball does this by causing members of the crowd to move away from the police, whether the officers are on foot or in a patrol car. So, while the blast ball does create space, it is the creation of space that minimizes the risk of further assaults or escalating violent/dangerous conduct.

7. In this instance, the blast ball was deployed using a method to significantly reduce the potential for injury; it was thrown off to a side away from the crowd. The blast ball was successful, in that it created additional space between the forward marching crowd and the patrol cars, reducing the aggressive action of the crowd and permitting more time for the acquisition of additional police resources. The screen captures below are from the in-car video attached to my

declaration (docket 148) at Exhibit F at 01:52-01:53 of playback.  They show that the blast ball detonated near the crowd, but in an open space.  The detonation is seen in the blue boxes.







8.      As set forth in paragraph 3 of my prior declaration (docket 148), Seattle Police officers have been repeatedly instructed on the directives regarding permitted uses of crowd control weapons as set forth in this Court's orders.  When I ordered an officer to deploy the blast ball described in this declaration, I believed by order and the blast ball deployment were lawful and consistent with this Courts' order regarding the parameters for permissible blast ball deployments.  The deployment was necessary in order to stop the imminent threat the individuals approaching the patrol car were posing to the officers.  I believed the deployment was reasonable and proportional under the circumstances, because the individuals in the crowd had been repeatedly instructed to move back, stop interfering with the vehicles, stop shining strobes into the eyes of the officers driving the vehicles, and leave the area, but they refused to obey those lawful orders.  Also, while deployment of one blast ball under these circumstances and near these individuals who were posing the safety threat under these circumstances was not likely to cause

any injury, the deployment was likely to be effective in stopping attacks on officers. In this instance, more space meant more safety. Further, this blast ball deployment was not indiscriminate; it was targeted to detonate near the individuals posing the threat to officer safety and damaging public property. These individuals had been repeatedly instructed that they should leave or be subject to police action, including the use of blast balls, and chose to remain. Finally, no one in the crowd near the blast ball deployment appeared to be acting in their capacity as a journalist, legal observer, or medic. My ultimate purpose in ordering the deployment of this one blast ball was to stop the members of this crowd from assaulting police officers and to stop the destruction of police property.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

SIGNED in Seattle, Washington this 17th day of December, 2020.

_____
JOHN BROOKS