THE HONORABLE RICHARD A. JONES

1

2

3

4

5        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
6                    AT SEATTLE

7

BLACK LIVES MATTER SEATTLE-KING
8    COUNTY, ABIE EKENEZAR, SHARON
     SAKAMOTO, MURACO KYASHNA-
9    TOCHA, ALEXANDER WOLDEAB,            NO. 2:20-cv-00887
     NATHALIE GRAHAM, and ALEXANDRA
10   CHEN,                                DECLARATION OF MATTHEW
                                          DIDIER
11                        Plaintiffs,

12   v.

13   CITY OF SEATTLE,

14                        Defendant.

15       I, MATTHEW DIDIER, hereby declare as follows:

16       1.      I am over the age of eighteen years and am a citizen of the United States.  I have

17   personal knowledge of the facts set forth herein and am competent to testify to them at trial.

18       2.      I am a Sergeant with the Seattle Police Department (SPD).

19       3.      On September 7, 2020, I was working as a uniformed bicycle sergeant for the 2K90

20   bike squad.  The 2K90 squad was assigned to crowd management Platoon One in response to protests

21   that were taking place in the area around the Seattle Police Officer's Guild (SPOG).  SPD had

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 1

1  intelligence indicating that members within the protest groups were hoping to cause damage to

2  buildings, injury to officers, and that the use of Molotov cocktails was likely.

3      4.      I attended roll call on September 7, 2020 at the West Precinct.  I understood the

4  Commander's Intent for SPD to facilitate free speech and assembly whenever possible, while also

5  preserving order and protecting both persons and property.  I was advised of and understood the terms

6  of this Court's orders related to SPD officers' use of crowd control weapons (CCWs) during the

7  course of demonstration events, including the use of OC spray and blast balls, and how it applied to

8  the deployment of these CCWs.  I had also received this information via email.

9      5.      I believe that my actions on September 7, 2020 complied with this Court's orders.

10  The events of September 7, 2020 were highly complex, dynamic, and violent.  I witnessed threats to

11  the safety of both the public and SPD officers through acts of violence, significant property damage,

12  criminal mischief, obstruction, and failures to disperse.  These threats guided my commands to my

13  squad and my decisions for arrests and uses of force.  During this event, I used four blast balls and

14  multiple bursts of OC spray from one M-9 canister.  I used these CCWs in compliance with this

15  Court's orders in order to maintain officer and crowd safety.

16      6.      I wrote a Blue Team report related to my work as an SPD sergeant on September 7,

17  2020.  A true and correct copy of my draft Blue Team report related to my uses of OC spray and blast

18  balls on September 7, 2020, is attached hereto as **Exhibit A.**  I understand this Exhibit was also

19  previously filed with the Court at Dkt. 146-2, B(39) (pp. 277-284).  At this time, my September 7,

20  2020 Blue Team report accurately reflects a summary of my memory of the September 7, 2020

21  demonstration.

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 2

7.     The purpose of this declaration is to provide this Court with information and details pertinent to my deployment of one particular burst of OC spray and one particular blast ball on September 7, 2020.

8.     We began monitoring the crowd at approximately 4:00 p.m. on September 7, 2020, when people began meeting near the International District Transit Station.  Some members of the crowd were wearing body armor and gas masks.  Some were carrying shields and umbrellas.  The crowd began moving south on Fourth Avenue South toward the SPOG office.  The 2K90 squad continued to monitor and did not engage with the crowd.

9.     At approximately 6:00 p.m., SPD was able to positively identify a subject in the crowd who was in possession of a Molotov cocktail.  The crowd was nearing the SPOG office at this time.  Lt. John Brooks ordered the arrest of the subject with the Molotov cocktail when feasible.

10.     When the suspect with the Molotov cocktail was on the south side of the SPOG building, it was determined that an arrest would be attempted.  This was the first contact SPD had physically engaged with the crowd.  The 2E80 squad moved in for the arrest, and I led the 2K90 squad to support the arrest.  Upon contact, members of the crowd began assaultive acts towards officers.  These assaultive acts included, but were not limited to using bear spray, throwing rocks, pushing, using fists to assault, and assaulting with improvised weapons including sticks.

11.     While establishing a police line for the 2E80 squad to make the arrest, I encountered an individual in a red sweatshirt.  As I addressed another threat with a targeted deployment of OC spray, this individual threw an object directed at me.  This is captured at 24:27:13 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B.  You can see the

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  object in the air, near the powerlines in the upper left-hand corner, identified with a red circle

2  around it.



This individual, wearing a red sweatshirt and identified in the photos above and below with green

rectangle then threw a second object at me. With the benefit of reviewing my video at slow speed,

I can now see that the object appears to be a water bottle.  This is captured at approximately

24:27:29 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145,

Exhibit B.

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 4

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669



This object, highlighted above with a red circle, was thrown at me.

12.     The individual in the red sweatshirt assaulted me, and I deployed a short burst of OC spray in defense of myself.  Initially, he moved back, but he quickly picked up another object off the ground and again approached the line.  The OC spray had the desired effect and I believe this deployment was reasonable and in compliance with this Court's orders because it was targeted at the specific imminent threat of physical harm and in response to a specific act of violence.  It was not feasible to provide a warning due to the complex, dynamic, and violent nature of the crowd in this situation.

13.     However, even after this initial deployment, the suspect in the red sweatshirt continued his assault on me.  The image below, taken 10 seconds after the suspect threw the water bottle at me (as indicated by the time stamp), depicts this man picking up another object from the

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 5

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

ground:



This is captured at 25:56:14 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B. It was a stick, and he threw it at me. This is captured at 25:57:00 and 25:57:07 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B:

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 6



The stick he threw nearly struck me in the face.  At the time, due to the highly dynamic nature of

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 7

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    these events, I did believe I was struck by the stick and I ordered his arrest. You can hear me tell

2    fellow officers at 26:31 on the September 7 compilation to go after "the guy in the red sweatshirt."

3          14.      In conjunction with the preparation of this declaration, I reviewed additional video

4    footage. Attached hereto as **Exhibit B** is a portion of Officer Morasco's BWV from September 7,

5    2020. At 01:22:39, Officer Morasco's BWV captures the suspect throwing the stick at me (I am

6    the officer in the center of the image, as indicated by the orange arrow):



17          15.      After he threw the stick, the suspect fled from officers along the east sidewalk and

18    into the crowd. Members of my squad rode their bikes north to attempt to arrest him, causing the

19    suspect to turn south and come back towards me, concealing himself within the crowd. Given that

20    I had already been assaulted by the suspect, and to lessen the likelihood and threat that he would

21    throw another object at me or other officers, I decided to deploy an additional burst of OC spray

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 8

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

as I attempted to disarm and arrest him.  My hope was that the OC spray would disorient the suspect, making it easier to take him into custody.  The less safe alternative to OC spray in this instance, was to rush into the crowd that surrounded him and go hands on with the suspect, which would have a created a greater risk of injury to him, myself, and the members of the crowd.  I deployed one short burst of OC spray targeted at the individual in the red sweatshirt.  It was not feasible to provide a warning due to the complex, dynamic, and violent nature of the crowd, and the fact that this was a fleeing suspect attempting to evade an arrest. This is captured at 26:47:02 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B. The suspect is shown within the green rectangle, with his left leg and white sneaker visible.



16.     This individual had his back towards me at the time I deployed the OC spray and therefore, the OC spray did not appear to make contact with him, affect him, or affect any other

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 9

member of the crowd, as they were also facing away from me at the time, as can be seen in the image above and those below. From my review of my BWV, it does not appear that anyone was impacted by this burst of OC spray, and no one complained of any injury. This is captured at 26:47:08, 26:47:11, 26:47:14 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B. The suspect is shown within the green rectangle, with his leg and white sneaker visible.



DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 10

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20
21



DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 11

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

17.     I understand that the Court found this particular OC spray deployment, which was made during the course of an arrest of an assaultive suspect, violated its orders. As I stated above, the alternative to OC spray in this instance would have required using hands-on techniques and/or using my bike to tackle the suspect. I believed that going hands-on would have created a greater risk of physical injury to the individual, other members of the crowd, and me, given the density of the crowd and the fact that members of this crowd have shown great hostility toward police and a willingness to physically prevent arrests. I also believed this OC spray deployment was necessary, reasonable, proportionate, targeted, and in compliance with the Court's orders. I believe this deployment was reasonable and in compliance with this Court's orders because it was targeted at the specific imminent threat of physical harm and in response to specific acts of violence. It was not feasible to provide a warning due to the complex, dynamic, and violent nature of the crowd in this situation.

18.     Ultimately, while I was not able to affect this arrest at that time, the OC spray deployment did encourage the individual to turn and run away, thus isolating himself from the crowd and stopping what had been ongoing assaultive behavior toward police. The images below show this man fleeing and evading arrest at 26:47:27 and 26:51:11 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B:

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 12

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669





19.     Despite his attempt to flee, this individual was arrested by other members of my

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 13

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  squad moments later.   Once this individual had been isolated from the crowd, it was much safer

2  for the officers to use hands-on techniques to make the arrest.

3       20.    I also understand the Court is concerned that I did not account for this OC

4  deployment in my draft Blue Team report.   However, I believe that I did account for this

5  deployment in my Blue Team, where I state the following:

6       Immediately following that pepper spray incident, a male threw a stick at me.  The stick
        struck me in or around the face.  The highly dynamic situation made it difficult to be
7       certain.  I used my M-9 pepper Spray to repel that subject, and eventually made an arrest
        on him.  I do not know if the pepper spray affected him.  **His arrest took approximately**
8       **3 minutes due to him running through the crowd.  At one point he ran at me and**
        **knowing he had already assaulted me, I used my M-9 directed at him, but it did not**
9       **affect him.**  He never complained to me of pepper spray injury, and I observed no pepper
        spray residue on him.  I asked him if he was injured after his arrest, and he had told me that
10      he just wanted to be sure he wasn't bleeding.  He, also, apologized for throwing the stick.

11  Exhibit A, at 5-6 (emphasis added).

12       21.    Once the suspect in the red sweatshirt was arrested, the 2K90s and other bike squads

13  were able to regroup.  We continued to move the crowd north on 4th Ave. S. and a dispersal order

14  was given to the entire crowd.  The crowd began throwing rocks and other objects at officers.  I

15  deployed two blast balls at this time, both targeted directly at specific, imminent safety threats.

16       28.    I understand that the Court found that my first blast ball deployment violated its

17  orders.  I also understand the Court is concerned that I did not account for this deployment in my

18  draft Blue Team report.  However, I did document this deployment in my Blue Team as follows:

19       I believe I used two blast balls at this approximate time.  Due to officers being in front of
        me, and the way protesters were linking shields, I used an over hand lob deployment.  I did
20      this to ensure that the blast balls were directed that the appropriate individuals (an
        underhand roll would have likely deflected the blast ball at unintended targets).  Both blast
21      balls went off while on the ground.

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 14

Exhibit A at 7.

29.    I understand that the Court believes that I threw the blast ball deep into the crowd and at a different area than another officer, indicating that it was an indiscriminate deployment intended to move the crowd and not in response to a specific, identified threat.  This deployment is captured at 27:56:23-28:44:29 on the September 7 Demonstration video compilation filed with the Court as Dkt. 145, Exhibit B.  I believe the Court is mistaken, because I deployed this blast ball in a targeted manner at the location of a specific, identified, imminent officer safety threat.

30.    When I initially joined the officers on the line, a member of the crowd had just thrown a rock, as captured by the reaction of the officers (highlighted in green)  at 28:05:07:



You can hear the officers yell "rock" at this time.  At 28:07:10, I ask the officers around me if they can identify who threw the rock.  I did not deploy a blast ball at this time, but given this assaultive

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 15

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

behavior, I did reach into my bag so that I would have a blast ball in hand in the event it became necessary to deploy one.  I kept my eyes on the crowd.  Due to the placement of my BWV camera on my chest, the video is facing downward.  My eyes were steadied on the crowd so that I could remain aware of any oncoming threats to myself, other officers, or members of the public in the form of thrown objects.

31.     A few seconds after I asked who threw the initial rock, I saw a large rock thrown toward the officers from a specific location in the crowd behind the initial police line.  You can hear the reaction of officers to this rock via the audio at 28:17:18.  It was this specific assault and imminent threat of physical harm that caused me to respond by deploying a blast ball at 28:26:21.

32.     In preparation of this declaration, I reviewed the BWV of Officer Spady.  Officer Spady's BWV captures the rocks thrown by members of the crowd during this time.  Attached hereto as **Exhibit C** is a portion of Officer Spady's BWV from September 7, 2020. You can hear the audio of officers yelling regarding the first rock at 1:28:51 which is the same audio you can hear at 28:05:07 on the September 7 compilation.   You can see the first rock hit the ground at 01:28:53 (highlighted in red) on Officer Spady's BWV:

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669



33.    The second rock (highlighted in red) is captured while airborne at 1:29:04 on Officer Spady's BWV.  Again, the audible reaction of the officers matches the reaction at 28:17:18 in the September 7 compilation.  In this same screenshot, you can see me (highlighted in green) reaching into my bike bag to retrieve and ready a blast ball in response:

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1

2

3

4

5

6

7

8

9



10

In the image below, the rock can be seen nearly striking our officers:

11

12

13

14

15

16

17



18

19

20

21

      34.     In response to this specific, imminent threat, I deployed  a blast ball overhand,

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 18

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

targeted at the area near the specific location from where I witnessed the rock being thrown. This deployment was consistent with my training.

35. At the time I deployed that blast ball, and now, I believed the deployment was consistent with the Courts' orders regarding use of CCWs. The deployment was necessary, reasonable, proportionate, and targeted. I observed that a large rock was thrown from a specific location within the crowd – the second rock thrown at officers in rapid succession, beyond the front line of the crowd. Consistent with my training, I threw this particular blast ball overhand and directly toward an open space near the location from which the second rock was thrown because there was a line of officers and a group of protesters blocking what would have been the path for an underhand throw along the ground. In this circumstance, an underhand throw would likely have caused the blast ball to detonate near unintended targets. I used an overhand throw in order for my deployment to be as targeted to the threat as possible. Because of my training and experience, I was and am confident my aim was accurate. I knew where the blast ball was going after I threw it. It was headed toward the area I targeted, which was the area near the specific location from which the second rock was thrown.

36. The fact that I threw this blast ball in an overhand fashion was also consistent with my training, given the officers and people who were in the area between me and the location from which the large rock was thrown. The purpose of doing so was to best target the deployment of the blast ball at the individual who was engaged in the assaultive behavior while minimizing the risk that an underhanded blast ball would stop short and detonate around other officers or members of the crowd. This type of targeted, overhand deployment aimed at the individual committing the

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 19

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    crime, to the best of my understanding, is consistent with my training and this Court's orders. This

2    deployment should not be interpreted as evidence of an indiscriminate deployment, because it was

3    intended to be the opposite.

4         37.    Immediately after deploying this blast ball, I watched it land and detonate on the

5    ground. I believe that my aim was accurate, as the blast ball detonated in the area near the specific

6    location in the crowd from which the second rock was thrown. I intended for my blast ball

7    deployment to cause the individual who threw the rock and any others in the same area engaging

8    in the same conduct to stop throwing objects at police. I was too far away to directly warn this

9    individual of my deployment, but it was reasonable for me to conclude that, before I threw the

10   blast ball, this individual heard the loud dispersal order given to the crowd and warning of possible

11   police action.

12        I declare under penalty of perjury under the laws of the United States of America that the

13   foregoing is true and correct to the best of my knowledge and belief.

14        SIGNED in _North Bonneville_, Washington, this 21st day of December, 2020.

15

16

17   MATTHEW DIDIER

18

19

20

21

DECLARATION OF
MATTHEW DIDIER (2:20-CV-00887) - 20

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669